1  H. G. Robert Fong, ESQ. State Bar # 53535
2  444 S. Flower Street, Suite 1500
   Los Angeles CA 90071-1435
3  Telephone (213) 488-1400
4
   Attorney for Plaintiff/Counter Defendants
5  JUN-EN ENTERPRISES and
6  AGAPE INDUSTRY CO., LTD.
7
8              **UNITED STATES DISTRICT COURT**
9          **CENTRAL DISTRICT OF CALIFORNIA-LOS ANGELES**

10  JUN-EN ENTERPRISES, a Taiwan          ) Case No: CV 12-2734 PSG (SSx)
    Corporation, AGAPE INDUSTRY CO.,       ) Hon. Philip S. Gutierrez
11  LTD., a Taiwan Corporation,            )
12                                         )
                   Plaintiffs ,            ) **DECLARATION OF H.G. ROBERT**
13                                         ) **FONG IN SUPPORT OF PLAINTIFFS'**
         vs.                               ) **OPPOSITION TO DEFENDANTS'**
14                                         ) **MOTION FOR ATTORNEY FEES**
15  PETER K. LIN, AGAPE INDUSTRIAL         )
    INC., and DOES 1 through 10,           )
16                 Defendants              )
17  ─────────────────────────────         )
18  PETER K. LIN, an individual, and       )
    AGAPE INDUSTRIAL, INC.,                )
19  Counter-Claimants/Third Party          ) Date Complaint Filed: 03/29/12
20                 Plaintiffs,             ) Discovery Cutoff: 10/15/13
21         vs.                             ) Trial Date: 06/24/14
22  JUN-EN ENTERPRISE, a Taiwan            )
    Corporation, AGAPE INDUSTRY CO.,       ) **Motion**:
23  LTD., a Taiwan Corporation, SHI RU     )
    YANG aka TONY YANG, an individual,     ) Date:      April 7, 2014
24  HSIU-YING LU, an individual, and Does  ) Time:      1:30 P.M.
25  1 through 10,                          ) Courtroom: 880
26                                         )
            Counter-Defendants and Third   )
27          Party Defendants.              )
28  ─────────────────────────────         )

i

## DECLARATION OF H. G. ROBERT FONG

I, H.G. Robert Fong, hereby declare as follows:

1.  I have personal knowledge of the following facts set forth below and if called as a witness, I could and would competently testify under oath thereto.

2.  I am an attorney in good standing, licensed in the State of California and duly admitted to practice law before California courts and Federal District Courts in the Central District of California.

3.  I am the counsel of record for JUN-EN and AGAPE INDUSTRY, YANG and LU in the above entitled case.  Mr. Russell Cole and I are the personal targets of a motion for attorneys fees in amount exceeding three years of tuition, fees, books and supplies to attend three years at the University of California.  I make this declaration in opposition thereto.  Included herein are quotes which I took from depositions in this matter.  I cite to line in page as to matters which I believe were established by the substantial documentation I have reviewed in this matter.

4.  This is to establish why the motion should be denied substantively, procedurally, and on the grounds that an award would result in a manifest injustice.  Much of what is here may have been avoided by a meet and confer under Local Rule 7-3, but Chan never asked for one.  I take this declaration as an opportunity to clarify remarks I made in open court on December 23, 2013, so the Court has a clear understanding of the reasons given for my statements concerning my clients' dismissals of affirmative

1   claims for relief, that is, that evidence adduced by the time of that decision

2   made it abundantly clear that they could only obtain a **Pyrrhic victory**, at

3   best, and that their best remedies for the wrongs perpetrated against them

4   was through the Taiwan criminal system.

5

6       5.  The clarity that any victory would likely be Pyrrhic was revealed

7   by evidence demonstrating that LIN had taken the astonishing steps to

8   hinder, delay and defraud my clients to the point he knowingly filed false tax

9   returns under penalty of perjury to change in an "official document" the

10   ownership of Agape Industries, Inc.  The evidence also reveals that had filed

11   false Information Statements with the California Secretary of State to "cook

12   the books" and create evidence designed to change past history.  That past

13   history was that the officers and directors listed in those statements were LU

14   and those she selected.  Upon his termination from Plaintiffs' employment,

15   he filed new Information Statements showing that him in place of LU and

16   her selections.  Accordingly, the accountant, Daniel Roan, refused to permit

17   my client's representatives a review of the books and records of Agape

18   Industry, since it was made to appear to be under LIN's control.

19

20       6.  Compounding this was the fact that Plaintiffs could not locate

21   assets worth chasing and the disheartening determination that Defendant's

22   counsel, Thomas Chan, has been paid by Plaintiffs' corporation, Agape

23   Industry, Inc., a California corporation.  LIN admitted under penalty of

24   perjury in the 2005, 2006, and 2007 tax filings that LU was the 100% owner

25   of that corporation.  Because she was sent copies of the schedules

26   acknowledging this, LU understood that she was holding the share interest in

27   trust for Agape Taiwan and JUN-EN.

28

1        7.  Important discovery which laid open LIN and his attorney's

2    conduct was obtained by the depositions and documents adduced in this case

3    of CPA Daniel Roan who did the books for LIN, Agape Industry, Inc. and

4    Agape Industrial, Inc.  He produced the tax returns he generated on LIN's

5    orders, as well as the accounting books and records, add bank statements for

6    both Agape Industry and Agape Industrial.  He refused had to allow Plaintiff

7    and LU's representative to look at the books after LIN was terminated.  By

8    the time Plaintiffs tried to investigate, LIN had cooked the books by having

9    Roan file tax returns in or about October 2011 showing that he, LIN was the

10   100% shareholder, rather than LU.  LIN also caused to be filed Corporate

11   Information Statements with the Secretary of State for California that the

12   officers and directors of Agape Industry had changed from the President

13   being LU to the officers and directors becoming him and his wife,

14

15       8.  I do not intend this to be a declaration in support of a motion for

16   summary judgment, but I contest Chan's claims that 100% of Roan's

17   testimony was with respect to time barred claims.  I am citing herein from

18   transcripts and exhibits obtained from the Roan deposition, as well as LIN's

19   testimony.  **A True and Correct copies of the Daniel Roan October 18,**

20   **2013 deposition is attached hereto as Exhibit 4.  True and Correct**

21   **copies of the related exhibits to the Daniel Roan deposition are attached**

22   **hereto as Exhibit 5.**  Chan claims 100% of the time spent relative to Roan

23   was for "time barred claims."  That is simply untrue.  The Roan deposition,

24   in conjunction with other testimony and evidence, established facts and

25   foundation relating to the UCL claims, fraud, conversion, setoff claims,

26   breach of fiduciary duty, his employment by Agape Industry from 2005-

27   2010, Lin's acts to attempt to "change of history" in 2010 and 2011,

28   apparent conflicts of interest between Chan and Fox Rothschild's

DECLARATION OF H. G. ROBERT FONG SUPPORTING PLAINTIFFS' OPPOSITION FOR ATTORNEY FEES

1  representation of Agape Industry, Inc., when all the books and records
2  showed that Agape Industry, Inc. was 100% owned by LU, yet Chan and
3  Fox Rothschild have sued LU YANG and Plaintiffs.  The payments reflected
4  in the Roan documents for February 2010 include payments to Chan and
5  Yee-Shuai (another attorney given the task of filing "revisionist" Statements
6  of Corporate Information for Agape Industry, Inc.) apparently to facilitate
7  corporate changes that LIN would use to loot Agape Industry, Inc. by LIN
8  forming Agape Industrial, Inc.  The facts adduced in another case, Agape
9  Industrial, Inc. v. Aruvil contradicted Chan and Fox Rothschild's claims
10  herein.  Notwithstanding the uncovering of this evidence and the LIN's
11  testimony in the Aruvil case and herein, Chan and Fox Rothschild have
12  inexplicably continue to pursue claims they should know to be false, to wit:
13
14       a.  Claiming that LIN was the owner of Agape Industry, when in fact
15  he had signed Tax Returns under penalty of perjury that LU was 100%
16  shareholder.  This established "fact" from 2005 remained unchanged, until
17  Lin caused the late filing of tax returns around October 2011, attempting to
18  undo that history.  Roan deposition, p. 24:3-21
19
20       3Q. Is that when the returns were prepared, October
21       4 of 2011?
22       5 A. Yes.
23       6 MR. FONG: We'll mark as Exhibit 4 Bates stamp
24       7 DR 730.
25       8 (Plaintiffs' Exhibit 4 was marked
26       9 for identification.)
27       10 Q. BY MR. FONG: Can you tell us what that is?
28       11 A. That's the billing statement for the tax return

DECLARATION OF H. G. ROBERT FONG SUPPORTING PLAINTIFFS' OPPOSITION FOR ATTORNEY FEES

1    12 for Agape Industry.

2    13 Q. For what work?

3    14 A. For tax return.

4    15 Q. What year?

5    16 A. 2008.

6    17 Q. So that tax return was about two years late?

7    18 A. Yes.

8    19 Q. Does that mean that no tax return for 2008 was

9    20 filed before October of 2011?

10    21 A. That's correct

11

12    The 2008, 2009, and 2010 late-filed tax returns removed LU as the

13   shareholder and reflected that LIN, instead, was 100% shareholder.

14

15    b.  That Lin established trademark significance with the "AG"mark,

16   rather than Agape Taiwan, JUN-EN and Agape Industry. This is

17   contradicted by Ex. 1 hereto, the "About" page in the webite for Agape

18   Industy, Inc. bearing a copyright date of 2005-2006.  This page was first

19   identified in Lin deposition in Aruvil case in which I became co-counsel.

20

21    c.  Claiming that Lin violated no fiduciary duties to Agape Industry

22   and LU whether for purposes of UCL or otherwise.  According to the

23   Information Statements he filed, he was the secretary of the corporation and

24   person who set the company up, ran it and represented under oath to LU by

25   the tax returns that she was 100% shareholder in the 2005-7 tax returns, yet

26   he testified that he never issued her any shares.

27

28

1    d.  Falsely claiming that Lin was an independent contractor, when the

2  tax returns produced by Roan showed that LIN was an employee of Agape

3  Industry, Inc. whose funding came from JUN-EN.  Roan, after testifying he

4  did all of Lin's Personal tax returns, testified at  p. 89:11-21

5    11 Q. BY MR. FONG: Who was his employer in the United

6    12 States from 2005 to 2010, based on what he told you?

7    13 MS. BACANI: Same objection.

8    14 THE WITNESS: Agape.

9    15 Q. BY MR. FONG: Agape Industry?

10    16 A. Yes.

11    17 MS. BACANI: Objection. Vague.

12    18 Q. BY MR. FONG: Did Peter report to you income

13    19 from any other entity besides Agape Industry?

14    20 MS. BACANI: Same objection.

15    21 THE WITNESS: No.

16

17  This testimony squarely contradicts LIN's allegations that he was an

18  independent contractor.

19

20    e.  By continuing to claim in pleadings that appropriate tax

21  withholding and payments were not made by JUN-EN, when the Roan

22  documents in conjunction with documents produced by Plaintiffs showed

23  that JUN-EN paid for all financial support, including the payment of salary

24  and taxes paid directly by Agape Industry, Inc..  See Roan, 31:25-32:10;

25

26    25 Q. Do you recall how many employees Agape Industry

27    1  had in 2008 1 approximately?

28    2 A. Two.

7

3 Q. Who were they?

4 A. Peter and his wife.

5 Q. And do you recall his wife's name?

6 A. Jan.

7 Q. Did you ever talk to Jan?

8 A. Yes.

9 Q. What did you talk to her about?

10 A. Things related to the tax return.

Payroll taxes are reflected in a line item in Roan Ex. 10-2 with the line item:

Payroll taxes                                          3,200.40     0.39

   f.  That LIN testified in the Aruvil case that Agape Industry advertised and sold JUN-EN machines, but that he employed a bait-and-switch to sell a Lead Long machine to Aruvil.

   g.  That the books and records he instructed Roan to create did not comport with Plaintiff's accounting, but instead suggests violations of monetary control laws in Taiwan and potentially money laundering.

   h.  That Chan and his firms, the Chan Law Group and Fox Rothschild are not beyond aiding and abetting one client against another, that is Lin by taking actions adverse to the parent company of its former client, Agape Industry, Inc. by its taking legal action against it parent [Jun-En] , the related company [Agape Taiwan], and 100% shareholderr [Hsieh-Ying Lu] and their principal [Tony Yang].  By their initial and then continued representation of LIN, regardless of his conduct and the contradictions in his

1  testimony and other evidence, and their taking actions adverse to Plaintiffs

2  and their principals, YANG and LU, it is obvious that any victory in the

3  United States would likely be Pyrrhic.

4      9.  Locating and "connecting the dots" in this matter has required

5  many, many hours of work to review and ferret out evidence sought to be

6  nullified or disguised by LIN's conduct while he was undergoing a transition

7  from running Agape Industry, Inc. from 2004 to present, and his obfuscation

8  of that business with his formation and running of Agape Industrial, Inc.

9  The fact that the Chan law group and Fox Rothschild were counseling him

10  during the transition from Agape Industry to Agape Industrial and the

11  farming out of work to the Shuai firm is suspect.  Fox Rothschild's tolerance

12  of LIN's ever changing story is astonishing, as much as their suing the

13  victims of LIN's misconduct.

14

15      10.  I have been counsel in a number of substantial plaintiff

16  commercial fraud cases where documents have been forged.  I have also had

17  some experience in money laundering and Patriot Act issues with allegations

18  of money laundering in a case I represented a plaintiff against HSBC.  LIN's

19  conduct is consistent with wrongdoing.

20      11.  The location and "connection of the dots" has required something

21  highly unusual.  I associated into the case of Agape Industrial, Inc. v. Aruvil,

22  Case No. BC458593, where Aruvil cross-complained against Agape

23  Industrial for being delivered a machine made by Lead Long, Plaintiff's

24  competitor, instead of the Jun-En machine it had expected under its order

25  with Agape Industry, Inc.  As one of the counsel for Aruvil, I was given

26  access to Lin's formerly "confidential" deposition as taken by Paul Orloff.

27  **A true and correct copy of the condensed version of that transcript is**

28  **attached hereto as Exhibit. 2**.  Fox Rothschild represented him in the

DECLARATION OF H. G. ROBERT FONG SUPPORTING PLAINTIFFS' OPPOSITION FOR ATTORNEY FEES

1    deposition, although the original case was filed by the Chan law group.

2    **Attached as Exhibit 3 is a true and correct copy of an email string**

3    **including a confidentiality designation served by Fox Rothschild** by

4    Steve Hamagami with a cc to Tom Chan.  Contained therein are attempts to

5    make confidential evidence that could not be construed as truly confidential.

6    Instead it evidences Fox Rothschild's attempts to conceal from interested

7    third parties like Plaintiffs, certain damaging testimony by LIN.  Among the

8    testimony sought to be concealed through the confidentiality designation is

9    the following:

10

11        a.  When the trademark LIN now claims herein as his own was used at

12   the trade shows, like FenceTech, he with Vincent Chu from JUN-EN was

13   "also a representative of Jun-En."  LIN Aruvil depo., p.21:21-22:l.  It was a

14   company booth, not a Peter Lin booth, Agape Industry's.  *Id.* p.13:18-14:15.

15   Despite his sworn testimony in tax returns that in 2005, Agape Industry was

16   100% owned by LU, he testified that Agape Industrial and Agape Industry

17   were the same with only a difference in names.  *Id.* 13:13-23.

18

19        b.  The website for Agape Industries, Inc. included an "About" page

20   describing Agape Industries as by implication, the US office of a Taiwan

21   company that had been in existence for about 30 years, i.e. Jun-En. Ex. 1.

22   LIN testified that he was "of course" responsible for the market in the U.S.

23   LIN Aruvil 19:24-20:4.  This in contrast to his current claim that he had the

24   Australian territory that covered the order for Locker, for which he has filed

25   claims herein.

26

27        c.  That he sold a Lead Long Machine to Aruvil, rather than the Jun-

28   En machine they expected..

1

2      d.  That he apparently could not recall the specifications for the Jun-

3  En product which was what Aruvil relied on to buy the AG1500.

4

5      e.  The reasons he founded Agape Industrial (on or near a date after he

6  was terminated)

7

8      f.  The fact that the entirety of LINs testimony was done with Tom

9  Chan representing him at the deposition, so he cannot claim ignorance.

10

11     g.  The fact that Tom Chan would sign pleading contradicting LIN's

12  testimony in the Aruvil case.

13

14     11.  Mr. Chan and his firm have put me and Mr. Cole in an unfair

15  light and have utterly disregarded facts they are aware of which controvert

16  his and his firm's assertions.  The lack of candor is wholly disheartening and

17  is illustrative of a "win at all costs" mentality.  When the facts and the law

18  are against you, attack your opposing counsel and have them pay for the

19  litigation against their own clients seems to be the motto.

20

21     12.  This Court has cited my almost 42 years in the practice as a basis

22  to sanction me in this matter.  This is the only case in which I have been

23  sanctioned in 42 years.  I value my reputation and submit that the sanctions

24  were a product of improper tactics.  The sanctions and the manner in which

25  this case has been conducted in total disregard of the truth has dissuaded my

26  clients from continuing on in the prosecution of their cases.  Hence, I was

27  instructed to dismiss their affirmative actions on December 23, 2013 and

28

DECLARATION OF H. G. ROBERT FONG SUPPORTING PLAINTIFFS' OPPOSITION FOR ATTORNEY FEES

1    followed those instructions.  In the meantime, I am informed and believe

2    that they are advancing the criminal action in Taiwan.

3

4         13.  This Court has also used my seniority against me.  I sought the

5    assistance of the DePasquale & Cole, because of my seniority and need for

6    help.  I am 67 years old and had come to the realization that age comes with

7    its problems.  I have known Paul DePasquale and Russell Cole by have

8    shared offices with them for more years than I can remember.  Mr.

9    DePasquale is more senior than me and I was informed that he would assist

10   Mr. Cole in the drafting of pleadings.  Those pleadings were not done in the

11   absence of knowing when certain causes of action accrued or what the

12   various potential statutes of limitation were.  Whether some had run or not

13   and whether the affirmative defense of a statute of limitations was dependent

14   on many factors.  As an old defense lawyer, I was aware that generally

15   speaking, the statute of limitations did not bar setoffs through proof of

16   causes of actions otherwise barred.  I was also aware of the *Cortez* case cited

17   in the brief herein, and its reference to the 3 year statute of limitations for

18   Labor Code violations, as we had alleged against LIN, was also essentially

19   extended by the 4 year period under the UCL.  In addition, I was aware of

20   that, as pointed out in the brief, that all other bases for extending the statute

21   of limitations applied to the UCL.  Coupled with the fact that my clients

22   were the victims of LIN's conduct required that we assert those claims and

23   to develop them as part of the UCL claim, the counter-claims and

24   affirmative defenses.

25

26        14.  I had apologized to the Court on December 23, 2013 for not

27   providing more information for it have considered on the ruling on the

28   Motion for Sanctions, because I understood that we had been put into a very

bad light by our not setting forth the complexity and nuances of evidence

and tactics we had uncovered.  It was and is a long story.  Experience

lawyers like Mr. Chan know that they can preserve the statute of limitations

by simply asserting it as an affirmative defense.  If it has run, Court will

instruct the jury and remove the claim for affirmative recovery purposes, but

not necessarily for purposes of setoff.  That has been the law since before I

began practicing law.  I believe that sanctions motions like the one here will

only serve to chill the legitimate advocacy of counsel and would be

detrimental to their ability to properly represent their clients.  Reasonable

minds can differ as to the running of statutes of limitation, as I personally

found out in split decision in *Landreth v. US.*  850 F. 2d 532 (9th Cir.1988).

Here, on the contract claim, Defendants alleged the existence of a written

memorandum supporting the contract between my clients and LIN.

Assuming that the copy of the May 2009 written memorandum produced in

this case satisfies the criteria for a written contract, I would have been remiss

in not asserting a breach thereof.

15.  I further noted that Thomas Chan is states "These entries
also include fees incurred in connection with Plaintiffs' deposition of
Defendants' CPA, Daniel Roan, who testified on matters only relating to the
Time-Barred Claims. Accordingly, these fees should be reimbursed in their
entirety." However, Thomas Chan does not set forth any foundation for his
pursuit of said fees.

16.  Finally, it is truly bewildering to my clients that their funds and
their corporation, Agape Industry, Inc. has been used to retain the Chan and
that their money has been used by LIN to pay Chan to sue them.  Now, even
more confusing to them is that Chan is now seeking for Mr. Cole and I to
subsidize the case against them by paying Agape Industrial, Inc. and LIN to
further finance this travesty against them, the victims.   I believe that the

1  issuance of attorney fees would promote a manifest injustice here and
2  request that the Court deny the motion.
3
4
5       I declare under penalty of perjury under the laws of the United States
6  of America that the forgoing is true and correct.
7
8  Executed:  March 17, 2014 in Los Angeles, CA.
9
10
11                              By:  __/s/  H.G. Robert Fong_____
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DECLARATION OF H. G. ROBERT FONG SUPPORTING PLAINTIFFS' OPPOSITION FOR ATTORNEY FEES

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**<u>EXHIBIT 1</u>**
**(WEBPAGE)**

DECLARATION OF H. G. ROBERT FONG SUPPORTING PLAINTIFFS' OPPOSITION FOR ATTORNEY FEES



## About Us

AGAPE Industry is one of the leading companies in the metal mesh industry. During these years, we have servicing thousands and thousands of satisfied customers, both international and domestic.

AGAPE since more than 30 years we manufacture metal mesh machines and also produce the metal mesh itself. In Taiwan, AGAPE have 6 plants. In China have 3 plants. And on 2004 we establish AGAPE sale office in United States for the best service. Years of service.



AGAPE worldwide is the only company which produces metal mesh on its own machines and therefore has the respective knowledge about the market requirements of metal mesh customers. Therefore a constant further development of the metal mesh machines is guaranteed.

AGAPE machines have been sold to worldwide and well acclaimed.

**Your "SUCCESS" is our "GOAL"**

- About Us
- Products
- News
- Contact Us
- Home

### Contact Information

**Agape Industry, Inc.**
23520 Telo Ave.
Suite one
Torrance, CA 90505, U.S.A.
Phone : (310) 325-9000
Fax : (310) 325-9008

© Copyright 2005-2006 | All right reserved.

Website designed by **Accelerate Online**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**<u>EXHIBIT 2</u>**
**(LIN/ARUVIL DEPOSITION)**

DECLARATION OF H. G. ROBERT FONG SUPPORTING PLAINTIFFS' OPPOSITION FOR ATTORNEY FEES

CONDENSED TRANSCRIPT

## SUPERIOR COURT OF CALIFORNIA

## FOR THE COUNTY OF LOS ANGELES

AGAPE INDUSTRIAL, INC., a
California Corporation,
)
)
)
          Plaintiff,      )
)
      vs.                 )     No. BC458593
)
ARUVIL INTERNATIONAL, INC., a  )      VOLUME I
New York Corporation, and DOES )
1 through 20, inclusive,       )
)
          Defendants.     )
)
_____)
)
AND RELATED CROSS ACTION       )
_____)

DEPOSITION OF THE PERSON MOST KNOWLEDGEABLE OF AGAPE

INDUSTRIAL, INC., PETER LIN

Tuesday, July 17, 2012

## *Jonnell Agnew & Associates*

Court Reporters • Interpreters • Videographers • Transcribers • Video Conference

170 South Euclid Avenue • Pasadena, California  91101
(800) 524-DEPO • PH: (626) 568-9854 • FX: (626) 568-9987



**Page 1**

```
 1              SUPERIOR COURT OF CALIFORNIA

 2              FOR THE COUNTY OF LOS ANGELES

 3

 4   AGAPE INDUSTRIAL, INC., a    )
     California Corporation,      )
 5                                )
               Plaintiff,         )
 6                                )
          vs.                     )   No. BC458593
 7                                )
     ARUVIL INTERNATIONAL, INC., a)   VOLUME I
 8   New York Corporation, and DOES)
     1 through 20, inclusive,     )
 9                                )
               Defendants.        )
10                                )
                                  )
11   AND RELATED CROSS ACTION     )
                                  )
12   _____)

13

14

15          DEPOSITION OF THE PERSON MOST KNOWLEDGEABLE OF

16   AGAPE INDUSTRIAL, INC., PETER LIN, taken on behalf of

17   the Defendants, at 170 South Euclid Avenue, Pasadena,

18   California, commencing at 10:33 A.M., on Tuesday,

19   July 17, 2012, pursuant to Notice, before MICHELLE

20   YOUNG, CSR No. 13656, a Certified Shorthand Reporter, in

21   and for the County of Los Angeles, State of California.

22                     ***

23

24

25
```

JONNELL AGNEW & ASSOCIATES
(800) 524-DEPO
1

---

**Page 2**

```
 1   APPEARANCES:

 2   For the Plaintiff:

 3       FOX ROTHSCHILD
         BY:  THOMAS T. CHAN, ESQ.
 4       1055 West 7th Street
         Suite 1880
 5       Los Angeles, California  90017
         (213) 624-6560
 6       (213) 622-1154 (Fax)
         tchan@foxrothschild.com
 7
 8   For the Defendants:

 9       ORLOFF & ASSOCIATES
         BY:  PAUL ORLOFF, ESQ.
10       8402 Florence Avenue
         Suite B1
11       Downey, California  90240
         (562) 869-3034
12       (562) 869-3539 (Fax)
         paul@orlofflitigation.com
13
14   Also Present:

15       Penny Kole, Mandarin Interpreter

16
17
18
19
20
21
22
23
24
25
```

JONNELL AGNEW & ASSOCIATES
(800) 524-DEPO
2

---

**Page 3**

| WITNESS | EXAMINATION | PAGE |
|---|---|---|
| Peter Lin | By Mr. Orloff | 6 |
| Afternoon Session | | 41 |

**E X H I B I T S**

| DEFENDANTS' | PAGE |
|---|---|
| 1 - E-mail from Sunnie dated January 27, 2010; one page | 19 |
| 2 - Business Entity Detail of Agape Industrial, Inc., dated 7/12/12; one page | 26 |
| 3 - Business Entity Detail for Agape Industry, Inc., dated 7/12/12; one page | 30 |
| 4 - Agape Industry, Inc., Web Page; one page | 33 |
| 5 - Jun-En Enterprise Web Site; one page | 34 |
| 6 - Page from Web site of Agape Industry, Inc.; one page | 36 |
| 7 - Photo with details of AG-1500 Chain Link Fencing Machine; one page | 43 |
| 8 - E-mail sent from skulkarni@aruvil.com dated July 13, 2009; one page | 76 |
| 9 - Unsigned Invoice From Agape Industrial, Inc., Dated August 26, 2009; three pages | 77 |
| 10 - Signed Invoice from Agape Industrial, Inc., dated August 26, 2009; three pages | 79 |
| 11 - Invoice for Agape Industry dated August 26, 2009; one page | 83 |

JONNELL AGNEW & ASSOCIATES
(800) 524-DEPO
3

---

**Page 4**

**I N D E X**
(Continued)

**E X H I B I T S**

| DEFENDANTS' | PAGE |
|---|---|
| 12 - Copy of check from Aruvil International, Inc., dated 9/18/09; one page | 86 |
| 13 - Check from Aruvil International, Inc., dated 2/26/10; one page | 90 |
| 14 - Notice of Deposition; six pages | 101 |
| 15 - E-mails sent between Shrinivas Kulkarni and Peter Lin; two pages | 103 |
| 16 - E-mails sent between AG-INFO and skulkarni@aruvil.com; three pages | 105 |
| 17 - E-mail between Peter Lin and Sean Sylvester; one page | 108 |
| 18 - Letter headed "Hi Peter"; one page | 116 |
| 19 - Drawing and explanation of machine; one page | 117 |

**QUESTIONS INSTRUCTED NOT TO ANSWER**

| PAGE | LINE |
|---|---|
| 32 | 20 |

**INFORMATION REQUESTED**

| PAGE | LINE |
|---|---|
| 46 | 18 |
| 96 | 20 |

JONNELL AGNEW & ASSOCIATES
(800) 524-DEPO
4

---

**Page 9**

1  is the basic of knowledge. You have some basis of
2  knowledge of dimensions by looking at this table that is
3  in front of you. You can estimate it's so many feet
4  long, so many feet wide based upon your experience of
5  estimating. But you've never been to my house, and so
6  you do not know the dimensions of the dining room table
7  in my house or even if I have a dining room table. That
8  would be a complete guess.
9      Do you understand the difference?
10  A.  I understand that.
11  Q.  And if there's a question that you do not
12  understand, please ask for clarification. Sometimes
13  lawyers ask questions that don't make any sense. If I
14  ask a question and you don't ask for a clarification, we
15  will assume that you understand the question.
16      Is that fair?
17  A.  All right.
18  Q.  We also need audible answers to be given.
19  Things such as "uh-huh" and "huh-uh" or some types of
20  grunts are not appropriate answers. We need -- when
21  there's a question that asks for a yes or no, we need a
22  yes or a no.
23  A.  All right.
24  Q.  And then your attorney who is sitting next to
25  you may make an objection. These are for the record in

JONNELL AGNEW & ASSOCIATES

9

(800) 524-DEPO

**Page 10**

1  the event that this comes up before a judge at some
2  point in time later for the judge to rule upon. But
3  you're still required to respond to the question unless
4  your attorney specifically says, "I instruct you not to
5  answer."
6  A.  I understand that.
7  Q.  Now, there was a list of things which were
8  identified as you being the person most knowledgeable on
9  behalf of Agape.
10      Have you reviewed the notice of deposition?
11  A.  Yes.
12  Q.  And are you the person most knowledgeable for
13  each of the 14 categories on behalf of Agape?
14  A.  Yes.
15  Q.  Who else works at Agape -- well, let me
16  clarify.
17      Right now, we're going to be referring to
18  Agape Industrial, the company that is the plaintiff in
19  this suit. Other than yourself, who else is employed at
20  Agape Industrial?
21  A.  Jan Hung; J-a-n, H-u-n-g.
22  Q.  How many employees are there at Agape
23  Industrial?
24  A.  I don't know how to answer the question
25  because I am not clear on the question. So that means

JONNELL AGNEW & ASSOCIATES

10

(800) 524-DEPO

**Page 11**

1  including me? And also I want to know whether you want
2  to know what's on the list, or are you also referring to
3  people who receive commissions?
4  Q.  Let's ask it this way: How many people work
5  for Agape Industrial in any capacity?
6  A.  Five, total.
7      MR. CHAN: I'm going to ask that the identity
8  of all of these individuals -- I want to mark the
9  transcript to attorneys' eyes only from now on.
10      MR. ORLOFF: Can we go off the record for just
11  one minute.
12      (A discussion was held off the record.)
13  BY MR. ORLOFF:
14  Q.  So who are the people? Who are the five
15  employees other than yourself and Jan Hung?
16      MR. CHAN: Objection; misstating witness's
17  testimony.
18  BY MR. ORLOFF:
19  Q.  Okay. As a matter of clarification, when I
20  say "employee," that's any person working for Agape
21  Industrial in any capacity.
22  A.  I'm referring to people who are
23  representatives all over the world, so I don't
24  understand. Do you want the names or what were you
25  asking?

JONNELL AGNEW & ASSOCIATES

11

(800) 524-DEPO

**Page 12**

1  Q.  Yes, the names.
2  A.  Carlos Mayoka (phonetic), Sergis (phonetic) --
3  I don't know the last name, Estapa (phonetic).
4  Q.  Is Estapa the person's first name or last
5  name?
6  A.  First name.
7  Q.  Okay. What is his last name?
8  A.  I don't know.
9  Q.  So that's five individuals. Is that everybody
10  who has -- who works for, in any capacity, for Agape
11  Industrial?
12  A.  Correct.
13  Q.  How long have --
14  How long has Jan Hung worked for Agape?
15  A.  Five years.
16  Q.  And what about Carlos Mayoka? How many years?
17  A.  Approximately seven years.
18  Q.  And how long has Sergis been working for
19  Agape?
20  A.  Four years.
21  Q.  And how long has Estapa been working for
22  Agape?
23  A.  Approximately two years, I think.
24  Q.  When did you first become acquainted with
25  Aruvil International?

JONNELL AGNEW & ASSOCIATES

12

(800) 524-DEPO

**Page 13**

```
 1      A.  I don't recall the exact year.  It may have
 2   been around 2005.  However, it could have been earlier
 3   than that.
 4      Q.  But approximately 2005 is your best estimate?
 5      A.  Correct.
 6      Q.  Who from Aruvil did you first become
 7   acquainted with?
 8      A.  S.K.
 9      Q.  Where did you meet S.K.?
10      A.  I believe it was at a trade show.
11      Q.  Do you know which trade show?
12      A.  AFA show.
13      Q.  What does AFH (sic) stand for?
14      A.  American Fencing Association show.
15      Q.  Oh, it's AFA?
16      A.  Correct.  Trade show's name is Fencetech,
17   F-e-n-c-e-t-e-c-h.
18      Q.  In 2005, were you an exhibitor?  Did you have
19   a booth?
20           MR. CHAN:  Objection; vague and ambiguous.
21           THE WITNESS:  May have it repeat, please?
22           MR. ORLOFF:  Madam Court Reporter, would you
23   please repeat the question?
24           (The previous question was read back
25           by the court reporter as follows:
```

**Page 15**

```
 1      Q.  Was it a lawsuit?
 2      A.  No.
 3      Q.  What were the legal issues?
 4      A.  Issues involving people.  It's private.  I
 5   think that's fair to say.
 6      Q.  That is a very general answer.  Would you be
 7   more specific?
 8      A.  The old name Agape Industry was changed to
 9   Agape Industrial because the old name happened to be
10   same of another company in Taiwan.
11      Q.  When you were in the trade show, the Fencetech
12   trade show in 2005, what machines did you have in your
13   booth?
14      A.  There was a chain link fence demo machine.
15      Q.  Only one?
16      A.  Yes.
17      Q.  And what --
18           Who was the maker of that chain link fence?
19      A.  Agape Industry company in Taiwan.
20      Q.  Was that the same as Jun-En; Jun-En?
21      A.  Yes.
22      Q.  Isn't it true that Jun-En and Agape Industry
23   were sister companies which you were affiliated with up
24   through January 2010?
```

**Page 14**

```
 1           "QUESTION:  In 2005, were you an
 2           exhibitor?  Did you have a booth?")
 3           THE WITNESS:  Yes.
 4   BY MR. ORLOFF:
 5      Q.  It was not Peter Lin that had the booth;
 6   correct?  It was a company; correct?
 7           MR. CHAN:  Objection; compound.
 8           THE WITNESS:  It was a company.
 9   BY MR. ORLOFF:
10      Q.  And what company had the booth which you were
11   at?
12      A.  Agape Industry.
13      Q.  Is Agape Industry a different company than
14   Agape Industrial?
15      A.  Different names.
16      Q.  What is the difference between Agape
17   Industrial and Agape Industry?
18      A.  The difference in name.
19      Q.  Is that all?
20      A.  Yes.
21      Q.  Did Agape Industry just change the name to
22   Agape Industrial?
23      A.  Yes.
24      Q.  Why did the company change its name to Agape
25   Industrial?
```

**Page 16**

```
 1           MR. CHAN:  Objection; vague and ambiguous.
 2           THE WITNESS:  Is it possible for you to
 3   repeat, please?
 4           MR. ORLOFF:  Madam Court Reporter, would you
 5   please repeat the question.
 6           (The previous question was read back
 7           by the court reporter as follows:
 8           "QUESTION:  Isn't it true that
 9           Jun-En and Agape Industry were sister
10           companies which you were affiliated
11           with up through January 2010?")
12           MR. CHAN:  Objection; vague and ambiguous
13   compound.
14           THE WITNESS:  I don't understand why you used
15   the month January 2010.
16   BY MR. ORLOFF:
17      Q.  Let me ask a slightly different question.
18           Isn't it true that Jun-En Enterprise
19   Corporation in Taiwan, Jun-En Enterprise U.S.A.,
20   Incorporated, and Agape Industry, Incorporated, U.S.A.
21   were sister corporations?
22           MR. CHAN:  Objection; vague and ambiguous.
23           THE WITNESS:  That's not true.
24   BY MR. ORLOFF:
25      Q.  Were Jun-En Enterprise Corporation in Taiwan
```

**[Page 17]**

```
 1   related to Agape Industry, Incorporated, U.S.A.?
 2        MR. CHAN:  Objection; vague and ambiguous.
 3        THE WITNESS:  They are not related.
 4   BY MR. ORLOFF:
 5        Q.  Were you employed by June-En Enterprise
 6   Corporation in Taiwan?
 7        MR. CHAN:  Objection; vague and ambiguous.
 8        THE WITNESS:  Give me a time frame, please.
 9   BY MR. ORLOFF:
10        Q.  Any time period.  That's going to be my next
11   question.
12        A.  Without a time frame, I don't know how to
13   answer.
14        Q.  During what time period were you working for
15   June-En Enterprise Corporation?
16        MR. CHAN:  Objection; lack of foundation.
17        THE WITNESS:  From 1999 through 2004, I worked
18   for June-En, that company when I was in Taiwan.
19   BY MR. ORLOFF:
20        Q.  During what time period did you work for
21   June-En Enterprise, U.S.A., Incorporated?
22        MR. CHAN:  Objection; lack of foundation.
23        THE WITNESS:  I don't know how to answer it
24   because you are asking questions relating to June-En
25   Enterprise.  I don't know how to answer the questions
```

JONNELL AGNEW & ASSOCIATES

17

(800) 524-DEPO

**[Page 18]**

```
 1   because that company is my own company incorporated in
 2   the U.S. so I don't know how to answer it.
 3   BY MR. ORLOFF:
 4        Q.  June-En Enterprise U.S.A., Incorporated is
 5   your company?
 6        A.  Yes.
 7        Q.  And when was Jun-En Enterprise U.S.A.
 8   incorporated?
 9        A.  I don't recall exactly when, but I think it
10   was around year 2007.
11        Q.  Is there a relationship between Agape Industry
12   and June-En Enterprise U.S.A., Incorporated?
13        A.  Agape Industry is also my own company, a
14   company incorporated by me.
15        Q.  Is June-En Enterprise U.S.A., Incorporated a
16   subsidiary of Agape Industry, Incorporated U.S.A.?
17        A.  No.
18        Q.  Is it the other way around?  Is Agape
19   Industry, Incorporated, a subsidiary of June-En
20   Enterprise U.S.A., Incorporated?
21        A.  No.
22        Q.  When you were at the booth in 2005 at
23   Fencetech, what name was on the booth?
24        A.  Agape Industry, Inc.
25        Q.  Did something happen of significance to Agape
```

JONNELL AGNEW & ASSOCIATES

18

(800) 524-DEPO

**[Page 19]**

```
 1   Industry, Inc., U.S.A. on January 10, 2010?
 2        MR. CHAN:  Objection; vague and ambiguous.
 3        THE WITNESS:  No.  Nothing significant
 4   happened.
 5        MR. ORLOFF:  I'd like to show you an e-mail,
 6   this we'd like to mark as Exhibit 1.
 7        MR. CHAN:  Can I have a copy?
 8        (Defendants' Exhibit 1 was marked for
 9        identification by the court reporter
10        and is attached hereto.)
11   BY MR. ORLOFF:
12        Q.  Have you taken a look at this, the first
13   exhibit?
14        A.  Yes.
15        Q.  Do you go by the name Kuo En?
16        A.  Not in the U.S.
17        Q.  Do you go -- that was not my question.
18        Do you go by the name of Kuo En Lin or Lin Kuo
19   En?
20        A.  I already answered the question.  I said not
21   in the U.S.  In the U.S., it's Peter Lin.
22        Q.  In Taiwan, do you go by the name Kuo En?
23        A.  Yes.
24        Q.  Now, were you in charge of the American market
25   for June-En Enterprise Corporation, June-En Enterprise
```

JONNELL AGNEW & ASSOCIATES

19

(800) 524-DEPO

**[Page 20]**

```
 1   U.S.A. and Agape Industry U.S.A.?
 2        A.  Agape Industry, Inc., and June-En Enterprise
 3   U.S.A., Inc., are my own company.  Of course, I be
 4   responsible for the market in the U.S.
 5        Q.  Was that being responsible in the U.S. for
 6   representing June-En?
 7        THE WITNESS:  Read back, please.
 8   BY MR. ORLOFF:
 9        Q.  Was that being responsible for or on behalf of
10   June-En?
11        MR. CHAN:  Objection; compound.
12        THE WITNESS:  Not necessarily.
13   BY MR. ORLOFF:
14        Q.  Were you told by June-En Enterprises in Taiwan
15   that effective on January 10, 2010, that you would no
16   longer be able to represent June-En?
17        MR. CHAN:  Objection; lack of foundation.
18        THE WITNESS:  How do I answer it?  Could you
19   please repeat it again?
20        MR. ORLOFF:  Madam Court Reporter, would you
21   please repeat the question.
22        (The previous question was read back
23        by the court reporter as follows:
24        "QUESTION:  Were you told by
25        June-En Enterprises in Taiwan that
```

JONNELL AGNEW & ASSOCIATES

20

(800) 524-DEPO

**Page 21**

```
 1   effective on January 10, 2010, that
 2          you would no longer be able to
 3          represent June-En?")
 4          THE WITNESS:  The correct way was that no
 5   longer representative of June-En Enterprise, Corp.,
 6   parenthesis Taiwan.
 7          MR. CHAN:  Can we take a break?
 8          MR. ORLOFF:  What's that?
 9          MR. CHAN:  Can we take a break?
10          MR. ORLOFF:  Sure.
11          (Recess.)
12   BY MR. ORLOFF:
13      Q.   Do you know who Sunnie from June-En Enterprise
14   Corporation, Taiwan is?
15      A.   I do.
16      Q.   And who is Sunnie?
17      A.   She works for the company called June-En
18   Enterprise, Corp., Taiwan.
19      Q.   Do you know what her position is there?
20      A.   Secretary.
21      Q.   And do you know Vincent Chiu from June-En
22   Enterprise, Corp., Taiwan?
23      A.   I do.
24      Q.   When you were in the booth at Fencetech in
25   2005, were you also a representative of June-En
```

**Page 22**

```
 1   Enterprise, Corp., Taiwan?
 2      A.   Yes.
 3      Q.   In 2005 at the Fencetech show, were you
 4   advertising for sale any brand of machine other than one
 5   made by June-En Enterprise, Corp., Taiwan?
 6      A.   Yes.
 7      Q.   What other machines were you advertising at
 8   that time at the show?
 9      A.   Nail machine.
10      Q.   What does that mean?  What is a nail machine?
11      A.   Nail.
12      Q.   Is that a brand name?
13      A.   No.
14      Q.   Is it, like, a hydraulic machine that shoots
15   nails?  What is this machine?
16          MR. CHAN:  Objection; compound.
17          THE WITNESS:  No.  A nail machine is a machine
18   that manufactures nails.
19   BY MR. ORLOFF:
20      Q.   Regarding fencing manufacturing machines,
21   chain link fencing manufacturing machines, were there
22   any other companies which you represented at the
23   Fencetech show in 2005?
24      A.   I had the ability to represent any chain link
25   fence maker or brand to sell.
```

**Page 23**

```
 1      Q.   Did you represent any other company other than
 2   June-En at the Fencetech show in 2005?
 3      A.   He is so confused.  He kept on asking me
 4   questions about whether I was representing June-En, this
 5   company, but actually I was representing this company.
 6   I was not representing that company.  I was at the show
 7   for this company, so I was under this name.  I could
 8   represent any company.  I wasn't representing that
 9   company.  He was totally confused.
10      Q.   What other company did you represent at
11   Fencetech in 2005?
12      A.   I did not represent any other company besides
13   Agape Industry, Inc.
14      Q.   Did you receive the e-mail in Exhibit 1 which
15   is in front of you?
16      A.   Yes.  Correction.  I have seen it, but I have
17   never received it.
18      Q.   Is your e-mail peter@agapeindustry.com or was
19   it at any time?
20      A.   Yes.
21      Q.   Was this message forwarded to you on or about
22   January 27, 2010?
23      A.   Yes.
24      Q.   And you received this from S.K.; correct?
25      A.   Yes.
```

**Page 24**

```
 1      Q.   And S.K. is the same person as Shrinivas
 2   Kulkarni; correct?
 3      A.   Correct.
 4      Q.   For the purposes of this deposition, we will
 5   use the name S.K., but that's the same individual.
 6          Is that fair?
 7      A.   That's fine.
 8      Q.   Did you talk to S.K. after receiving this
 9   e-mail?
10      A.   Yes.
11      Q.   What was the next conversation that you had
12   with S.K. after this e-mail?
13      A.   I don't quite recall.
14      Q.   Do you recall talking to or having an e-mail
15   to S.K. or from S.K. related to your representation or
16   affiliation with June-En Enterprise Corporation, Taiwan?
17          MR. CHAN:  Objection; compound.
18          THE WITNESS:  Can I have it repeat, please?
19   BY MR. ORLOFF:
20      Q.   Let me rephrase the question.
21          Did you have a conversation with S.K. after
22   this e-mail about your affiliation with June-En
23   Enterprise, Corp., Taiwan?
24      A.   Yes.
25      Q.   What was the substance of that conversation?
```

**Page 25**

```
1       A.  That the machine you ordered, your company
2   ordered, was an order made from or with Agape Industry,
3   Inc.
4       Q.  Can you explain a little bit more?
5           MR. CHAN:  Objection; vague and ambiguous.
6           THE WITNESS:  I don't know how to explain
7   more.
8   BY MR. ORLOFF:
9       Q.  Did you discuss with S.K. after receiving this
10  e-mail that the machine that had been ordered was from
11  June-En, but that you would not be delivering a June-En
12  product?
13          MR. CHAN:  Objection; compound; vague and
14  ambiguous.
15          THE WITNESS:  I never said that.
16  BY MR. ORLOFF:
17      Q.  Did you speak with S.K. about receiving a
18  June-En machine after receiving this e-mail?
19      A.  No.
20      Q.  When did you transfer from Agape Industry to
21  Agape Industrial?
22          MR. CHAN:  Objection; assumes facts not in
23  evidence.
24          THE WITNESS:  Repeat his question, please.
25          MR. ORLOFF:  Would you please repeat the
```

JONNELL AGNEW & ASSOCIATES
(800) 524-DEPO

**Page 26**

```
1   question, Madam Court Reporter?
2           (The previous question was read back
3           by the court reporter as follows:
4           "QUESTION:  When did you transfer
5           from Agape Industry to Agape
6           Industrial?")
7           MR. CHAN:  Objection; vague and ambiguous.
8           THE WITNESS:  Agape Industrial, Inc., was
9   formed in 2009.
10  BY MR. ORLOFF:
11      Q.  Do you recall what month?
12      A.  I do not.
13          MR. ORLOFF:  I'd like to mark this next as
14  Exhibit 2.
15          (Defendants' Exhibit 2 was marked for
16          identification by the court reporter
17          and is attached hereto.)
18  BY MR. ORLOFF:
19      Q.  Can you take a look at this?
20          Does this refresh your recollection about when
21  the corporation was formed, specifically, Agape
22  Industrial, Incorporated?
23      A.  There's a date on this document.
24      Q.  Did you form Agape Industrial, Incorporated,
25  in or about March 30th, 2009?
```

JONNELL AGNEW & ASSOCIATES
(800) 524-DEPO

**Page 27**

```
1   well, since it's on the document, I would
2   think it's correct.
3       Q.  Do you have any reason to believe or
4   understand that this is not correct?
5           MR. CHAN:  Compound.
6           THE WITNESS:  I can go back to check my
7   information.
8   BY MR. ORLOFF:
9       Q.  Now, there was something that we didn't
10  explain in the beginning, and this is probably a good
11  time to explain this to you.
12          Is that you will have an opportunity after
13  this deposition is completed to review the transcript
14  and to look at things, information such as dates or
15  times or just any information, any responses.  So you
16  can go back, and if it's -- if you find that the date's
17  incorrect, you would be able to correct that.
18          However, I need to warn you that any changes
19  that are made of substance may look upon your veracity
20  for truth telling and we can comment on that, on the
21  fact that you changed your answer.
22      A.  All right.
23      Q.  After March 30, 2009, did you continue
24  operating Agape Industry, Incorporated?
25      A.  Yes.
```

JONNELL AGNEW & ASSOCIATES
(800) 524-DEPO

**Page 28**

```
1       Q.  For how long after March 30, 2009, did you
2   continue operating Agape Industry, Inc.?
3           MR. CHAN:  Objection; vague and ambiguous.
4           THE WITNESS:  I continued to use Agape
5   Industry for some of the things that were started with
6   Agape Industry.
7   BY MR. ORLOFF:
8       Q.  Were one of those things the sale of a machine
9   to Aruvil?
10      A.  Yes.
11      Q.  When did you stop using the name Agape
12  Industry, Inc., altogether?
13      A.  Approximately the end of 2009.
14          (Witness's counsel speaking in Mandarin.)
15          MR. ORLOFF:  And I'm going to ask that counsel
16  not be speaking with Mr. -- with the deponent while the
17  question is pending.
18          MR. CHAN:  There was no question pending.
19          MR. ORLOFF:  He was in the middle of
20  answering, it appears.
21          MR. CHAN:  I thought he was done with his
22  answer.
23          THE WITNESS:  In addition, Agape Industry and
24  Agape Industrial are two different companies.
25  ///
```

JONNELL AGNEW & ASSOCIATES
(800) 524-DEPO

**Page 29**

1   BY MR. ORLOFF:
2        Q.   Didn't you say earlier that it was the same
3   company, that they were both your companies?
4            MR. CHAN:  Objection; compound.
5            THE WITNESS:  Though both are my company, but
6   they are two separate companies with different names.
7   BY MR. ORLOFF:
8        Q.   Didn't Agape Industry cease to be operating
9   and you took over under the name Agape Industrial,
10  Incorporated, all the same business?  Is that not true?
11           MR. CHAN:  Objection; vague and ambiguous;
12  compound.
13           THE WITNESS:  Different.
14  BY MR. ORLOFF:
15       Q.   Completely different?
16       A.   No, that's not correct.  Part of it is
17  different, part of it is the same.
18       Q.   Okay.  What part was the same?
19       A.   Too many for me to say.  Just like two
20  circles, when they overlap, they -- of course, the area
21  that overlaps is the same.  So when there are two
22  companies in the same business, of course there will be
23  areas that overlap.
24       Q.   How did the two companies overlap, meaning
25  Agape Industrial and Agape Industry?

JONNELL AGNEW & ASSOCIATES
29
(800) 524-DEPO

**Page 30**

1        A.   Some machines were sold by both companies.
2        Q.   How did you determine which company got the
3   sale?
4        A.   I don't understand his question.
5        Q.   Do you live on Fox Ridge Lane?
6        A.   Yes.
7        Q.   Is that your address of where you live, found
8   in Exhibit 2?
9        A.   Correct.
10           MR. ORLOFF:  Now, I want you to take a look at
11  this next exhibit, which is going to be marked as
12  Exhibit 3.
13           (Defendants' Exhibit 3 was marked for
14           identification by the court reporter
15           and is attached hereto.)
16  BY MR. ORLOFF:
17       Q.   Is this 24325 Crenshaw Boulevard, Number 108,
18  Torrance, California 90505, an address that you used?
19       A.   Yes.
20       Q.   Isn't it true that June-En Enterprise U.S.A.,
21  Incorporated, also used the same address?
22       A.   Correct.
23       Q.   Now, this shows that the status of Agape
24  Industry, Inc., was suspended.  Is that your
25  understanding that the corporation is a suspended

JONNELL AGNEW & ASSOCIATES
30
(800) 524-DEPO

**Page 31**

1   corporation?
2        A.   Correct.
3        Q.   When did Agape Industry, Inc., become
4   suspended, do you know?
5        A.   I don't.
6        Q.   Was Agape Industry, Inc., a viable corporation
7   in December of 2009?
8            MR. CHAN:  Objection; vague and ambiguous.
9            THE WITNESS:  In 2009, it was.  It had
10  businesses.
11  BY MR. ORLOFF:
12       Q.   Was Agape Industry, Inc., doing any business
13  in 2010?
14       A.   Repeat his question, please.  I heard 2010,
15  but I need to hear the name of the company again.
16           MR. ORLOFF:  Madam Court Reporter, would you
17  please repeat the question.
18           (The previous question was read back
19           by the court reporter as follows:
20            "QUESTION:  Was Agape Industry,
21  Inc., doing any business in 2010?")
22           THE WITNESS:  No.
23  BY MR. ORLOFF:
24       Q.   And you were the agent for service of process
25  for Agape Industry, Inc.; correct?

JONNELL AGNEW & ASSOCIATES
31
(800) 524-DEPO

**Page 32**

1        A.   Correct.
2        Q.   Were you not also the agent for service of
3   process for June-En Enterprise U.S.A., Inc.?
4        A.   Yes.
5        Q.   Do you know who has the -- or who is using the
6   name Agape Industry, Incorporated, currently?
7        A.   No one's using it.
8        Q.   What was the company in Taiwan who is using
9   the name Agape Industry?
10       A.   The Agape Industry, Corp., in Taiwan.
11       Q.   Is Agape Industry, Corp., in Taiwan controlled
12  or owned by June-En Enterprise, Incorporated, Taiwan?
13       A.   I don't know.
14       Q.   Who told you to stop using the name Agape
15  Industry, Inc.?
16       A.   No one told me to stop using the name, but --
17  Well, go ahead.
18       Q.   What were you going to add?
19       A.   Let him continue to ask.
20       Q.   If no one told you to stop using the name
21  Agape Industry, Inc., what was the legal issue which you
22  testified about earlier?
23           MR. CHAN:  Objection; calls for a legal
24  conclusion.
25           I instruct the witness not to answer any --

JONNELL AGNEW & ASSOCIATES
32
(800) 524-DEPO

1    provide any legal testimony, any legal opinion you have
2    received from the lawyer in attorney-client
3    communication. Please do not disclose.
4    BY MR. ORLOFF:
5       Q.   Can you answer?
6            MR. CHAN:  Same objection.
7            THE WITNESS:  No, I can't.
8            MR. ORLOFF:  I'd like to mark this next
9    exhibit as Number 4.
10           (Defendants' Exhibit 4 was marked for
11           identification by the court reporter
12           and is attached hereto.)
13           MR. ORLOFF:  If you can take a look at this.
14   BY MR. ORLOFF:
15      Q.   Was this your company?
16           MR. CHAN:  Objection; vague and ambiguous.
17           THE WITNESS:  I don't know how to answer the
18   question.
19   BY MR. ORLOFF:
20      Q.   This is a -- a Web site, or this is from a Web
21   site identifying itself as agapeindustry.com.  Did you
22   produce this Web page?
23      A.   Yes.
24      Q.   Did you have the address of 23520 Telo Avenue,
25   Suite One, Torrance, California 90505?

JONNELL AGNEW & ASSOCIATES
33
(800) 524-DEPO

1       A.   At that time, yes.
2       Q.   When did you stop using that address?
3       A.   2009.  May I add something?
4       Q.   Sure.  What would you like to add?
5       A.   The address shown on Exhibit 3 was changed.
6    The original address at incorporation was the address
7    stated here on this document.
8            I meant Exhibit 4.
9       Q.   Do you still use the phone number
10   (310) 325-9000?
11      A.   Yes.
12      Q.   And is your fax number also (310) 325-9008?
13      A.   Yes.
14           MR. ORLOFF:  I'd like you to take a look at
15   this next one we are going to be identifying, marking as
16   Exhibit 5.
17           (Defendants' Exhibit 5 was marked for
18           identification by the court reporter
19           and is attached hereto.)
20   BY MR. ORLOFF:
21      Q.   Are you familiar with this Web page?
22      A.   Yes.
23      Q.   Isn't this the same address at the -- for the
24   contact?
25      A.   Yes.

JONNELL AGNEW & ASSOCIATES
34
(800) 524-DEPO

1       Q.   When was this web page created, do you know?
2       A.   I don't recall.
3       Q.   It says copyright 2009 on the page.  Does that
4    mean -- does that refresh your recollection?
5       A.   I don't recall, but I would think it may be
6    correct.
7       Q.   Do you have any information to -- or any
8    reason to doubt that this was created in 2009?
9       A.   I think I don't.
10      Q.   Do you still use the number (310) 325-4600?
11      A.   I don't recall ever having that number.
12      Q.   Isn't that the same phone number and the
13   contact as on the left-hand side of the page?
14      A.   I see the number listed on this page.
15   However, I don't recall ever owning that number.
16      Q.   How long, or when was the last time you used
17   the name June-En Enterprise U.S.A., Inc., for business
18   purposes?
19      A.   I don't recall.
20      Q.   Did you still use the name June-En Enterprise
21   U.S.A., Inc., in 2010?
22      A.   Not to my recollection.
23      Q.   To your recollection, was the last time you
24   used the name June-En Enterprise, Inc., in 2009?
25      A.   I don't recall.

JONNELL AGNEW & ASSOCIATES
35
(800) 524-DEPO

1       Q.   Did you use June-En Enterprise U.S.A., Inc.,
2    in 2009?
3       A.   I don't recall.
4       Q.   What's your best estimate as to the last time
5    you used June-En Enterprise U.S.A., Inc.?
6       A.   I don't recall.  I know I incorporated this
7    company.  I don't recall whether I ever used the
8    company.
9       Q.   Did you receive any orders through this Web
10   site?
11      A.   No.
12      Q.   How can you tell you didn't?
13      A.   Not to my recollection.
14      Q.   Isn't it true that Agape Industry had six
15   plants throughout the world?
16      A.   That's what I wrote on the Web site.
17      Q.   Was it true when you wrote it?
18      A.   I can consider that to be true.
19      Q.   One more time?
20      A.   I can consider that to be true.
21           MR. ORLOFF:  I'd like you to take a look at
22   this next exhibit, we're going to call it Number 6.
23           (Defendants' Exhibit 6 was marked for
24           identification by the court reporter
25           and is attached hereto.)

JONNELL AGNEW & ASSOCIATES
36
(800) 524-DEPO

**Page 37**

BY MR. ORLOFF:
1
2    Q.   Are you familiar with this Web page?
3    A.   Yes.
4    Q.   And was all the information in here correct
5 when you wrote it?
6    A.   Not necessarily.
7    Q.   What was inaccurate on this Web page?
8    A.   You see here, to write an article or
9 something, this is my Web site or Web page.  Why should
10 I tell him?  Why should I tell you what part is
11 accurate, what part is inaccurate?
12       MR. ORLOFF:  Objection; nonresponsive.
13 BY MR. ORLOFF:
14    Q.   Would you please answer the question?
15    A.   There's nothing wrong, no mistakes.
16    Q.   Is it accurate that Agape Industry, Inc., was
17 in business for more than 30 years prior to 2006?
18    A.   No.
19    Q.   That would be inaccurate, correct, to this
20 statement that says:
21          "Agape since more than 30 years
22          we manufacture metal mesh machines."
23    A.   I don't agree.
24    Q.   Not sure exactly what your response is, and so
25 I'd like to ask a clarifying question.

JONNELL AGNEW & ASSOCIATES
37
(800) 524-DEPO

**Page 38**

1       Is it true that "Agape since more than
2 30 years we manufacture metal mesh machines"?
3    A.   Agape Industry is an import/export trading
4 company.  It may represent any maker located anywhere in
5 the world.  The maker may be located in China, Taiwan,
6 or any other part of the world.  And any of the maker
7 has long history, then Agape may say that.
8    Q.   When did June-En begin business, June-En
9 Enterprise in Taiwan, do you know?
10    A.   I don't know.
11    Q.   It says:
12          "In Taiwan Agape have 6 plants."
13       What were those six plants?  What did they
14 manufacture?
15    A.   I already answered earlier that it may
16 represent any plant.  As long as I tell the plant that I
17 have orders, I have customers, then I can represent that
18 plant.
19       MR. CHAN:  Can we take a quick break?
20       MR. ORLOFF:  What's that?
21       MR. CHAN:  Can we take a quick break?
22       MR. ORLOFF:  I was thinking --
23       MR. CHAN:  Do you want to have lunch?
24       MR. ORLOFF:  How about let's go till 1:00?
25 Can we do that and --

JONNELL AGNEW & ASSOCIATES
38
(800) 524-DEPO

**Page 39**

1       MR. CHAN:  I don't know if I can wait.  Do you
2 can ask a couple more questions and see if I --
3       MR. ORLOFF:  Let me ask a few more questions.
4 I just got this one and one more exhibit to ask about.
5 I don't have very much more on these couple of exhibits.
6 BY MR. ORLOFF:
7    Q.   What companies were those six plants in Taiwan
8 identified in this Web site?
9    A.   Any.  Any one.
10    Q.   What company names were they?
11    A.   At the time, whichever company I needed, I
12 would represent that company.
13    Q.   Did you just say that Agape have six plants
14 because that was a nice number to -- to represent?
15       MR. CHAN:  Objection; argumentative.
16       THE WITNESS:  It's just a number.
17 BY MR. ORLOFF:
18    Q.   Is it the same with:
19          "In China we have 3 plants."
20    A.   Yes.
21    Q.   Was June-En one of the six plants in Taiwan?
22    A.   It depends on what was the product.
23    Q.   What were the companies in Taiwan which
24 manufactured chain link fencing machines of those six
25 plants?

JONNELL AGNEW & ASSOCIATES
39
(800) 524-DEPO

**Page 40**

1       MR. CHAN:  Objection; vague and ambiguous;
2 lack of foundation.
3       THE WITNESS:  I don't know how to answer it.
4       MR. CHAN:  We do need to take a break.  I need
5 to take a break.
6       MR. ORLOFF:  Okay.
7       MR. CHAN:  I'll be back real quick.
8       (Whereupon, at the hour of
9       12:50 p.m., a luncheon recess was
10      taken, the deposition to be resumed
11      at 2:08 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

JONNELL AGNEW & ASSOCIATES
40
(800) 524-DEPO

PASADENA, CALIFORNIA, TUESDAY, JULY 17, 2012

2:08 P.M.

PETER LIN,

having been previously duly sworn,
was examined and testified as follows:

MR. ORLOFF: Can you repeat the last question?

(The previous question was read back
by the court reporter as follows:

"QUESTION: What were the
companies in Taiwan which manufactured
chain link fencing machines of those
six plants?")

EXAMINATION

BY MR. ORLOFF:.

Q. There's a company Lead Long.
Is Lead Long one of the six companies, of
those six plants?

MR. CHAN: Objection; vague and ambiguous.

THE WITNESS: That's a fair statement.

BY MR. ORLOFF:

Q. Was June-En one of the six manufacturers?

MR. CHAN: Objection; assumes facts not in

JONNELL AGNEW & ASSOCIATES

41

(800) 524-DEPO

---

evidence.

THE WITNESS: That's also a fair statement.

BY MR. ORLOFF:

Q. How long have you been using Lead Long or
selling Lead Long products?

A. I don't recall how long it has been. It's
been a while.

Q. Give your best estimate.

A. It has been a while, but I don't recall how
many years.

Q. More than seven years?

A. I can't answer it because I don't know exactly
how long it is.

Q. Was it prior to 2009 that you started using
Lead Long?

A. Yes.

Q. You identified two companies that were from
Taiwan, that Agape had plants or were using companies.
What were the other four?

MR. CHAN: Objection; lack of foundation.

THE WITNESS: I have already answered the
question. When necessary, I could represent any
company.

BY MR. ORLOFF:

Q. But you identified six companies, that there

JONNELL AGNEW & ASSOCIATES

42

(800) 524-DEPO

---

MR. CHAN: Objection; assumes facts not in
evidence; misstating witness's testimony; lack of
foundation.

THE WITNESS: The Web site was designed by
someone else. And based on what I see here, the year
was 2005 to 2006. And even though earlier on something
says six plants, but I could say there were many plants,
or maybe just two or three plants anyway. It was a long
time ago and I already said the six is just a number.

MR. ORLOFF: I'd like to mark this next one as
Exhibit 7.

(Defendants' Exhibit 7 was marked for
identification by the court reporter
and is attached hereto.)

BY MR. ORLOFF:

Q. Is this page also from your Web site?

A. I don't recall.

Q. It has at the bottom:
"www.agapeindustry.com/pages/
popups/ag1500.html."
Does that refresh your recollection whether
this is from your Web site?

A. That may be so. However, you do recall that
the Web site was designed by someone else, not me.

JONNELL AGNEW & ASSOCIATES

43

(800) 524-DEPO

---

Q. Who designed the Web site for Agape Industry?

A. A Web site company.

Q. Who provided the information to the Web site
company?

A. I have done that.

Q. So you provided all of the information and the
photos and Accelerate Online put it all together; is
that accurate?

MR. CHAN: Objection; compound.

THE WITNESS: The Web site was designed by
that company.

BY MR. ORLOFF:

Q. Was all of the information that you gave to
Accelerate Online, was it -- strike that question.
Was all of the information given to Accelerate
Online for purposes of the Agape Industry Web site, was
all of that information provided by you personally?

A. That's correct. But that was a long time ago,
many years ago.

Q. There's this page in front of you, Exhibit 7,
which identifies AG-1500 chain link fencing machine.
Did you provide all of the words that are on the top to
Accelerate Online?

A. I don't recall.

Q. Was there anybody other than yourself who gave

JONNELL AGNEW & ASSOCIATES

44

(800) 524-DEPO

---

1  Information about Agape Industry to Accelerate Online?

2     A.   I don't recall.

3     Q.   Do you know where the information came from

4  for the Agape Industry Web site?

5     A.   I don't recall.

6     Q.   Who manufactures AG-1500?

7     A.   Agape Industry.

8     Q.   Okay.  Was Agape Industry manufacturing

9  machines itself?

10    A.   Agape Industry, Inc., is a U.S. company.  It

11 does not manufacture machines.  It is an import/export

12 trading company.

13    Q.   Okay.  Then who manufactured AG-1500 for Agape

14 Industry?

15         THE INTERPRETER:  This is the interpreter

16 speaking.  The interpreter is not able to distinguish

17 most of the nouns between singular form and plural form,

18 and here is the rendition of the answer the interpreter

19 heard:  Manufacture or manufacturers in Taiwan.

20 BY MR. ORLOFF:

21    Q.   Was there one manufacturer, or were there

22 more -- or was there more than one manufacturer of

23 AG-1500 in 2009?

24    A.   In Taiwan, more than two.

25    Q.   Identify the two manufacturers.

JONNELL AGNEW & ASSOCIATES

45

(800) 524-DEPO

1         MR. CHAN:  Objection; lack of foundation.

2     A.   Do I need to answer?

3     Q.   Yes.

4     A.   Lead Long.

5     Q.   Is that L-e-a-d, L-o-n-g?

6     A.   Yes.

7     Q.   What was the other company?

8     A.   June-En.

9     Q.   Any other company from Taiwan?

10    A.   Yes.

11    Q.   What other company?

12    A.   I can't think of the name right now.  I know

13 it is located in the middle part of Taiwan.

14         MR. ORLOFF:  Would the court reporter leave a

15 blank space so that Mr. Lin can fill it in once he

16 reviews his notes and finds out for us?

17         THE REPORTER:  Yes.

18         (Information requested:  _____

19 _____

20 _____

21 _____.)

22 BY MR. ORLOFF:

23    Q.   Do you have the ability to look at notes and

24 see what company that was?

25    A.   Yes.

JONNELL AGNEW & ASSOCIATES

46

(800) 524-DEPO

1  And once you review the transcript, would you

2  put in the name of the company located in the middle of

3  Taiwan?

4     A.   Yes.

5     Q.   Were there any other companies in 2009?

6     A.   I would think there are.  However, sitting

7  here right now, I can't recall.

8     Q.   Looking at the exhibit in front of you, Number

9  7, are the specifications on the top accurate?

10         MR. CHAN:  Objection; lack of foundation.

11 BY MR. ORLOFF:

12    Q.   Let me clarify.  Are the specifications on the

13 top of the page accurate for an AG-1500 machine?

14         MR. CHAN:  Objection; lack of foundation.

15         THE WITNESS:  I am unable to answer.

16 BY MR. ORLOFF:

17    Q.   Are you not familiar with the specifications

18 of an AG-1500?

19    A.   With my computer or with my records, I would

20 be.

21    Q.   Do you know whether the -- do you know what

22 the number of the machine, the model of the machine that

23 Agape Industrial, Inc., sold to Aruvil?

24    A.   The model is AG-1500.  I know that.

25    Q.   And the mesh size of the machine that you sold

JONNELL AGNEW & ASSOCIATES

47

(800) 524-DEPO

1  to Aruvil, did it have the capacity to go from one inch

2  to three-and-a-half inch?

3     A.   I don't recall.

4     Q.   Do you recall any mesh size that the AG-1500

5  was able to use?

6     A.   I do not.

7     Q.   Do you know whether the AG-1500 could produce

8  a two-inch mesh?

9     A.   It can.

10    Q.   Do you know any other sizes that it could

11 produce?

12    A.   All sizes depend on the customers' demand.

13    Q.   How do you change the size on the AG-1500?

14    A.   Change the tooling.

15    Q.   What does that mean to "change the tooling"?

16    A.   In order to get different size in the mesh,

17 you have to change the tooling.

18    Q.   Okay.  What is tooling?

19    A.   Tooling is tooling.

20    Q.   The wire spins on the bar.  Is that bar that

21 it spins on the tooling?

22         MR. CHAN:  Objection; foundation; vague and

23 ambiguous.

24         THE WITNESS:  In your question, you used the

25 word "bar."  The bar is part of the tooling.

JONNELL AGNEW & ASSOCIATES

48

(800) 524-DEPO

**[Page 49]**

1    BY MR. ORLOFF:

2        Q.   Okay.  In order to change the mesh size, does

3    the whole tooling need to be replaced with a different

4    tooling?

5        A.   Yes.

6        Q.   This also identifies a speed of weaving blade

7    from 200 RPM to 1500 RPM.

8             Could the AG-1500 go at 1500 RPMs?

9             MR. CHAN:  Objection; foundation.

10            THE WITNESS:  Is he referring to what's

11   written on this page?

12   BY MR. ORLOFF:

13       Q.   I'm asking the AG-1500, could it operate at

14   speeds up to 1500 RPMs?

15       A.   I would like to ask him where did he get 1500

16   RPM from.

17       Q.   This is a deposition.  The deposition is that

18   I ask the questions and you answer the questions.

19            Can you answer the question, please?

20       A.   I'm unable to answer.

21       Q.   Is that because you do not personally know how

22   fast the -- the blade speed is of the AG-1500?

23       A.   I know that information.

24       Q.   What is the maximum blade speed of the

25   AG-1500?

                    JONNELL AGNEW & ASSOCIATES

                                 49

                        (800) 524-DEPO

**[Page 50]**

1        A.   That speed depends on each manufacturer.

2        Q.   Does June-En manufacture an AG-1500?

3        A.   I don't know.

4        Q.   Does Lead Long manufacture an AG-1500?

5        A.   AG-1500 is a model name.  This model is AG

6    Industries model.

7        Q.   What is AG Industries?

8        A.   Sorry.  I meant Agape Industry.

9        Q.   It still hadn't answered my question.

10            Do you know whether Lead Long manufactures a

11   product under the name AG-1500?

12       A.   When a purchase order came from Agape

13   Industry, then the machine will be called AG-1500.

14       Q.   You still haven't answered my question.

15            Do you know whether Lead Long has a product

16   that goes under the name AG-1500?

17       A.   I don't know.

18       Q.   That company that was located in the middle of

19   Taiwan that you don't have the name of right now but

20   which you referred to earlier, does that company have a

21   product which goes under the name AG-1500 as far as you

22   are aware?

23       A.   I don't know.

24       Q.   Is there a particular gauge of wire which the

25   AG-1500 will operate at 1500 RPMs?

                    JONNELL AGNEW & ASSOCIATES

                                 50

                        (800) 524-DEPO

**[Page 51]**

1        A.   Yes.

2        Q.   What is the RPM, or what gauge of wire will

3    the AG-1500 operate at 1500 RPMs?

4        A.   I don't know.

5        Q.   Will the AG-1500 manufactured by June-En

6    operate at a speed up to 1500 RPMs?

7        A.   I don't know.

8        Q.   Will a Lead Long machine produce --

9             Would a Lead Long which goes under -- strike

10   that question.

11            Will an AG-1500 manufactured by Lead Long

12   operate at speeds of up to 1500 RPM?

13       A.   It has a different speed index.

14       Q.   What is the speed index on the Lead Long?

15       A.   It can go up to 1,000 RPM.

16       Q.   So any machine that goes under AG-1500, that's

17   above a thousand RPMs, is, or would have been

18   manufactured by June-En; is that correct?

19            MR. CHAN:  Objection; vague and ambiguous.

20            THE WITNESS:  I don't know how to answer this

21   question.

22   BY MR. ORLOFF:

23       Q.   You testified that the maximum speed of a Lead

24   Long is a thousand RPM; is that correct?

25       A.   The speed is represented anywhere between one

                    JONNELL AGNEW & ASSOCIATES

                                 51

                        (800) 524-DEPO

**[Page 52]**

1    to 1000.

2        Q.   One RPM or 100 RPM to 1000?

3             MR. CHAN:  Objection; compound.

4             THE WITNESS:  I don't recall.

5    BY MR. ORLOFF:

6        Q.   I was asking for clarification of your

7    statement.  You said from one to 1,000.  I withdraw the

8    question.

9             Is it accurate to say that the Lead Long

10   manufactured AG-1500 has a blade speed of one to 1,000

11   RPM?

12            THE WITNESS:  I am unable to verify that the

13   speed ranges from one to 1,000.  However, I do know the

14   maximum speed is 1,000 RPM.

15   BY MR. ORLOFF:

16       Q.   So the maximum speed on an AG-1500

17   manufactured by Lead Long is 1,000 RPM; is that correct?

18       A.   Well, that is how Lead Long represented.

19       Q.   Do you have any information to believe that

20   that representation is inaccurate?

21       A.   Each designer has his own way to represent the

22   speed.  Each company has its own way.

23       Q.   That didn't answer my question.

24            MR. ORLOFF:  Madam Court Reporter, would you

25   please repeat the question.

                    JONNELL AGNEW & ASSOCIATES

                                 52

                        (800) 524-DEPO

(The previous question was read back
by the court reporter as follows:
"QUESTION: Do you have any
information to believe that that
representation is inaccurate?")
THE WITNESS: That's how Lead Long did its calculation. That's how you did the calculation.
BY MR. ORLOFF:
**Q.** Do you have any information that Lead Long's calculations are inaccurate?
**A. Each company has its own way to do the calculation. I cannot say that Lead Long's way is inaccurate.**
**Q.** You haven't found out that Lead Long's measurements were inaccurate; correct?
**A. Repeat, please.**
MR. ORLOFF: Madam Court Reporter, can you please repeat the question.
(The previous question was read back
by the court reporter as follows:
"QUESTION: You haven't found out
that Lead Long's measurements were
inaccurate; correct?")
THE WITNESS: To Lead Long himself, its calculation is correct. So to Lead Long, the

calculation is correct.
BY MR. ORLOFF:
**Q.** But you haven't tested it yourself to find out that it was not correct?
MR. CHAN: Lack of foundation.
THE WITNESS: How do I do testings?
BY MR. ORLOFF:
**Q.** Have you done testing on the Lead Long machine?
**A. Yes.**
**Q.** Okay. What did your testing result --
What were the results of your testing -- or actually, let me strike that.
What testing did you do on the Lead Long machine, the Lead Long AG-1500?
**A. Speed and capacity.**
**Q.** And what were the results of your testing?
**A. Accurate.**
**Q.** What did you test with regard to speed including the test that you made?
**A. For speed, of course, I would be reading at the indicator just to read the speed.**
**Q.** Were you able to see the Lead Long-manufactured AG-1500 operate at a thousand RPMs?
**A. I saw it.**

**Q.** What size wire was in the machine when it was operating at a thousand RPMs?
**A. I don't recall.**
**Q.** Was there wire in the machine when it was operating at a thousand RPMs?
**A. Yes.**
**Q.** Do you have a written result of your findings?
**A. No.**
**Q.** When did you do this testing on speed, on the Lead Long-manufactured AG-1500?
**A. I don't recall.**
**Q.** Have you sold a Lead Long-manufactured AG-1500 to anyone other than Aruvil?
**A. Yes.**
**Q.** To whom?
**A. I only know the location or locations, I do not have names of the customers.**
THE INTERPRETER: Again, the interpreter does not know whether the answer refers to singular or plural.
BY MR. ORLOFF:
**Q.** What are the locations?
**A. Middle East and Southeast Asia.**
**Q.** You've sold two machines or three machines altogether. One to Aruvil, one to the Middle East, and

one to Southeast Asia?
**A. No. Several.**
**Q.** How many in the United States?
**A. None.**
**Q.** Do you mean none other than the one to --
Well, who manufactured -- let me strike that question.
Who manufactured the AG-1500 that was sold to Aruvil?
**A. Lead Long.**
**Q.** When you referred to Southeast Asia, what country specifically?
**A. I don't recall.**
**Q.** Was it India?
**A. No.**
**Q.** Have you sold any machines to India?
**A. No.**
**Q.** Have you seen the AG-1500 manufactured by June-En?
**A. I have placed purchase order or purchase orders with June-En for the manufacturing of AG-1500.**
**Q.** Joanne? Who is Joanne?
**A. June-En.**
**Q.** Oh, June-En. Okay.
And to whom did you sell the June-En-produced

**Page 57**

1    AG-1500s?

2    A.   Many.

3    Q.   What is your best estimate of the number of

4 June-En-manufactured AG-1500s?

5    A.   **Approximately five or six.**

6    Q.   During what time period were these five or six

7 June-En-manufactured AG-1500 machines sold?

8    A.   **Prior to 2010.**

9    Q.   Okay. For how long prior to 2010?

10    A.   **I think between six or seven years.**

11    Q.   So is your best estimate approximately 2003 to

12 2010?

13    A.   **Not all the way to 2010. It was all the way**

14 **through the end of 2009.**

15    Q.   So is it accurate to say 2003 through 2009?

16    A.   **I think that might be a fair statement.**

17    Q.   Who did you sell the last one to? And let me

18 be specific. Who did you sell the last

19 June-En-manufactured AG-1500 to?

20    A.   **I don't recall.**

21    MR. CHAN: We need to take a break.

22    MR. ORLOFF: Sure.

23    (Recess.)

24    MR. ORLOFF: What was the last question?

25    (The previous question was read back

JONNELL AGNEW & ASSOCIATES

57

(800) 524-DEPO

**Page 58**

1 by the court reporter as follows:

2    "QUESTION: Who did you sell the

3 last one to? And let me be specific.

4 Who did you sell the last

5 June-En-manufactured AG-1500 to?")

6 BY MR. ORLOFF:

7    Q.   Who manufactured the AG-1500 which you sold to

8 Aruvil?

9    A.   **Lead Long.**

10    Q.   Did you discuss with anybody from Aruvil prior

11 to January 2010 who the manufacturer would be of the

12 AG-1500?

13    A.   **They never asked that.**

14    Q.   Did you ever tell anybody from Aruvil who the

15 manufacturer of the AG-1500 would be?

16    A.   **I never tell that to customers.**

17    Q.   What is the maximum blade speed capacity of

18 the June-en-manufactured AG-1500?

19    A.   **I don't remember.**

20    Q.   Does Exhibit 7 help you at all in refreshing

21 your recollection?

22    A.   **No.**

23    Q.   Is there an AG-1500 which has -- okay. Strike

24 that question.

25    Is there a manufacturer of an AG-1500 which

JONNELL AGNEW & ASSOCIATES

58

(800) 524-DEPO

**Page 59**

1 will produce a blade speed of 2500 RPM?

2    A.   **I can set the machine speed at 1500 RPM. As a**

3 **matter of fact, I can set the speed 1500 RPM on any**

4 **machine, any machine manufactured by any manufacturers.**

5 **The question is whether the machine can reach that speed**

6 **or not.**

7    Q.   Can the -- or is it -- okay. Strike that.

8    What machine can reach 1500 RPM?

9    A.   **Every machine can reach 1500 RPM. That is**

10 **merely a number, just a value shown over there.**

11    Q.   Can --

12    Which machines can reach 1500 RPM with wire?

13    A.   **I don't know.**

14    Q.   When you said that any machine can reach 1500

15 RPM, did you mean that it could reach that speed without

16 wire?

17    A.   **To reach 1500 RPM with wire requires two**

18 **conditions. Number one, the quality of the wire**

19 **material, and second is the operator's experience.**

20 **Without the two prerequisites, it's not reachable.**

21    Q.   What size wire will you need to reach 1500 RPM

22 on a Lead Long machine?

23    A.   **I have already told him that the maximum of**

24 **Lead Long is 1,000 RPM.**

25    Where did 1500 come from?

JONNELL AGNEW & ASSOCIATES

59

(800) 524-DEPO

**Page 60**

1    Q.   What size wire would you need to have in order

2 for a June-en-manufactured AG-1500 to operate at 1500

3 RPM?

4    A.   **I have already answered the question. It**

5 **requires the wire material quality and the operator's**

6 **experience. Without those, how can you do the testing?**

7    Q.   My question was specifically about the wire

8 quality.

9    What wire quality would you need to have in

10 order to operate at 1500 RPMs on a June-en-manufactured

11 AG-1500?

12    A.   **I don't know.**

13    Q.   Is there anyone else at Agape Industrial,

14 Inc., who would know the answer to that question?

15    A.   **No.**

16    Q.   Do you know whether there is -- strike that.

17    If there was a expert at operating the

18 June-en-manufactured AG-1500 and there was the right

19 type of wire, do you know if the June-en-manufactured

20 AG-1500 would be able to operate at a speed of 1500 RPM?

21    MR. CHAN: Objection; vague and ambiguous.

22    THE WITNESS: It's possible.

23 BY MR. ORLOFF:

24    Q.   What about the other manufacturer located in

25 the middle of Taiwan who manufactures AG-1500 with an

JONNELL AGNEW & ASSOCIATES

60

(800) 524-DEPO

1    expert operator and the right type of wire, could that
2    machine get up to 1500 RPM?
3        A.   How could I know the maximum speed of the
4    machine manufactured by the manufacturer located in the
5    middle of Taiwan?
6            MR. ORLOFF:  That didn't respond to my
7    question.  Objection; nonresponsive.
8    BY MR. ORLOFF:
9        Q.   Would you please answer the question?
10       A.   I don't know how to answer it.
11       Q.   Do you know the answer?
12       A.   I don't know the answer.
13       Q.   You testified that you don't know the maximum
14   speed of the -- for the manufacturer of the AG-1500 for
15   the company, the manufacturer located in the middle of
16   Taiwan and the manufacturer of the 1500.
17           AG-1500 by Lead Long has a maximum of 1,000
18   and the maximum of the June-En AG-1500 is -- can be up
19   to 1500.  Did that summarize your testimony accurately?
20       A.   1500 RPM is something set by people.  The
21   1,000 RPM from Lead Long-manufactured machine can -- I
22   can also change the setting to 1500 RPM.  And you're
23   talking about the manufacturer located in the middle
24   part of Taiwan.  It does not carry the AG-1500 because
25   AG-1500 is a model name of a product of Agape Industry.

JONNELL AGNEW & ASSOCIATES
61
(800) 524-DEPO

1        Q.   Does Agape Industry have a company located in
2    the middle of Taiwan manufacture an AG-1500 for it?
3        A.   No.
4        Q.   Are the only companies that manufacture or
5    have ever manufactured the AG-1500 for Agape Industry,
6    was that Lead Long and June-En?
7        A.   Correct.
8        Q.   With regard to the AG-1500, if you sold a
9    machine that had a blade speed in excess of 1,000, would
10   that not have been manufactured by June-En?
11           MR. CHAN:  Objection; incomplete hypothetical;
12   vague and ambiguous.
13           THE WITNESS:  I have already said repeatedly
14   that speed is something set by people.  I can tell the
15   company to set the speed at 700, 800, 900 or a thousand.
16   How could I determine just by the speed setting to tell
17   who the manufacturer is?
18   BY MR. ORLOFF:
19       Q.   There are only two manufacturers of the
20   AG-1500; one is Lead Long, the other one is June-En.
21   You testified that Lead Long has a maximum of 1,000 RPM
22   and June-En has a maximum of up to 1500.
23           If you sold a machine that was in excess of a
24   thousand RPM, would it not have been a
25   June-en-manufactured AG-1500?

JONNELL AGNEW & ASSOCIATES
62
(800) 524-DEPO

1            MR. CHAN:  Objection; vague and ambiguous.
2            THE WITNESS:  That's incorrect.
3    BY MR. ORLOFF:
4        Q.   What was incorrect about what I said?
5        A.   I have set machines manufactured by June-En at
6    1,000 RPM.
7        Q.   Have you set June-en-manufactured AG-1500
8    machines in excess of 1,000 RPM?
9        A.   In your question, you're asking about
10   exceeding 1,000; correct?
11       Q.   Yes.
12       A.   Yes, on some.  No, on the others.
13       Q.   My question was directed specifically at the
14   AG-1500 manufactured by June-En.
15           Have you operated an AG-1500 manufactured by
16   June-En in excess of a thousand RPM?
17       A.   I have already answered the question.  Yes, I
18   have set some machine at 1,000, and also I have set some
19   at 1200 or 1500 RPM.
20       Q.   When you say "some machines," were those
21   machines all June-en-manufactured AG-1500?
22       A.   Yes.
23       Q.   Okay.  What is the blade speed for production
24   capacity of ten gauge wire, two-inch mesh, two meters in
25   length at 240 meters squared per hour?

JONNELL AGNEW & ASSOCIATES
63
(800) 524-DEPO

1            MR. CHAN:  Objection; incomplete hypothetical.
2            THE WITNESS:  What are you asking?  Are you
3    asking about June-En machine or Lead Long machine?
4    BY MR. ORLOFF:
5        Q.   The AG-1500 in Exhibit 7 identifies a
6    producing capacity of ten-gauge wire at two-inch mesh
7    times two-meter length operating at 240 square meters
8    per hour.
9            What is the blade speed?
10           MR. CHAN:  Objection; lack of foundation;
11   misleading witness.
12           THE WITNESS:  I'm unable to answer.
13           MR. ORLOFF:  I offer counsel, Mr. Chan,
14   clarification in order to make this hypothetical more
15   complete in order to allay the objection.
16           What additional information is necessary for
17   this hypothetical?
18           MR. CHAN:  Counsel, you are the person
19   noticing the deposition.  It's for you to ask the
20   question, it's for the witness to provide his best
21   testimony.  I'm not here to provide you any assistance
22   in that regard other than urging your client to testify to
23   the best of his recollection and truthfully.
24           MR. ORLOFF:  But there was an objection as to
25   an incomplete hypothetical and also misleading the

JONNELL AGNEW & ASSOCIATES
64
(800) 524-DEPO

07/27/2012 04:10:53 PM                     Page 61 to 64 of 130                     16 of 33 sheets

| | |
|---|---|
| 1 | witness. I don't want to be misleading the witness or |
| 2 | to be presenting an incomplete hypothetical. We're |
| 3 | trying to get to the truth here, and this was the |
| 4 | representation that's in front of us from this page. If |
| 5 | you do not wish to ask a question, that's fine. |
| 6 | MR. CHAN: Counsel, I regret I'm not here to |
| 7 | ask questions or answer your questions. It's for you to |
| 8 | ask questions, it's for the witness to answer your |
| 9 | questions if he can to the best of his knowledge and |
| 10 | truthfully. |
| 11 | BY MR. ORLOFF: |
| 12 | Q.   Why haven't you taken down the Web site for |
| 13 | Agape Industry if you haven't been using it in the last |
| 14 | three years? |
| 15 | A.   I asked it to take it down. After that, I did |
| 16 | not check into it. So I don't know. |
| 17 | Q.   Who did you ask to have it taken down? |
| 18 | A.   I asked my Web designer to put it -- to say |
| 19 | it's under construction. |
| 20 | Q.   Do you still pay for the hosting of the Web |
| 21 | site? |
| 22 | A.   The Web site hosting is always five years each |
| 23 | time. |
| 24 | Q.   My question is not reservation of the name, |
| 25 | but of the annual hosting of the Web site? |

<div align="center">

JONNELL AGNEW & ASSOCIATES

65

(800) 524-DEPO

</div>

| | |
|---|---|
| 1 | A.   Yes. |
| 2 | Q.   When you were negotiating this contract with |
| 3 | Aruvil, were the negotiations all in English? |
| 4 | A.   Correct. |
| 5 | Q.   Did you ever use a translator to translate any |
| 6 | of the terms or at any point in time? |
| 7 | A.   No. |
| 8 | Q.   Who did you negotiate with from Aruvil? |
| 9 | A.   S.K. |
| 10 | Q.   Did you have any negotiation with Vilas |
| 11 | Kulkarni? |
| 12 | A.   Only till the very end. |
| 13 | THE INTERPRETER: I'm sorry. The interpreter |
| 14 | needs to change to "only at the very end." Thank you. |
| 15 | BY MR. ORLOFF: |
| 16 | Q.   When was the very end? |
| 17 | A.   I would think it was around -- now this is |
| 18 | approximation, I think it was approximately around |
| 19 | August 2009. |
| 20 | Q.   Other than S.K. and Vilas Kulkarni, was there |
| 21 | anyone else from Aruvil that you negotiated the contract |
| 22 | with? |
| 23 | A.   No. |
| 24 | Q.   Did you ever go to college? |
| 25 | A.   Yes. |

<div align="center">

JONNELL AGNEW & ASSOCIATES

67

(800) 524-DEPO

</div>

| | |
|---|---|
| 1 | A.   No. Ours was not paid annually. |
| 2 | Q.   Your name in Taiwan is Kuo En Lin; that's |
| 3 | correct? |
| 4 | A.   Correct. |
| 5 | Q.   And I notice that your middle name is En. |
| 6 | Does that have anything to do with the En in June-En? |
| 7 | A.   No. |
| 8 | Q.   Is that just a coincidence? |
| 9 | A.   Correct. |
| 10 | Q.   Who started June-En? |
| 11 | A.   I don't know. |
| 12 | Q.   How did you become the United States |
| 13 | representative of June-En? |
| 14 | A.   I already told you earlier. I worked at |
| 15 | June-En Taiwan from 1999 through whatever year that was. |
| 16 | Q.   But how did you become the representative in |
| 17 | the United States? |
| 18 | A.   Well, when I returned back to the U.S., they |
| 19 | told me that I could sell their machine. So I started |
| 20 | selling their machines. |
| 21 | Q.   What's your date of birth? |
| 22 | A.   August 12, 1956. |
| 23 | Q.   And when did you first start learning English? |
| 24 | A.   When I was in high school. |
| 25 | Q.   So in the early to mid '70s; is that correct? |

<div align="center">

JONNELL AGNEW & ASSOCIATES

66

(800) 524-DEPO

</div>

| | |
|---|---|
| 1 | Q.   Where did you go to college? |
| 2 | A.   Are you asking about where in Taiwan or where |
| 3 | in the U.S.? |
| 4 | Q.   Let's start off with Taiwan. |
| 5 | Where in Taiwan? What school did you go to in |
| 6 | Taiwan for college? |
| 7 | A.   Zhen Xiu Institute of Technology. |
| 8 | Q.   What did you study at Zhen Xiu? |
| 9 | A.   Electronics engineer. |
| 10 | Q.   What degree did you get from Zhen Xiu? |
| 11 | A.   I believe B.S., it was. |
| 12 | Q.   What school did you go to in the United |
| 13 | States, meaning university or college? |
| 14 | A.   Stevens Tech. |
| 15 | Q.   Where is Stevens Tech at? |
| 16 | A.   Hoboken New Jersey. |
| 17 | Q.   Is that Hoboken? |
| 18 | A.   Yes. |
| 19 | Q.   What did you study at Stevens Tech? |
| 20 | A.   Computer science. |
| 21 | Q.   And when you were at Stevens Tech, were all of |
| 22 | your studies done in English? |
| 23 | A.   Yes. |
| 24 | Q.   Where were you first employed? |
| 25 | A.   I have always been self-employed. |

<div align="center">

JONNELL AGNEW & ASSOCIATES

68

(800) 524-DEPO

</div>

**Page 69**

1  for Agape Industry; correct?
2  things.
3  A. Correct.
4  Q. And before Agape Industry you were working for
5  June-En Enterprise Taiwan; correct?
6  A. Correct.
7  Q. Where did you work before June-En Enterprise
8  in Taiwan?
9  A. New Jersey.
10  Q. What were you doing in New Jersey?
11  A. Restaurant.
12  Q. What were you doing in the restaurant?
13  A. Manager.
14  Q. What was the name of the restaurant?
15  A. There were so many, I can't recall them.
16  Q. You were a manager of many restaurants in New
17  Jersey?
18  A. Correct.
19  Q. Name one.
20  A. Hunan Garden.
21  THE INTERPRETER: Interpreter's spelling which
22  may not be the legal spelling, H-u-n-a-n.
23  BY MR. ORLOFF:
24  Q. When were you the manager of Hunan Garden?
25  A. Prior to 1998, all my work was related to
JONNELL AGNEW & ASSOCIATES
69
(800) 524-DEPO

**Page 71**

1  things.
2  Q. Were you continuously selling fencing machines
3  from 1998 until the present?
4  A. Correct.
5  Q. Was there somebody, or was there a company
6  that you worked for prior to working for Jun-En in
7  fencing machines?
8  A. I don't know what you are referring to. Are
9  you referring to when I was in Taiwan or when I was in
10  the U.S.? I -- I just don't know.
11  Q. You testified earlier that you worked at
12  June-En from about 1999 to 2004, and you also testified
13  that you worked up until approximately 1998 as a
14  restaurant manager. That left the gap of one year of
15  1998 to 1999. That is the year that I'm asking about.
16  MR. CHAN: Objection; misstating witness's
17  testimony.
18  THE WITNESS: There was no gap. After I
19  stopped being a restaurant manager, I started working
20  for Jun-En. There was no gap.
21  BY MR. ORLOFF:
22  Q. Who are the officers of Agape Industrial at
23  this time?
24  A. Myself, Peter Lin.
25
JONNELL AGNEW & ASSOCIATES
71
(800) 524-DEPO

**Page 70**

1  restaurant business.
2  Q. '98? Was it '98?
3  A. (Witness nods head.)
4  Q. Were you always a restaurant manager prior to
5  1998?
6  A. Correct.
7  Q. Were you a restaurant manager while you were
8  in school in Hoboken?
9  A. No.
10  Q. After you finished school, Stevens Tech --
11  When did you finish school at Stevens Tech?
12  A. I didn't finish.
13  Q. When did you last go to Stevens Tech?
14  A. I don't recall.
15  Q. What's your best estimate?
16  A. I don't recall exactly when it was. I would
17  think it was around 1984.
18  Q. So is it your testimony that from
19  approximately 1984 until 1998, you were a restaurant
20  manager?
21  A. Not a restaurant, many restaurants.
22  Q. How long were you at Hunan Gardens?
23  A. I don't recall.
24  Q. From 1998 until the present, were you
25  continuously selling fencing machines?
JONNELL AGNEW & ASSOCIATES
70
(800) 524-DEPO

**Page 72**

1  Q. Are there any other officers or are you the
2  only one?
3  A. Jan Hung.
4  Q. Is it J-a-n or G-i-n?
5  A. J-a-n.
6  Q. Okay. What is Jan Hung's position with Agape
7  Industrial?
8  A. I think secretary.
9  Q. You are the president of Agape Industrial?
10  A. Yes.
11  Q. Do you have any other position with Agape
12  Industrial?
13  A. Sales manager.
14  Q. Any other positions?
15  A. No.
16  Q. Are there only two officers of Agape
17  Industrial at this time?
18  A. Correct.
19  Q. Has that been the same since the company
20  started in March of 2009?
21  MR. CHAN: You know, Counsel, I --
22  Is that part of the topic that you designated
23  him?
24  MR. ORLOFF: We're identifying just the
25  positions with the company, just identifying.
JONNELL AGNEW & ASSOCIATES
72
(800) 524-DEPO

**Page 73**

```
 1   held?  But you didn't -- it's not part of the company as
 2   to the structure of the company and who's the officers.
 3   I don't believe you designated anything close to that.
 4        If you want to take his personal deposition,
 5   hey, I'm -- I'm -- it's fine with me.  But right now,
 6   it's person most knowledgeable, so I don't believe that
 7   the structure of the company is part of your -- part of
 8   the notice.
 9        MR. ORLOFF:  I understand what you're saying.
10   This is identifying what -- who had authority and what
11   authority was made.
12        MR. CHAN:  You can ask him what position he
13   holds and what authority he has, but that, I'm fine.
14   You know about the negotiation part, but -- but the rest
15   of the company or even who the shareholders and all the
16   structure, I don't believe you designated, so -- and I
17   mean you're talking about further taking his, you know,
18   continuing the deposition, so I just want to make sure
19   that's really necessary.
20        MR. ORLOFF:  It will be necessary.  There's a
21   lot of material that we're going to need to cover.
22        MR. CHAN:  Then limit it to the scope of your
23   notice.
24        MR. ORLOFF:  Okay.
```

JONNELL AGNEW & ASSOCIATES
73
(800) 524-DEPO

**Page 74**

```
 1   BY MR. ORLOFF:
 2        Q.  You testified earlier about Carlos Mayoka.
 3   What was his position?
 4        A.  Salesman.
 5        Q.  And what was Sergis's position?
 6        A.  Salesman.
 7        Q.  And --
 8        MR. CHAN:  Again, none of these people --
 9        If you have to, lay a foundation as to why
10   they're necessary to ask questions about all of the
11   employees.
12        MR. ORLOFF:  That will come with my next
13   question.
14        MR. CHAN:  I mean, if you can.
15        MR. ORLOFF:  I will.  I will.
16        MR. CHAN:  If you lay the foundation as to
17   whether these people have dealt with and acknowledged,
18   that's a different issue.
19        MR. ORLOFF:  That's my next question.  That is
20   my next question.  Just let me --
21        MR. CHAN:  All right.
22        MR. ORLOFF:  Allow me this.
23        MR. CHAN:  I would lay the foundation first
24   and show that it's necessary before we get into all the
25   details about all these people.  I don't know how far
```

JONNELL AGNEW & ASSOCIATES
74
(800) 524-DEPO

**Page 75**

```
 2        MR. ORLOFF:  Allow me to lay a foundation.
 3        MR. CHAN:  Yeah, okay.  Please.
 4   BY MR. ORLOFF:
 5        Q.  What was Estapa's position?
 6        A.  Salesman.
 7        Q.  Did either Carlos, Sergis, or Estapa have any
 8   contact with -- in selling product to Aruvil?
 9        A.  No.
10        Q.  What about Jan Hung?  Did Jan Hung have any --
11   have any dealings with -- in attempting to sell or in
12   selling anything to Aruvil?
13        A.  No.
14        Q.  Were you the only one who made representations
15   to anybody from Aruvil, as in direct representations?
16        MR. CHAN:  Objection; vague and ambiguous.
17        THE WITNESS:  Would you please repeat your
18   question, please?
19   BY MR. ORLOFF:
20        Q.  Are you the only person who made a direct
21   representation to anyone from Aruvil about the AG-1500?
22        A.  Yes.
23        Q.  What do you first represent, or when was the
24   first conversation about purchasing a machine from --
25   from Agape?
```

JONNELL AGNEW & ASSOCIATES
75
(800) 524-DEPO

**Page 76**

```
 1        MR. CHAN:  Objection; vague and ambiguous.
 2        THE WITNESS:  Please clarify.  With whom?
 3   BY MR. ORLOFF:
 4        Q.  Between you and anyone from Aruvil, the very
 5   first representation or communication?
 6        A.  Relating to selling the machine?
 7        Q.  Yes, the AG-1500.
 8        A.  I don't recall exactly.
 9        MR. ORLOFF:  I'd like to mark this next as
10   Exhibit 8.
11        (Defendants' Exhibit 8 was marked for
12        identification by the court reporter
13        and is attached hereto.)
14   BY MR. ORLOFF:
15        Q.  Did you receive this e-mail?
16        A.  Yes.
17        Q.  In the about two thirds of the way down, it
18   says:
19        "I expect that you remember us
20        from the various shows we have met at.
21        We would like your most competitive
22        quote for a new chain link weaving
23        machine to be installed in New Jersey
24        near our warehouse.  Can you or your
25        sales team give me a call to discuss
```

JONNELL AGNEW & ASSOCIATES
76
(800) 524-DEPO

**Page 77**

1   the requirements and the different

2   dies and accessories that will be

3   required along with the machine."

4       Was there a conversation or any call or any

5   communication regarding purchasing a machine before this

6   e-mail on July 13, 2009?

7     A.   Yes.

8     Q.   What was the substance of that conversation

9   that happened before this date?

10     A.   Well, on July 13th they send me an e-mail. So

11   based on that, we talked about what machine they want to

12   buy.

13     Q.   Now, my question was, was there anything

14   before this?

15     A.   I don't recall.

16     Q.   What was the quote that was sent?

17     A.   I don't recall.

18     Q.   Was it an invoice like this one right here?

19       MR. ORLOFF:  Let's call this next one

20   Exhibit 9.

21       (Defendants' Exhibit 9 was marked for

22       identification by the court reporter

23       and is attached hereto.)

24       MR. ORLOFF:  Exhibit 9 is three pages.

25       MR. CHAN:  What's the Bates stamp for this?

JONNELL AGNEW & ASSOCIATES

77

(800) 524-DEPO

**Page 78**

1   Is there a Bates stamp for this document?

2       MR. ORLOFF:  No, there wasn't.  There isn't a

3   Bates stamp.

4       MR. CHAN:  So was it produced to us?

5       MR. ORLOFF:  Yes.

6       MR. CHAN:  It was?  Okay.

7       MR. ORLOFF:  There's an e-mail in the original

8   production, and these were also these documents.  You

9   see, this is one of 78.  These were the e-mails which we

10   produced in our first production.

11       MR. CHAN:  Thanks.

12   BY MR. ORLOFF:

13     Q.   So do you have your response to this, the

14   question?

15     A.   Could you please repeat your question?

16       MR. ORLOFF:  Madam Court Reporter, would you

17   please repeat the question.

18       (The previous question was read back

19       by the court reporter as follows:

20         "QUESTION:  Was it an invoice

21       like this one right here?")

22       THE WITNESS:  No.

23   BY MR. ORLOFF:

24     Q.   Your attorneys produced this -- this document.

25   It's three pages, but it's not signed.  But it does look

JONNELL AGNEW & ASSOCIATES

78

(800) 524-DEPO

**Page 79**

1   have a little bit different thing some of the other ones.

2   This one obvious one is that the spacing invoice, the E

3   is carried over to the next line.  But is this -- was

4   this --

5       What is this document?

6     A.   From here, I can see that this is not the

7   first document.

8     Q.   What was the first document, or when was

9   this -- strike that question.

10       What was the significance of that document?

11     A.   This is only for them to look at.  It really

12   doesn't carry any significance.

13     Q.   Were there any changes made to this document

14   before the next one was signed?

15     A.   I don't recall.

16       MR. ORLOFF:  I'd like to mark this next one as

17   Exhibit 10.

18       (Defendants' Exhibit 10 was marked

19       for identification by the court

20       reporter and is attached hereto.)

21   BY MR. ORLOFF:

22     Q.   Three pages.  When was this document signed?

23     A.   I think it was signed sometime around the

24   middle of February in 2010.  When I say middle, I mean

25   between the 10th and the 20th.

JONNELL AGNEW & ASSOCIATES

79

(800) 524-DEPO

**Page 80**

1     Q.   Why do you recall it being somewhere in the

2   middle of February 2010?

3     A.   Because this was signed by myself and Vilas at

4   the Fencetech show.

5     Q.   This was signed --

6       Which Fencetech show?

7     A.   The 2010 Fencetech show.

8     Q.   Where at?

9     A.   I don't recall.

10     Q.   Do you not recall which city it was signed in?

11     A.   Fencetech show changes its show location every

12   year, so I don't recall where it was.

13     Q.   But you were present at the show in

14   February 2010; correct?

15     A.   Correct.

16     Q.   And was this in Las Vegas?

17     A.   I don't recall.

18     Q.   Is there only one Fencetech show per year?

19     A.   Correct.

20     Q.   And does it always happen -- occur in February

21   of each year?

22     A.   January or February.

23     Q.   Who is the manufacturer of this AG-1500?

24     A.   Lead Long.

25     Q.   Where on this document does it say Lead Long?

JONNELL AGNEW & ASSOCIATES

80

(800) 524-DEPO

**81**

1    Q.   That's not necessary.

2    Q.   Where does it say it on here?

3    A.   Why should I say it there?

4    Q.   This is a deposition for you to answer

5    questions.

6         Isn't it true that Lead Long is not identified

7    on here anywhere?

8    A.   The customer was having a business dealing

9    with Agape Industrial, not Lead Long.

10   Q.   Wasn't there another contract which was

11   previously signed with Agape Industry which looked

12   substantially similar to this?

13   A.   Yes.

14   Q.   Why was there a change from Agape Industry to

15   Agape Industrial?

16   A.   I already told you why earlier.

17   Q.   You did not answer the question or the answer

18   to this question.

19   A.   Agape Industry stopped doing business in 2009.

20   So when I started doing business with this company, I

21   asked them to sign a new contract with me.

22   Q.   But you said that there were contracts that

23   were already entered into that you completed in 2009.

24        Why didn't you complete the contract under

25   Agape Industry?

JONNELL AGNEW & ASSOCIATES

(800) 524-DEPO

---

**82**

1    A.   Because at the time they received something

2    from Jun-En about no longer.  For me, in order to save

3    trouble in the future, I explained the situations to

4    Vilas, and I asked Vilas to sign a new contract.  Vilas

5    agreed to it.  Had Vilas not agreed to resign, then this

6    would not have been resigned.

7    Q.   When was the machine delivered?

8         MR. CHAN:  He wants to take a break.

9         MR. ORLOFF:  Can we just go another ten

10   minutes and we'll call it a day at 5:00?

11        MR. CHAN:  Well, you know, we drive a long way

12   to here.  Now, if you got a -- you're going to do it

13   another day, then I'm going to insist we get done today

14   because I'm not going to drive, you know, all the way

15   from Palos Verdes to here.  And then because, you know,

16   this deposition today we're here ready to give you

17   deposition, you know, seven full hours.  We already

18   provide the deposition, so if you're going to terminate

19   it, then I'm going to let you recontinue, you know,

20   resume it.  So I'm going to have to insist that we

21   finish this seven hours today.

22        MR. ORLOFF:  If you want to go seven hours,

23   we'll go seven hours.

24        MR. CHAN:  Because if we can get it done

25   today, I don't want to come back again.  Besides, he's

JONNELL AGNEW & ASSOCIATES

(800) 524-DEPO

---

**83**

1    not going to be here again till Taiwan tomorrow.

2    That's why we rescheduled it today, if you remember

3    that.

4         MR. ORLOFF:  Let's go off the record.

5         (Recess.)

6         MR. ORLOFF:  I'd like to mark this next one as

7    Exhibit 11.  It is three pages.  And it has some other

8    writing on it.  Essentially, that's some of the amounts

9    are crossed out and changed.

10        (Defendants' Exhibit 11 was marked

11        for identification by the court

12        reporter and is attached hereto.)

13   BY MR. ORLOFF:

14   Q.   When was Exhibit 11 signed?

15        MR. CHAN:  Lack of foundation.

16        THE WITNESS:  At the end of August 2009.

17   BY MR. ORLOFF:

18   Q.   Did you meet --

19        Or is that your signature on page three?

20   A.   Yes.

21   Q.   Were you present with Mr. Vilas Kulkarni when

22   you signed this?

23        THE INTERPRETER:  Were you present when you

24   signed this?

25   ///

JONNELL AGNEW & ASSOCIATES

(800) 524-DEPO

---

**84**

1    BY MR. ORLOFF:

2    Q.   Were you present with Vilas Kulkarni when he

3    signed this?

4    A.   Yes.

5    Q.   And you signed it in his presence; is that

6    correct?

7    A.   Correct.

8    Q.   Where were you at when you signed it?

9    A.   I was in New York, the headquarters of Aruvil.

10   Q.   Now, was this -- this says "ProForma Invoice."

11        What does ProForma mean?

12   A.   That's the purchase order.  That's what we

13   meant in a purchase order or a contract.

14   Q.   Now, next to ProForma Invoice, it says

15   "final."  Was that on there when you signed the

16   agreement?

17   A.   No.

18   Q.   What about "plus extra set of dies."  Was that

19   on there when you signed it?

20   A.   No.

21   Q.   What about, it says signed copy part one, two

22   and three on each page.  Were those on the document when

23   you signed it?

24   A.   No.

25   Q.   And on page 2, there's -- 86,000 is crossed

JONNELL AGNEW & ASSOCIATES

(800) 524-DEPO

1 after that. Whose initials are that, do you know?

2 A. I made the change and I put the initial there.

3 Q. When was that change made?

4 A. At the time of signing. We made the changes

5 before we signed.

6 Q. Why did you have the name Agape Industry,

7 Inc., on this agreement?

8 A. Earlier on, I already said that prior to 2009,

9 most of the documents we send out used the name Agape

10 Industry, Inc., including quote invoices.

11 Q. Wasn't this a final contract?

12 A. Yes.

13 Q. What did you discuss with Vilas Kulkarni when

14 you got him to sign the second agreement identified in

15 Exhibit 10?

16 A. I don't recall everything in detail. However,

17 generally, I told him. And plus, he also received

18 something from Jun-En asking me no longer using this

19 name for business. Therefore, I told him that to avoid

20 future troubles, I have asked all contract to be changed

21 to this name, even though both companies are under my --

22 me. So I told him that I have already asked people to

23 change contracts to use Agape Industrial, for him to

24 sign this new agreement.

JONNELL AGNEW & ASSOCIATES

85

(800) 524-DEPO

---

1 Q. Did you state at any time that the contract in

2 Exhibit 11 was void?

3 A. I did not say it was voided.

4 Q. You had already ordered the machine to be made

5 back in August of 2009; is that correct?

6 A. Correct.

7 Q. And Exhibit 11 identifies that delivery time

8 is upon receipt of your down payment within 150 days.

9 Does that mean that you're going to have the

10 machine delivered within 150 days of receiving the down

11 payment?

12 A. Correct.

13 Q. And wouldn't that put it at approximately late

14 February when delivery should be made?

15 A. That's about the time.

16 MR. ORLOFF: I'd like to identify this next

17 one as Exhibit 12.

18 (Defendants' Exhibit 12 was marked

19 for identification by the court

20 reporter and is attached hereto.)

21 BY MR. ORLOFF:

22 Q. This identifies an invoice date of 8/26/09 but

23 the date on the check is 9/18/09; is that correct?

24 A. That's correct.

25 Q. So this identifies that delivery should have

JONNELL AGNEW & ASSOCIATES

86

(800) 524-DEPO

---

2 Or when did you -- when did you receive this?

3 A. I would think it was late September 2009.

4 Q. Within a few days after 9/18/09; is that

5 correct?

6 A. I think so.

7 Q. Doesn't that mean that delivery should have

8 been within five months of that date?

9 A. It is true that on the agreement it says

10 150 days. However, in practicality, normally speaking

11 when machines are delivered, there is always some kind

12 of delay.

13 Q. The machine should have been very close to

14 being finished in the middle of February of 2010;

15 correct?

16 A. Correct.

17 Q. Did you have any indication that your supplier

18 would not deliver the machine in mid February?

19 A. I don't recall any indications. At -- it was

20 expected to deliver between late February or early

21 March.

22 Q. Who did you order the machine from in August

23 or in September of 2009?

24 A. Lead Long.

25 Q. Did it make any difference to Lead Long that

JONNELL AGNEW & ASSOCIATES

87

(800) 524-DEPO

---

1 you had an agreement that said Agape Industry on the

2 top?

3 A. No.

4 Q. What did -- strike that.

5 Why not just go and finish this contract up

6 that you had through Agape Industry and finish it up in

7 February of 2010?

8 THE INTERPRETER: Repeat, please. I'm sorry.

9 I lost you.

10 BY MR. ORLOFF:

11 Q. Okay. Why did you not go ahead and finish

12 delivery of the machine and complete the contract on the

13 old August 26, 2009, contract?

14 MR. CHAN: Objection; vague and ambiguous.

15 THE WITNESS: I don't understand the question.

16 In my mind, what I did was really to follow up or to

17 follow the August 26th invoice by signing the

18 February 2010 invoice.

19 BY MR. ORLOFF:

20 Q. If you look at Exhibit 11, was there any

21 discussion at that time of how much it would be for

22 dies, or were the dies included in this price?

23 A. This price includes two sets of dies.

24 Q. Where does that say that in this contract?

25 A. Number 5.

JONNELL AGNEW & ASSOCIATES

88

(800) 524-DEPO

---

**Page 89**

```
 1  sets, it would be extra?
 2      A.   Correct. And that is the reason why S.K.
 3  wanted to add the writing here for one extra set of
 4  dies. At the time, I didn't tell him the price.
 5  Therefore, in the other invoice, I included the price
 6  for extra set.
 7      Q.   Is that the only difference between the two?
 8      A.   There's another difference in document
 9  number -- in Exhibit 11. You can see that only
10  percentage were specified. One is five percent and the
11  other 55 percent.
12           However, in Exhibit 10, the dollar amount was
13  calculated and specified. That being said, Exhibit 10
14  replaces Exhibit 11.
15      Q.   There's also something that says U.S. 37,330
16  before shipment.
17           Did Aruvil send you 37,330?
18      A.   No.
19      Q.   They sent you 25,000; correct?
20      A.   I think so.
21      Q.   Was there any discussion about changing it to
22  25,000?
23      A.   I told them about the requirement to make a
24  payment before shipment. As a matter of fact, I called
```

**Page 90**

```
 1  them. They kept on pushing it off. They kept on
 2  telling me that they needed the machine in a hurry.
 3  They also told me that they, being a big company, they
 4  would pay me. They never told me that they would short
 5  pay me.
 6           They kept on saying that they needed the
 7  machine in a hurry and they would pay me because they,
 8  being a big company, they would. However, by the time I
 9  received the check, I found out they short paid me.
10  They underpaid me. However, it was too late because the
11  machine was already shipped.
12      Q.   When was the machine shipped?
13      A.   I don't recall exactly when.
14           MR. ORLOFF: I'd like to mark this next one as
15  Exhibit 13.
16           (Defendants' Exhibit 13 was marked
17            for identification by the court
18            reporter and is attached hereto.)
19           MR. CHAN: Excuse me. Let us look at the
20  exhibit first, please.
21  BY MR. ORLOFF:
22      Q.   Did you take a look at this exhibit? Did you
23  receive this check from Agape, I mean, from Aruvil?
24      A.   Yes.
25      Q.   How long before this check came did -- was
```

**Page 91**

```
 2      A.   Repeat, please.
 3           MR. ORLOFF: Madam Court Reporter, can you
 4  please repeat the question?
 5           (The previous question was read back
 6            by the court reporter as follows:
 7            "QUESTION: How long before this
 8            check came did -- was Exhibit 10
 9            signed?")
10           THE WITNESS: Approximately 180 days.
11  BY MR. ORLOFF:
12      Q.   Is Exhibit 10 the final one?
13      A.   Yes.
14      Q.   So you're saying 180 days before this check
15  was signed, Exhibit 10 was signed?
16           MR. CHAN: Lack of foundation.
17           THE WITNESS: I don't know what you are trying
18  to ask.
19  BY MR. ORLOFF:
20      Q.   How long --
21           When did you receive the check, Exhibit 13?
22      A.   I believe it was early March.
23      Q.   And you had some discussions before this about
24  signing another agreement; correct?
25      A.   I don't know what you are talking about.
```

**Page 92**

```
 1           What another agreement?
 2      Q.   Exhibit 10. Wasn't Exhibit 10 signed in mid
 3  February 2010 at the trade show?
 4      A.   Yes.
 5      Q.   And about a month before that, there was an
 6  e-mail which came from Jun-En saying that you were no
 7  longer associated with Agape Industry; correct?
 8      A.   That's what they said. The e-mail was sent by
 9  them. It had nothing to do with me.
10      Q.   Did Vilas Kulkarni tell you anything about his
11  concerns when he met with you in February of 2010 about
12  getting the machine?
13      A.   He said he wanted the machine, and he asked
14  when it can be shipped.
15      Q.   Are you familiar with the production capacity
16  of the machine which you were selling to Aruvil?
17      A.   Yes.
18      Q.   The contract says 270 square meters per hour
19  by GI wire Number 10, two inch by two meters. Do you
20  know whether the machine that you shipped ever produced
21  at that capacity?
22      A.   Yes.
23      Q.   What testing did you do?
24      A.   The same testings.
25      Q.   Please describe what testing that was.
```

**Page 93**

```
 1    A.  using galvanized wire Number 10, two-inch mesh
 2   by two meters, and -- what they are in width, and then
 3   the production was 270 square meters per hour.
 4        Q.  Did you do the testing yourself?
 5        A.  No.
 6        Q.  Who did the testing?
 7        A.  Engineers at the plant.
 8        Q.  At which plant?
 9        A.  Lead Long.
10        Q.  And who is the engineer who did the testing?
11        A.  I don't recall.
12        Q.  Did you have the machine --
13            Or how much wire did you have, did you test
14   with in the machine?
15            How much wire did you test with the machine?
16        A.  I don't know.
17        Q.  When I say this machine, I'm talking about the
18   one actually shipped.
19            Did you have an engineer or somebody testing
20   the actual machine that was delivered before it was
21   actually put onto the -- onto the dock to be shipped
22   off?
23            MR. CHAN:  Objection; asked and answered.
24            THE WITNESS:  Before any machine is shipped,
25   we always have all testings done on the machine to be
```

**Page 94**

```
 1   shipped.
 2   BY MR. ORLOFF:
 3        Q.  What kind of hydraulic oil did you put into
 4   the machine before it was -- before it was ran in the
 5   test?
 6            MR. CHAN:  Objection; lack of foundation.
 7            THE WITNESS:  The answer is beyond my ability.
 8   BY MR. ORLOFF:
 9        Q.  Did you personally see the testing done on the
10   machine?
11        A.  I already answered.
12        Q.  You actually saw it yourself?  Did you see it
13   yourself, the testing?
14        A.  I already asked the same question earlier.  I
15   did not see it.
16        Q.  Do you have any knowledge about how many
17   square feet or square meters of material was produced of
18   fencing material in the test before it was sent?
19        A.  We always do a lot of the testings.  So now he
20   is asking how much was produced during the testings?
21            Well, we always test for the speed and the
22   machine's stability.  So to do those testings, I would
23   think it would be two rolls or plus of the wire
24   material.
25        Q.  You said you would think.
```

**Page 95**

```
 1        Do you know whether two rolls were produced?
 2        A.  First of all, let me make some clarification.
 3            My previous answer, I used the word two rolls
 4   plus in the material.  I was referring to the wire.  It
 5   would require wire anywhere between two to four rolls.
 6   But it sounds to me that you're asking about the
 7   finished product, but I was referring to the wire that
 8   would be used.
 9        Q.  How much finished product was produced in the
10   test of this machine that was actually shipped?
11        A.  I don't know.  I do know that two to four
12   rolls of wire would produce a lot, a lot of the finished
13   product.
14        Q.  Did you purchase or actually use two to four
15   rolls of wire in testing this particular machine?
16        A.  Yes.
17        Q.  Do you have any photos of that wire or that
18   mesh that was produced?
19        A.  No.  When we do testings, we don't only use
20   one gauge size.  For instance, if the machine is meant
21   for gauge 10, we would do testings, not just on 10.  We
22   would also do testings on gauge 9 or gauge 11.
23        Q.  What gauge wire did you test with on this
24   machine?
25        A.  Generally speaking, we use the three sizes, 9,
```

**Page 96**

```
 1   10, 11 or two of the three.
 2        Q.  If you were to take a look at the contract
 3   number -- Exhibit Number 10.  What is that word next to
 4   the Number 1?
 5        A.  You mean this?
 6        Q.  Yes.  What is that word?
 7        A.  "Specication."
 8        Q.  What is "specication"?
 9        A.  Specification.
10        Q.  That was just something I needed to clarify.
11            Is there any way that you would be able to
12   find out who actually got this machine to run at
13   270 meters -- square meters per hour using galvanized
14   wire 10-gauge making two-inch mesh two meters in length
15   or two meters in width?
16        A.  Yes.
17            MR. ORLOFF:  Madam Court Reporter, can you
18   leave a blank there for the name?
19            THE REPORTER:  Yes.
20            (Information requested: _____
21   _____
22   _____
23   _____.)
24   BY MR. ORLOFF:
25        Q.  And when you review the transcript, will you
```

**Page 97**

1   fill in the name of the person?

2     **A.**   **Engineer Yen, Y-e-n, can do it.**

3     **Q.**   He could do it, or he did do it?

4     **A.**   **He did it.**

5     **Q.**   Did Engineer Yen do this before it left from

6   Taiwan?

7     **A.**   **Being the chief engineer, generally speaking,**

8   **after engineers under him finished the testings, he**

9   **would always do a final testing.**

10     **Q.**   Did Mr. Yen report to you that he made this

11   particular machine run at 270 square meters per hour

12   using galvanized wire 10-gauge with two-inch mesh, two

13   meters wide prior to being shipped?

14     **A.**   **Yes. That's requirement before shipment.**

15     **Q.**   Did Mr. Yen, was he able to get the machine

16   running at the same capacity after it had been delivered

17   to Pennsauken, New Jersey?

18     **A.**   **Yes.**

19     **Q.**   Did you have Mr. Yen training the people from

20   Aruvil?

21     **A.**   **Yes.**

22     **Q.**   Mr. Yen doesn't speak English, does he?

23     **A.**   **Correct.**

24     **Q.**   You translated for him; correct?

25     **A.**   **Yes.**

JONNELL AGNEW & ASSOCIATES

97

(800) 524-DEPO

---

**Page 98**

1     **Q.**   Were the people from Aruvil, was it -- did you

2   understand that this was their first fencing machine?

3     **A.**   **Yes.**

4     **Q.**   And did you include --

5     Wasn't there training included as part of the

6   agreement?

7     **A.**   **Yes.**

8     **Q.**   Knowing that they didn't have any -- didn't

9   have a machine before, did you provide enough training

10   for them to be able to run the machine?

11     **A.**   **Yes.**

12     **Q.**   Was that all done in those five days of

13   training?

14     **A.**   **Yes.**

15     **Q.**   Did the training include how to make all of

16   the dies, the different dies work?

17     **A.**   **Repeat, please.**

18     MR. ORLOFF: Madam Court Reporter, can you

19   please repeat the question.

20     (The previous question was read back

21     by the court reporter as follows:

22     "QUESTION: Did the training

23     include how to make all of the dies,

24     the different dies work?")

25     THE WITNESS: We don't train them on how to

JONNELL AGNEW & ASSOCIATES

98

(800) 524-DEPO

---

**Page 99**

1   work on all different dies. However, we do teach them,

2   train them on how to change dies and how to get it to

3   operate. We would make sure repeatedly they know how to

4   change dies. Because if there are ten different dies,

5   then there's no way you can teach all ten in five days.

6   BY MR. ORLOFF:

7     **Q.**   What are the increments that the mesh goes up

8   by? Meaning, does it go up by quarter inch, half inch,

9   whole inches? What does it go up by?

10     **A.**   **That all depends on the customer's**

11   **determination on market requirement.**

12     **Q.**   There were four dies delivered; correct?

13     **A.**   **Correct.**

14     **Q.**   Did you teach on all four of those dies?

15     **A.**   **Earlier on, I already said that we don't teach**

16   **them on all different dies. We do teach them how to**

17   **change the dies.**

18     **Q.**   Did you teach on more than one die?

19     **A.**   **Of course.**

20     **Q.**   How many did you teach on?

21     **A.**   **I don't recall.**

22     **Q.**   Did you ever have any reports of complaints

23   about the machine working?

24     MR. CHAN: Objection; vague and ambiguous.

25     THE WITNESS: Reports from where?

JONNELL AGNEW & ASSOCIATES

99

(800) 524-DEPO

---

**Page 100**

1   BY MR. ORLOFF:

2     **Q.**   Did you have any reports from somebody from --

3   or anybody from Aruvil that the machine which was

4   delivered, the AG-1500, had problems?

5     **A.**   **S.K. wrote something to me.**

6     **Q.**   Only one time?

7     **A.**   **There were a few times. He also called me.**

8     **Q.**   Did you ever get the machine working to his

9   satisfaction?

10     **A.**   **Well, we had already taught them on how to use**

11   **the machine, we had already provided the training to**

12   **them. However, they failed to pickup the skills on how**

13   **to use the machine. So I told him that in order for me**

14   **to retrain them, they will have to pay extra. So they**

15   **thought about it, and they did not respond.**

16     **Q.**   Did S.K. complain to you about the twisting

17   and knuckling system?

18     **A.**   **He did.**

19     **Q.**   And what did you make of his complaints?

20     **A.**   **I told him that twisting and knuckling is a**

21   **result of difference in wire material characteristics**

22   **such as the hardness and the nature of the raw material.**

23     **I told him to overcome the problem, one will**

24   **need to gradually adjust the machine. I told him that**

25   **it takes a lot of time, and that's the only way to**

JONNELL AGNEW & ASSOCIATES

100

(800) 524-DEPO

---

**Page 101**

```
1    overcome it.
2        Q.  What is the basis of your knowledge for saying
3    that?
4        A.  Based on my experience.
5        MR. CHAN:  I ask him whether he need a break.
6    He seems to be tired, but --
7        MR. ORLOFF:  No.  I think I need a break.
8        MR. CHAN:  Okay.  All right.
9        (Recess.)
10       MR. ORLOFF:  Before I forget, I'd like to
11   attach this next document as Exhibit 14.  This is the
12   notice of the deposition.
13       (Defendants' Exhibit 14 was marked
14       for identification by the court
15       reporter and is attached hereto.).
16   BY MR. ORLOFF:
17       Q.  Did you receive this?
18       A.  Yes.
19       Q.  And starting on page 4 it asks for several
20   documents to be produced.
21       Have you looked at these?
22       A.  Yes.
23       Q.  What documents do you have to be produced?
24       A.  I have produced everything that I need to
25   produce.
```

**Page 102**

```
1        Q.  You identified earlier in one of the breaks
2    that you have some text messages.
3        A.  Yes.  I will be send that to Steven, or they
4    will be transferred to you.
5        MR. CHAN:  Well, you already tried to send it.
6        THE WITNESS:  I forwarded it to you.  I don't
7    know if you received or not.  If not, I could --
8        MR. CHAN:  I got it.
9        MR. ORLOFF:  I have not received it.
10       THE WITNESS:  Okay.  When I get back, I try --
11       MR. CHAN:  I forward it to you.
12       THE WITNESS:  -- to forward it to you.  Okay.
13   BY MR. ORLOFF:
14       Q.  Other than those text messages, are there any
15   other documents that you have that have not yet been
16   produced?
17       A.  No.
18       Q.  What efforts did you take to repair the
19   machine after it was delivered to Aruvil?
20       MR. CHAN:  Objection; lack of foundation.
21       THE WITNESS:  There was no so-called repair.
22   BY MR. ORLOFF:
23       Q.  Did you receive reports of the machine jamming
24   up?
25       A.  Had there been any jamming up incidents, that
```

**Page 103**

```
1    would not be called repair.  That will be just for the
2    machine to be adjusted, and that would be due to their
3    failure in adjusting the machine correctly.  Sometimes
4    jamming up is normal.  That happens due to the
5    difference in wire thickness.  And also the quality of
6    the wire.
7    BY MR. ORLOFF:
8        Q.  Did you see the wire that Aruvil was using
9    when you went to look the machine in April of 2010?
10       A.  Yes.
11       Q.  Did you see any problems with the wire they
12   were using?
13       A.  The quality wasn't that good.
14       Q.  How can you tell?  What was wrong with the
15   quality?
16       A.  From the appearance and from the simple
17   testings we do, like, twisting it.
18       MR. ORLOFF:  I'd like you to take a look at
19   next exhibit, which I will be marking as Exhibit 15.
20   It's two pages.
21       (Defendants' Exhibit 15 was marked
22       for identification by the court
23       reporter and is attached hereto.)
24       MR. ORLOFF:  It's an e-mail at the bottom of
25   the page dated 19, August, 2009.  And it's from
```

**Page 104**

```
1    skulkarni to -- it says info@agapeindustry.com.
2    BY MR. ORLOFF:
3        Q.  Did you receive this e-mail?
4        MR. CHAN:  I'm sorry.  August?  Whatever here,
5    this is July.  Oh, I see.  August 19th.
6        MR. ORLOFF:  Yes.
7        MR. CHAN:  All right.
8    BY MR. ORLOFF:
9        Q.  In this, did this e-mail change any of the
10   terms of the agreement?
11       THE WITNESS:  Well, I don't know what you are
12   asking.  In this e-mail, I see that he was asking me
13   whether we can do the things he listed, and he was
14   waiting for us to respond.
15   BY MR. ORLOFF:
16       Q.  There's a -- it says:
17           "Can you expedite the delivery of
18           the machine."
19       Did you have that as a term of the agreement?
20       A.  I told him that I could try to expedite it,
21   but I couldn't promise that would be able to happen
22   because a lot of things would take time.  For instance,
23   the heat treatment, that kind of processing requires
24   time.  I told him that if you want a good machine,
25   you'll have to give me time.  Because without enough
```

**Page 105**

1  time), the machine will not be a good machine.

2  MR. ORLOFF: I'd like to take a look at

3  this next exhibit. This one is asking for --

4  Take a look at this next document.

5  MR. CHAN: Excuse me. Let me finish looking

6  over. If I'm not done, I'm sure the witness is not.

7  (Defendants' Exhibit 16 was marked

8  for identification by the court

9  reporter and is attached hereto.)

10  THE REPORTER: What number was that?

11  MR. ORLOFF: I think it's Number 16.

12  MR. CHAN: We're ready.

13  BY MR. ORLOFF:

14  Q. Okay. S.K. was asking you, it says to send

15  the contact info of your existing customers in the U.S.

16  and Canada and your reference was Sean Sylvester, Mills

17  Industrial Supply; is that correct?

18  MR. CHAN: Objection; foundation; document

19  speaks for itself.

20  THE WITNESS: Well, that's what it says on the

21  document.

22  BY MR. ORLOFF:

23  Q. Did you provide the name Sean Sylvester?

24  A. Yes.

25  Q. In what capacity do you know Sean Sylvester?

JONNELL AGNEW & ASSOCIATES

105

(800) 524-DEPO

**Page 106**

1  A. Reference.

2  Q. How do you know him?

3  A. My customer. He was my customer.

4  Q. Do you consider him knowledgeable about chain

5  link weaving machines?

6  A. He was quite familiar with this machine.

7  Q. What kind of machine did Sean Sylvester have?

8  A. AG-1500.

9  Q. And who was the manufacturer of the AG-1500

10  that Sean Sylvester had?

11  A. Jun-En.

12  Q. Did you find it necessary to invite

13  Mr. Sylvester to Aruvil's Pennsauken, New Jersey's

14  warehouse?

15  MR. CHAN: Objection; lacks foundation; vague

16  and ambiguous.

17  THE WITNESS: Repeat again, please.

18  MR. ORLOFF: Madam Court Reporter, would you

19  please repeat the question.

20  (The previous question was read back

21  by the court reporter as follows:

22  "QUESTION: Did you find it

23  necessary to invite Mr. Sylvester to

24  Aruvil's Pennsauken, New Jersey's

25  warehouse?")

JONNELL AGNEW & ASSOCIATES

106

(800) 524-DEPO

**Page 107**

1  THE WITNESS: Well, because it was very cold.

2  There were weather-related issues because they were near

3  Canada. It was quite cold. So I told Vilas about it.

4  I told Vilas it was weather-related, but Vilas did not

5  believe me. So I asked Sean to talk to them about it.

6  BY MR. ORLOFF:

7  Q. Why would Sean Sylvester come down? Why would

8  you ask him to come down? Was it just because of the

9  weather, or did it have something to do with the machine

10  that was at Aruvil?

11  MR. CHAN: Objection; compound; asked and

12  answered.

13  THE WITNESS: I asked Sean to come down here.

14  Not because of machine issues, it was because of people

15  issues. It's only because of people issues. That's why

16  I asked Sean to come down here to help me.

17  BY MR. ORLOFF:

18  Q. What were the people issues?

19  A. Well, first, in March, an engineer was invited

20  to go to Aruvil. However, because that engineer was not

21  so specialized in that, therefore, that engineer was not

22  able to complete the training. Therefore, I asked Sean

23  to come down here to help to assist and to teach, to

24  transfer his experience to people at Aruvil.

25  Q. Did it make a difference that he was -- that

JONNELL AGNEW & ASSOCIATES

107

(800) 524-DEPO

**Page 108**

1  Sean Sylvester was training on a Jun-En -- was training

2  on a Lead Long machine when his experience was on a

3  Jun-En machine?

4  A. There were some differences; however, there

5  were some similarities too.

6  MR. ORLOFF: I'd like you to take a look at

7  the next exhibit which we're going to mark as Number 17.

8  (Defendants' Exhibit 17 was marked

9  for identification by the court

10  reporter and is attached hereto.)

11  BY MR. ORLOFF:

12  Q. Whose -- what's the date on this document?

13  A. August 11th, 2011, -- 2010, sorry.

14  Q. And who is it from?

15  A. Sean.

16  Q. Is that the same Sean Sylvester we were

17  talking about just a minute ago?

18  A. Yes.

19  Q. And this was --

20  This is one of your e-mails that you received

21  from him; correct?

22  A. Yes.

23  Q. This identifies that there's a problem with

24  the wire bending. Was there --

25  Do you know what the issue was regarding the

JONNELL AGNEW & ASSOCIATES

108

(800) 524-DEPO

1 wire being bent.

2     MR. CHAN:  Objection; lack foundation.

3     THE WITNESS:  I don't know.  That's what he

4 said.

5 BY MR. ORLOFF:

6     Q.  Were you aware of the importance of the bend

7 that was created by the forks?

8     A.  I don't know.  That's what he said.  That's

9 what he was thinking.  That's his opinion.

10     Q.  How important is the formation of the bend in

11 the wire, in the cut wire so that the wire weaves

12 consistently?

13     MR. CHAN:  Objection; vague and ambiguous;

14 lacks foundation.

15     THE WITNESS:  To me, there was no problem with

16 the machine, and I don't really quite understand what he

17 was talking about.  Being the CFO, his information came

18 from Chris.  Therefore, information was relayed back and

19 forth, so I really don't quite understand what he was

20 talking about.

21     To me, there was no problem with the machine.

22 BY MR. ORLOFF:

23     Q.  Who is Chris?

24     A.  Chris is Sean's operator located in Canada.

25     Q.  When this e-mail was written, was Sean

JONNELL AGNEW & ASSOCIATES

109

(800) 524-DEPO

---

1     Q.  Did you ever send or provide any drawings or

2 any new designs to Aruvil for better performing forks?

3     MR. CHAN:  Objection; lacks foundation.

4     THE WITNESS:  There was only one drawing.

5     If you're asking me about providing drawings

6 to them, there was just that one.  There was no more

7 improved drawings or designs.

8 BY MR. ORLOFF:

9     Q.  Why not?

10     A.  They didn't ask for it from me.

11     Q.  But you knew that there was problems with the

12 forks; correct?

13     A.  I don't believe that.  I never said there were

14 problems with the forks.

15     Q.  Do you disagree with Chris and Sean that there

16 were problems with the forks?

17     A.  I don't know what they were saying.  I don't

18 understand what they were saying.

19     Q.  Did you send an e-mail to follow up asking

20 what they were talking about?

21     A.  To whom?

22     Q.  To Sean.

23     A.  I don't need to discuss with him.

24     Q.  Sean was helping out Aruvil to get the machine

JONNELL AGNEW & ASSOCIATES

111

(800) 524-DEPO

---

1 Sylvester in Aruvil's Pennsauken, New Jersey facility?

2     A.  No.

3     Q.  Was Chris in Pennsauken?

4     A.  Yes.

5     Q.  So Chris went down to Pennsauken from Canada?

6     A.  Yes.

7     Q.  Did you send or provide Aruvil with new or

8 improved forks?

9     A.  I don't recall.  When Chris went to their

10 facility, they were thinking about having us send our

11 engineers over there as well.  I said that will be fine.

12 However, they would have to pay the training fees.  But

13 they didn't want to do that.

14     Therefore, they talk to Sean, so Sean sent

15 Chris, their operator, to meet with them.

16     However, Chris was more familiar with his

17 machine.  For him to train people on a different

18 machine, Sean could only do his best.

19     Correction.  Not training fee.  But they -- I

20 told them for me to send engineers to train them, they

21 would have to pay the expenses related to the training.

22 BY MR. ORLOFF:

23     Q.  Expenses meaning flight and hotel?

24     A.  And wages at $300 per day.

25     Q.  The engineer works at $300 per day?

JONNELL AGNEW & ASSOCIATES

110

(800) 524-DEPO

---

1 working and to get them to try to make the machine work

2 and they identified a problem with the forks.  Did you

3 just ignore this as if it wasn't a problem?

4     MR. CHAN:  Objection; lacks foundation.

5     THE WITNESS:  I did not ignore it.  I told

6 them that this is something that we could handle it.  I

7 told them that you should use your existing forks and

8 gradually try to adjust it.  You already have the basic

9 theory.  The basic theory is all the same.  You just

10 need to gradually adjust it yourself.

11 BY MR. ORLOFF:

12     Q.  Did you explain how to adjust it?

13     A.  They knew how to adjust it.

14     Q.  That's not what I asked.  Would you answer the

15 question?

16     A.  Please repeat your question.

17     MR. ORLOFF:  Madam Court Reporter, would you

18 please repeat the question.

19     (The previous question was read back

20     by the court reporter as follows:

21     "QUESTION:  Did you explain how

22     to adjust it?")

23     MR. CHAN:  Objection; vague and ambiguous.

24 BY MR. ORLOFF:

25     Q.  Do you understand the question?

JONNELL AGNEW & ASSOCIATES

112

(800) 524-DEPO

---

1    A.  I don't know how to answer it.

2    Q.  Did you explain to Sean Sylvester on how to

3    adjust the forks?

4    A.  I told Sean that last time when you were in

5    New Jersey, you already saw how our engineer adjust the

6    forks. So you go ahead, tell Chris how to adjust the

7    forks based on what you saw.

8        MR. CHAN:  Would you -- time out. I need to

9    lower the blind because it's blinding me. I'm sure

10   there's a way to lower the blind. Thank you.

11       (A discussion was held off the record.)

12       MR. ORLOFF:  Can I have the last question?

13       (The previous question was read back

14       by the court reporter as follows:

15       "QUESTION:  Did you explain to

16       Sean Sylvester on how to adjust the

17       forks?")

18   BY MR. ORLOFF:

19   Q.  Did you feel confident that Sean Sylvester

20   knew how to adjust the forks?

21   A.  Sean was in Canada at the time Sean was the

22   CFO of the company. Sean send Chris over there.

23       However, Chris was not our trainer and Chris

24   only had the experience using his machine. There was no

25   way I could do when Chris wanted to give his feedback to

                    JONNELL AGNEW & ASSOCIATES

                              113

                        (800) 524-DEPO

1    Sean. There. There was nothing I could do about him giving his

2    feedback. But that was only based on his experience

3    using his machine.

4    Q.  How much different is the Jun-En-manufactured

5    AG-1500 from the Lead Long-manufactured AG-1500?

6    A.  It's different at the location of the forks,

7    which is for the -- the scissors. Because that is

8    different. Therefore, he could only use what he knew to

9    try to solve the problem.

10   Q.  That doesn't quite answer my question.

11       How does the Lead Long machine differ from the

12   Jun-En machine?

13   A.  But I have already answered.

14   Q.  I see that you were doing something with your

15   hands. Can you explain what you're --

16   A.  The forks. The only difference is at the

17   forks.

18   Q.  Did they have a different system as one being

19   a pull system and the other being a push system?

20   A.  No. That's not true.

21   Q.  Okay. When they're feeding the wire, do both

22   systems have a push system?

23       MR. ORLOFF:  Objection; vague and ambiguous.

24       THE WITNESS:  I don't understand what you're

25   saying.

                    JONNELL AGNEW & ASSOCIATES

                              114

                        (800) 524-DEPO

1        BY MR. ORLOFF:

2    Q.  There's --

3        There are basically two different types of

4    systems when the wire is -- is made to go through --

5    through the -- through the systems that each one creates

6    half of a link.

7        Did they both have a push system or both have

8    a pull system or did one have -- pull the wire and the

9    other one pushes the wire?

10       MR. CHAN:  Objection; lacks foundation; vague

11   and ambiguous.

12       THE WITNESS:  I don't understand his question.

13   The push, the pull, the wire. I don't understand it. I

14   have never heard that in feeding the wire through the

15   system. I've never heard the term push or pull being

16   used.

17   BY MR. ORLOFF:

18   Q.  Did you inform Aruvil of this problem with the

19   forks?

20       MR. CHAN:  Objection; lacks foundation.

21       THE WITNESS:  There was no problem with the

22   forks, so why should I?  When do I --

23       Why should I tell them anything.

24       MR. ORLOFF:  I'd like you to take a look at

25   this next exhibit, Number 18.

                    JONNELL AGNEW & ASSOCIATES

                              115

                        (800) 524-DEPO

1        (Defendants' Exhibit 18 was marked

2        for identification by the court

3        reporter and is attached hereto.)

4    BY MR. ORLOFF:

5    Q.  Did you receive this?

6        MR. CHAN:  Could you please let me finish

7    going over it with the witness?  Over the rest.

8        MR. ORLOFF:  Sure. Take your time.

9    BY MR. ORLOFF:

10   Q.  Have you reviewed this e-mail or this

11   document?

12   A.  Yes.

13   Q.  And did you receive this on or about June 3rd,

14   2010?

15   A.  I don't really recall.

16   Q.  Did this picture with the explanation and all

17   the writing attached, was it attached to this letter

18   when it was sent to you?

19       MR. ORLOFF:  Objection; lacks foundation.

20       THE WITNESS:  To my recollection, this page

21   was sent over by a fax. I'm referring to this page.

22   BY MR. ORLOFF:

23   Q.  Were they both sent at the same time?

24       MR. ORLOFF:  Objection; lacks foundation.

25       THE WITNESS:  I already said, I only recall

                    JONNELL AGNEW & ASSOCIATES

                              116

                        (800) 524-DEPO

**117**

```
1   receiving this page.
2   BY MR. ORLOFF:
3       Q.  You only recall receiving which page?  The
4   first page or the second page?
5       A.  The second page.
6       MR. ORLOFF:  Okay.  And do you mind if we
7   separate these two into two different exhibits, Counsel?
8       MR. CHAN:  These were produced to us at the
9   beginning because I don't see a Bates stamp and they
10  don't look like an e-mail.
11      MR. ORLOFF:  Take a look at what was sent to
12  you by e-mail.  I e-mailed it to your office, I don't
13  know, when we had our exchange of exhibits.
14      MR. CHAN:  This is not an e-mail, 19.
15      MR. ORLOFF:  We'll call it, the second one,
16  19, Exhibit 19.
17      (Defendants' Exhibit 19 was marked
18          for identification by the court
19          reporter and is attached hereto.)
20  BY MR. ORLOFF:
21      Q.  Take a look at Exhibit 19.  It says:
22          "The twist knuckle equipment is
23      faulty."
24          This looks like some problems being expressed
25  by S.K. of Aruvil.
```

JONNELL AGNEW & ASSOCIATES

(800) 524-DEPO

**118**

```
1   What was your response to this?
2       MR. ORLOFF:  Objection; lacks foundation.
3       THE WITNESS:  This is something he wrote and a
4   lot of it involves technology.  I was not there.  He
5   wrote it.  Therefore, a lot of things he -- that's
6   written in this page is something that I didn't know.
7   BY MR. ORLOFF:
8       Q.  Did you not understand this even as an
9   electrical engineer?
10      A.  Electrical and mechanical are totally
11  separate.
12      Q.  Do you know what a cam is?
13      A.  I don't.
14      Q.  Do you know what it means that the -- where it
15  says the finger does not grab wire?
16      A.  I do.  When we were there, we taught them in
17  full how to grab the wire.  However, they didn't learn
18  when we tried to teach them.  We taught them in full,
19  but they didn't learn.
20          What else can I do?
21      Q.  Did you understand the word "finger" here to
22  mean a finger on a person's hand?
23      A.  A finger of a machine.
24          How could it be a finger off a person's hand?
25      Q.  What does --
```

JONNELL AGNEW & ASSOCIATES

(800) 524-DEPO

**119**

```
1       Q.  Or how is the finger to be adjusted?
2       A.  There is special knob for adjustment.
3       Q.  So did you understand that the knuckling gets
4   stuck every six or seven knuckles?
5       A.  When it gets stuck, that means the adjustment
6   is not correct.  So one needs to go to make the
7   adjustment.
8       Q.  Well, once the adjustment is done, you would
9   just need to do it one time for the knuckling, would it
10  not be?
11      A.  That's not true.
12      Q.  How often would the knuckling need to be
13  adjusted?
14      A.  It needs to be adjusted to the correct
15  position.
16      Q.  Did you explain what the correct position was
17  for the knuckling?
18      A.  Each position could be potentially a correct
19  position.  They all need to be adjusted based on the
20  characteristics of the wire and the diameter of the
21  wire.
22      Q.  Did you explain how to adjust to the -- to the
23  people at Aruvil?
24      A.  When we were there, we taught them everything
25  about the adjustment including how to adjust the machine
```

JONNELL AGNEW & ASSOCIATES

(800) 524-DEPO

**120**

```
1   to them.
2       Q.  When you and Mr. Yen left after that first
3   visit, was the machine working consistently?
4       A.  Yes.
5       Q.  Now, this Exhibit 18, you received this;
6   correct?
7       MR. CHAN:  Objection; lacks foundation; asked
8   and answered.
9       THE WITNESS:  I already answered the question.
10  BY MR. ORLOFF:
11      Q.  When you received it, did it have all the
12  other writing on it?
13      MR. CHAN:  Objection; misstating witness's
14  testimony.
15      THE WITNESS:  I don't know why you are saying
16  things like that.  I already told you I have never
17  received this document.
18  BY MR. ORLOFF:
19      Q.  Okay.  Have you ever talked to S.K. about
20  problems with the machine in terms of them trying all
21  the different combinations of the worms, and the feed
22  rollers, tensions, and weaving blade positions?
23      MR. ORLOFF:  Objection; compound; also lacks
24  foundation.
25      THE WITNESS:  We taught them everything in
```

JONNELL AGNEW & ASSOCIATES

(800) 524-DEPO

**Page 121**

1  BY MR. ORLOFF:
2  Q.  I asked if you ever recall S.K. complaining?
3  MR. CHAN:  Objection; vague and ambiguous.
4  THE WITNESS:  No.  I don't recall.
5  MR. ORLOFF:  It's 7:30 at this time.  And I'd
6  like to suspend the deposition at this time for the
7  evening and to resume at another time that's mutually
8  agreeable to everybody.
9  I offer the following stipulation:  That the
10  court reporter be relieved of her duties under the Code
11  with regard to maintaining the original; that the
12  original be sent to counsel for the deponent; that the
13  deponent be given an opportunity of two weeks to review
14  the transcript; and that in the event -- and to make any
15  changes and fill in any blanks and return that within
16  two weeks of receiving the -- the transcript; and that
17  in the event the original is lost, or unavailable for
18  whatever reason, that a certified copy can be used in
19  its stead.
20  MR. CHAN:  I would agree to the usual
21  stipulation of 30 days, not two weeks.  We need to go
22  through it and probably have to translate into Chinese
23  for him.  And he will be out of town, out of the
24  country.

JONNELL AGNEW & ASSOCIATES
121
(800) 524-DEPO

**Page 122**

1  And so, Court Reporter, when do you think you
2  may be able to give us the transcript?  We will need the
3  time.
4  THE REPORTER:  Ten business days.
5  MR. ORLOFF:  Presuming we get our continuance
6  tomorrow, which I don't see why we wouldn't, I don't
7  have a problem with 30 days.  So stipulated.
8  MR. CHAN:  Well, if we can't get a continuance
9  we can talk.  But now, as for now, I'd be willing to
10  stipulate to the usual 30 days.
11  MR. ORLOFF:  Okay.  So stipulated with the
12  caveat that it's 30 days instead of two weeks.
13  MR. CHAN:  Thank you.
14  MR. ORLOFF:  And just for clarification of the
15  record, we are not in agreement with that this whole
16  deposition is subject to attorneys' eyes only.  I
17  understand counsel's position in this, and we will take
18  this up separately.
19  MR. CHAN:  And also, as I said, we are willing
20  to stay behind to finish the deposition as well.  So if
21  you so wish, we are ready and willing to finish with the
22  deposition tonight.  I understand the court reporter's
23  willing to stay later, and I think our most valuable
24  interpreter is also willing to stay late.  And so I --
25  you know, and I'm willing to stay late.  And I

JONNELL AGNEW & ASSOCIATES
122
(800) 524-DEPO

**Page 123**

2  So -- so I would like to continue and finish
3  the deposition.  I wouldn't want to continue it.
4  MR. ORLOFF:  I understand.  I'm not able to at
5  this time.
6  MR. CHAN:  Well, then I wouldn't -- I wouldn't
7  stipulate to the suspension of the deposition.  So if
8  you want to terminate it, we'll terminate it.  But if
9  you suspend it, I disagree with the suspension.  We are
10  ready and willing to continue until the deposition is
11  done.  I would hope that the Court will agree to
12  continue the trial, and -- but I -- I really --
13  You know, if the Court is willing to continue
14  the trial, I think it will be easier for everybody.
15  Unfortunately, we don't know at this time, and I don't
16  want to suspend it.  I really would prefer we continue
17  and get it over with.
18  MR. ORLOFF:  It's not practical.  There's too
19  much material for me to be going through to be finishing
20  up tonight, and I'm not going to be able to do this
21  tonight.  It is unreasonable as it is -- it's after
22  7:30, and it's reasonable to suspend at this time.
23  MR. CHAN:  We'll have to agree to disagree
24  then.
25  MR. ORLOFF:  We can go off the record.

JONNELL AGNEW & ASSOCIATES
123
(800) 524-DEPO

**Page 124**

1  (Whereupon the deposition was
2  adjourned at 7:39 P.M.)

JONNELL AGNEW & ASSOCIATES
124
(800) 524-DEPO

Please be advised I have read the foregoing
deposition, and I state there are:
(Check one)

_____ NO CORRECTIONS

_____ CORRECTIONS ATTACHED


_____
PERSON MOST KNOWLEDGEABLE OF
AGAPE INDUSTRIAL, INC.,
PETER LIN


_____
Date Signed



--oOo--

JONNELL AGNEW & ASSOCIATES
125
(800) 524-DEPO

---

| PAGE | LINE | CHANGE/ADD/DELETE |
|---|---|---|
| 2 | — — | _____ |
| 3 | — — | _____ |
| 4 | — — | _____ |
| 5 | — — | _____ |
| 6 | — — | _____ |
| 7 | — — | _____ |
| 8 | — — | _____ |
| 9 | — — | _____ |
| 10 | — — | _____ |
| 11 | — — | _____ |
| 12 | — — | _____ |
| 13 | — — | _____ |
| 14 | — — | _____ |
| 15 | — — | _____ |
| 16 | — — | _____ |
| 17 | — — | _____ |
| 18 | — — | _____ |
| 19 | — — | _____ |
| 20 | — — | _____ |
| 21 | — — | _____ |
| 22 | — — | _____ |
| 23 | — — | _____ |
| 24 | — — | _____ |
| 25 | Deponent's Signature _____ Date _____ |

JONNELL AGNEW & ASSOCIATES
127
(800) 524-DEPO

---

**DEPONENT'S CHANGES OR CORRECTIONS**

Note: If you are adding to your testimony, print
the exact words you want to add.  If you are deleting
from your testimony, print the exact words you want
to delete.  Specify with "Add" or "Delete" and sign
this form.

DEPOSITION OF:      PERSON MOST KNOWLEDGEABLE OF
                    AGAPE INDUSTRIAL, INC.,
                    PETER LIN

CASE:            AGAPE VS. ARUVIL

DATE OF DEPOSITION: JULY 17, 2012

| PAGE | LINE | CHANGE/ADD/DELETE |
|---|---|---|
| 14 | — — | _____ |
| 15 | — — | _____ |
| 16 | — — | _____ |
| 17 | — — | _____ |
| 18 | — — | _____ |
| 19 | — — | _____ |
| 20 | — — | _____ |
| 21 | — — | _____ |
| 22 | — — | _____ |
| 23 | — — | _____ |
| 24 | — — | _____ |
| 25 | Deponent's Signature _____ Date _____ |

JONNELL AGNEW & ASSOCIATES
126
(800) 524-DEPO

---

STATE OF CALIFORNIA      )
                         ) ss.
COUNTY OF LOS ANGELES    )


        I, PERSON MOST KNOWLEDGEABLE OF AGAPE
INDUSTRIAL, INC., PETER LIN, having appeared for my
deposition on Tuesday, July 17, 2012, do this date
declare under penalty of perjury that I have read the
foregoing deposition, I have made any corrections,
additions or deletions that I was desirous of making
in order to render the within transcript true and
correct.
        IN WITNESS WHEREOF, I have hereunto
subscribed my name this ___ day of_____,
2012.




_____
      W I T N E S S



JONNELL AGNEW & ASSOCIATES
128
(800) 524-DEPO

CERTIFICATE OF READER-INTERPRETER

1  I,_____, whose address is

2  _____ a person who speaks the

3  language of the witness, namely, _____

4  do hereby certify that on the ___ day of _____,

5  2011, I did translate the foregoing deposition from

6  the English language to the Mandarin language,

7  reading same to the witness in his native tongue, to

8  the best of my ability;

9       That all corrections and changes requested

10  by the witness were made and initialed by the

11  witness;

12       That upon completion of said reading, the

13  witness did confirm to me that he had understood the

14  reading.

15

16

17

18

19                    _____

                     Reader-Interpreter

20

21                    _____

                     Date

22

23

24

25

**JONNELL AGNEW & ASSOCIATES**

129

(800) 524-DEPO

---

STATE OF CALIFORNIA        )
                           )  ss.
COUNTY OF LOS ANGELES      )

        I, MICHELLE YOUNG, CSR No. 13656, a court
reporter for the County of Los Angeles, State of
California, do hereby certify;

        That prior to being examined, PETER LIN, the
witness named in the foregoing deposition, was by me
duly sworn to testify the truth, the whole truth, and
nothing but the truth;

        That said deposition was taken before me at
the time and place herein set forth, and was taken by me
in shorthand and thereafter transcribed into typewriting
under my direction and supervision, and I hereby certify
that the said deposition is a full, true and correct
transcript of my shorthand notes so taken;

        I further certify that I am neither counsel
for nor related to any party to said action, nor in any
way interested in the outcome thereof.

        IN WITNESS WHEREOF, I hereto subscribe my name
this 27th day of July, 2012.

                    _____
                    Certified Shorthand Reporter in
                    and for the County of Los Angeles,
                    State of California

                    JONNELL AGNEW & ASSOCIATES
                        (800) 524-DEPO

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**<u>EXHIBIT 3</u>**
**(E-MAIL STRING)**

DECLARATION OF H. G. ROBERT FONG SUPPORTING PLAINTIFFS' OPPOSITION FOR ATTORNEY FEES

**Subject:** FW: Agape v. Aruvil - Peter Lin Depo
**From:** Paul Orloff <paulorloff@hotmail.com>
**Date:** 9/17/2012 12:30 PM
**To:** Bob Fong <bobfong@ix.netcom.com>

---

From: SHanagami@foxrothschild.com
To: paulorloff@hotmail.com
CC: TChan@foxrothschild.com; CLiu@foxrothschild.com
Date: Tue, 14 Aug 2012 19:39:50 -0700
Subject: RE: Agape v. Aruvil - Peter Lin Depo

The following portions of Peter Lin's deposition taken on July 17, 2012 are designated as Attorney's Eyes Only (in page:line format), pursuant to the Court's protective order

10:18 through 12:22;
14:12 through 15:10;
16:17 through 18:20;
19:23 through 20:11;
21:23 through 22:1;
28:22 through 30:2;
32:9 through 33:5;
35:14 through 36:6;
39:19-20;
41:24 through 42:2;
46:7 through 46:21;
50:2 through 50:3;
51:5 through 51:7;
56:18 through 58:5;
58:17-19;
60:17-22;
62:4-7;
66:12 through 66:22;
69:4-9;
71:6-21;
74:2-6;
75:5-13;

The following portions of Peter Lin's deposition taken on July 17, 2012 are designated as Confidential (in page:line format), pursuant to the Court's protective order:

30:3-7;
41:11-23;
42:4-16;
45:21 through 46:6;
50:4 through 50:23;
51:11 through 55:11;
56:8-10;
58:7-9;
59:21-25;
60:1-15;
61:13-25;
62:8 through 63:22;
63:23 through 64:22;

80:23 through 81:1;
81:6-9;
81:17 through 82:6;
85:7-11;
85:14-25;
87:22 through 88:11;
92:5-9;
93:8-9;
96:11 through 97:23;
107:25 through 108:3;
114:4-17;


**Steven S. Hanagami**
Attorney at Law
**Fox Rothschild LLP**
1055 West 7th Street, Suite 1880
Los Angeles, CA  90017-2544
Direct Line: 213-225-2600
Office Main Line: 213-624-6560
Facsimile: 213-622-1154
shanagami@foxrothschild.com
www.foxrothschild.com
P *Help save our environment by printing this document only if necessary.*

---

**From:** Hanagami, Steven S.
**Sent:** Tuesday, August 14, 2012 4:51 PM
**To:** 'Paul Orloff'
**Cc:** Liu, Cindy; Chan, Thomas T.
**Subject:** RE: Agape v. Aruvil - Peter Lin Depo

Hi Paul,

I have your letter that was mailed to Thomas Chan on August 7th, while Mr. Chan was out of the country.  At present, the deposition is marked Attorney's Eyes Only under the protection of the Court's protective order.  For you to "unseal" or de-designate material to a lesser designation, you will need a court order, rather than your self-imposed deadline of today's date.

However, to avoid a battle and allow the parties to prepare for mediation, I am in the process of reviewing the deposition and will likely re-designate material as Attorney's Eyes Only, Confidential, or no designation.  I am trying to get this done by tomorrow.  Alternatively, you may seek your remedies as outlined under the Court's protective order.

**Steven S. Hanagami**
Attorney at Law
**Fox Rothschild LLP**
1055 West 7th Street, Suite 1880
Los Angeles, CA  90017-2544
Direct Line: 213-225-2600
Office Main Line: 213-624-6560
Facsimile: 213-622-1154
shanagami@foxrothschild.com
www.foxrothschild.com
P *Help save our environment by printing this document only if necessary.*

---

**From:** Chan, Thomas T.

**Sent:** Tuesday, August 14, 2012 4:39 PM
**To:** 'Paul Orloff'
**Cc:** Hanagami, Steven S.; Liu, Cindy
**Subject:** RE: Agape v. Aruvil - Peter Lin Depo

Paul,

I just got back from my vacation today and have not had the chance to review the transcript and have not had a chance to touch base with Steven as to whether he has responded to you on my behalf.  If not, as soon as I reviewed the transcript, I will inform you of the portions to be released from the protective order.

Tom

_____

**Thomas T. Chan**
Partner
**Fox Rothschild LLP**
**Cell 213 842-2443**
**Direct 213 225-2611**
**Office 213 624-6560**


ATTENTION: IRS CIRCULAR 230 DISCLOSURE: Pursuant to Treasury Regulations, any tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used or relied upon by you or any other person, for the purpose of (i) avoiding penalties under the Internal Revenue Code, or (ii) promoting, marketing or recommending to another party any tax advice addressed herein.
-------------------------------------------- This e-mail contains PRIVILEGED AND CONFIDENTIAL INFORMATION intended only for the use of the Individual(s) named above. If you are not the intended recipient of this e-mail, or the employee or agent responsible for delivering this to the intended recipient, you are hereby notified that any dissemination or copying of this e-mail is strictly prohibited. If you have received this e-mail in error, please immediately notify us by telephone at (215)-299-2167 or notify us by e-mail at helpdesk@foxrothschild.com. Also, please mail a hardcopy of the e-mail to Fox Rothschild LLP, 2000 Market Street, Philadelphia PA 19103-3222 via the U.S. Postal Service. We will reimburse you for all expenses incurred. Thank you.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**<u>EXHIBIT 4</u>**
**(NOVEMBER 18, DANIEL ROAN DEPOSITION)**

DECLARATION OF H. G. ROBERT FONG SUPPORTING PLAINTIFFS' OPPOSITION FOR ATTORNEY FEES

```
 1                    UNITED STATES DISTRICT COURT
 2                        CENTRAL DISTRICT
 3
 4
 5     JUN-EN ENTERPRISES, et al.,   )
                                     )
 6             Plaintiff,            )
                                     )
 7        vs.                        )   CASE NO.:  CV12-2734PSG
                                     )
 8     PETER K. LIN, et al.,         )
                                     )
 9             Defendant.            )
       _____)
10
11
12                        CONFIDENTIAL
13                 DEPOSITION OF DANIEL ROAN
14
15     DATE AND TIME:          TUESDAY, OCTOBER 8, 2013
                               10:05 A.M.
16
       PLACE:                  2705 S. DIAMOND BAR BLVD
17                             SUITE 398
                               DIAMOND BAR  CA  91765
18
       REPORTED BY:            LESLIE A. TOLEDO, CSR #8345
19
       JOB NO.:                LT100813
20
21
22
23
24
25              RIGGS REPORTING (805) 557-1075
```

```
 1                    APPEARANCES
 2     FOR THE PLAINTIFF:
 3          LAW OFFICES KU & FONG
            BY:  H.G. ROBERT FONG
 4          Attorney at Law
            444 South Flower Street
 5          Suite 1500
            Los Angeles, California  90071
 6          (213) 488-1400
 7          DEPASQUALE & COLE
            BY:  RUSSELL COLE (Not present)
 8          Attorney at Law
            523 West 6th Street
 9          Suite 707
            Los Angeles, California  90014
10          (213) 629-3550
11
12     FOR THE DEFENDANT:
13          FOX ROTHSCHILD, LLP
            BY:  LENA N. BACANI
14          Attorney at Law
            1055 West 7th Street
15          Suite 1880
            Los Angeles, California  90017
16          (213) 624-6560
17     FOR THE WITNESS:
18          THE LIN LAW FIRM
            BY:  ELIZABETH P. LIN
19          Attorney at Law
            2705 South Diamond Bar Boulevard
20          Suite 398
            Diamond Bar, California  91765
21          (909) 595-5522
22     ALSO PRESENT:  CATHERINE SHU, MANDARIN INTERPRETER
                       PETER K. LIN
23                     VIBEKE FONG
24
25
```

3

```
 1                    I N D E X

 2    WITNESS                                    PAGE

 3    DANIEL ROAN

 4          Examination by Mr. Fong                5

 5          Examination by Ms. Bacani             90

 6          Further Examination by Mr. Fong      101

 7

 8                  E X H I B I T S

 9    No.   Description                          Page

10    1     CD Cover                               8

11    2     CD & Directory of Contents             8

12    3     Invoice dated 10/7/11                 23

13    4     Invoice dated 10/7/11                 24

14    5     Invoice dated 12/7/07                 25

15    6     Statement of Information 2/10/10      41

16    7     Statement of Information 2/12/10      42

17    8     Receipt 2/10/10                       45

18    9     Fax Transmittal 9/26/11               46

19    10    Balance Sheet 12/31/09                60

20    11    General Ledger Report 12/31/08        63

21    12    Chinatrust Bank Statement 4/30/08     67

22    13    General Ledger Report 12/31/08        70

23    14    General Ledger Report 12/31/09        74

24    15    General Ledger 12/31/11               75

25    16    General Ledger Report 12/31/10        76
```

| | | | |
|---|---|---|---|
| 1 | 17 | HSBC Statement February 2010 | 78 |
| 2 | 18 | HSBC Statement May 2010 | 83 |
| 3 | 19 | Trial Balance 12/31/06 | 102 |
| 4 | 20 | Trial Balance 12/31/05 | 107 |
| 5 | 21 | General Ledger Report 12/31/09 | 107 |
| 6 | 22 | General Ledger Report 12/31/06 | 109 |
| 7 | 23 | Chinatrust Bank Statement 8/31/06 | 111 |
| 8 | 24 | Chinatrust Bank Statement 4/28/06 | 111 |

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                         CATHERINE SHU,

 2     the Interpreter, affirmed to faithfully interpret English

 3      into Mandarin and Mandarin into English to the best of

 4                           her ability,

 5                          DANIEL ROAN,

 6           called as a witness, having duly stated

 7            under penalty of perjury, was examined

 8        and testified through the interpreter as follows:

 9

10                         EXAMINATION

11     BY MR. FONG:

12        Q.   Good morning, Mr. Roan.  My name is Bob Fong.

13     I'm an attorney for the plaintiffs in this case.

14        A.   (In English)  Good morning.

15        Q.   Have you ever had your deposition taken before?

16        A.   Yes.

17        Q.   On how many occasions?

18        A.   Twice.

19        Q.   When did you have the depositions taken?

20        A.   A few years ago.

21        Q.   And did it have anything to do with Mr. Lin?

22        A.   No.

23        Q.   Were the depositions translated?

24        A.   No.

25        Q.   So you did those in English?
```

 1        A.    Yes.

 2        Q.    You've asked for a translator today.  Is there a

 3   reason for that?

 4        A.    So I will express myself more clearly.

 5        Q.    I had agreed to do it with a translator, but the

 6   problem is, it could make the deposition twice as long.

 7        A.    Yes.

 8        Q.    And I'm wondering if a translator is really

 9   needed.

10        A.    I will feel more comfortable with the

11   translator.

12        Q.    Well, we'll go along with that and see how far

13   we go with the translator.  As you know, a deposition is

14   court proceeding.

15        A.    Yes.

16        Q.    You'll be testifying today as if you were in a

17   court of law before a judge and a jury.  Do you

18   understand that?

19        A.    Yes.

20        Q.    It has the same solemnity as if you were in a

21   court of law, so do not be mislead by the fact that we're

22   doing the deposition in your attorney's office.  Okay?

23        A.    Yes.

24        Q.    Because you've had two depositions before, I'm

25   not going to go through the standard admonitions.

1        A.    Yes.

2        Q.    Whether you had a deposition in a state court

3   case or a federal case, it's pretty much the same.  Do

4   you understand that?

5        A.    Yes.

6        Q.    And you're familiar with the fact that you'll be

7   presented with the original deposition transcript for

8   your signature?

9        A.    Yes.

10        Q.    Can you give us a summary of your educational

11   background, please?

12        A.    I graduate from UC Riverside with MBA degree.

13        Q.    Did you go there for undergraduate as well?

14        A.    No.

15        Q.    Where did you go for undergraduate?

16        A.    In Taiwan.

17        Q.    What school?

18        A.    University of Zhong Xin.

19        Q.    And what course of study did you take at

20   Xhong-Xin University?

21        A.    Financial tax -- (In English)  Financial and

22   taxation.

23        Q.    Now, you're a certified public accountant?

24        A.    Yes.

25        Q.    When did you obtain your CPA certification?

```
1        A.   In 1995.

2        Q.   And when did you get your MBA degree?

3        A.   1990.

4        Q.   Have you always practiced in California or have

5   you been elsewhere?

6        A.   In California only.

7        Q.   You produced a CD of documents in this case.

8        A.   Yes.

9        Q.   And I'm going to -- I forgot to bring the

10  sleeves, but I've got copies of the CD and a copy of the

11  original label.  In fact, I've got the original disc

12  here.  Do you recognize that, sir?

13       A.   Yes.

14            MR. FONG:  We're going to attach the CD and with

15  the label that I've copied as Exhibit 1.

16                 (Plaintiffs' Exhibit 1 was marked

17                  for identification.)

18            THE WITNESS:  Yes.

19            MR. FONG:  I'm going to mark as Exhibit 2, a

20  directory of what was on the CD.

21            MS. LIN:  Can I get a copy, please?  Do you have

22  extra copies?

23            MR. FONG:  Sure.

24                 (Plaintiffs' Exhibit 2 was marked

25                  for identification.)
```

```
 1        Q.   BY MR. FONG:  Can you tell us how the documents

 2   were compiled for the CD?

 3             MS. LIN:  Objection.  May call for

 4   attorney-client privilege.  You can answer the question,

 5   but don't discuss anything that we've discussed.

 6             THE WITNESS:  I quite don't understand your

 7   question.  What would you like to know?

 8        Q.   BY MR. FONG:  What did you do to determine what

 9   to copy into the CD?

10        A.   According to the requirements on the subpoena.

11        Q.   And so what physically did have you have to do

12   to comply with the subpoena?

13        A.   Just itemize each one required in the subpoena.

14        Q.   So the subpoena called for documents; correct?

15        A.   Probably.

16        Q.   Did you personally select the documents to be

17   copied and put into the CD?

18        A.   No.

19        Q.   Who did?

20        A.   My attorney did.

21        Q.   What did your attorney do to select the

22   documents?

23        A.   I hand my documentation to my attorney for copy.

24        Q.   In what form were the documents that you handed

25   to your attorney?
```

1          A.   PDF files.

2          Q.   Did you hand your attorney more PDF files than

3    are shown in the CD, or the DVD, or are those all the

4    documents that you gave her?

5          A.   They are all inside.

6          Q.   So that's the full universe of documents that

7    you have on Peter Lin, Agape Industry, Agape Industrial,

8    and Jun-En; correct?

9          A.   I don't understand the part regarding the

10   documentation related to Peter Lin.

11         Q.   Okay.  Have you produced in this DVD or CD all

12   of the documents that you have that relate to Peter Lin?

13         A.   Yes.

14         Q.   And that's the same with Agape Industry?

15         A.   Yes.

16         Q.   And the same with Agape Industrial?

17         A.   Yes.

18         Q.   And the same with respect to Jun-En; correct?

19         A.   Yes.

20         Q.   What did you do to retrieve the PDFs that you

21   gave to your attorney?

22         A.   From my computer.

23         Q.   In what types of folders were these documents

24   retrieved?

25         A.   I don't understand what you mean.

```
1        Q.   What kind of software do you use?

2        A.   WPPW.

3        Q.   WPPW?

4        A.   (In English)  Yeah.

5        Q.   How old is that software?

6        A.   A long time.

7        Q.   "A long time" could be many things.  How many

8   years?

9             MS. LIN:  Objection.  Lack of foundation.  You

10  can answer, if you understand the question.

11            THE WITNESS:  About ten something years, more

12  than ten years.

13       Q.   BY MR. FONG:  So am I correct that all the

14  information that you had on the file shown in the DVD

15  were obtained from the WPPW software?

16       A.   Part of them.

17       Q.   What part was from the WPPW software and what

18  was from something else?

19       A.   Financial report and general ledger, they are

20  from WPPW.

21       Q.   You have other documents that were put into

22  Exhibit 1.  Where did they come from?

23       A.   Some bank statements and also some statements

24  provided by Peter.

25       Q.   When you say, "statements provided by Peter,"
```

1     what do you mean?

2          A.   His monthly bank statement as well as his credit

3     card statements.

4          Q.   Did you produce copies of all of the monthly

5     bank statements and credit card statements that you

6     received from Mr. Lin?

7          A.   Yes.

8          Q.   Now, somebody inputted that information into a

9     computer program; correct?

10         A.   Yes.

11         Q.   Who did that?

12         A.   My previous secretary.

13         Q.   And what's your previous secretary's name?

14         A.   Vickie.

15         Q.   Last name?

16         A.   Y-e-h.

17         Q.   Did you, in preparing -- strike that.

18              Can you tell us the types of documents as an

19     accountant that you prepared for Peter Lin?

20         A.   The documentation for bookkeeping as well as

21     financial reports.

22         Q.   How often would you do the bookkeeping?

23         A.   Once a year.

24         Q.   Do you know whether Mr. Lin used any kind of

25     computer program to generate information that you saw?

1           MS. LIN:  Objection.  Calls for speculation.

2      You can answer to the extent that you know.

3           THE WITNESS:  I don't know.

4      Q.    BY MR. FONG:  Did you ever receive any printouts

5      from a computer program from Mr. Lin?

6      A.    I don't know.

7      Q.    You're familiar with common software like

8      QuickBooks?

9      A.    Yes.

10     Q.    How would you describe what QuickBooks is?

11     A.    It's accounting software.

12     Q.    It's a pretty popular piece of software for

13     small businesses, would you agree?

14     A.    Yes.

15     Q.    Do you know of any other common accounting

16     software like QuickBooks?

17     A.    Peachtree.

18     Q.    Any others?

19     A.    That's about it.

20     Q.    That takes up probably 80, 90 percent of the

21     market; right?

22     A.    Yes, yes.

23     Q.    Did you ever see anything that led you to

24     believe that Mr. Lin or the companies that he was

25     supposedly representing used accounting software like

1    QuickBooks or Peachtree?

2              THE INTERPRETER:  I'm sorry, Counsel, could you

3    please repeat the question?  Thank you.

4              THE REPORTER:  Do you want me to read it back?

5              MR. FONG:  Yes, please.

6                   (The record was read back.)

7              THE WITNESS:  Yes.

8    Q.   BY MR. FONG:  What did you see in that regard?

9    A.   2011 report.

10   Q.   Is that the only thing that you saw that

11   appeared to have come from accounting software?

12   A.   Yes.

13   Q.   Do you recall what company that was associated

14   with?

15   A.   Agape Industry.

16   Q.   In order to prepare the reports that you did for

17   Mr. Lin, did you have to talk to Mr. Lin or anyone

18   associated with him?

19   A.   Yes.

20   Q.   What did you have to find out from Mr. Lin to

21   prepare your reports?

22   A.   Such as his account details, like the purpose of

23   this expense, or the purpose of the deposit, things like

24   that.

25   Q.   How would you receive these communications from

1    Mr. Lin?

2        A.    Over the phone or by fax.

3        Q.    Did you keep copies of all of the faxes that you

4    received from him?

5        A.    Yes.

6        Q.    And did you produce those in the PDFs?

7        A.    Yes.

8        Q.    Now, in addition to financial reports and a

9    general ledger, did you not also prepare tax returns?

10       A.    Yes.

11       Q.    Who did you bill for those tax returns?

12       A.    To the company.

13       Q.    You had a document which or -- strike that.

14             Can you tell me how it is -- strike that.

15             Please describe the procedure by which your

16   company prepared billing for the accounting work it did

17   for Mr. Lin?

18       A.    After I finish the work, I would bill to my

19   client.

20       Q.    How soon after you finished the work would you

21   bill your client?

22       A.    Usually very soon.

23       Q.    That's your business; right?  And when you say

24   "very soon," about how soon after the work was done would

25   you bill Mr. Lin?

```
1          A.    I would do it together.

2          Q.    So would you present, for instance, a tax return

3    with your bill for preparing it?

4          A.    Yes.

5          Q.    We will go into that a little bit later.  Did

6    you do anything to form any of the companies that Mr. Lin

7    worked for or was associated with?

8          A.    Yes.

9          Q.    What did you do in that regard?

10         A.    I helped him to establish the company.

11         Q.    Which company?

12         A.    Agape Industry.

13         Q.    Is that the only one that you helped him with?

14         A.    As well as Jun-En, as well as Agape Industrial.

15         Q.    What did that work involve?

16         A.    Secretary to file to the Secretary of State to

17   establish the company.

18         Q.    Did you prepare the articles of incorporation?

19         A.    Yes.

20         Q.    The bylaws?

21         A.    Not for bylaws.

22         Q.    Let me ask you this:  Did you actually get a

23   corporate kit for your client here?

24         A.    Yes.

25         Q.    Who did you understand the client was?
```

```
 1              MS. LIN:  Objection.  Vague and ambiguous.  Why

 2      don't you specify by which particular client.

 3          Q.   BY MR. FONG:  With regard to the formation of

 4      Agape Industry, who did you understand the client was?

 5          A.   Yes, I do know.

 6          Q.   Who was it?

 7          A.   Are you referring to the shareholders?  I quite

 8      don't understand your question.  Could you please be more

 9      specific?

10          Q.   You had clients for the work; correct?

11          A.   Yes.

12          Q.   Who did you list as the client for the formation

13      of Agape Industry?

14          A.   My contact person was Peter Lin.

15          Q.   Was he the sole contact person for Agape

16      Industry?

17          A.   He was the main contact person.

18          Q.   Were there any others besides Peter Lin who were

19      contact persons for a Agape Industry?

20          A.   And Miss Lu, L-u.

21          Q.   Do you recall Miss Lu's full name?

22          A.   Her Chinese name is X-h-s-i-u, Y-i-n-g.

23          Q.   Did you ever meet Miss Lu?

24          A.   No.

25          Q.   Did you ever have any communications with
```

```
 1    Miss Lu?

 2         A.   Yes.

 3         Q.   What kind of communications did you have with

 4    Miss Lu?

 5         A.   By fax.

 6         Q.   Did you produce all faxes to and from Miss Lu in

 7    the production of documents shown in Exhibit 1?

 8         A.   Yes.

 9         Q.   Who did you understand Miss Lu was?

10         A.   She was the shareholder of the company.

11         Q.   How do you know that?

12         A.   Peter told me.

13         Q.   Did Miss Lu tell you that also?

14         A.   No.

15         Q.   When did Peter tell you that Miss Lu was the

16    shareholder of Agape Industry?

17         A.   When the company was established.

18         Q.   That was about 2005; is that correct?

19         A.   Yes.

20         Q.   What did you do to determine -- strike that.

21              Did you ever receive information as to how much

22    capital Miss Lu put in to Agape Industry to purchase her

23    shares?

24         A.   No.

25         Q.   Did you ever see any ledgers to show
```

1    capitalization of Agape Industry?

2         A.   Like what type of ledger?  I don't know what you

3    meant.

4         Q.   Well, when you're forming a corporation, you

5    understand that there's a stock subscription of some

6    sort; is that correct?

7         A.   Yes.

8         Q.   Did you ever see anything that designated the

9    amount in the capital account for the initial

10   capitalization of Agape Industry?

11        A.   There was a deposit.  I was told by Peter that

12   that deposit was for capital.

13        Q.   So you saw something going into a bank account?

14        A.   Yes.

15        Q.   Do you recall what the amount of money was for

16   the initial capitalization?

17        A.   Yes.

18        Q.   How much was it?

19        A.   10,000.

20        Q.   Are you going to teach me Mandarin because I can

21   hear the English and the Mandarin?  And Peter told you

22   the 10,000 was for Miss Lu's shares; correct?

23        A.   He said that $10,000 was from the shareholder or

24   shareholders.

25        Q.   Did your corporate kit include share

1    certificates?

2         A.    I don't remember.

3         Q.    Let me kind of go into what I've seen for the

4    last 40 years.  Corporate kits are something that you can

5    buy from companies that produce them.  Agree with that?

6         A.    Yes.

7         Q.    Corporate kit includes share certificates, stock

8    register, corporate seal, blank documents of

9    incorporation, and perhaps blank bylaws; is that correct?

10        A.    Yes.

11        Q.    Is that the type of corporate kit that you used

12   to form Agape Industry?

13        A.    Yes.

14        Q.    Who maintained physical possession of the

15   corporate kit for Agape Industry?

16        A.    Peter.

17        Q.    That corporate kit also had a stock register;

18   correct?

19        A.    Yes.

20        Q.    Peter was given physical custody of all of that

21   after the company was formed; is that correct?

22        A.    Yes.

23        Q.    Did you hand that corporate kit to Peter Lin?

24        A.    Yes.

25        Q.    Have you ever seen it since you handed it to

```
 1   him?

 2        A.   I don't remember.

 3        Q.   Now, as an accountant, you prepared certain

 4   tax-related documents for Agape Industry; correct?

 5        A.   Yes.

 6        Q.   Among the tax documents you prepared were tax

 7   returns of various types; correct?

 8        A.   Yes.

 9        Q.   And you prepared Form 1120 corporate tax returns

10   for Agape Industry; correct?

11        A.   Yes.

12        Q.   You also prepared -- strike that.

13             You had to make a determination as to what type

14   of corporation of form, whether it was going to be a C

15   corp or an S corporation or whatever; correct?

16        A.   That was determined by my client.

17        Q.   Did you have discussions with your client with

18   regard to the type of corporation to form for Agape

19   Industry?

20        A.   Yes.

21        Q.   And do you recall what the discussions were?

22        A.   I told him Agape Industry was only good for C

23   corporation.

24        Q.   They couldn't select an S corporation; correct?

25        A.   I don't think so.
```

1    Q.   And that's because the shareholder was not a

2    resident of the United States; correct?

3    A.   That's correct.

4    Q.   So as part of your functions as an accountant

5    for Agape Industry, you had to file Form 5472s, and that

6    document, or that form, is for information

7    return/foreign-owned U.S. corporation depreciation

8    schedules; correct?

9    A.   That's regarding the foreign-owned shareholders

10   information.

11   Q.   And you reported that Agape Industry was

12   100 percent owned by a foreign shareholder for the years

13   2005 through 2007; correct?

14   A.   Yes.

15   Q.   Do you know when the 2007 Form 5472 was filed?

16   A.   I'm not sure of the exact date it was.

17   Q.   Do you recall whether that was done in the year

18   2007 or the year 2008?

19   A.   It must be after the year 2007.

20   Q.   So likely done in 2008; correct?

21   A.   Probably.

22        MR. FONG:   I'm going to show you a series of

23   bills from the DVD that you produced.  And let's see if

24   that will refresh your recollection as to when certain

25   work was done.  I'm going to show you what we'll mark as

1    the next exhibit in order.  This is Exhibit 3, a bill

2    with a Bates stamp number DR -- I'm going to skip the

3    zeros -- 729.  It's dated October 7th, 2011.

4                    (Plaintiffs' Exhibit 3 was marked

5                    for identification.)

6         Q.    BY MR. FONG:  Can you tell us what that is?

7               MS. BACANI:  Counsel, do you have copies for --

8               MR. FONG:  I thought I had it.

9               MS. BACANI:  Do you have one for me?  I just

10   gave one to Peter's counsel.  Do you have one for me?

11              MR. FONG:  They're collated in reverse.

12        Q.    BY MR. FONG:  Looking at Exhibit 3, what is

13   that?

14        A.    That's our billing statement.

15        Q.    What's the billing statement for?

16        A.    The expense for tax return.

17        Q.    Let me make sure that I've got the right one.

18              MS. LIN:  Can I get the Bates number again,

19   please?

20              MR. FONG:  Yes, it's 729.

21        Q.    BY MR. FONG:  So 729 appears to be for

22   preparation of the 2009 tax returns for Agape Industry;

23   correct?

24        A.    Yes.

25        Q.    And the date of the bill is October 7th, 2011;

1    correct?

2         A.   Yes.

3         Q.   Is that when the returns were prepared, October

4    of 2011?

5         A.   Yes.

6              MR. FONG:  We'll mark as Exhibit 4 Bates stamp

7    DR 730.

8                   (Plaintiffs' Exhibit 4 was marked

9                    for identification.)

10        Q.   BY MR. FONG:  Can you tell us what that is?

11        A.   That's the billing statement for the tax return

12   for Agape Industry.

13        Q.   For what work?

14        A.   For tax return.

15        Q.   What year?

16        A.   2008.

17        Q.   So that tax return was about two years late?

18        A.   Yes.

19        Q.   Does that mean that no tax return for 2008 was

20   filed before October of 2011?

21        A.   That's correct.

22        Q.   Did you discuss with anyone why there had been a

23   failure to file a tax return on time for the year 2008?

24        A.   Yes.

25        Q.   Can you recall what the discussions included?

```
1          A.   I asked Peter for accounting information.

2          Q.   Well, you had prepared timely tax returns before

3     2008, didn't you?

4          A.   I should have been.

5          Q.   But there came a time when there appears to be a

6     gap in filing; correct?

7          A.   Yes.

8          Q.   So let's go through -- I'm going to give you a

9     set of documents together.  It's Bates stamped DR 731 to

10    733.

11              MR. FONG:  We'll mark that as Exhibit 4.

12              MS. LIN:  I think we're on Exhibit 5.

13              MR. FONG:  Sorry.  Five.

14                   (Plaintiffs' Exhibit 5 was marked

15                    for identification.)

16         Q.   BY MR. FONG:  Take a look at those, please.  So

17    if we look at Bates stamp 733, that's the bill for

18    preparing the 2005 return; correct?

19         A.   Yes.

20         Q.   And that was done on December 7th, 2007;

21    correct?

22         A.   It should be.

23         Q.   At the same time you prepared one for 2006;

24    correct?

25         A.   I should have been.
```

1        Q.    That's shown on 732; correct?

2        A.    Yes.

3        Q.    And then the next year you prepared the 2007

4    return in October of 2008; correct?

5        A.    Yes.

6        Q.    Was Agape on an annualized basis or a fiscal

7    year basis, do you recall?

8        A.    By calendar year should be.

9        Q.    Did you have a procedure where you would remind

10   clients that they've got to come in and do their tax

11   returns?

12       A.    Yes.

13       Q.    So you sort of got caught up here by the 2007

14   tax return that you did in October of '08, that's pretty

15   close to being on time; correct?

16       A.    Yes.

17       Q.    Do you know whether the company was on an

18   extension at that time?

19       A.    I would do the extension for them.

20       Q.    I don't recall seeing the extension documents in

21   your production.  Maybe it's my old eyes, but do you

22   recall if you made copies of those documents?

23       A.    I don't remember.

24       Q.    Now, let's go to the next filings.  So what

25   we've covered so far is a filing through what year?

```
1     2007; correct?  I couldn't find -- so there was a gap

2     from the filing for the '07 return in October -- strike

3     that.

4              There's a gap in the filing of tax returns

5     between October 6th, 2008 for the 2007 return and the

6     filing of the 2008 return on October 7th, 2011; is that

7     correct

8        A.   Yes.

9        Q.   Do you know why that is?

10       A.   Because Peter did not provide the information.

11       Q.   Did you ask him why?

12       A.   I did.

13       Q.   What did he tell you?

14       A.   He said there were some issues between him and

15    Taiwan and they were discussing about it.

16       Q.   They were discussing that for three years?

17       A.   I don't know how long and how many discussions

18    between them.

19       Q.   I mean, you can see that there was a three-year

20    gap; correct?

21       A.   Yes.

22       Q.   Should have only been a one-year gap; right?

23            MS. LIN:  Objection.  You're testifying for the

24    witness.

25       Q.   BY MR. FONG:  You can answer the question.
```

1          A.    Could you please repeat your question?

2          Q.    Normally, you would expect a one-year interval

3     between filing tax returns; correct?

4          A.    Yes.

5          Q.    And that's because you want your clients to file

6     their returns on time; correct?

7          A.    Yes.

8          Q.    And if they don't file on time, they can be

9     subject to penalties and audits; agreed?

10         A.    Yes.

11         Q.    What's the maximum extension that you can get

12    for your clients for tax returns?

13         A.    Six months.

14         Q.    What did Agape Industry do, if anything, to not

15    file a tax return for the 2008 tax year until 2011?

16               MS. LIN:  Objection.  Lack of foundation.  Can

17    you please rephrase your question?

18         Q.    BY MR. FONG:  You can answer the question if you

19    know.

20         A.    Could you please repeat and be more specific?

21         Q.    As Agape Industry's accountant, weren't you

22    concerned that the company had failed to file its 2008

23    tax return for three years, or two years, at least?

24         A.    Yes.

25         Q.    Why would you be concerned?

1          A.    As an accountant, my responsibility is to remind

2     my client to file tax return on time.

3          Q.    Because it's good for the client; true?

4          A.    Yes.

5          Q.    And it's good for you because you get paid;

6     right?

7          A.    Yes.

8          Q.    How many times did you remind Peter Lin that he

9     needed to get the 2008 tax return filed?

10         A.    I have reminded him.  As far as how many times,

11    I don't remember.

12         Q.    Did you have a custom and practice of contacting

13    your clients to remind them, "Hey, tax return is late.

14    Got to get it done," something like that?

15         A.    Yes, we usually will call them to remind them.

16         Q.    You've got a tickler system of some sort that

17    tells you to call up clients that, "Hey, get the stuff

18    over to me, so I can do your taxes"; correct?

19         A.    Usually we will remind our client to provide

20    information for the tax return before the due date.

21         Q.    Now, your accounting system that you identified,

22    is that something that gives you reminders to send to

23    your clients to get information or do you use some other

24    means of figuring out when to contact the client?

25         A.    Usually I have a client list.  According to my

```
1    client list, I will remind my clients for tax return.

2         Q.   Is that a computerized list?

3         A.   No.

4         Q.   So it's a handwritten list or --

5         A.   It's a list.

6         Q.   So most accountants go crazy during tax return

7    periods; correct?

8         A.   Yes.

9         Q.   Many clients want to do everything last minute

10   and you're staying up all night to finish the job;

11   correct?

12        A.   Yes.

13        Q.   And then when that mass of tax returns is done,

14   you can actually eat, and sleep, and breathe; right?

15        A.   Yes.

16        Q.   And that's when you start making calls to the

17   people who failed to file a return sometime; correct?

18   You've got plenty of time to, "Hey, get that return in.

19   You've missed it."

20        A.   Yes.

21        Q.   How many times would you estimate you reminded

22   Peter Lin that he needed to get the 2008 tax return

23   filed?

24             MS. LIN:  Objection.  Asked and answered.

25        Q.   BY MR. FONG:  Answer the question, please.
```

```
1          A.   I don't remember how many times.

2          Q.   I've asked you for an estimate.  What's your

3     best estimate?

4          A.   Two to three times.

5          Q.   What did he tell you was the reason why he

6     wasn't getting it done pursuant to your request that he

7     give you the information?

8          A.   He told me he was on the business trip very

9     often, so he did not have time to prepare those

10    information.

11         Q.   He said that for two years?

12         A.   I don't remember.

13         Q.   So the two or three times that you reminded him,

14    he said he was on a business trip, "I can't take care of

15    it"; correct?

16         A.   I quite don't remember.

17         Q.   Did Mr. Lin give you any other excuses for why

18    he wasn't getting the 2008 information to you on time?

19         A.   I don't remember.

20         Q.   Now, you prepared W-2 forms for the company,

21    didn't you?

22         A.   Yes.

23         Q.   Company had employees, didn't it?

24         A.   Yes.

25         Q.   Do you recall how many employees Agape Industry
```

```
 1    had in 2008 approximately?

 2         A.    Two.

 3         Q.    Who were they?

 4         A.    Peter and his wife.

 5         Q.    And do you recall his wife's name?

 6         A.    Jan.

 7         Q.    Did you ever talk to Jan?

 8         A.    Yes.

 9         Q.    What did you talk to her about?

10         A.    Things related to the tax return.

11         Q.    When would you talk to her versus talking to

12    Peter?

13         A.    (In English.)  It's hard to say.

14         Q.    Understood.  Did they segregate the information

15    that they would give you?

16         A.    I don't remember.

17         Q.    Do you recall Jan's last name?

18         A.    H-u-n-g.

19         Q.    Jan Hung; correct?

20         A.    Yes, I think so.

21         Q.    Did Jan Hung provide you any specific

22    information for the work that you needed to get done?

23         A.    Yes.

24         Q.    What did she give you?

25         A.    (In English)  Bank statement and credit card
```

1      statements.

2          Q.    Anything else?

3          A.    That's about it.

4          Q.    What else did you receive from Agape that you

5      needed to prepare tax returns?

6          A.    The bank statements that I just mentioned, as

7      well as those expenses.

8          Q.    How would you know how to categorize what was in

9      the credit card statements?

10         A.    Some are from the credit card transaction, which

11     had been categorized already.

12         Q.    Well, there were credit card statements, for

13     instance, for purchases from Gucci, how would you

14     categorize those?

15         A.    I will ask them the purpose of this transaction.

16         Q.    Who did you ask?

17         A.    Peter, sometimes Jan.

18         Q.    Now, you had -- strike that.

19               Did you determine that one or both of them were

20     using the company credit card for personal items?

21         A.    According to what I was told.

22         Q.    That's what -- they told you that; right?

23         A.    Yes.

24         Q.    And you categorized some of the transactions as

25     being loans to them; correct?

1       A.   Yes.

2       Q.   That's because they told you that, "Yeah, we're

3    mixing in some of our own personal stuff with the

4    business, so we need you to help us segregate these";

5    correct?

6       A.   Yes.

7       Q.   Now, with respect to the loans, did you have a

8    ledger for the loans that they told you were from the

9    company to them for their personal things?

10      A.   Yes.

11      Q.   Was there a separate loan account that you kept

12   in a separate ledger or what?

13      A.   It is covered in the general ledger.

14      Q.   Do you recall whether they told you if they ever

15   paid back any of these loans?

16      A.   I don't remember.

17      Q.   Now, in 2011, when you prepared the 2008 tax

18   return for Agape Industry, did you know that Peter Lin

19   had been fired by the Taiwan company?

20      A.   I didn't know.

21      Q.   Did he ever tell you that there was a falling

22   out between him and the Taiwan companies?

23      A.   Peter told me between him and Taiwan, there was

24   some arguments.

25      Q.   Did he tell you what those arguments were?

1      A.   No.

2      Q.   What did you understand the purpose of Agape

3   Industry was?

4      A.   For business.

5      Q.   What business?

6      A.   For import and export.

7      Q.   Of what?

8      A.   Metal mesh.

9      Q.   Who did you understand Miss Lu was with respect

10  to metal mesh?

11     A.   Peter told me.

12     Q.   What did Peter tell you about the relationship

13  between metal mesh and Miss Lu?

14     A.   Peter told me the company's name was Metal Mesh.

15  The business for the company was for metal mesh.

16     Q.   Which company, Miss Lu's company or Agape

17  Industry?

18     A.   Agape Industry.

19     Q.   Did you know that there was a parent company in

20  Taiwan?

21     A.   You should put this way, I was told by Peter

22  Miss Lu was the shareholder.

23     Q.   Of?

24     A.   Agape Industry.

25     Q.   What did you understand Miss Lu did in Taiwan?

```
1        A.    I didn't know.

2        Q.    He never told you?

3        A.    No.

4        Q.    And his wife never told you?

5        A.    No.

6        Q.    I think it's a good time for a break.  We've

7    been going for about an hour.

8                   (A short break was taken.)

9             MR. FONG:  Let's go back on the record.

10       Q.    BY MR. FONG:  Do you recall whether you prepared

11   any tax returns for the years 2009, '10, or '11 for Agape

12   Industry?

13       A.    Report.  I prepared financial reports for the

14   purpose of tax return.

15       Q.    I have a question about the procedure for filing

16   tax returns relative to Agape Industry.  The documents

17   that you provided in the DVD have your name typed out as

18   the preparer.  Does that indicate that the original was

19   actually signed by you?

20       A.    Which year are you referring to?

21       Q.    2005, '6, and '7?

22       A.    Yes.

23       Q.    If the name is typed out in the copy of tax

24   returns that you provided, does that mean that you

25   actually signed the original?
```

1       A.    Yes.

2       Q.    Now, none of the copies of the tax returns that

3   you produced have a signature by the tax payer.

4       A.    Usually, I will only sign the copy which file to

5   the IRS.  (In English)  And also California Franchise Tax

6   Board.

7       Q.    Right, but I'm looking for the tax payer's

8   signature.  I couldn't tell whether or who signed the tax

9   return for the tax payer as opposed to you as the

10  preparer?

11      A.    Usually, IRS will have a copy of the tax return,

12  the copy with the tax payer signature is should be filed

13  at IRS already.

14      Q.    Understood, but what I'm trying to find out is

15  whether you have a record of who signed the Agape tax

16  returns on behalf of Agape as the tax payer?

17      A.    For that part, I don't know.  I only prepare the

18  tax return and then after my signature, I will send it to

19  my client.

20      Q.    So you didn't E-file any of these returns?

21      A.    No.

22      Q.    So am I correct that you don't really know

23  whether the tax returns were ever filed for Agape

24  Industry?

25      A.    That's correct.

1       Q.    Were you involved in the formation of Agape

2    Industrial?

3       A.    Yes.

4       Q.    How were you involved in the formation of Agape

5    Industrial?

6       A.    I was asked by Peter to form that company for

7    him.

8       Q.    What did you do in that regard?

9       A.    I prepared the articles of incorporation and the

10   corporate kit.

11      Q.    When was that done?

12      A.    2009.

13      Q.    Did he tell you why he was forming Agape

14   Industrial?

15      A.    He told me he was going to do some business.

16      Q.    Wasn't he already doing business?

17      A.    He said he was going to do some business on his

18   own.

19      Q.    Did you understand he was doing it on behalf of

20   somebody else before he was going to do it on his own?

21      A.    I didn't know.

22      Q.    Did you ask him what the relationship would be

23   between Agape Industry and Agape Industrial?

24      A.    I asked him, those two names were very similar

25   to each other.

1        Q.    Same address, too; right?

2        A.    I quite don't remember.

3        Q.    Now, for 2008, when you filed the returns for

4    Agape Industry, I couldn't find either a Form 5472 for

5    the foreign ownership and I couldn't find a Schedule G

6    for domestic ownership.

7        A.    I was told by Peter the shares has been changed.

8        Q.    Did he tell you how they were changed?

9        A.    I was given a Statement of Information by him.

10       Q.    And he gave that to you in September of 2011;

11   correct?

12       A.    Yes.

13       Q.    He didn't give you that before September of

14   2011, did he?

15       A.    He did not.

16       Q.    Did you trust everything that Peter Lin told you

17   about Agape Industry?

18       A.    Yes, he gave me that Statement of Information.

19       Q.    You had to rely on your client; correct?  You

20   had to rely on your client to tell you the truth;

21   correct?

22       A.    Yes.

23       Q.    You weren't certifying that what he presented to

24   you was accurate; correct?

25       A.    Yes.

1         Q.   You never audited the company, did you?

2         A.   I didn't.

3         Q.   Your records reflect payment to a law firm of

4    law offices of Yee-Horn Shuai, S-h-u-a-i?

5         A.   It was like that, according to the information

6    that Peter gave to me.

7         Q.   Did Peter tell you who Mr. Shuai was?

8         A.   No.

9         Q.   Had you in the past filed the statements of

10   domestic stock corporation for Agape or did somebody

11   else?

12        A.   (In English)  Can you repeat the question again?

13        Q.   The Statement of Information filed with the

14   Secretary of State in California, you know what that is;

15   correct?

16        A.   Yes.

17        Q.   Did you have anything to do with filing the

18   statements of information for Agape Industry?

19        A.   Yes.

20        Q.   What did you do in that regard for Agape

21   Industry?

22        A.   I prepared annual renewal.

23        Q.   Did you file all of those on time?

24        A.   I don't remember.

25        Q.   I don't recall seeing the Statement of

1     Information for Agape Industry in the documents that you

2     produced.  Did you keep copies of those in your practice?

3          A.   Yes, it is included in the DVD.

4          Q.   It should be in the DVD and it may be my memory

5     and I recognize that.  Okay.  Now, I'm going to show you

6     a copy with a file stamp.  It shows a filing date of

7     February 10, 2010 for Agape Industry.

8               MR. FONG:  We'll mark that as the next exhibit,

9     which is what?

10              THE REPORTER:  Six.

11                   (Plaintiffs' Exhibit 6 was marked

12                    for identification.)

13              THE WITNESS:  This one was not prepared by

14     myself (indicating).

15              MS. BACANI:  Hold on.  Let's make sure

16     everybody's got copies.

17          Q.   BY MR. FONG:  Do you see the filing date,

18     February 10, 2010?

19          A.   Yes.

20          Q.   Did you prepare this one?

21          A.   No.

22          Q.   How do you know?

23          A.   I know this was not prepared by me.

24          Q.   What are you looking for to determine that it

25     was or wasn't prepared by you?

```
 1        A.   Because in my file, I didn't see this one

 2   prepared by me.

 3        Q.   It's not in your file; right?

 4        A.   That's correct.

 5        Q.   Okay.  Understood.

 6             MR. FONG:  Now, let's look at the next filing

 7   on -- mark that as Exhibit 7.  It's filed February the

 8   12th, two days later.

 9                  (Plaintiffs' Exhibit 7 was marked

10                   for identification.)

11             MS. BACANI:  There's only two copies.

12             MR. FONG:  I've got more copies.  It's just if

13   you want to look at it.

14             THE WITNESS:  This is not prepared by me.

15        Q.   BY MR. FONG:  Again, what characteristics are

16   you looking at in Exhibit 7 to determine that it's not

17   prepared by you?

18        A.   I don't remember, but I do know this was not

19   prepared by me.

20        Q.   But how would you know it's not prepared by you?

21        A.   As far as I recall, I didn't file this one.

22        Q.   Well, you don't have a photographic memory, do

23   you?

24        A.   That's correct.

25        Q.   Is there anything about the manner, or the font,
```

1   or anything in Exhibit 7 that suggests to you that you

2   did not prepare it?

3       A.   I know this was not prepared by me.  Everything

4   prepared by me were already covered in the DVD, but this

5   one is not included in the DVD.

6       Q.   So if it's not on the DVD, it wasn't prepared by

7   you; correct?

8       A.   I should say this one was not prepared by me.

9       Q.   Yes.  Now, Exhibit 7 refers to a Statement of

10  Information.  Do you see that in box one, "Statement of

11  information is amended as of May 25, 2005"?  Do you see

12  that?

13      A.   Yes.

14      Q.   Did you prepare a Statement of Information on

15  behalf of Agape?

16      A.   Are you talking about this one?

17      Q.   No, at any time.

18      A.   Yes, I prepared the Statement of Information.

19      Q.   And that would have been one that included the

20  one that went all the way back to May of 2005?

21      A.   Yes.

22      Q.   Did Peter Lin ever tell you that he filed

23  Exhibit 7?

24      A.   No.

25      Q.   Did Peter Lin ever tell you that all the

1    statements of information that you had previously filed

2    were wrong?

3         A.    No.

4         Q.    Can you tell me who R & L Accountancy

5    Corporation is?

6         A.    That's my company.

7         Q.    That's at 20547 East Walnut Drive?

8         A.    Yes.

9         Q.    So you used to be under the name Daniel B. Roan,

10   then you went to R & L Accountancy Corporation?

11        A.    Yes.

12        Q.    And who is Yen Ling Chen, Y-e-n, L-i-n-g,

13   C-h-e-n?

14        A.    I don't remember.

15        Q.    You had a tax return for 2011, which appears to

16   have been prepared by Yen Ling Chen.

17        A.    Okay.  That's 2011 accountant for tax return.

18        Q.    Do you recall whether Yen Ling Chen was the

19   accountant for Agape Industry, Agape Industrial, or

20   somebody else?

21        A.    That person was Agape Industry accountant.

22        Q.    Do you know why there was a change from you to

23   Yen Ling Chen for accounting services or tax preparation?

24        A.    Because I was told by Peter that he had some

25   arguments with Taiwan and then I told him I was not good

1    for this type of accounting services for him anymore.

2        Q.   You wanted to stay away from the dispute;

3    correct?

4        A.   Yes.

5        Q.   You learned from experience not to get involved;

6    correct?

7        A.   You can say that.

8        Q.   Now, during the same period in February of 2010,

9    do you recall that there was some work done by Fannie

10   Shuai, F-a-n-n-i-e, S-h-u-a-i?

11       A.   The Statement of Information -- the cover for

12   the state of information that Peter faxed to me contained

13   the information of that person.

14       Q.   Let's take a look at Bates No. 966.

15           MR. FONG:  Well, I might have to ask Elizabeth

16   to make copies of this.  We'll mark this as -- let's do

17   both of these, four copies of those, please.

18           MR. FONG:  We'll mark Bates No. 966 as Exhibit

19   8.

20                    (Plaintiffs' Exhibit 8 was marked

21                    for identification.)

22       Q.   BY MR. FONG:  Do you see the date of the fax as

23   February 10, 2010 at 5:06:42 p.m.?  Do you see that?

24       A.   Could you please repeat one more time?

25       Q.   If you look at the bottom of the box, that date

1    correlates with the filing of Exhibit 6, which is dated

2    February the 10th.  Do you see that?

3         A.   Yes.

4         Q.   Do you know who Mr. -- or do you know who Fannie

5    Shuai is?

6         A.   No.

7         Q.   Do you know Yee-Horn Shuai?

8         A.   No.

9         Q.   Do you recall that your accounting records

10   include payments made to the Law Offices of Yee-Horn

11   Shuai?

12        A.   I don't remember.

13             MR. FONG:  I'm going to mark as Exhibit 9 the

14   documents Bates stamped DR 967.  That's the fax bearing

15   Shuai and Associates letterhead.

16                  (Plaintiffs' Exhibit 9 was marked

17                   for identification.)

18             THE WITNESS:  Yes.

19        Q.   BY MR. FONG:  You had received this; correct?

20        A.   Yes.

21        Q.   Do you know what that was for?

22        A.   That's the filing for Statement of Information

23   provided by Peter to me.

24        Q.   Do you know why you got a copy of this?

25        A.   Because Peter told me that ownership has

1    changed.

2         Q.   Did he tell you that on or about September 26th,

3    2011, as shown in Exhibit 9?

4         A.   Yes.

5         Q.   Did he tell you how that ownership was changed?

6         A.   It also stated in the Statement of Information

7    reflecting the new president -- (In English) new

8    director.

9         Q.   And that was Peter himself?

10        A.   It should be.

11        Q.   Did Peter ever explain why the big change in

12   ownership?

13        A.   No.

14        Q.   Did Peter ever have you do anything to wind up

15   Agape Industry?

16        A.   Could you please repeat?

17        Q.   Do you know what winding up a corporation means?

18        A.   Could you please be more specific?

19        Q.   When you're going to close a corporation, do you

20   know what that involves?

21        A.   Legally, I'm not very familiar with this.

22        Q.   Did your company do wind-ups of corporations or

23   did you leave that to the lawyers?

24        A.   Yes.

25        Q.   Did you do any kind of a winding up of Agape

```
1    Industry?

2         A.   No.

3         Q.   With regard to Agape Industrial, do you know who

4    supplied the capital for that corporation?

5         A.   Peter.

6         Q.   How do you know that?

7         A.   I was told by Peter that it was his capital.

8         Q.   Now, with regard to the loans that were shown in

9    your books to Peter and his wife, were those loans ever

10   paid off or forgiven?

11        A.   Which company are you referring to?

12        Q.   Agape Industry.

13        A.   I don't remember, however, it is included in the

14   general ledger.

15        Q.   Did you ask for proof of the actual repayments?

16        A.   Some of the loans were from Peter.

17        Q.   And was Peter paid back?

18        A.   He told me he did.

19        Q.   Do you recall the reason for loans from Peter?

20        A.   Some of them were the personal credit card

21   charges.

22        Q.   And so that's really what was characterized as a

23   loan; correct?

24        A.   Yes.

25        Q.   That's something that you might have to do, for
```

1    instance, the company card has reached its limit?

2         A.    For that, I don't know.

3         Q.    Did you do any accounting as to the suppliers of

4    product to Agape Industry?

5         A.    No.

6         Q.    Do you know whether Agape Industry had a single

7    source of products?

8         A.    I don't know.

9         Q.    Did you do any filing for Jun-En Enterprise USA?

10        A.    I help this company launched.

11        Q.    And what did you understand Jun-En Enterprise

12   was?

13        A.    It was also a corporation.  I don't know what

14   you meant.

15        Q.    How was it related to Agape Industry?

16        A.    I don't know the relationship between those two.

17        Q.    Did anyone explain to you why Jun-En Enterprise

18   USA was formed?

19        A.    Peter told me that Mr. Yang would like to

20   establish this company.

21        Q.    And Mr. Yang has got a first name of Shi, S-h-i,

22   middle name Ru, R-u?

23        A.    Yes.

24        Q.    Had you ever met Mr. Yang?

25        A.    Yes.

1      Q.   What was your relationship with Mr. Yang?

2      A.   He was my ex-client long, long time ago.

3      Q.   From when?

4      A.   (In English)  Fifteen years ago.  Approximately

5  15 years ago.

6           I don't remember exact time, but just a long

7  time ago.

8      Q.   Do you recall what kind of a -- strike that.

9           What was the nature of the business relationship

10  between you and Mr. Yang 15 years ago?

11      A.   Long time ago he also established a company.

12      Q.   Do you remember the name of the company?

13      A.   G-e-o-e-a-r-n.

14      Q.   I think it's going to be confused.

15           MS. LIN:  Geo-Earn, G-e-o-E-a-r-n.

16      Q.   BY MR. FONG:  Who was involved in Geo-Earn?

17      A.   Mr. Yang.

18      Q.   Anybody else that you know of?

19      A.   Gordon.  There was another individual named

20  Gordon.

21      Q.   Do you recall the nature of that business?

22      A.   Import and export.

23      Q.   Of what?

24      A.   Some products, industrial products, something

25  like that.  Don't remember.

1    Q.   Do you recall whether it included expanded metal

2  products, metal mesh products and the like?

3    A.   I don't remember.

4    Q.   Was Peter Lin involved in that company?

5    A.   No.

6    Q.   Do you know whether Mr. Yang was involved in

7  Agape Industry?

8    A.   I don't know.

9    Q.   But you knew he was involved with Jun-En

10 Enterprise; correct?

11   A.   Yes, because he was shareholder.

12   Q.   And he was the CEO; correct?

13   A.   I don't remember.  I have to refer to the

14 Statement of Information.

15   Q.   Do you recall before -- strike that.

16        Do you recall whether somebody on behalf of

17 Mr. Yang tried to get a hold of the accounting records

18 for Agape Industry?

19   A.   Agape -- regarding Agape Industry?

20   Q.   Yes.

21   A.   Miss Lu has request me for that.

22   Q.   And what did you tell her?

23   A.   I faxed her the information that she requested.

24   Q.   What information was that?

25   A.   The company's accounting information reports as

```
 1    well as tax returns.

 2        Q.   Do you recall that Miss Lu tried to get somebody

 3    to come down to see what else you had?

 4        A.   She hired a manager to contact me.

 5        Q.   And who was that?

 6        A.   I don't remember that person's name.

 7        Q.   Did you ever talk to that manager?

 8        A.   Probably, yes.

 9        Q.   Do you recall about when that occurred?

10        A.   I don't remember.

11        Q.   Within the last two or three years?

12        A.   It should be.

13        Q.   What did the manager ask you for?

14        A.   That person wanted to have appointment with me.

15        Q.   And did you make an appointment with him?

16        A.   No, in the end we did not.

17        Q.   Can you tell me why not?

18        A.   Because I told Peter and Peter instruct me not

19    to meet with that person.

20        Q.   Can you tell me exactly what you told Peter and

21    what he said to instruct you not to meet with the

22    manager?

23        A.   I told him that there was a manager coming from

24    Taiwan who wanted to see me.  I told Peter about that and

25    Peter told me since he was the main contact, that's why I
```

1    didn't meet with that manager.

2         Q.   Did Peter threaten you with anything to meet

3    with this manager?

4         A.   No.

5         Q.   Did the manager tell you what he wanted to meet

6    with you for?

7         A.   The manager wanted to get some information

8    regarding Agape Industry accounting.

9         Q.   Did you have an understanding at the time that

10   you talked to the manager that Miss Lu owned Agape

11   Industry?

12        A.   Yes.

13        Q.   And you understood she was a hundred percent

14   shareholder; correct?

15        A.   I was not sure.

16        Q.   Well, based upon your filings with the Form 5472

17   showing a hundred percent foreign ownership, wasn't it

18   your understanding that she was a 100 percent

19   shareholder?

20        A.   Yes, that was before year 2007.

21        Q.   And so did Peter tell you at some point that he

22   became a hundred percent shareholder, you didn't have to

23   talk to Miss Lu anymore?

24        A.   Yes.

25        Q.   In fact, Peter told you this about 2011;

1    correct?

2        A.    Yes.

3        Q.    Peter told you that he had taken over the

4    company from Miss Lu; is that correct?

5        A.    Yes.

6        Q.    Did you ask Peter for evidence of his

7    acquisition of 100 percent share ownership of Agape?

8        A.    That would be this one Statement of Information

9    (indicating).

10        Q.    That somebody else prepared; correct?

11        A.    Yes.

12        Q.    And that's the one you refused to prepare

13    yourself; correct?

14        A.    You should say after that I didn't prepare for

15    this.  I didn't refuse to prepare for this.

16        Q.    Well, you were asked to prepare it, weren't you?

17        A.    No.

18        Q.    So he just went to Fannie Shuai and had her

19    prepare it?

20        A.    I don't know, that's possible.

21        Q.    And you accepted it at face value; correct?

22        A.    It should be.

23        Q.    Do you know whether any shares have ever really

24    issued out of Agape Industry?

25        A.    I don't remember.

1      Q.   Did you ever see any evidence that shares were

2    ever issued to Miss Lu?

3      A.   I don't remember.

4      Q.   But Peter told you the company did get the money

5    from her; correct?

6      A.   He told me that money was from Taiwan.

7      Q.   There are a number of accounts that are

8    referenced in your books.  It's 12:20, why don't we break

9    for lunch.  I'm hoping to get done within an hour.

10           THE WITNESS:  (In English) If you want to

11    continue, that's fine.

12                  (A lunch break was taken.)

13      Q.   BY MR. FONG:  When Mr. Lin told you that the

14    money came from Taiwan, what did you understand that to

15    mean?

16      A.   It was the money from Taiwan probably from loan

17    or from the shareholders.

18      Q.   Do you have any knowledge, information, or

19    belief as to what Agape Industry was doing in the metal

20    mesh business?

21      A.   According to Peter, I was told that Agape

22    Industry would be in mesh -- metal mesh business.

23      Q.   What did you understand that to involve?

24      A.   Could you be more specific?

25      Q.   Well, were they going to be selling machines or

1    end product or what?

2         A.    Probably both.

3         Q.    Why do you think both?

4         A.    Peter probably has mentioned that to me.

5         Q.    Did he ever give any brochures about what the

6    company did?

7         A.    No.

8         Q.    Did you ever see any Websites that related to

9    the business?

10        A.    No.

11        Q.    Do you have an understanding that product was

12   going to be sold?

13        A.    I don't know.

14        Q.    You would have expected that the business would

15   have included some buying and selling of product?

16        A.    Yes.

17        Q.    The accounting records that Peter gave you

18   included records of purchases and sales; correct?

19        A.    No, the accounting was done based on bank

20   transactions.

21        Q.    Right, but would he have to characterize some of

22   the transactions as being purchases and some as being

23   sales?

24        A.    Yes.

25        Q.    You used the classic double-entry accounting;

1    correct?

2         A.   Yes.

3         Q.   And in doing this, you have to account for what

4    comes in and what goes out; correct?

5         A.   Yes.

6         Q.   It's the old debits and credits?

7         A.   Yes.

8         Q.   And so did you see inventory on one side of the

9    debit and credit and then payment for that?

10        A.   I didn't see any inventory, but I do have

11   information on record regarding the payment.

12        Q.   So did you have an understanding that Agape was

13   a zero-inventory business?

14        A.   Probably, I don't remember.

15        Q.   Do you know what the company did, then, to make

16   money?

17        A.   Import and export some products.

18        Q.   Right.  Well, when you're importing products,

19   does that normally involve a purchase?

20        A.   That's possible.

21        Q.   Did Mr. Lin give you records of purchases?

22        A.   No.

23        Q.   Did he give you records of sales?

24        A.   No.

25        Q.   Did you ever calculate profits from the purchase

1    and sale of goods?

2         A.    Basically it would reflect in the report.

3         Q.    A typical tax return that you prepared, for

4    instance, in 2007 shows gross receipts or sales of

5    $852,582.

6              THE INTERPRETER:  I'm sorry, Counsel?

7              THE WITNESS:  It should be.

8         Q.    BY MR. FONG:  How did you derive that number?

9         A.    From the deposit from the incoming deposit at

10   bank account.

11        Q.    How could you segregate deposits that comprised

12   receipts for sales versus loans, for instance?

13        A.    According to what Peter told me.

14        Q.    So you were given limited information that

15   comprised the bank statements that were explained to you

16   by Peter; is that correct?

17        A.    Yes.

18        Q.    So he would characterize each of the deposits?

19        A.    Yes.

20        Q.    Now, the next line is "Cost of goods sold,"

21   that's line 2 of the 1120 form.  And for that same year

22   it's $746,286.

23        A.    Yes.

24        Q.    How would you get that information?

25        A.    From the payments at the bank account.

```
1          Q.   So that would be a combination of checks and

2     transfers?

3          A.   Yes.

4          Q.   Do you recall whether any of the transfers were

5     wire transfers?

6          A.   Some of them were wire transfers.

7          Q.   Now, relative to the cost of goods sold, could

8     you determine the source of the goods from the

9     information that Peter gave you?

10         A.   I was not able to.

11         Q.   Could you determine whether there was a sole

12    source or multiple sources?

13         A.   I was unable to.

14         Q.   Did you ask him for any details to show the

15    specifics as to each of the line items that went into the

16    calculation for the totals?

17         A.   I have asked Peter for some purchase-related

18    payments in order to determine which one was for

19    purchase.

20         Q.   And what did he give you?

21         A.   He gave me some categorized items and told me

22    those were the categories.

23         Q.   Did he ever name names as to either suppliers or

24    customers of Agape Industry?

25         A.   Some of them were paid by check and you could
```

```
 1    find payee on those checks.  Some of them were done

 2    through wire transfers and you could find the

 3    beneficiaries.

 4        Q.   So you got the canceled check copies or the

 5    actual canceled checks themselves?

 6        A.   I don't remember.

 7        Q.   If you were given detailed documentation like

 8    that, would you have made copies of them to keep in your

 9    files or just use them and give them back to Mr. Lin?

10            MS. LIN:  Objection.  Improper hypothetical.

11    You can answer if you can.

12            THE WITNESS:  Some of them I would copy -- make

13    copies, but doesn't mean I would copy all of them.

14        Q.   BY MR. FONG:  But the full universe of what you

15    copied is in that DVD that you produced; correct?

16        A.   Yes.

17            MR. FONG:  I'm going to mark as the next exhibit

18    in order Bates stamped Nos. 880 through 885.

19                (Plaintiffs' Exhibit 10 was marked

20                 for identification.)

21        Q.   BY MR. FONG:  Looking at Exhibit 10, can you

22    tell us what that is?

23        A.   Page 880?

24        Q.   Yes.

25        A.   This is financial statement report.
```

1     Q.   It's entitled -- the first page is entitled

2     "Balance Sheet."

3     A.   Yes.

4     Q.   Do you know when this was prepared?

5     A.   It should be done in year 2011.

6     Q.   That's when you got paid to do the tax returns

7     for all those years that relate?

8     A.   It should be.

9     Q.   And this is supposed to show the balance sheet

10    for Agape Industry at the end of December 31st, 2009;

11    correct?

12    A.   Yes.

13    Q.   It was $277,144.20 in the bank; correct?

14    A.   Yes.

15    Q.   In a reference to "Loan from shareholders" of

16    $203,039.  Do you see that?

17    A.   Yes.

18    Q.   How did you calculate that amount?

19    A.   It should be covered in general ledger.  You can

20    see the transaction in and out.

21    Q.   Do you know the source of that $203,000?

22    A.   It should be.

23    Q.   Where do you understand or where do you recall

24    the source was?

25    A.   I know it was a loan.

1        Q.    How do you know?

2        A.    I was told by Peter.

3        Q.    Do you know who the shareholder was who made the

4    loan?

5        A.    It should be covered in the general ledger

6    reflecting it was a loan.

7        Q.    But a loan from whom?

8        A.    Peter told me it was loan for the shareholder.

9        Q.    Who was the shareholder?

10       A.    Who was the shareholder?  He told me that was a

11   loan for the shareholder, but he didn't say which

12   shareholder.  It's supposed to be Peter's.  I remember he

13   told me that's the loan he put in.

14       Q.    So Peter told you that in 2009 he put in a loan

15   of 200-some-odd-thousand dollars; correct?  203,000-plus

16   dollars?

17       A.    They are not owed for the 2009.  On the balance

18   sheet, it just said it was the ending balance.  It didn't

19   have all the transaction will happen in 2009.

20       Q.    Right, because you also did the 2008 return

21   during the same period; correct?

22       A.    Yes.

23       Q.    And he showed about 150,000 in loans in 2008;

24   correct?

25       A.    Probably.

1      Q.   Do you know who the shareholder was who put in

2   the 150,000?

3      A.   I have to refer to the document.  I don't

4   remember.

5      Q.   What document would you look at to see the

6   source of the purported loan?

7      A.   It is in the general ledger covered in the CD,

8   DVD.

9      Q.   So you want to look at the general ledger for

10  2009; correct?

11     A.   Yes.

12     Q.   So you have -- the information with respect to

13  the source was verbal from Peter Lin to you; correct?

14     A.   I quite don't remember.

15          MR. FONG:  I don't have a copy of this, so I'm

16  going to ask Elizabeth to make copies of that one, DR

17  878.

18          We'll mark 878 as Exhibit 11.

19               (Plaintiffs' Exhibit 11 was marked

20               for identification.)

21     Q.   BY MR. FONG:  Do you see that handwriting there

22  in the middle of the page says, "Loan from Peter Lin

23  80,000"?

24     A.   Yes.

25     Q.   Did you see any detail to support that

```
1    characterization of the $80,000?

2         A.    No.

3         Q.    Is this just something that he told you?

4         A.    Yes.

5         Q.    Now, the reference is to a deposit on April the

6    7th, presumably 2008; correct?

7         A.    Yes.

8         Q.    Did you have the actual bank statement to show

9    that deposit?

10        A.    Yes, it shows on the bank statement.

11        Q.    Do you recall which bank referenced this?

12        A.    I quite don't remember.

13        Q.    Do you recall the names of the bank accounts

14   whose statements you were given?

15        A.    I know he has HSBC and Chinatrust.

16        Q.    And you kindly produced copies of those

17   statements?

18        A.    Yes.

19        Q.    So if we look at their statements for April 7th

20   of 2008, the 80,000 should show up; correct?

21        A.    Yes.

22        Q.    Since we've already marked your entire file as

23   Exhibit 1 and the CD, I'm not going to mark these, but

24   I'm going to just have him take a look at the copy.  I

25   can put the CD in a computer for you to look at if you
```

 1    want to take a look.  DR 479 to 480.

 2            MS.BACANI:  Counsel, is there a reason that

 3    you're not marking this?  Is it just we don't have extra

 4    copies?

 5            MR. FONG:  We've marked the whole file and it's

 6    in there and you've got the copy.

 7            MS.BACANI:  Well, I understand, but there's over

 8    a thousand documents in that file, or at least over a

 9    thousand pages, so I think it would be very helpful to

10    mark this as a separate exhibit.

11            MR. FONG:  We can downstream, but I just want to

12    establish the foundation, if any, for the 80,000.

13            MS.BACANI:  Would it be possible for us to look

14    at this?

15            MR. FONG:  Sure.

16            THE WITNESS:  You should be able to see it on

17    the bank statement.

18        Q.   BY MR. FONG:  That bank statement I showed you,

19    which is on DR 479 to 480 should have the 80,000 loan,

20    unless that's from the Chinatrust account; correct?

21        A.   I don't remember this fund was from which bank

22    account, however, you should be able to see it on the

23    bank statement.

24        Q.   Exactly.  I'm trying to see if there's another

25    account that I'm not aware of.  I'll show you in a

1    minute.  I've given you the account from HSBC for that

2    date.  Now, there's an account with East West Bank, too,

3    so maybe it's there.  Could I have those two pages back?

4    I'm just trying to see if we can locate the documents.

5        A.   I don't remember how many bank accounts he had.

6    If -- for the account that he had, they are covered in

7    the DVD.

8        Q.   I've got Chinatrust, that's on DR 497 to 498 and

9    I see a wire transfer on the 9th of April for 100,000,

10   but I don't see anything that correlates with April the

11   7th.  Can you verify that?

12       A.   Yes, there was a deposit right here on the

13   April 7th, 80,000.

14       Q.   Okay.  Then there's a reference to 100,000 on

15   the second page.  Is that coming in or going out?

16       A.   That was for other debit, so it should be out.

17       Q.   So we've got 80,000 again?

18       A.   Yes.

19       Q.   Then 100,000 went out two days later; correct?

20       A.   Yes.

21       Q.   Do you recall what the 100,00 was for?

22       A.   I don't remember, however, it should have been

23   covered in the general ledger.

24            MS.BACANI:  Counsel, before you put that away, I

25   think we should mark that as an exhibit since the witness

```
 1    is testifying as to the content of the exhibit that we

 2    haven't yet marked.  So to make the record clear, I think

 3    we do need to have that marked.

 4            MR. FONG:  Sure.  Elizabeth?

 5            MS.BACANI:  Thank you, sorry.

 6                (Plaintiffs' Exhibit 12 was marked

 7                 for identification.)

 8        Q.   BY MR. FONG:  Now, let's go back to your report

 9    Exhibit 10.  Can you show me where that $100,000 payment

10    is shown in Exhibit 10?

11        A.   It will be shown in the general ledger, but I

12    don't remember under which category.

13        Q.   Is it in Exhibit 10?

14        A.   Which one is Exhibit 10?

15        Q.   It's Bates stamped 880 through 885.  I'm looking

16    at the wrong year.  You're right.  Sorry.  That's 2009.

17    I apologize.  So the 100,000 should show up in the

18    general ledger for 2008; correct?

19        A.   It should be.

20        Q.   Let me show you -- unfortunately, we're here, if

21    we had had it in my office, I would have her make the

22    copies.  Miss Lin?

23            MS. LIN:  That's all right.  Actually, you can

24    just go and use the copy machine if you'd like.

25            MR. FONG:  I almost brought a printer.  I have
```

```
1    too many things to bring.

2         Q.   BY MR. FONG:  Let's go to page 10 of your 2008

3    general ledger report that's Bates stamped 848.

4         A.   Yes.

5         Q.   And that references the 80,000 as a loan from

6    Peter Lin; correct?

7         A.   Yes.

8         Q.   And that was because Mr. Lin told you that's

9    what it should be characterized as; correct?

10        A.   Yes.

11        Q.   Do you know where the source of the 80,000 was?

12        A.   I don't know.

13        Q.   There's also reference to -- let me show you

14   851.  It's page 13 of your '08 report.  Do you see

15   there's a reference to the $100,000?

16        A.   Yes.

17        Q.   It's for purchases; correct?

18        A.   Yes.

19        Q.   Were you told what the $100,000 was the purchase

20   of?

21        A.   No.

22        Q.   Do you know where that money went?

23        A.   I don't know.  It only showed transfer here.

24        Q.   All you can do is look at the numbers --

25             MS.BACANI:  I'm sorry, Counsel --
```

1        Q.    BY MR. FONG:  -- and accept your client's

2    characterization of it; correct?

3        A.    Yes.

4              MS.BACANI:  I'm sorry, Counsel, I'm afraid I

5    have to object and insist that all counsel present be

6    provided with copies before you start questioning the

7    witness on the documents.  It's impossible for us to

8    really follow what you're looking at and when you're

9    pointing him to certain items in the document.  So if you

10   would be so kind as to provide us copies before you start

11   questioning, that would be appreciated.

12             MR. FONG:  Tell you what, I'm going to ask

13   Elizabeth to copy 848 to 842.

14             MS. LIN:  Yeah, you can just use that copier

15   right there.

16             MS.BACANI:  Thank you.

17       Q.    BY MR. FONG:  There's a name of Turocy,

18   T-u-r-o-c-y, that shows up in your records.  Do you know

19   who Turocy was or is?

20       A.    I don't know who that person was or is.

21       Q.    Did Mr. Lin tell you who that was?

22       A.    I quite don't remember if that person was their

23   sales rep or something else.  I couldn't remember.

24       Q.    Was he paid as an independent contractor?

25       A.    It should be reflecting in the general ledger

1    which category that belonged to.

2         Q.   Do you recall whether he was provided with

3    either a W-2 or a 1099?

4         A.   It won't be W-2.  It will not be W-2.

5         Q.   1099?

6         A.   Probably, but I'm not sure.

7         Q.   There are times you wouldn't prepare either a

8    W-2 or a 1099 for payments to representatives; correct?

9         A.   We always issued the W-2 to the employees on

10   time.  However, for 1099, it was not like that.

11        Q.   Let's take a look at that exhibit at 851.

12   You'll see the handwritten note, "Ernest Turocy."

13        A.   Yes.

14        Q.   It says, "Wire:  American Dawn, Inc."?

15             MS. LIN:  Are we marking this as Exhibit 13,

16   Counsel?

17             MR. FONG:  Sure.  Yes, please.

18                  (Plaintiffs' Exhibit 13 was marked

19                   for identification.)

20        Q.   BY MR. FONG:  Is that your handwriting?

21        A.   No.

22        Q.   Do you know whose handwriting that is?

23        A.   I don't remember.

24        Q.   If we look at page 851 of the Bates stamp, we've

25   got a current period change total of slightly over a

1    million dollars.  Do you see that?

2        A.   Yes.

3        Q.   Is that money going out of the company or into

4    the company?

5        A.   It should be the in.

6        Q.   So is the reference to Ernest Turocy

7    $60,000-plus, is that coming into the company?

8        A.   I'm not sure, but I know that fund was from

9    American Dawn, Inc.

10       Q.   Okay.  You don't know if there's a connection

11   between American Dawn, D-a-w-n, Inc., and Ernest Turocy;

12   correct?

13       A.   I don't know.

14       Q.   And then if we go to the bottom of 851, we see a

15   listing of purchases; correct?

16       A.   Yes.

17       Q.   Now, some of these are just listed as wire

18   transfers without identifying the transferees; correct?

19       A.   That's correct.

20       Q.   Do you know why there's no detail as to the

21   entity receiving the monies?

22       A.   Because Peter told me most of the wire transfers

23   were to purchase the goods.

24       Q.   Did he tell you to whom the wire transfers were

25   made?

1        A.    No.

2        Q.    If you look at 852, there are wires that

3    identify what appear to be payees.  Do you see that?

4        A.    Yes.

5        Q.    So it will have Agape Industry Taiwan, see some

6    that are, for instance, Chen, Chiang, C-h-e-n,

7    C-h-i-a-n-g, Su Tuo?

8        A.    Yes.

9        Q.    Do you know where you got that detail from?

10       A.    It shows on the bank statements.

11       Q.    Now, all these documents relating to

12   transactions in '08 and forward were given to you in

13   2011; is that correct?

14       A.    Yes.

15       Q.    And they were characterized in 2011 rather than

16   back around the date when the transaction occurred;

17   correct?

18       A.    Yes.

19       Q.    Do you know the source of income from which

20   Peter Lin supposedly paid in deposits into Agape

21   Industry, which were characterized as loans?

22            MS.BACANI:  Objection.  Vague.  Counsel, could

23   you restate the entity you're talking about?

24            MR. FONG:  Agape Industry.

25            THE WITNESS:  Peter told me that was his loan.

1        Q.   BY MR. FONG:  Right, but do you know where Peter

2    got the money from?

3        A.   I don't know.

4        Q.   Did you see income derived by Peter Lin from

5    Agape Industry that would be consistent with the loans

6    that he's making to the company?

7        A.   I quite don't remember, but it should be covered

8    in the general ledger under loan to shareholder or

9    shareholder to loans.

10       Q.   No, I understand that's how it's characterized.

11   Okay.  Do you know what the paradigm is for money

12   laundering?

13            MS. LIN:  Can you restate the question?

14       Q.   BY MR. FONG:  Do you know what money laundering

15   is?

16       A.   Probably.

17       Q.   What is it?

18       A.   Yeah, probably like, for example, like drug

19   dealers, they make money from selling drugs, but they

20   turn around doing something else to make that money

21   legal.

22       Q.   It's to clean the money; right?

23            MS.BACANI:  Objection.  Vague, calls for a legal

24   conclusion.

25            MR. FONG:  I want to mark as the next exhibit in

1    order DR 924, which everybody has got a copy of.

2                 MS. LIN:  Fourteen.

3                       (Plaintiffs' Exhibit 14 was marked

4                       for identification.)

5         Q.   BY MR. FONG:  That's a copy of one of the

6    general ledger pages you prepared; correct?

7         A.   Yes.

8         Q.   And you see everything that's circled there with

9    the handwriting that says, "Loan from Peter Lin"?

10        A.   Yes.

11        Q.   Who circled those amounts?

12        A.   It should be done by Peter.

13        Q.   Who wrote in the loan -- the words, "Loan from

14   Peter Lin" for all the circled transactions?

15        A.   Peter probably.

16        Q.   Did you recognize the handwriting as being

17   Peter's?

18        A.   It looks like it.

19        Q.   Do you know why these notations exist in your

20   copy of your general ledger?

21        A.   When I was doing accounting, I didn't know which

22   one was the loan, which one was the sales, so Peter

23   helped me to do that.

24        Q.   And so you had, at the time you prepared these

25   general ledgers, three years of accounting records that

1    you had to go through to produce general ledgers and then

2    tax returns; correct?

3         A.   Yes.

4         Q.   And there's no way you would really know where

5    all this money came from other than based upon what

6    Mr. Lin told you; correct?

7         A.   Yes.

8              MR. FONG:  I'm going to refer you next to DR

9    962, which is part of your general ledger as of

10   December 31st, 2011.  We will mark that as 15, I think,

11   it is.

12                    (Plaintiffs' Exhibit 15 was marked

13                    for identification.)

14        Q.   BY MR. FONG:  Did you prepare that page of the

15   general ledger?

16        A.   No.

17        Q.   Who prepared it?

18        A.   I believe it was done by another accountant.

19        Q.   It's the new accountant; correct?

20        A.   I think so.

21        Q.   And we see "Turrocy," spelled differently, here

22   and Associates."  Do you see that?

23        A.   Yes.

24        Q.   Why did you have the other accountant's general

25   ledger for 2011 in your files?

```
1        A.   Peter told me that he was going to give me a

2   copy.

3        Q.   Why?

4        A.   Because he said I should keep a copy, so I did.

5        Q.   Did he tell you why?

6        A.   No.

7        Q.   Weren't you a little unhappy about not doing the

8   work?

9        A.   No.

10       Q.   Did you continue to have some sort of an

11  accounting oversight for Agape Industry after the new

12  accountant came in?

13       A.   No.

14       Q.   Do you know who Tom Chan is?

15       A.   No.

16       Q.   Have you ever heard of the law firm called the

17  Chan Law Group?

18       A.   I don't know.

19       Q.   Did you do the accounting for Agape Industry in

20  2010?

21       A.   Yes.

22            MR. FONG:  We'll mark it as Exhibit 16 DR 946.

23               (Plaintiffs' Exhibit 16 was marked

24               for identification.)

25       Q.   BY MR. FONG:  Do you recognize what that is,
```

1    sir?

2         A.   Yes.

3         Q.   If we look -- did your firm prepare that general

4    ledger?

5         A.   Yes.

6         Q.   And it shows $150 to your firm in 2010; correct?

7         A.   Yes.

8         Q.   Then there's a payment to Yee Horn Shuai on

9    February 26th, 2010, $1,500.  Do you see that?

10        A.   Yes.

11        Q.   It looks like that's shortly after Fannie Shuai

12   prepared and sent the statement to the Secretary of

13   State; correct?

14        A.   I don't know.  You have to refer to the

15   document.

16        Q.   We saw the February 10th, 2010 filing, I think

17   it was.  You've got that fax from Fannie Shuai?

18             MS. LIN:  Objection.  Calls for speculation.

19        Q.   BY MR. FONG:  The payment to the Shuai office

20   was consistent with the fax from Fannie Shuai in February

21   of 2010; correct?

22        A.   It looks like it in the same period.

23        Q.   On the same day that Yee Horn Shuai was paid

24   1500, the Chan Law Group, LLP was paid $5,000.  Do you

25   see that?

 1        A.   In the same period of time, but I'm not sure it

 2   would be on the same date.

 3        Q.   Let's take a look at the date on the left.

 4   They're both February 26th, 2010; correct?

 5        A.   It's hard to say.  Because when we do the

 6   accounting for that month, we would put all the checks

 7   and the cash on the last day of the month.  Usually we do

 8   that way.

 9        Q.   So these aren't the dates when the amounts were

10   posted on the bank statement?

11        A.   They should be in the same month, but maybe not

12   on the same date.

13        Q.   Chan Law Group is referenced as receiving $5,000

14   on February 26th, 2010; correct?

15        A.   Yes.

16        Q.   But that could actually reference any payment in

17   February?

18        A.   It was paid in February.

19             MR. FONG:  I want to mark next as Exhibit 17, DR

20   540 through 542, copies of that.  HSBC statement for

21   February of 2010.

22                     (Plaintiffs' Exhibit 17 was marked

23                      for identification.)

24             MS.BACANI:  Counsel, when you get to a good

25   stopping point, could we take a bathroom break?

1            MR. FONG:  Sure.

2            MS.BACANI:  Thank you.

3       Q.   BY MR. FONG:  Looking at Exhibit 17, that's a

4    copy of the HSBC statement from the DVD.

5       A.   Yes.

6       Q.   Okay.  And so you're right, if you look at that

7    statement, the check that correlates with the Chan office

8    is check No. 241, posted February 12th, 2010; correct?

9       A.   Yes.

10           THE REPORTER:  Could we take a break?  My

11   machine seems to have frozen up.

12           MR. FONG:  Sure.

13           (A short break was taken.)

14           MR. FONG:  Back on the record.

15      Q.   BY MR. FONG:  Mr. Roan, looking at Exhibit 17,

16   HSBC document from February of 2010.  Take a look at the

17   fax header on the top of these two pages.  Do you see it?

18      A.   Yes.

19      Q.   It shows a date of April 9, 2010 at 5:39 p.m.;

20   correct?

21      A.   Yes.

22      Q.   And it's sent from Peter?

23      A.   I'm not sure.

24      Q.   Well, look to the right of the "5:39P," do you

25   see the words on the top it says, "P-e-t-e-r"?

1       A.    Yeah.

2       Q.    That's Peter Lin, isn't it?

3       A.    Yes.

4       Q.    And it's got looks like a fax number where the

5   area code is illegible, but it's 325-9008.  Do you

6   recognize that fax?

7       A.    I'm -- I quite don't remember if that number

8   belong to Peter.

9       Q.    Do you have any idea why there's a fax header

10  with this date from Peter on the copy that you've got?

11      A.    I don't remember.

12      Q.    You weren't doing any business with Peter Lin in

13  2010; correct?

14      A.    2010, I don't remember, probably there was some.

15      Q.    And I don't recall seeing an invoice from you

16  for any work done in 2010 in the DVD documents you

17  produced.

18      A.    Because the accounting was not finished until

19  2011.

20      Q.    Yes, and you billed that out in September of

21  2011; correct?

22      A.    I billed out in year 2011, probably in September

23  or October.

24      Q.    Yes, that's what the exhibit shows.  But I see

25  no billing for any work done in 2010.  Do you recall

```
 1    whether you did any work for 2010?

 2         A.   I believe all the works were done in 2011.

 3         Q.   Right.   That's what I'm trying to find out,

 4    whether this Exhibit 17 was faxed to you in 2010

 5    consistent with the fax header date of April 9, 2010.

 6         A.   I don't remember why the statement was in 2010.

 7    However, I remember I finished the accounting in 2011.

 8         Q.   Understood.   Looking at Exhibit 16 again, this

 9    is the general ledger report for the end of 2010, and

10    looking at legal and accounting, we have the billing from

11    the Chan Law Group with a reference to check No. 241 for

12    the amount of $5,000.   Do you see that?

13         A.   Yes.

14         Q.   Were you aware that the Chan Law Group was

15    headed up by Tom Chan?

16         A.   I don't know.

17         Q.   Do you know who Tom Chan is?

18         A.   I don't know.

19         Q.   Do you know who represents Mr. Lin?

20         A.   I don't know.

21         Q.   And then we have another payment to Mr. Shuai

22    referencing check No. 410.   Do you see that?

23         A.   Yes.

24         Q.   That's April 30th of 2010; correct?

25         A.   Yes, that was paid in April.
```

1        Q.    Yes.  Do you have any idea what that was for?

2        A.    I don't know.

3        Q.    And then there's a reference to Legalway Law

4    Firm for May 28th of 2010.

5        A.    Yes.

6        Q.    It's a reference to $5,700 with no reference

7    number.  Do you see that?

8        A.    Yes.

9        Q.    How did you locate the 5,700-dollar payment?

10       A.    It should be showing on the bank statement.

11       Q.    For May of 2010; correct?

12       A.    It should be.

13       Q.    Do you know who Legalway Law Firm was?

14       A.    I don't know.

15       Q.    Do you know what services were performed by

16   Legalway Law Firm?

17             MS. BACANI:  Objection.  Calls for speculation.

18             THE WITNESS:  (In English)  Legal service.

19       Q.    BY MR. FONG:  Is that what Mr. Lin told you?

20       A.    No, because it belongs to legal expenses.

21       Q.    Sure, but who characterized that for you?

22       A.    According to our payment, it belongs to legal

23   services.

24             MR. FONG:  I'm going to mark as Exhibit 18 the

25   HSBC statement for May 1st through May 28th, 2010.

```
 1                  (Plaintiffs' Exhibit 18 was marked

 2                  for identification.)

 3        Q.    BY MR. FONG:  While that's being copied, do you

 4   have a recollection as to receiving anything as to where

 5   Legalway Law Firm was located?

 6        A.    No.

 7        Q.    So looking at what we've now marked as Exhibit

 8   18, we can see the reference to that $5,700; correct?

 9        A.    Yes.

10        Q.    It says, "Book debit Agape Industry Inc BBK."

11   What's the BBK, do you know?

12        A.    I don't know, probably that's bank code.

13        Q.    It says, "Mega International Commercial Bank

14   Kaohsiung"?

15        A.    Yes.

16        Q.    And it looks like "BNF," does that stand for

17   beneficiary?

18        A.    Yes.

19        Q.    So would that indicate to you that there was a

20   transfer or a payment from the HSBC account to Mega

21   International Commercial Bank in Taiwan Kaohsiung?

22        A.    We should put this way, $5,700 was transferred

23   from HSBC bank account to Legalway Law Firm.

24        Q.    Do you have any idea what services were

25   performed by somebody named Legalway Law Firm in
```

1    apparently Kaohsiung, Taiwan?

2          MS. LIN:  Objection.  I believe that's been

3    asked and answered.

4          Q.   BY MR. FONG:  Let's go back to Exhibit 17.  And

5    if you look at the transaction on this HSBC statement for

6    February of 2010, there's $50,000 debiting to the same

7    bank in Kaohsiung; right?

8          A.   (In English)  I'm sorry, which one are you

9    talking about?

10          Which transaction are you talking about?

11          Q.   February 9th, you see a $50,000 reference there.

12          A.   Yes.

13          Q.   With the beneficiary is Ticho, T-i-c-h-o,

14    Industries?

15          A.   Yes.

16          Q.   Do you know who that is?

17          A.   I don't remember.

18          Q.   Do you know what that $50,000 amount might have

19    been for?

20          A.   Probably it was a purchase.  It should be

21    covered in general ledger.

22          Q.   Right, but again, that's just what Mr. Lin told

23    you it was for; correct?

24          A.   It should be.

25          Q.   Did Mr. Lin ever show you bills of lading for

1    anything that Agape purchased?

2        A.    No.

3        Q.    Did he ever show you any invoices from anybody

4    that Agape purchased product from?

5        A.    No.

6        Q.    Did Mr. Lin have a list of customers or

7    suppliers that he provided to you?

8        A.    No.

9        Q.    And Mr. Lin never told you that his relationship

10   with Agape in Taiwan and Jun-En in Taiwan was terminated

11   around this time period of January, February, 2010; is

12   that correct?  He never told you that, did he?

13       A.    No.

14       Q.    Did you ever prepare any personal tax return for

15   Peter Lin or his wife, is it Jan or Jun Hung?

16       A.    Yes.

17       Q.    For what years did you prepare personal tax

18   returns for Peter Lin and/or his wife?

19       A.    In the recent years.

20       Q.    From when to when have you been the tax preparer

21   for Peter Lin and/or his wife?  Did you do both of them

22   or not?

23       A.    Yes, I prepare for both of them, but I don't

24   remember which year I started to do that.

25       Q.    Do you recall approximately what year you

```
1    started to do personal tax returns for Peter Lin and his

2    wife?

3         A.   I quite don't remember.

4         Q.   What's your best estimate, sir?

5         A.   It has been a few years, but I really don't

6    remember which year I started to do that.

7         Q.   What's the earliest year you can remember?

8         A.   Probably year 2005, year 2006, I'm not sure.

9         Q.   And so have you continuously filed tax returns

10   each year for Peter Lin and his wife?  And I don't mean

11   filed, but prepared the tax return?

12        A.   Yes.

13        Q.   Did Peter Lin ever prepare a Schedule C for any

14   of the income that he earned between 2005 and 2010?

15        A.   I quite don't remember.  I have to go back to

16   refer to the tax return.

17        Q.   You've got all these still on your computer;

18   correct?

19        A.   Yes.

20        Q.   Did you prepare a joint return for Peter Lin and

21   his wife?

22        A.   Yes.

23        Q.   Do you still have an accounting relationship

24   with Peter Lin and his wife?

25        A.   Yes.
```

1      Q.    How much are you paid to prepare their tax

2   returns?

3      A.    For personal tax return?

4      Q.    Yes, sir.

5      A.    (In English)  A few hundred dollars.

6      Q.    Did you, in preparing their personal tax

7   returns, correlate the information that you had for Agape

8   Industry, Agape Industrial, and any other company so that

9   the tax returns were consistent?

10          MS. BACANI:  Objection.  Vague.

11          THE WITNESS:  I do need to.

12      Q.    BY MR. FONG:  Now, you had prepared the Agape

13   Industry tax returns for three years, I think, in 2011

14   correct?

15      A.    Until 2010.

16      Q.    Right.  And so did you have to go back and look

17   at the Lin's tax returns to make sure that what you

18   prepared for Agape was consistent with what you had

19   already filed for them?

20      A.    Well, I prepare -- when I prepare for the tax

21   return, I need all the information about all types of

22   income.  I need those information.

23      Q.    At the time you filed the personal -- or you

24   prepared the personal tax returns for Peter Lin and his

25   wife, were those all filed within time limits, the

1    correct time limits?

2         A.   I don't remember.  Most of them were filed on

3    time, but I'm not sure each year would file on time.

4         Q.   Now, because you had three years of tax returns

5    to prepare for Agape Industry, you had to characterize

6    the transactions, or Peter had to characterize the

7    transaction so they were consistent with what was

8    reflected in his personal tax return; correct?

9              MS. BACANI:  Objection.  Calls for speculation.

10             THE WITNESS:  Could you be more specific?

11        Q.   BY MR. FONG:  Well, you had characterized

12   certain line items as loans to and from Peter and the

13   company; correct?

14        A.   Yes.

15        Q.   And that was in the three-year batch that you

16   sort of processed at one time; correct?

17        A.   Yes.

18        Q.   And your characterization of those as loans and

19   other characterizations had to be consistent with what

20   you had already prepared for Peter and his wife and

21   presumably they filed; correct?

22        A.   It's hard to say because for the personal loan,

23   it will not be shown on the same -- in the same year of

24   the personal income tax return.

25        Q.   You might have no entry because it's a

```
 1    nontaxable event to make the loan; correct?

 2        A.   Yes.

 3        Q.   And so there's only a taxable event if, what, he

 4    gets paid back and there's a profit?

 5        A.   For that part, I don't know, but for his income,

 6    I remember that's from the work, the salary.

 7        Q.   Was -- did you report income to Peter Lin from

 8    Taiwan?

 9             MS. BACANI:  Objection.  Vague.

10             THE WITNESS:  No.

11        Q.   BY MR. FONG:  Who was his employer in the United

12    States from 2005 to 2010, based on what he told you?

13             MS. BACANI:  Same objection.

14             THE WITNESS:  Agape.

15        Q.   BY MR. FONG:  Agape Industry?

16        A.   Yes.

17             MS. BACANI:  Objection.  Vague.

18        Q.   BY MR. FONG:  Did Peter report to you income

19    from any other entity besides Agape Industry?

20             MS. BACANI:  Same objection.

21             THE WITNESS:  No.

22             MR. FONG:  Let's take a five-minute break.  I

23    may be done.

24                  (A short break was taken.)

25        Q.   BY MR. FONG:  Mr. Roan, have you ever testified
```

1   as an expert witness?

2        A.   No.

3        Q.   Have you ever heard the term "Chinese wall,"

4   w-a-l-l?  And I'm not talking about the Great Wall in

5   China, but a Chinese wall?

6        A.   No.

7             MR. FONG:  I have no further questions at this

8   time.  Thank you, sir.

9             MS. BACANI:  Good afternoon.  I'll try to make

10  this real quick.  We didn't really announce ourselves for

11  the record, but I'm Lena Bacani.  I'm with Fox Rothschild

12  and I'm representing the defendants in this litigation

13  including Mr. Peter Lin and the other corporate

14  defendant, which is Agape Industrial.  Thank you for

15  testifying today.  I just had a couple of questions just

16  to complete my notes and I'm not going to take a long

17  time.  But I wanted to understand.

18                        EXAMINATION

19  BY MS. BACANI:

20       Q.   You testified earlier that Mr. Lin was your

21  primary contact regarding the formation of Agape Industry

22  USA; is that correct?

23       A.   Yes, Agape Industry in USA.

24       Q.   Did you ever talk with anyone else from Taiwan

25  about the formation of Agape Industry USA?

1      A.   I don't remember.  Probably none.

2      Q.   And is your answer the same regarding the

3  formation of Jun-En USA, was Mr. Lin your primary contact

4  for the formation of Jun-En USA?

5      A.   Yes.

6      Q.   And did you ever talk with anyone from Taiwan

7  about forming the U.S. entity Jun-En USA?

8      A.   No.

9      Q.   And sorry to be repetitive, I just want to make

10  sure I'm complete.  Regarding Agape Industrial, one of

11  the defendants in this action, was Peter Lin your primary

12  contact for the formation of Agape Industrial?

13      A.   Yes.

14      Q.   And did you ever talk with anyone in Taiwan

15  about the formation of Agape Industrial?

16      A.   No.

17      Q.   You testified earlier that you recall receiving

18  a fax from a Mrs. Lu.  Do you recall when, approximately,

19  that fax was received?

20      A.   I quite don't remember the exact time.

21      Q.   Do you recall what the fax was regarding?

22      A.   Probably it has something to do with the

23  information request.

24      Q.   When you say, "information request," are you

25  referring to the information requested in the subpoena?

1        A.   I don't remember.

2        Q.   Was this a fax received when Mrs. Lu asked you

3    for additional documents -- strike that.

4             Was this fax from Mrs. Lu regarding her request

5    to obtain documentation on Agape Industry USA?

6        A.   It should be.

7        Q.   Had you ever talked to Mrs. Lu before that time?

8        A.   I quite don't remember, probably not.

9        Q.   Had you ever met with Mrs. Lu at any time?

10       A.   No.

11       Q.   You had testified earlier about -- and I

12   apologize, I know him by Tony Yang.  If I refer to him as

13   Mr. Yang, will you know who I'm speaking of?  Had you

14   ever talked to Mr. Yang about the formation of either

15   Agape Industry USA, Jun-En USA, or Agape Industrial?

16       A.   Probably none.

17       Q.   You also testified a little bit earlier that

18   there was, I believe, you said a $10,000 payment to fund

19   the formation of Agape Industry USA; is that correct?

20       A.   Peter told me the capital was $10,000.

21       Q.   I see.  Did you ever see the -- strike that.

22            Did you see a check or a wire transfer statement

23   for the $10,000?

24       A.   I quite don't remember.  If there was, it should

25   be covered in the general ledger.

1    Q.   And regarding detail about who the payment was

2    from, would this also appear on the general ledger?

3              MR. FONG:  Objection.  Calls for speculation.

4              THE WITNESS:  No, you will not be able to see

5    that.

6    Q.   BY MS. BACANI:  Would that information be

7    somewhere else in the records you provided on the DVD

8    that you provided?

9    A.   I don't remember, but there is a transaction for

10   $10,000.  According to Peter, that was for capital.

11   Q.   And was it your understanding -- strike that.

12             Did you ever receive any checks or wire

13   transfers from anyone in Taiwan -- strike that.

14             Did you ever receive a check or wire transfer or

15   any other funds from anyone in Taiwan for the formation

16   of Agape Industry USA?

17             MR. FONG:  Objection.  Vague and ambiguous.

18             THE WITNESS:  No.

19   Q.   BY MS. BACANI:  And do you recall ever receiving

20   a check or wire transfer or other funds from anyone in

21   Taiwan for the formation of the company Jun-En USA?

22   A.   No.

23   Q.   And same question, did you ever receive a check

24   or wire transfer or other funds for the formation of

25   Agape Industrial from anyone in Taiwan?

1      A.   No.

2      Q.   Did the funds used to form Agape Industry USA

3  come from Mr. Lin?

4          MR. FONG:  Objection.  No foundation.  Calls for

5  speculation.

6          THE WITNESS:  I quite don't remember.  However,

7  in the DVD you will be able to find an invoice or record

8  regarding this or a payment.

9      Q.   BY MS. BACANI:  So you believe you produced it

10  in the documents responsive to the subpoena?

11      A.   I should.  I'm not sure, but I should.

12      Q.   So as you sit here today, do you have any

13  recollection whether the funds received for the formation

14  of Agape Industry USA were from Peter's personal account

15  as opposed to a company account?

16      A.   I don't remember who made that payment.

17  However, in the DVD it should cover that information who

18  would be the payor.

19      Q.   Thank you.  Is that the same answer for the

20  formation of Jun-En USA and Agape Industrial, that the

21  information regarding the funding of the entities should

22  be discernible from documents in the DVD?

23      A.   It should be.

24      Q.   You also testified earlier that you prepared,

25  but never filed tax returns for Agape Industry USA; is

1    that correct?

2         A.    Yes.

3         Q.    Is that true also for Jun-En USA?

4         A.    For Jun-En, I didn't do this company's

5    accounting.

6         Q.    I apologize.  What about -- strike that.

7               What about Agape Industrial, did you prepare tax

8    returns for Agape Industrial?

9         A.    Yes.

10        Q.    And just to be clear, you prepared -- strike

11   that.

12              To be clear, you prepared the tax returns, but

13   you don't know whether they were ultimately filed or

14   when; correct?

15        A.    That's correct.

16        Q.    In preparation of the tax returns for Agape

17   Industry USA, did you pay any of the taxes on behalf of

18   Agape Industry USA -- strike that.

19              I apologize.  That was a terrible question.

20              You testified that you prepared the tax returns

21   for Agape Industry USA; correct?

22        A.    Yes.

23        Q.    Did you ever write checks to cover federal taxes

24   as a result of those tax returns?

25        A.    No.

1       Q.   So it was the responsibility of individuals in

2   Agape Industry USA to actually -- if they owed taxes, to

3   actually pay the government; correct?

4       A.   Yes.

5       Q.   Is that true, as well, of state tax?

6       A.   Yes.

7       Q.   What about workers' compensation, did you, as

8   part of your preparing the tax returns, did you ever

9   calculate workers' compensation insurance or payments

10   required by the company?

11       A.   No.

12       Q.   So how did Agape Industry USA -- strike that.

13       Are you aware -- strike that.  Sorry.

14       So getting back to the actual payment of

15   workers' compensation for Agape Industry USA, did you

16   help the company or calculate those payments for Agape

17   Industry USA?

18       A.   No.

19       Q.   Did you ever write any checks or make any funds

20   transfers to the state of California to pay workers'

21   compensation for Agape Industry USA?

22       MR. FONG:  Vague, ambiguous, and unintelligible.

23       THE WITNESS:  No.

24       Q.   BY MS. BACANI:  Did you ever write any checks or

25   make any funds transfers to cover any taxes, state or

1    federal, for Agape Industry USA?

2         A.    I quite don't remember.

3         Q.    And what about for -- strike that.

4              For Agape Industrial, did you calculate workers'

5    compensation required to be paid by Agape Industrial?

6              MR. FONG:  Objection.  Assumes facts not in

7    evidence, vague, ambiguous, and unintelligible.

8              THE WITNESS:  Probably not.

9         Q.    BY MS. BACANI:  So was your role limited for

10   Agape Industry USA to preparing the tax returns and not

11   the day-to-day accounting for the company?

12        A.    That's correct.

13        Q.    And the same question for Agape Industrial, your

14   role was to prepare the federal and state tax returns,

15   but not the -- you weren't involved in the day-to-day

16   accounting of the business; correct?

17        A.    That's correct.

18        Q.    Just to be clear, so you didn't cut checks or

19   transfer funds on behalf of Agape Industry USA?

20        A.    I did not.

21        Q.    And you never transferred funds or cut checks on

22   behalf of Jun-En USA?

23        A.    I did not.

24        Q.    And the same question for Agape Industrial, you

25   never cut checks or transferred funds on behalf of Agape

1    Industrial?

2        A.    No.

3        Q.    Any other business fees -- strike that.

4              Do you know who did the day-to-day accounting

5    for Agape Industry USA?

6              MR. FONG:  Objection.  Assumes facts not in

7    evidence if there was such.

8              THE WITNESS:  I don't know.

9        Q.    BY MS. BACANI:  Same thing with Jun-En USA and

10   Agape Industrial, were you aware of -- strike that.

11             For Jun-En USA, you did not prepare the tax

12   returns, do you know who did prepare the tax returns for

13   Jun-En USA?

14       A.    I don't know.

15       Q.    And for Agape Industrial, do you know who kept

16   the books for the company?

17       A.    It should be kept with Peter.

18       Q.    And all of the information that you received to

19   prepare the tax return only came from Peter Lin; is that

20   correct?

21       A.    Peter or his wife.

22       Q.    And his wife being June Hung or Jan?

23       A.    Jan Hung.

24       Q.    Was there ever any stock issued for Agape

25   Industry USA?

```
 1              MR. FONG:  Objection.  No foundation, calls for
 2    speculation.
 3              THE WITNESS:  I don't know about that.
 4         Q.   BY MS. BACANI:  Did you ever -- strike that.
 5              Did you ever contact anyone in Taiwan about the
 6    transfer of stock certificates in Agape Industry USA?
 7         A.   No.
 8         Q.   Was there ever any stock issued for Jun-En USA?
 9              MR. FONG:  Objection.  No foundation, calls for
10    speculation.
11              THE WITNESS:  I don't know.
12         Q.   BY MS. BACANI:  Did you ever talk to anyone in
13    Taiwan about the issuance of stock in Jun-En USA?
14         A.   No.
15         Q.   And the same question for Agape Industrial, do
16    you know was there ever any stock issued for Agape
17    Industrial?
18         A.   Could you please repeat?
19         Q.   Yes.  Let me rephrase.  Do you know whether
20    there was ever any stock certificates issued for Agape
21    Industrial?
22         A.   I quite don't remember.
23         Q.   Can you recall whether you ever talked to anyone
24    in Taiwan about the issuance of stock in Agape
25    Industrial?
```

```
 1        A.    No.

 2        Q.    Did anyone in Taiwan ever contact you prior

 3   to -- strike that.

 4              Did anyone in Taiwan ever contact you about the

 5   stock issued in Agape Industry USA prior to January 2010?

 6        A.    No.

 7        Q.    Did anyone from Taiwan ever contact you about

 8   stock in Jun-En USA prior to January 2010?

 9        A.    No.

10        Q.    And the same question, sorry to be repetitive,

11   but did anyone in Taiwan ever contact you about stock for

12   Agape Industrial prior to January 2010?

13        A.    No.

14              MS. BACANI:  Well, at this point, I'd like to

15   just take, like, a quick five-minute break, just confer

16   with defendant and see if we have any additional

17   questions, but I'm very close to being done.

18                   (A short break was taken.)

19              MS. BACANI:  We can go back on the record.

20        Q.    BY MS. BACANI:  I'm sorry, I just need to

21   clarify a couple of minor points because I may be getting

22   the names wrong.  Let me ask you this way:  Were you ever

23   contacted -- strike that.

24              When you testified earlier that you were

25   contacted by Mrs. Lu, is that Mrs. Lu with an L-u or a
```

1      Mrs. Liu with an L-i-u?

2          A.   L-u.

3          Q.   I only ask because apparently there might be

4      separate individuals.  And were you ever contacted by

5      Mr. Yang regarding -- I think I asked you earlier about

6      the formation of Agape Industry, Jun-En USA, and Agape

7      Industrial, were you ever contacted by Mr. Yang regarding

8      any of these three companies?

9          A.   No.

10         Q.   Were you ever contacted by anyone in Taiwan

11     other than Mrs. Lu regarding the three companies, Agape

12     Industry USA, Jun-En USA, and Agape Industrial?

13         A.   No.

14              MS. BACANI:  That's all I have.  Thank you very

15     much.

16              MR. FONG:  I'm going to try to clarify some of

17     the testimony of Mr. Roan.

18                      FURTHER EXAMINATION

19     BY MR. FONG:

20         Q.   Ms. Bacani used the terms "somebody from

21     Taiwan," and I'm not sure what that means.  Do you?

22         A.   Probably people in Taiwan.

23         Q.   Okay.  Do you know where Peter Lin lived before

24     2005?

25              MS. BACANI:  Objection.  Calls for speculation.

```
1              THE WITNESS:  I don't know.

2        Q.   BY MR. FONG:  Do you know what his origin is?

3              MS. BACANI:  Same objection.

4              THE WITNESS:  Probably Taiwan, but I'm not sure.

5        Q.   BY MR. FONG:  When you speak with Mr. Lin, do

6   you speak Mandarin, or Taiwanese, or English or what?

7        A.   Chinese and English.

8        Q.   Which dialect?

9        A.   Mandarin.

10       Q.   I thought that's Cantonese.  Does Peter Lin

11  speak with a Taiwanese accent or mainland Chinese accent,

12  can you tell?

13       A.   It sounds like Taiwanese accent.

14       Q.   Okay.

15             MR. FONG:  Now, with regard to payment history,

16  we'll mark as the next exhibit in order, Exhibit 19,

17  Bates stamp Nos. 780 to 781.  That's the ending

18  balance -- comparative ending trial balance for Agape

19  Industry.

20                  (Plaintiffs' Exhibit 19 was marked

21                   for identification.)

22       Q.   BY MR. FONG:  Do you have that in front of you?

23       A.   Yes.

24       Q.   Now, in 2006, you prepared tax documents

25  indicating that 100 percent of the shares of Agape
```

```
1    Industry were owned by an individual in Taiwan.  Do you

2    recall that?

3        A.   Yes.

4        Q.   And that shareholder was Miss Lu; correct?

5        A.   Yes.

6        Q.   And so let's take a look at this trial balance

7    and see what it means.  Let's look at DR 780.  It says,

8    "Loan Payable stockholder $104,500."  Do you see that?

9    That's in parenthesis.  What does that mean?

10       A.   That means credit.

11       Q.   So that's $104,500 that you and Peter Lin had

12   identified as a loan from the stockholder to the company;

13   is that correct?

14           MS. BACANI:  Objection.  Vague, calls for

15   speculation.

16           THE WITNESS:  That's the loan from the

17   shareholder.

18       Q.   BY MR. FONG:  And that shareholder was

19   identified as Miss Lu; correct?

20           MS. BACANI:  Same objection.

21           THE WITNESS:  It's a shareholder.

22       Q.   BY MR. FONG:  The only shareholder you

23   identified was the hundred percent shareholder in 2006

24   who was who?

25           MS. BACANI:  Objection.
```

1          MS. LIN:  Objection.

2          THE WITNESS:  Please refer to the tax return or

3     the document contained in DVD.

4          Q.   BY MR. FONG:  Did the shareholder change over

5     time?

6          A.   Could you be more specific?

7          Q.   Did the identity of the shareholder change

8     between 2005 and 2008?

9          A.   Before year 2007, as far as I recall, that

10    person was Miss Lu.

11         Q.   And so the $104,500 was attributed as a loan

12    from Miss Lu; correct?

13         MS. BACANI:  Objection.  Vague, calls for

14    speculation.

15         MS. LIN:  Speculating.

16         THE WITNESS:  I don't remember.  However, in the

17    general ledger, you will find some detailed information

18    in that regard.

19         Q.   BY MR. FONG:  Do you know of any other

20    shareholder in 2006 for Agape Industry besides Miss Lu?

21         MS. BACANI:  Objection.  Calls for speculation.

22         THE WITNESS:  That's the loan from the

23    stockholder.

24         Q.   BY MR. FONG:  The sole stockholder; correct?

25         MS. LIN:  Objection.  Asked and answered.

```
1          Q.   BY MR. FONG:  Correct, sir?

2          A.   The only shareholder?

3          Q.   Yes.

4          A.   It should be.

5          Q.   And there's a reference to "Loan Payable –

6    Officers" of what was $7,119.06 reduced to $317.34.  Do

7    you see that?

8          A.   Yes.

9          Q.   Do you recall who the officers were in 2006?

10              MS. LIN:  Objection.  Vague and ambiguous.

11              THE WITNESS:  Which officer are you referring

12   to?

13         Q.   BY MR. FONG:  Any of the officers.

14         A.   That $7,000 probably was for Peter's salary and

15   we were about to issue that.

16         Q.   Why do you say "probably"?

17         A.   Regarding how did we come out this $7,119, you

18   will be able to find it in the general ledger between

19   2005 or 2006.

20         Q.   Do you recall that Peter was not paid for a

21   period of time and so that was treated as a loan?

22              MS. BACANI:  Objection.  Vague, calls for

23   speculation.

24              THE WITNESS:  Sometimes we would do this in this

25   way.
```

1     Q.    BY MR. FONG:  If the company was short of cash,

2     you had to do something to make the books balance;

3     correct?

4     A.    Yes.

5     Q.    Now, let's look at the second page of

6     Exhibit 19, that's DR 781.  This shows "Common Stock

7     $10,000" in parenthesis.

8     A.    Yes.

9     Q.    Where is that taken from?

10     A.    That's the company's capital investment.

11     Q.    Now, let's go back to 2005 -- strike that.

12           Why is the $10,000 in Exhibit 19 in parenthesis?

13     A.    That means credit.

14     Q.    What does that mean?

15     A.    That means that was the stockholder's equity,

16     yes.

17     Q.    Does that mean that the cash was actually

18     received?

19     A.    That's possible or probably not.

20     Q.    Where would the entry come from?

21     A.    In year 2005, there was a stock receivable under

22     other receivables.

23     Q.    Did you check that during one of our breaks?

24     A.    No.

25     Q.    That was under account 194-0; correct?

```
 1        A.   Yes.

 2             MR. FONG:  If you look at what we'll mark as the

 3   exhibit next in order, 20, that's a page related to the

 4   comparative trial balance ending the end of '05.

 5                  (Plaintiffs' Exhibit 20 was marked

 6                   for identification.)

 7        Q.   BY MR. FONG:  Do you see that?

 8        A.   Yes.

 9        Q.   That refers to the $10,000 number; correct?

10        A.   Yes.

11        Q.   Does this reflect that there's $10,000 owing for

12   the stock or $10,000 that was paid into the stock?

13        A.   According to this in 2005, the fund was not in

14   yet.

15        Q.   Was the $10,000 ever received, to your

16   knowledge?

17        A.   Probably the fund went in in year 2006.

18        Q.   Okay.

19             MR. FONG:  Mark as Exhibit 21 DR 889.

20                  (Plaintiffs' Exhibit 21 was marked

21                   for identification.)

22        Q.   BY MR. FONG:  Can you tell us what account

23   number 198-0 is?

24        A.   It is a temporary account.

25        Q.   You've got the term, "exchange" with three
```

```
1    question marks.

2         A.   For some categories that I was not sure, I would

3    put in this account temporarily.

4         Q.   These are in the preparation of this document

5    things that were uncertain as to how to categorize;

6    correct?

7         A.   Yes.

8         Q.   Did you ever determine what the debit balances

9    were for this 198 account?

10        A.   Peter told me most of this were personal

11   expenses.

12        Q.   Were these line items taken from credit cards?

13        A.   Yes.

14        Q.   Now, you have a "TWN$."  What does that stand

15   for, is that Taiwan?

16        A.   Yes, that's Taiwan dollars, NT.

17        Q.   And then you have "CHN$"; correct, that's

18   Chinese dollars?

19        A.   For "TWN$," that's the money he spent in Taiwan.

20   For "CHN$," that was the money that he spent in China.

21        Q.   Then you have a reference, "3 CC EXP for Peter

22   Lin (Personal)" balances it out; correct?

23        A.   Yes.

24        Q.   Is this what Peter told you to do is to charge

25   those as his personal expenses?
```

1        A.    We should put this way, Peter told me those were

2    not the company expense, those were his personal expense.

3        Q.    And, again, these are things that he told you in

4    2011; correct?

5        A.    Should be.

6        Q.    Do you know who all the names relate to?

7        A.    I don't know.

8        Q.    With regard to the loans from Taiwan, do you

9    have any knowledge as to the source of those loans?

10              MS. BACANI:  Objection.  Vague, lacks

11   foundation.

12              THE WITNESS:  I don't know.

13              MR. FONG:  Looking at Exhibit 22, which is DR

14   789.

15                   (Plaintiffs' Exhibit 22 was marked

16                    for identification.)

17       Q.    BY MR. FONG:  There's some detail on the loan

18   payable stockholder, two payments of a total of $104,500;

19   correct?

20       A.    Yes.

21       Q.    And so there should be detail in the bank

22   records somewhere that correlate with the CR04 and the

23   CR08; correct?

24       A.    I don't remember, but you can refer to the bank

25   statement.

1      Q.   Right, understood.  But for you to actually

2   characterize it and actually get an ID number of CR04 and

3   CR08, you had to see the evidence of that; correct?

4      A.   Yes.

5      Q.   You didn't just make stuff up just because Peter

6   told you something; correct?

7           MS. BACANI:  Objection.  Vague.

8           THE WITNESS:  I did according to the bank.

9      Q.   BY MR. FONG:  So you had to find some detail to

10  show an economic event that was referenced by a writing

11  from the bank for you to put in this $104,500 on Exhibit

12  22; correct?

13     A.   Yes.

14     Q.   Now, the reference numbers of CR04 and CR08,

15  what do they correlate with?

16     A.   CR-04 means the cash received in April 2006.

17     Q.   Cash can come in in many different ways;

18  correct?

19     A.   Yes.

20     Q.   Could be dollar bills; correct?

21     A.   Yes.

22     Q.   Can be wire transfers?

23     A.   Yes.

24     Q.   Can be checks?

25     A.   Yes.

```
 1        Q.    Now, did you see the loan amount of $104,500

 2   actually put into any of the bank accounts that Mr. Lin

 3   provided to you?

 4            MS. LIN:  Vague, ambiguous, unintelligible.

 5            THE WITNESS:  (In English)  You've got bank

 6   statements where it show deposit.

 7        Q.    BY MR. FONG:  So let's look at that page, DR

 8   440.

 9            MR. FONG:  So we are on 23.  I think that's what

10   the mathematicians call a prime number.

11                  (Plaintiffs' Exhibit 23 was marked

12                   for identification.)

13        Q.    BY MR. FONG:  Exhibit 23 shows $100,000 credit

14   on April -- I mean, on August 21st, '06; correct?

15        A.    Yes.

16        Q.    And that correlates with what you have in

17   Exhibit 22; correct?

18        A.    Yes.

19            MR. FONG:  We're going to mark as Exhibit 24 DR

20   No. 435.

21                  (Plaintiffs' Exhibit 24 was marked

22                   for identification.)

23        Q.    BY MR. FONG:  And the $4,500 shows up there,

24   doesn't it?  It's a $4,500 deposit on April 17th;

25   correct?
```

1      A.    Yes.

2      Q.    Now, am I correct that it was Peter Lin who told

3    you how to characterize the amounts referenced in the

4    bank statements?

5      A.    Yes.

6      Q.    If, in fact, this money was from Taiwan, and

7    either on behalf of or through the stockholder, Miss Lu,

8    and she wanted to pay for her stock, it was up to Peter

9    Lin to allocate that $10,000 payment to capital; isn't

10   that true?

11          MS. BACANI:  Objection.  Vague, calls for

12   speculation.

13          THE WITNESS:  Basically Peter told me which

14   transaction was for loan, which transaction was for the

15   deposit, which transaction was for the sales.

16     Q.    BY MR. FONG:  Bottom line is, the stockholder

17   transferred by August 31st, 2006, at least $104,500 into

18   the bank account of Agape Industry; true?

19          MS. BACANI:  Objection.  Vague, calls for

20   speculation.

21          THE WITNESS:  I know that fund of loan was from

22   Taiwan.

23     Q.    BY MR. FONG:  Well, you don't know personally

24   whether it was a loan, all you know is that there was a

25   money transfer that Mr. Lin characterized for you;

1    correct?

2         A.   He told me that was a loan from Taiwan.

3         Q.   And he is the sole source of your knowledge as

4    to the identity of what those transfers were for;

5    correct?

6         A.   Yes.

7              MR. FONG:  Thank you.  No further questions.

8              MS. BACANI:  I have just two quick follow-ups to

9    just to follow up what Mr. Fong just asked you.

10                       FURTHER EXAMINATION

11   BY MS. BACANI:

12        Q.   Is Mr. Lin also the sole source of information

13   regarding who you should list as the shareholder for

14   Agape Industry USA?

15        A.   Yes.

16        Q.   And is Mr. Lin also the source of information as

17   to who you should list as the shareholder for Jun-En USA?

18        A.   Yes.

19        Q.   I'm sorry, just to close the loop, one more

20   question:  Is Mr. Lin also the sole source of information

21   regarding who you should list as the sole shareholder for

22   Agape Industrial?

23        A.   Yes.

24             MS. BACANI:  Thank you.  No more questions.

25             MR. FONG:  Thank you, Mr. Roan.

1          MS. BACANI:  Before we go off the record, I'd

2     just like to designate the transcript as confidential.

3          Thank you, Mr. Roan.

4               (A discussion was held off the record.)

5          MR. FONG:  Let's go on the record.  We will

6     stipulate that the court reporter is relieved of her

7     obligation to maintain the original of the transcript;

8     that she can send that transcript directly to Mr. Roan

9     for signature with instructions to read, sign, and

10    correct within the 30-day time period from his receipt

11    thereof.  And that he'll send that original back to me;

12    that if I don't get it within that 30 days, it will be

13    deemed signed and corrected for all purposes.

14         MS. BACANI:  One small correction to that, it

15    should go to all counsel, so you should send it to,

16    obviously his counsel, but I should also get a copy,

17    please.

18         MR. FONG:  No, the errata sheet.  You're not

19    going to get the original.

20         MS. BACANI:  Not the original.

21         MR. FONG:  That's what I'm saying.  Okay.  Thank

22    you.

23              (The deposition concluded at 4:07 p.m.)

24

25

```
1           DEPONENT'S CHANGES AND DECLARATION PAGE

2      PAGE       LINE        CHANGE

3      _____      _____       _____

4      _____      _____       _____

5      _____      _____       _____

6      _____      _____       _____

7      _____      _____       _____

8      _____      _____       _____

9      _____      _____       _____

10     _____      _____       _____

11     _____      _____       _____

12     _____      _____       _____
```

13            (If more space is needed, use the back side of

14     this page first, then additional paper, to note

15     corrections as needed, dating and signing each page.)

16            I declare under penalty of perjury that the

17     foregoing deposition is true and correct; that I have

18     read my deposition and have made the necessary changes,

19     additions or deletions as indicated above to my answers

20     that I deem necessary.

21            Executed on this _____ day of _____,

22     2013, at _____, California.

23

24                              _____

                                Daniel Roan

25

```
1                       REPORTER'S CERTIFICATE

2

3          I, Leslie A. Toledo, a Certified Shorthand Reporter

4     within and for the State of California, do hereby

5     certify:

6          That prior to being examined, the witness named in

7     the foregoing deposition was affirmed by me to testify

8     to the truth, the whole truth and nothing but the truth;

9          That the said deposition was taken down by me in

10    Stenotype at the time and place therein stated and was

11    thereafter transcribed under my direction;

12         That the said deposition is a true record of the

13    testimony given by the witness.

14

15         I further certify that I am not of counsel or

16    attorney for any of the parties hereto or in any way

17    interested in the event of this cause, and that I am not

18    related to any of the parties hereto.

19

20         Dated this        day of                 2013,

21         at Chino, California.

22

23                           _____

                             Leslie A. Toledo, CSR No. 8345

24

25
```

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**<u>EXHIBIT 5</u>**
**(NOVEMBER 18, DANIEL ROAN DEPOSITION EXHIBITS)**

DECLARATION OF H. G. ROBERT FONG SUPPORTING PLAINTIFFS' OPPOSITION FOR ATTORNEY FEES



i-1

EXHIBIT _____1_____
WIT: Daniel Roan
DATE: 10/8/13
LESLIE A. TOLEDO, CSR #8345



2-2

**R & L ACCOUNTANCY CORPORATION**
20547 E WALNUT DR N STE H
WALNUT, CA 91789-2923
(909) 598-7510

Client 9147
October 7, 2011

**AGAPE INDUSTRY, INC.**
**3601 W. FOX RIDGE LANE #C**
**ROLLING HILLS ESTATE, CA 90274**

| FEDERAL FORMS |
|---|
| Form 1120     2009 U.S. Corporation Income Tax Return |
| Schedule G     Information on Persons Owning Stock |
| Form 4562     Depreciation and Amortization |
| Form 7004     Application for Automatic Extension |
|     Depreciation Schedules |

| CALIFORNIA FORMS |
|---|
| Form 100     2009 California Corporation Income Tax Return |
| Form 100-ES     Corporation Estimated Tax |
| Schedule P     Alternative Minimum Tax and Credit Limitation |
| Form 3805Q     Net Operating Loss Deduction |
| Form 3885     Depreciation and Amortization |
|     California Depreciation Schedules |

| FEE SUMMARY | | |
|---|---|---|
| Preparation Fee | $ | 500.00 |
| Amount Due | $ | 500.00 |

Please make check payable to "R & L ACCOUNTANCY CORP".

Thank you for your business.

EXHIBIT 3
WIT: Daniel Roan
DATE: 10/8/13
LESLIE A. TOLEDO, CSR #8345

DR000729

3-1

**DANIEL B. ROAN CPA**
20547 E WALNUT DR N STE H
WALNUT, CA 91789-2923
(909) 598-7510

Client 8121
October 7, 2011

**AGAPE INDUSTRY, INC.**
3601 W. FOX RIDGE LANE #C
ROLLING HILLS ESTATE, CA 90274

| FEDERAL FORMS | |
|---|---|
| Form 1120 | 2008 U.S. Corporation Income Tax Return |
| Form 4562 | Depreciation and Amortization |
| Form 7004 | Application for Automatic Extension |
| | Depreciation Schedules |

| CALIFORNIA FORMS | |
|---|---|
| Form 100 | 2008 California Corporation Income Tax Return |
| Form 100-ES | Corporation Estimated Tax |
| Form 3805Q | Net Operating Loss Deduction |
| Form 3885 | Depreciation and Amortization |
| | California Depreciation Schedules |

| FEE SUMMARY | | |
|---|---|---|
| Preparation Fee | $ | 500.00 |
| Amount Due | $ | 500.00 |

EXHIBIT 4
WIT: Daniel Roan
DATE: 10/8/13
LESLIE A. TOLEDO, CSR #8345

CONFIDENTIAL

DR000730

**DANIEL B. ROAN, CPA**
2440 S. HACIENDA BLVD. #103
HACIENDA HEIGHTS, CA 91745
(626) 961-1200

Client 5130
December 7, 2007

**AGAPE INDUSTRY, INC.**
**23520 TELO AVENUE, SUITE #1**
**TORRANCE, CA 90505**

### FEDERAL FORMS

| | |
|---|---|
| Form 1120 | 2005 U.S. Corporation Income Tax Return |
| Form 4562 | Depreciation and Amortization |
| Form 5472 | Information Return/Foreign-Owned U.S. Corp. |
| | Depreciation Schedules |

### CALIFORNIA FORMS

| | |
|---|---|
| Form 100 | 2005 California Corporation Income Tax Return |
| Form 100-ES | Corporation Estimated Tax |
| Form 3805Q | Net Operating Loss Deduction |
| Form 3885 | Depreciation and Amortization |
| | California Depreciation Schedules |

### FEE SUMMARY

| | | |
|---|---|---|
| Preparation Fee | $ | 500.00 |
| Amount Due | $ | 500.00 |

EXHIBIT 5
WIT: Daniel Roan
DATE: 10/8/13
LESLIE A. TOLEDO, CSR #8345

CONFIDENTIAL

DR000733

**DANIEL B. ROAN, CPA**
2440 S. HACIENDA BLVD. #103
HACIENDA HEIGHTS, CA 91745
(626) 961-1200

Client 6127
December 7, 2007

**AGAPE INDUSTRY, INC.**
**23520 TELO AVENUE, SUITE #1**
**TORRANCE, CA 90505**

| FEDERAL FORMS |
|---|
| **Form 1120**      2006 U.S. Corporation Income Tax Return |
| **Form 4562**      Depreciation and Amortization |
| **Form 5472**      Information Return/Foreign-Owned U.S. Corp. |
|                   Depreciation Schedules |

| CALIFORNIA FORMS |
|---|
| **Form 100**      2006 California Corporation Income Tax Return |
| **Form 100-ES**      Corporation Estimated Tax |
| **Form 3805Q**      Net Operating Loss Deduction |
| **Form 3885**      Depreciation and Amortization |
|                   California Depreciation Schedules |

| FEE SUMMARY | | |
|---|---|---|
| **Preparation Fee** | $ | 500.00 |
| **Amount Due** | $ | 500.00 |

CONFIDENTIAL

**DANIEL B. ROAN CPA**
20547 E WALNUT DR N STE H
WALNUT, CA 91789-2923
(909) 598-7510

Client 7123
October 6, 2008

**AGAPE INDUSTRY, INC.**
**23520 TELO AVENUE, SUITE #1**
**TORRANCE, CA 90505**

| FEDERAL FORMS | |
|---|---|
| Form 1120 | 2007 U.S. Corporation Income Tax Return |
| Form 4562 | Depreciation and Amortization |
| Form 5472 | Information Return/Foreign-Owned U.S. Corp. |
| | Depreciation Schedules |

| CALIFORNIA FORMS | |
|---|---|
| Form 100 | 2007 California Corporation Income Tax Return |
| Form 100-ES | Corporation Estimated Tax |
| Form 3805Q | Net Operating Loss Deduction |
| Form 3885 | Depreciation and Amortization |
| | California Depreciation Schedules |

| FEE SUMMARY | | |
|---|---|---|
| Preparation Fee | $ | 500.00 |
| Amount Due | $ | 500.00 |

CONFIDENTIAL

5-3



# State of California
## Secretary of State



# E-951822

## FILED

### STATEMENT OF INFORMATION
(Domestic Stock and Agricultural Cooperative Corporations)

FEES (Filing and Disclosure): $25.00. If amendment, see instructions.
**IMPORTANT - READ INSTRUCTIONS BEFORE COMPLETING THIS FORM**

In the office of the Secretary of
State of the State of California

**Feb - 10 2010**

This Space For Filing Use Only

1. CORPORATE NAME (Please do not alter if name is preprinted.)
C2700354
AGAPE INDUSTRY, INC.

**S**

DUE DATE:

COMPLETE ADDRESSES FOR THE FOLLOWING (Do not abbreviate the name of the city. Items 2 and 3 cannot be P.O. Boxes.)

| | CITY | STATE | ZIP CODE |
|---|---|---|---|
| 2. STREET ADDRESS OF PRINCIPAL EXECUTIVE OFFICE<br>24325 CRENSHAW BLVD., NO. 108   TORRANCE  CA 90505 | | | |
| 3. STREET ADDRESS OF PRINCIPAL BUSINESS OFFICE IN CALIFORNIA, IF ANY | | | |
| 4. MAILING ADDRESS OF THE CORPORATION, IF DIFFERENT THAN ITEM 2 | | | |

NAMES AND COMPLETE ADDRESSES OF THE FOLLOWING OFFICERS (The corporation must have these three officers. A comparable title for the specific officer may be added; however, the preprinted titles on this form must not be altered.)

| | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| 5. CHIEF EXECUTIVE OFFICER/<br>PETER  K.  LIN  24325 CRENSHAW BLVD., NO. 108   TORRANCE, CA 90505 | | | | |
| 6. SECRETARY/<br>PETER  K.  LIN  24325 CRENSHAW BLVD., NO. 108   TORRANCE, CA 90505 | | | | |
| 7. CHIEF FINANCIAL OFFICER/<br>PETER  K.  LIN  24325 CRENSHAW BLVD., NO. 108   TORRANCE  CA 90505 | | | | |

NAMES AND COMPLETE ADDRESSES OF ALL DIRECTORS, INCLUDING DIRECTORS WHO ARE ALSO OFFICERS (The corporation must have at least one director.  Attach additional pages, if necessary.)

| | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| 8. NAME<br>PETER K. LIN   24325 CRENSHAW BLVD., NO. 108   TORRANCE, CA 90505 | | | | |
| 9. NAME | | | | |
| 10. NAME | | | | |

11. NUMBER OF VACANCIES ON THE BOARD OF DIRECTIONS, IF ANY:

AGENT FOR SERVICE OF PROCESS (If the agent is an individual, the agent must reside in California and Item 13 must be completed with a California street address (a P.O.Box address is not acceptable).  If the agent is another corporation, the agent must have on file with the California Secretary of State a certificate pursuant to Corporations Code section 1505 and Item 13 must be left blank.)

12. NAME OF AGENT FOR SERVICE OF PROCESS
PETER K. LIN

| 13. STREET ADDRESS OF AGENT FOR SERVICE OF PROCESS IN CALIFORNIA, IF AN INDIVIDUAL | CITY | STATE | ZIP CODE |
|---|---|---|---|
| 24325 CRENSHAW BLVD., NO. 108   TORRANCE, CA 90505 | | | |

**EXHIBIT** 6
WIT: Daniel Koan
DATE: 10/8/13
LESLIE A. TOLEDO, CSR #8345

TYPE OF **BUSINESS**

14. DESCRIBE THE TYPE OF BUSINESS OF THE CORPORATION
WHOESALE TRADE OF MESH PRODUCT

15. BY SUBMITTING THIS STATEMENT OF INFORMATION TO THE CALIFORNIA SECRETARY OF STATE, THE CORPORATION CERTIFIES T CONTAINED HEREIN, INCLUDING ANY ATTACHMENTS, IS TRUE AND CORRECT.

| 02/10/2010 | PETER K. LIN | PRESIDENT | |
|---|---|---|---|
| DATE | TYPE OR PRINT NAME OF PERSON COMPLETING THE FORM | TITLE | SIGNATURE |

SI-200 C (REV 01/2008)

APPROVED BY SECRETARY OF STATE



**State of California**
**Secretary of State**

`10-659682`

**FILED**
In the office of the Secretary of State
of the State of California

*EC*

FEB 1 2 2010

*A*

This Space For Filing Use Only

**STATEMENT OF INFORMATION**
(Domestic Stock and Agricultural Cooperative Corporations)
FEES (Filing and Disclosure): $25.00. If amendment, see instructions.
**IMPORTANT — READ INSTRUCTIONS BEFORE COMPLETING THIS FORM**

1. *CORPORATE NAME (Please do not alter if name is preprinted.)*

AGAPE INDUSTRY, INC.
C2700354

STATEMENT OF INFORMATION IS AMENDED AS OF MAY 25, 2005

**S**

EXHIBIT _7_
WIT: *Daniel Roan*
DATE: _10/8/13_
LESLIE A. TOLEDO, CSR #8345

**DUE DATE:**

**COMPLETE ADDRESSES FOR THE FOLLOWING** (Do not abbreviate the name of the city. Items 2 and 3 cannot be P.O. Boxes.)

| | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| 2. STREET ADDRESS OF PRINCIPAL EXECUTIVE OFFICE | | CITY | STATE | ZIP CODE |
| 24325 CRENSHAW BLVD., NO. 108 | | TORRANCE | CA | 90505 |
| 3. STREET ADDRESS OF PRINCIPAL BUSINESS OFFICE IN CALIFORNIA, IF ANY | | CITY | STATE | ZIP CODE |
| | | | CA | |
| 4. MAILING ADDRESS OF THE CORPORATION, IF DIFFERENT THAN ITEM 2 | | CITY | STATE | ZIP CODE |

**NAMES AND COMPLETE ADDRESSES OF THE FOLLOWING OFFICERS** (The corporation must have these three officers. A comparable title for the specific officer may be added; however, the preprinted titles on this form must not be altered.)

| | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| 5. CHIEF EXECUTIVE OFFICER/ | ADDRESS | CITY | STATE | ZIP CODE |
| PETER K. LIN | 24325 CRENSHAW BLVD., NO. 108 | TORRANCE | CA | 90505 |
| 6. SECRETARY/ | ADDRESS | CITY | STATE | ZIP CODE |
| PETER K. LIN | 24325 CRENSHAW BLVD., NO. 108 | TORRANCE | CA | 90505. |
| 7. CHIEF FINANCIAL OFFICER/ | ADDRESS | CITY | STATE | ZIP CODE |
| PETER K. LIN | 24325 CRENSHAW BLVD., NO. 108 | TORRANCE | CA | 90505 |

**NAMES AND COMPLETE ADDRESSES OF ALL DIRECTORS, INCLUDING DIRECTORS WHO ARE ALSO OFFICERS** (The corporation must have at least one director. Attach additional pages, if necessary.)

| | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| 8. NAME | ADDRESS | CITY | STATE | ZIP CODE |
| PETER K. LIN | 24325 CRENSHAW BLVD., NO. 108 | TORRANCE | CA | 90505 |
| 9. NAME | ADDRESS | CITY | STATE | ZIP CODE |
| 10. NAME | ADDRESS | CITY | STATE | ZIP CODE |

11. NUMBER OF VACANCIES ON THE BOARD OF DIRECTORS, IF ANY:

**AGENT FOR SERVICE OF PROCESS** (If the agent is an individual, the agent must reside in California and Item 13 must be completed with a California street address (a P.O. Box address is not acceptable). If the agent is another corporation, the agent must have on file with the California Secretary of State a certificate pursuant to Corporations Code section 1505 and Item 13 must be left blank.)

12. NAME OF AGENT FOR SERVICE OF PROCESS

PETER K. LIN ·

| 13. STREET ADDRESS OF AGENT FOR SERVICE OF PROCESS IN CALIFORNIA, IF AN INDIVIDUAL | CITY | STATE | ZIP CODE |
|---|---|---|---|
| 24325 CRENSHAW BLVD., NO. 108 | TORRANCE | CA | 90505 |

**TYPE OF BUSINESS**

14. DESCRIBE THE TYPE OF BUSINESS OF THE CORPORATION

WHOLESALE TRADE OF METAL MESH PRODUCTS

15. BY SUBMITTING THIS STATEMENT OF INFORMATION TO THE CALIFORNIA SECRETARY OF STATE, THE CORPORATION CERTIFIES THE INFORMATION CONTAINED HEREIN, INCLUDING ANY ATTACHMENTS, IS TRUE AND CORRECT.

| 2/10/10 | PETER K. LIN | SECRETARY | | |
|---|---|---|---|---|
| DATE | TYPE/PRINT NAME OF PERSON COMPLETING FORM | TITLE | SIGNATURE | |

SI-200 C (REV 01/2008)

APPROVED BY SECRETARY OF STATE

Sep 27 11 08:11a                                                3103259008          p.19

09/26/2011  12:32   626405  3                                              PAGE   03/03



# State of California

## Secretary of State

### Confirmation of Receipt of Document / Receipt for Payment

| | |
|---|---|
| Transaction ID: | FF941237-571A-44CA-9790-FF7E879BE7CE |
| Confirmation #: | 05912P |
| Charge Description | E-file Statement of Information for C2700354 |
| Name: | FANNIE SHUAI |
| Address: | 301 E. COLORADO BLVD. |
| Address Line 2 | SUITE 514 |
| City/State/Zip: | PASADENA, CA 91101 |
| Phone: | 626405-0348 |
| Email: | FSHUAI@SBCGLOBAL.NET |
| Amount: | 25 |
| E-File Session: | 1575588 |
| AVS Response: | Y |
| Date/Time: | 2/10/2010 5:06:42 PM |

**Note: Confirmation of receipt does not constitute an approved/accepted filing. We recommend that you print or save this screen as a record of your E-file transaction and credit card payment.**

If you are representing a business, we want you to be aware of a deceptive solicitation sent to many companies implying they have to go through a private, third party vendor – and pay an exorbitant fee – in order to file official documents with our office.

These solicitations are asking for fees of up to $495 to file various documents with our office – documents that, in most cases, have a filing fee of $25 for Statements of Information at most and $0 for termination documents.

A Customer Alert on our website at www.sos.ca.gov/business/be/alert-misleading-solicitations.htm has more details about these deceptive ploys, as well as information on how you can file documents directly with our office and contact the Attorney General if you have been victimized.

EXHIBIT ___8___
WIT: Danie l Roan
DATE: 10/8/13
LESLIE A. TOLEDO, CSR #8345

1 of 1

2/10/2010 5:05 PM

CONFIDENTIAL

DR000966

Sep 27 11 08:10a                                          3103259008              p.17
09/26/2811  12:32  6264xxxx  ⊓

# SHUAI & ASSOCIATES
## ATTORNEYS-AT-LAW

## FAX TRANSMITTAL SHEET

301 E. Colorado Blvd., Suite 514
Pasadena, California 91101
Tel.:   (626) 405-0348
Fax:   (626) 405-0890
Email: Yshuai@shuai.ipmail.att.net

DATE: 9/26/11

| PLEASE DELIVER TO: | PHONE NO. | FAX NO. |
|---|---|---|
| Peter Lin / Agape. | | 310-325-9008 |

FROM:   Yeo-Horn Shuai

| NUMBER OF PAGES, INCLUDING COVER: 3 | ORIGINAL TO FOLLOW: x |
|---|---|

RE: Statement of Info.

CONTENTS:

____   LETTER                              ____   DOCUMENTS

MESSAGE:

FOR YOUR INFORMATION ONLY.
FOR YOUR REVIEW AND COMMENTS.

Mr. Lin:-

attached please find the statement of Info.
and receipt of filing. The filing date was 2/10/2010.
If you have filed one this year yourself, we
don't have a copy. If you need a conformed
copy, we will have to order from Secretary
of State.
                                              Jannie.

If you do not receive the entire fax, please call us as soon as possible at (626) 405-0348

This message is intended for the use of the individual or entity to which it is addressed, and may contain information that is PRIVILEGED and CONFIDENTIAL. If you are not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and return the original message to us at the above address via the U.S. Postal Service. Thank you.

CONFIDENTIAL

EXHIBIT  9
WIT: Daniel Zoan
DATE: 10/8/13
LESLIE A. TOLEDO, CSR #8345

DR000967

9-1

# AGAPE INDUSTRY, INC.
## Balance Sheet
### December 31, 2009

### ASSETS

| | | |
|---|---|---|
| **CURRENT ASSETS** | | |
| Cash in Banks | $ | 207,144.20 |
| TOTAL CURRENT ASSETS | | 207,144.20 |
| **PROPERTY and EQUIPMENT** | | |
| TOTAL PROPERTY AND EQUIPMENT | | -0- |
| **OTHER ASSETS** | | |
| Organization Costs | | 1,000.00 |
| Accumulated Amortization | | (900.00) |
| TOTAL OTHER ASSETS | | 100.00 |
| **TOTAL ASSETS** | $ | 207,244.20 |

### LIABILITIES & STOCKHOLDER'S EQUITY

| | | |
|---|---|---|
| **CURRENT LIABILITIES** | | |
| Payroll Taxes Payable | $ | 1,489.60 |
| TOTAL CURRENT LIABILITIES | | 1,489.60 |
| **LONG TERM LIABILITIES** | | |
| Loan from shareholders | | 203,039.00 |
| TOTAL LONG TERM LIABILITIES | | 203,039.00 |
| **STOCKHOLDER'S EQUITY** | | |
| Common Stock | | 10,000.00 |
| Retained earnings | | (92,269.03) |
| Net Income for Current Period | | 84,984.63 |
| TOTAL STOCKHOLDER'S EQUITY | | 2,715.60 |
| **TOTAL LIABILITIES &** | | |
| STOCKHOLDER'S EQUITY | $ | 207,244.20 |

EXHIBIT 10
WIT: Daniel Roan
DATE: 10/8/13
LESLIE A. TOLEDO, CSR #8345

DR000880

10-1

## AGAPE INDUSTRY, INC.
### Statement of Operations
### For the Year Ended December 31, 2009

|  | AMOUNT | % |
|---|---|---|
| **REVENUE** | | |
| Sales | $ 822,335.60 | 100.00 |
| TOTAL REVENUE | 822,335.60 | 100.00 |
| **COST OF SALES** | | |
| Purchases | 561,009.73 | 68.22 |
| Freight In, Customs & Duty | 11,790.87 | 1.43 |
| TOTAL COST OF SALES | 572,800.60 | 69.66 |
| GROSS PROFIT (LOSS) | 249,535.00 | 30.34 |
| **OPERATING EXPENSES** | | |
| Advertising | 4,483.30 | 0.55 |
| Amortization | 200.00 | 0.02 |
| Auto and truck expense | 2,575.28 | 0.31 |
| Bank Charge | 716.13 | 0.09 |
| Commission | 7,785.00 | 0.95 |
| Credit Card Service | 112.38 | 0.01 |
| Dues and subscriptions | 2,234.59 | 0.27 |
| Freight Out | 3,769.19 | 0.46 |
| Insurance | 909.31 | 0.11 |
| Legal and accounting | 300.00 | 0.04 |
| Meals & Entertainment | 4,067.77 | 0.49 |
| Office Expenses | 5,035.70 | 0.61 |
| Outside Helps | 17,200.00 | 2.09 |
| Payroll taxes | 3,200.40 | 0.39 |
| Repairs and maintenance | 1,216.08 | 0.15 |
| Show Expenses | 25,464.84 | 3.10 |
| Supplies | 5,066.97 | 0.62 |
| Taxes & Licenses | 347.96 | 0.04 |
| Telephone | 9,843.80 | 1.20 |
| Travel | 35,566.75 | 4.33 |
| Utilities | 376.26 | 0.05 |
| Wages and salaries | | |
| Salaries-Officers | 18,000.00 | 2.19 |
| Salaries-Others | 15,600.00 | 1.90 |
| TOTAL WAGES AND SALARIES | 33,600.00 | 4.09 |
| TOTAL OPERATING EXPENSES | 164,071.71 | 19.95 |
| INCOME (LOSS) FROM OPERATIONS | 85,463.29 | 10.39 |

CONFIDENTIAL

DR000881

10-2

### *AGAPE INDUSTRY, INC.*
#### *Statement of Operations*
#### *For the Year Ended December 31, 2009*

|  | AMOUNT | % |
|---|---|---|
| OTHER INCOME AND EXPENSE |  |  |
| Other income | 290.06 | 0.04 |
| Interest income | 31.28 | -0- |
| TOTAL OTHER INCOME AND EXPENSE | 321.34 | 0.04 |
| NET INCOME BEFORE TAXES | 85,784.63 | 10.43 |
| PROVISION FOR TAXES |  |  |
| Provision for state inc. taxes | 800.00 | 0.10 |
| TOTAL PROVISION FOR TAXES | 800.00 | 0.10 |
| NET INCOME (LOSS) | $ 84,984.63 | 10.33 |

CONFIDENTIAL

10-3

|  |  | AGAPE INDUSTRY, INC. | | | Prepared by: _____ |  |
|  |  | Comparative Trial Balance | | | Reviewed by: _____ |  |
| Run: | 5/09/13   4:41PM | 12/31/09 | | | Approved by: _____ |  |
| Account Number/Description | WP # | 12/31/08 | UnAdj Bal | Adjust Number/Amt | | Final Bal |
|  |  |  |  |  |  |  |
| 101-0 Cash on Hand | | 0.00 | 0.00 | | | 0.00 |
| 102-0 Cash in Chinatrust Bank-Checking | | 11,375.85 | 0.00 | | | 0.00 |
| 103-0 Cash in HSBC Bank | | 28,708.63 | 207,132.86 | | | 207,132.86 |
| 104-0 Cash in East West Bank-Checking | | 0.00 | 0.00 | | | 0.00 |
| 105-0 Cash in HSBC Bank-Saving | | 29,059.80 | 11.34 | | | 11.34 |
| 110-0 Accounts Receivable, trade | | 0.00 | 0.00 | | | 0.00 |
| 110-1 Other Receivable | | 0.00 | 894.00 | 5 | (894.00) | 0.00 |
| 140-0 Inventory | | 0.00 | 0.00 | | | 0.00 |
| 160-0 Prepaid Expenses | | 0.00 | 0.00 | | | 0.00 |
| 180-0 Prepaid-Other | | 0.00 | 0.00 | | | 0.00 |
| 190-0 Deposits | | 0.00 | 0.00 | | | 0.00 |
| 197-0 Bank Transfer | | 0.00 | 0.00 | | | 0.00 |
| 198-0 Exchange ??? | | 0.00 | 8,798.99 | 3 | (8,798.99) | 0.00 |
| 199-0 Suspense | | 0.00 | (30,660.00) | 2 | 30,660.00 | 0.00 |
| 201-0 Land | | 0.00 | 0.00 | | | 0.00 |
| 202-0 Leasehold Improvement | | 0.00 | 0.00 | | | 0.00 |
| 203-0 Accumulated Depreciation-L/H Imp | | 0.00 | 0.00 | | | 0.00 |
| 204-0 Furniture and fixtures | | 0.00 | 0.00 | | | 0.00 |
| 205-0 Accum Deprec-Furniture & Fixtures | | 0.00 | 0.00 | | | 0.00 |
| 206-0 Machinery and Equipment | | 0.00 | 0.00 | | | 0.00 |
| 207-0 Accum Deprec-Machinery & Equipr | | 0.00 | 0.00 | | | 0.00 |
| 208-0 Vehicle | | 0.00 | 0.00 | | | 0.00 |
| 209-0 Accumulated Depreciation-Vehicle | | 0.00 | 0.00 | | | 0.00 |
| 210-0 Computer | | 0.00 | 0.00 | | | 0.00 |
| 211-0 Accumulated Depreciation-Comput | | 0.00 | 0.00 | | | 0.00 |
| 220-0 Accumulated Depreciation | | 0.00 | 0.00 | | | 0.00 |
| 271-0 Goodwill | | 0.00 | 0.00 | | | 0.00 |
| 275-0 Security Deposits | | 0.00 | 0.00 | | | 0.00 |
| 281-0 Organization Costs | | 1,000.00 | 1,000.00 | | | 1,000.00 |
| 286-0 Accumulated Amortization | | (700.00) | (700.00) | 4 | (200.00) | (900.00) |
| 292-0 Notes receivable - long term | | 0.00 | 0.00 | | | 0.00 |
| Total Assets | | 69,444.28 | 186,477.19 | | 20,767.01 | 207,244.20 |
| 310-0 Accounts Payable | | 0.00 | 0.00 | | | 0.00 |
| 318-0 Accrued Pension Expenses | | 0.00 | 0.00 | | | 0.00 |
| 320-0 Accrued Wages | | 0.00 | 0.00 | | | 0.00 |
| 321-0 Federal Payroll Tax Payable | | (1,285.20) | (1,285.20) | | | (1,285.20) |
| 322-0 State Payroll Tax Payable | | (67.20) | (92.40) | | | (92.40) |
| 326-0 Accrued FUTA Tax | | (112.00) | (112.00) | | | (112.00) |
| 327-0 Accrued State Unemployment Insu | | 0.00 | 0.00 | | | 0.00 |
| 330-0 Accrued Federal Income Tax | | 0.00 | 0.00 | | | 0.00 |

Comparative Trial Balance

CONFIDENTIAL   DR000883

10-4

## AGAPE INDUSTRY, INC.

### Comparative Trial Balance

| Run: 5/09/13 4:41PM | | 12/31/09 | | | | |
|---|---|---|---|---|---|---|
| Account Number/Description | WP # | 12/31/08 | UnAdj Bal | | Adjust Number/Amt | Final Bal |
| 331-0 Accrued State Income Tax | | 0.00 | 800.00 | 1 | (800.00) | 0.00 |
| 335-0 Accrued Local Inc Tax | | 0.00 | 0.00 | | | 0.00 |
| 338-0 Sales Tax Payable | | 0.00 | 0.00 | | | 0.00 |
| 340-0 Bank Loan | | 0.00 | 0.00 | | | 0.00 |
| 345-0 Customer Deposits | | 0.00 | 0.00 | | | 0.00 |
| 350-0 Credit Card Loan-AMEX | | 0.00 | (919.72) | 6 | 919.72 | 0.00 |
| 351-0 Credit Card Loan-CHASE | | 0.00 | (16,956.66) | 6 | 16,956.66 | 0.00 |
| 352-0 Credit Card Loan-UNITED MILEAG | | 0.00 | (20,670.94) | 6 | 20,670.94 | 0.00 |
| 355-0 Loan Payable - Stockholder | | (150,248.91) | (143,524.67) | 2 | (30,660.00) | (203,039.00) |
| | | | | 3 | 8,798.99 | |
| | | | | 5 | 894.00 | |
| | | | | 6 | (38,547.32) | |
| Total Liabilities | | (151,713.31) | (182,761.59) | | (21,767.01) | (204,528.60) |
| 400-0 Common Stock | | (10,000.00) | (10,000.00) | | | (10,000.00) |
| 410-0 Additional Paid-In Capital | | 0.00 | 0.00 | | | 0.00 |
| 420-0 Treasury Stock, At Cost | | 0.00 | 0.00 | | | 0.00 |
| 430-0 Retained Earnings | | 26,990.56 | 92,269.03 | | | 92,269.03 |
| 450-0 Net Income for Current Period | | 0.00 | 0.00 | | | 0.00 |
| Total Equity | | 16,990.56 | 82,269.03 | | 0.00 | 82,269.03 |
| 500-0 Sales | | (1,049,743.20) | (822,335.60) | | | (822,335.60) |
| 510-0 Sales, cash | | 0.00 | 0.00 | | | 0.00 |
| 520-0 Sales Discounts Allowed | | 0.00 | 0.00 | | | 0.00 |
| 521-0 Sales returns | | 0.00 | 0.00 | | | 0.00 |
| Total Income | | (1,049,743.20) | (822,335.60) | | 0.00 | (822,335.60) |
| 600-0 Beginning Inventory | | 0.00 | 0.00 | | | 0.00 |
| 601-0 Purchases | | 905,559.67 | 561,009.73 | | | 561,009.73 |
| 602-0 Purchase Discounts Taken | | 0.00 | 0.00 | | | 0.00 |
| 610-0 Direct Labor | | 0.00 | 0.00 | | | 0.00 |
| 620-0 Freight In, Customs & Duty | | 19,972.48 | 11,790.87 | | | 11,790.87 |
| 630-0 Supplies | | 0.00 | 0.00 | | | 0.00 |
| 650-0 Ending Inventory | | 0.00 | 0.00 | | | 0.00 |
| 652-0 Inventory Variation | | 0.00 | 0.00 | | | 0.00 |
| 671-0 Salaries-Officers | | 18,000.00 | 18,000.00 | | | 18,000.00 |
| 672-0 Salaries-Others | | 15,600.00 | 15,600.00 | | | 15,600.00 |
| 680-0 Advertising | | 9,620.68 | 4,483.30 | | | 4,483.30 |
| 690-0 Amortization Expense | | 200.00 | 0.00 | 4 | 200.00 | 200.00 |

Page 2                                        Comparative Trial Balance

DR000884

10-5

## AGAPE INDUSTRY, INC.

### Comparative Trial Balance

| Run: 5/09/13 4:41PM | | 12/31/09 | | | |
|---|---|---|---|---|---|
| Account Number/Description | WP # | 12/31/08 | UnAdj Bal | Adjust Number/Amt | Final Bal |
| 700-0 Auto and Truck Expense | | 3,848.99 | 2,575.28 | | 2,575.28 |
| 710-0 Bad Debt Expense | | 0.00 | 0.00 | | 0.00 |
| 711-0 Bank Charge | | 880.99 | 716.13 | | 716.13 |
| 713-0 Commission | | 7,800.00 | 7,785.00 | | 7,785.00 |
| 713-1 Commission-Mai Yee Wong | | 0.00 | 0.00 | | 0.00 |
| 714-0 Credit Card Service | | 351.61 | 112.38 | | 112.38 |
| 715-0 Contributions | | 0.00 | 0.00 | | 0.00 |
| 725-0 Depreciation Expense | | 0.00 | 0.00 | | 0.00 |
| 730-0 Dues and Subscriptions | | 2,364.69 | 2,234.59 | | 2,234.59 |
| 735-0 Meals & Entertainment | | 807.90 | 4,067.77 | | 4,067.77 |
| 738-0 Freight Out | | 8,765.10 | 3,769.19 | | 3,769.19 |
| 740-0 Insurance | | 15,303.27 | 909.31 | | 909.31 |
| 745-0 Interest Expense | | 0.00 | 0.00 | | 0.00 |
| 750-0 Legal and Accounting | | 3,889.71 | 300.00 | | 300.00 |
| 760-0 Miscellaneous Expenses | | 0.00 | 0.00 | | 0.00 |
| 762-0 Marketing & Promotion | | 4,740.00 | 0.00 | | 0.00 |
| 765-0 Office Expense | | 3,561.51 | 5,035.70 | | 5,035.70 |
| 768-0 Outside Helps | | 11,760.28 | 17,200.00 | | 17,200.00 |
| 769-0 Postage | | 0.00 | 0.00 | | 0.00 |
| 770-0 Rent | | 12,000.00 | 0.00 | | 0.00 |
| 775-0 Repair and Maintenance | | 715.20 | 1,216.08 | | 1,216.08 |
| 776-0 Security | | 0.00 | 0.00 | | 0.00 |
| 777-0 Supplies | | 0.00 | 5,066.97 | | 5,066.97 |
| 778-0 Show Expenses | | 24,912.04 | 25,464.84 | | 25,464.84 |
| 779-0 Professional Fees | | 0.00 | 0.00 | | 0.00 |
| 780-0 Payroll Taxes | | 3,298.40 | 3,200.40 | | 3,200.40 |
| 781-0 Taxes & Licenses | | 139.00 | 347.96 | | 347.96 |
| 782-0 Telephone | | 11,248.49 | 9,843.80 | | 9,843.80 |
| 784-0 Travel | | 28,822.97 | 35,566.75 | | 35,566.75 |
| 786-0 Utilities | | 569.09 | 376.26 | | 376.26 |
| 788-0 Other Income | | (450.60) | (290.06) | | (290.06) |
| 910-0 Interest on Loans | | 0.00 | 0.00 | | 0.00 |
| 920-0 Rental Income | | 0.00 | 0.00 | | 0.00 |
| 930-0 Interest Income | | (59.80) | (31.28) | | (31.28) |
| 945-0 Gain of Sale of Equipment | | 0.00 | 0.00 | | 0.00 |
| 950-0 Provision for Federal Income Tax | | 0.00 | 0.00 | | 0.00 |
| 960-0 Provision for State Income Taxes | | 800.00 | 0.00 | 1 | 800.00 | 800.00 |
| 999-0 VOID CHECKS | | 0.00 | 0.00 | | 0.00 | 0.00 |
| Total Expenses | | 1,115,021.67 | 736,350.97 | 1,000.00 | 737,350.97 |
| Net Income(Loss) | | (65,278.47) | 85,984.63 | (1,000.00) | 84,984.63 |
| Total Debits/Credits | | 0.00 | 0.00 | 0.00 | 0.00 |

Page 3                                                      Comparative Trial Balance

CONFIDENTIAL

DR000885

10-6

## AGAPE INDUSTRY, INC.

### General Ledger Report

Run: 10/05/11    11:00AM                              12/31/08

| Date | Jrnl/Adj # | Ref # | Description | Debit | Credit | Balance |
|------|-----------|-------|-------------|-------|--------|---------|
| **500-0  Sales** | | | | | | |
| | | | Beginning Balance | | | 0.00 |
| 1/31/08 | CR01 | | 01/03 DEPOSIT | | 8,140.00 | |
| 1/31/08 | CR01 | | 01/14 DEPOSIT | | 37,075.00 | |
| 1/31/08 | CR01 | | 01/15 DEPOSIT | | 14,148.00 | |
| 2/29/08 | CR01 | | 02/22 WIRETRANSFER | | 14,370.00 | |
| 2/29/08 | CR01 | | 02/25 WIRETRANSFER | | 16,800.00 | |
| 3/31/08 | CD03 | | 03/26 DEPOSIT ITEMS RETURNED | 1,400.00 | | |
| 3/31/08 | CR01 | | 03/03 DEPOSIT | | 25,030.00 | |
| 3/31/08 | CR01 | | 03/18 WIRETRANSFER | | 1,262.00 | |
| 3/31/08 | CR01 | | 03/19 DEPOSIT IMMEDIATE AVAILA | | 1,400.00 | |
| 3/31/08 | CR01 | | 03/20 WIRETRANSFER | | 2,796.00 | |
| 3/31/08 | CR02 | | 03/24 WIREIN-COMMERCE BK ARMCO | | 68,400.00 | |
| 4/30/08 | CR01 | | 04/01 DEPOSIT | | 1,400.00 | |
| 4/30/08 | CR01 | | 04/07 DEPOSIT  *Loan from Peter Lin* | | 80,000.00 | |
| 4/30/08 | CR01 | | 04/04 WIRETRANSFER | | 33,153.00 | |
| 4/30/08 | CR01 | | 04/10 WIRETRANSFER | | 1,262.00 | |
| 4/30/08 | CR01 | | 04/14 WIRETRANSFER | | 301.00 | |
| 4/30/08 | CR01 | | 04/14 WIRETRANSFER | | 25,080.00 | |
| 4/30/08 | CR01 | | 04/23 WIRETRANSFER | | 3,000.00 | |
| 5/31/08 | CR01 | | 05/01 WIRE TRANSFER | | 2,000.00 | |
| 5/31/08 | CR01 | | 05/06 WIRE TRANSFER | | 32,868.00 | |
| 5/31/08 | CR01 | | 05/16 WIRE TRANSFER | | 9,704.00 | |
| 5/31/08 | CR01 | | 05/22 WIRE TRANSFER | | 635.00 | |
| 5/31/08 | CR01 | | 05/29 WIRE TRANSFER | | 175,575.00 | |
| 7/31/08 | CR01 | | 07/03 WIRE TRANSFER | | 12,500.00 | |
| 7/31/08 | CR01 | | 07/16 WIRE TRANSFER | | 19,800.00 | |
| 7/31/08 | CR01 | | 07/18 WIRE TRANSFER | | 25,000.00 | |
| 7/31/08 | CR01 | | 07/23 WIRE TRANSFER | | 26,335.80 | |
| 7/31/08 | CR01 | | 07/30 WIRE TRANSFER | | 58,590.00 | |
| 8/31/08 | CR01 | | 08/22 WIRE TRANSFER | | 6,980.00 | |
| 8/31/08 | CR02 | | 08/12 DEPOSIT | | 21,338.50 | |
| 8/31/08 | CR02 | | 08/19 DEPOSIT | | 21,338.50 | |
| 8/31/08 | CR02 | | 08/25 DEPOSIT | | 13,876.20 | |
| 9/30/08 | CR01 | | 09/04 WIRE TRANSFER | | 33,600.00 | |
| 9/30/08 | CR01 | | 09/08 WIRE TRANSFER | | 45,200.00 | |
| 9/30/08 | CR02 | | 09/02 DEPOSIT | | 3,346.00 | |
| 9/30/08 | CR02 | | 09/08 DEPOSIT | | 29,232.00 | |
| 9/30/08 | CR02 | | 09/25 DEPOSIT | | 1,835.00 | |
| 10/31/08 | CR02 | | 10/02 WIRE:HENDOK LTD | | 77,079.00 | |

EXHIBIT 11
WIT: Daniel Loan
DATE: 10/8/13
LESLIE A. TOLEDO, CSR #8345

Page 1                                               General Ledger Report

CONFIDENTIAL                                       DR000878



Chinatrust Bank (U.S.A.)
中國信託

www.chinatrustusa.com

028 00008 00
ACCOUNT:
DOCUMENTS:        6

PAGE:       1
            04/30/2008

AGAPE INDUSTRY INC
23520 TELO AVE SUITE#1
TORRANCE CA  90505

30
 0
 6

TORRANCE                                    TELEPHONE:310-791-2868
22939 HAWTHORNE BLVD
TORRANCE, CA 90505-2206

Dear Customer,
    We at Chinatrust Bank strive to keep our customers informed about the
    privacy and security of their information. Recently, various news
    agencies have reported data security breaches at a Northeastern grocery
    store chain involving millions of debit and credit card numbers, which
    serves as a reminder to you to be vigilant in safeguarding your Credit
    Card, Debit Card, and PIN numbers, and to change your PIN periodically.
    If you would like additional information on how to protect your account
    information, please feel free to contact any of our branches.

SMALL BUSINESS CHECKING ACCOUNT

|  |  | LAST STATEMENT 03/31/08 | 49,756.72 |
|---|---|---|---|
| AVERAGE BALANCE | 70,149.36 | 7 CREDITS | 144,196.00 |
|  |  | 20 DEBITS | 119,831.49 |
|  |  | THIS STATEMENT 04/30/08 | 74,121.23 |

- - - - - - - - - - DEPOSITS - - - - - - - - - -
REF #.....DATE......AMOUNT REF #.....DATE......AMOUNT REF #.....DATE......AMOUNT
    04/01   1,400.00   9993 04/07   80,000.00

- - - - - - - - - OTHER CREDITS - - - - - - - - -

| DESCRIPTION | DATE | AMOUNT |
|---|---|---|
| WIRE TRANSFER | 04/04 | 33,153.00 |
| WIRE TRANSFER | 04/10 | 1,262.00 |
| WIRE TRANSFER | 04/14 | 301.00 |
| WIRE TRANSFER | 04/14 | 25,080.00 |
| WIRE TRANSFER | 04/23 | 3,000.00 |

* * * C O N T I N U E D * * *



CONFIDENTIAL



EXHIBIT  12
WIT: Daniel Roan
DATE: 10/8/13
LESLIE A. TOLEDO, CSR #8345

MEMBER
FDIC

DR000497

12-1



**Chinatrust Bank** U.S.A.
中 國 信 託
www.chinatrustusa.com

028 00008 00       PAGE:        2
ACCOUNT:                    04/30/2008
DOCUMENTS:              6

AGAPE INDUSTRY INC

=================================================================
                    SMALL BUSINESS CHECKING ACCOUNT
=================================================================

- - - - - - - - CHECKS - - - - - - - - -
CHECK #..DATE.....AMOUNT  CHECK #..DATE.....AMOUNT  CHECK #..DATE.....AMOUNT
   539*04/04   1,500.00    542 04/14      59.32     544 04/16     790.00
   541 04/15      99.00    543 04/14     684.25     545 04/11   1,176.25

(*) INDICATES A GAP IN CHECK NUMBER SEQUENCE

- - - - - - - - OTHER DEBITS - - - - - - - -
| DESCRIPTION | DATE | AMOUNT |
|---|---|---|
| WIRE TRANSFER FEE | 04/01 | 30.00 |
| WIRE TRANSFER FEE | 04/01 | 30.00 |
| WIRE TRANSFER | 04/01 | 2,200.00 |
| WIRE TRANSFER | 04/01 | 11,905.10 |
| WIRE TRANSFER FEE | 04/04 | 10.00 |
| SO CALIF EDISON PAYMENTS 2259332393 | 04/07 | 37.84 |
| WIRE TRANSFER FEE | 04/09 | 30.00 |
| WIRE TRANSFER | 04/09 | 100,000.00 |
| WIRE TRANSFER FEE | 04/10 | 10.00 |
| WIRE TRANSFER FEE | 04/14 | 10.00 |
| WIRE TRANSFER FEE | 04/14 | 10.00 |
| WIRE TRANSFER FEE | 04/23 | 10.00 |
| AT&T PAYMENT 571327025PAC | 04/24 | 1,158.90 |
| CHECK # 546 - VZ WIRELESS ARC ARC 0546 | 04/10 | 80.83 |

- - - ITEMIZATION OF NSF PAID AND RETURNED ITEM FEES - - -

|  | THIS PERIOD | YEAR TO DATE |
|---|---|---|
| NSF PAID ITEM FEE: | .00 | .00 |
| NSF RETURNED ITEM FEE: | .00 | .00 |
| OVERDRAFT FEES: | .00 | .00 |

- - - - - - - DAILY BALANCE - - - - - - - -
| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|---|---|---|---|---|---|
| 04/01 | 36,991.62 | 04/10 | 49,737.95 | 04/16 | 72,290.13 |
| 04/04 | 68,634.62 | 04/11 | 48,561.70 | 04/23 | 75,280.13 |
| 04/07 | 148,596.78 | 04/14 | 73,179.13 | 04/24 | 74,121.23 |
| 04/09 | 48,566.78 | 04/15 | 73,080.13 | | |



CONFIDENTIAL

MEMBER
FDIC

DR000498

12-2

## AGAPE INDUSTRY, INC.

### General Ledger Report

| Run: 5/09/13 | | 4:33PM | 12/31/08 | | | |
|---|---|---|---|---|---|---|
| Date | Jrnl/Adj # | Ref # | Description | Debit | Credit | Balance |
| 5/19/08 | CD65 | AC-350 | American Express-05/19/08 | | 6,077.02 | |
| 6/18/08 | CD66 | AC-350 | American Express-06/18/08 | | 6,302.15 | |
| 7/18/08 | CD67 | AC-350 | American Express-07/18/08 | | 6,525.25 | |
| 8/18/08 | CD68 | AC-350 | American Express-08/18/08 | | 2,898.25 | |
| 9/17/08 | CD69 | AC-350 | American Express-09/17/08 | | 4,013.02 | |
| 10/17/08 | CD70 | AC-350 | American Express-10/17/08 | | 8,875.17 | |
| 11/18/08 | CD71 | AC-350 | American Express-11/18/08 | | 2,421.22 | |
| 12/18/08 | CD72 | AC-350 | American Express-12/18/08 | | 8,198.44 | |
| | 4 | | TO RECORD A/E CARD PAID BY PETER | 89,564.60 | | |
| | | | **Current Period Change** | 89,564.60 | 89,564.60 | 0.00 |
| | | | **Ending Balance** | | | 0.00 |
| **351-0 Credit Card Loan-AT&T** | | | | | | |
| | | | Beginning Balance | | | 0.00 |
| | | | Current Period Change | 0.00 | 0.00 | 0.00 |
| | | | Ending Balance | | | 0.00 |
| **352-0 Credit Card Loan-MBNA America** | | | | | | |
| | | | Beginning Balance | | | 0.00 |
| | | | Current Period Change | 0.00 | 0.00 | 0.00 |
| | | | Ending Balance | | | 0.00 |
| **355-0 Loan Payable - Stockholder** | | | | | | |
| | | | Beginning Balance | | | (22,141.66) |
| 3/19/08 | CD63 | | 03/06 PRO HEALTH-CATALOG MER | 210.45 | | |
| 4/18/08 | CD64 | | 04/14 GUCCI GROUP | 723.01 | | |
| 4/30/08 | CR01 | | 04/07 DEPOSIT LOAN FROM PETER | | 80,000.00 | |
| 5/31/08 | CD05 | 5419 | DEBIT: PETER LIN | 3,000.00 | | |
| 5/31/08 | CD05 | 559 | PETER LIN | 20,000.00 | | |
| 6/18/08 | CD66 | | 05/23 STEIN OPTICIAN | 325.00 | | |
| 6/18/08 | CD66 | | 05/24 GAP | 53.58 | | |
| 7/31/08 | CD47 | 101 | PETER LIN | 13,000.00 | | |
| 8/31/08 | CD08 | 596 | PETER LIN | 8,000.00 | | |
| 10/31/08 | CD10 | 611 | CASH | 1,250.00 | | |
| 10/31/08 | CD10 | 614 | CASH | 1,250.00 | | |
| 10/31/08 | CD10 | 615 | CASH | 1,250.00 | | |
| 11/18/08 | CD71 | | 10/31 PRO HEALTH-CATALOG MERCH | 210.45 | | |
| 11/18/08 | CD71 | | 11/11 ITUNES | 4.97 | | |
| 11/30/08 | CD11 | 616 | CASH | 500.00 | | |

EXHIBIT 13
WIT: Daniel Roan
DATE: 10/8/13
LESLIE A. TOLEDO, CSR #8345

Page 10

General Ledger Report

CONFIDENTIAL

DR000848

13-1

AGAPE INDUSTRY, INC.

General Ledger Report

Run: 5/09/13     4:33PM                          12/31/08

| Date | Jrnl/Adj # | Ref # | Description | | Debit | Credit | Balance |
|---|---|---|---|---|---|---|---|
| 11/30/08 | CD11 | 617 | CASH | | 1,500.00 | | |
| 11/30/08 | CD51 | 113 | PETER LIN | | 2,100.00 | | |
| 11/30/08 | CD51 | 112 | PETER LIN | | 500.00 | | |
| 11/30/08 | CD51 | 114 | PETER LIN | | 150.00 | | |
| 12/18/08 | CD72 | | 12/13 ITUNES | | 1.99 | | |
| 12/18/08 | CD72 | | 12/16 ITUNES | | 0.99 | | |
| 12/31/08 | CD12 | 619 | CASH | | 3,000.00 | | |
| | 2 | | #199-0 NET PAYCHK vs #355 LOAN-PETER | | | 25,634.00 | |
| | 4 | | TO RECORD A/E CARD PAID BY PETER | | | 89,564.60 | |
| | 5 | | TO RECORD PERSONAL EXP vs SUPP EXP | | 10,060.91 | | |
| | | | | Current Period Change | 67,091.35 | 195,198.60 | (128,107.25) |
| | | | | Ending Balance | | | (150,248.91) |

400-0 Common Stock

| | | | | | Debit | Credit | Balance |
|---|---|---|---|---|---|---|---|
| | | | | Beginning Balance | | | (10,000.00) |
| | | | | Current Period Change | 0.00 | 0.00 | 0.00 |
| | | | | Ending Balance | | | (10,000.00) |

410-0 Additional Paid-In Capital

| | | | | | Debit | Credit | Balance |
|---|---|---|---|---|---|---|---|
| | | | | Beginning Balance | | | 0.00 |
| | | | | Current Period Change | 0.00 | 0.00 | 0.00 |
| | | | | Ending Balance | | | 0.00 |

420-0 Treasury Stock, At Cost

| | | | | | Debit | Credit | Balance |
|---|---|---|---|---|---|---|---|
| | | | | Beginning Balance | | | 0.00 |
| | | | | Current Period Change | 0.00 | 0.00 | 0.00 |
| | | | | Ending Balance | | | 0.00 |

430-0 Retained Earnings

| | | | | | Debit | Credit | Balance |
|---|---|---|---|---|---|---|---|
| | | | | Beginning Balance | | | 26,990.56 |
| | | | | Current Period Change | 0.00 | 0.00 | 0.00 |
| | | | | Ending Balance | | | 26,990.56 |

450-0 Net Income for Current Period

| | | | | | Debit | Credit | Balance |
|---|---|---|---|---|---|---|---|
| | | | | Beginning Balance | | | 0.00 |
| | | | | Current Period Change | 0.00 | 0.00 | 0.00 |
| | | | | Ending Balance | | | 0.00 |

                       General Ledger Report

CONFIDENTIAL

DR000849

13-2

AGAPE INDUSTRY, INC.

General Ledger Report

| Run: 5/09/13 | 4:33PM | | 12/31/08 | | | |
|---|---|---|---|---|---|---|
| Date | Jml/Adj # | Ref # | Description | Debit | Credit | Balance |

**500-0 Sales**

| | | | Beginning Balance | | | 0.00 |
|---|---|---|---|---|---|---|
| 1/31/08 | CR01 | | 01/03 DEPOSIT | | 8,140.00 | |
| 1/31/08 | CR01 | | 01/14 DEPOSIT | | 37,075.00 | |
| 1/31/08 | CR01 | | 01/15 DEPOSIT | | 14,148.00 | |
| 2/29/08 | CR01 | | 02/22 WIRETRANSFER | | 14,370.00 | |
| 2/29/08 | CR01 | | 02/25 WIRETRANSFER | | 16,800.00 | |
| 3/31/08 | CD03 | | 03/26 DEPOSIT ITEMS RETURNED | 1,400.00 | | |
| 3/31/08 | CR01 | | 03/03 DEPOSIT | | 25,030.00 | |
| 3/31/08 | CR01 | | 03/18 WIRETRANSFER | | 1,262.00 | |
| 3/31/08 | CR01 | | 03/19 DEPOSIT IMMEDIATE AVAILA | | 1,400.00 | |
| 3/31/08 | CR01 | | 03/20 WIRETRANSFER | | 2,796.00 | |
| 3/31/08 | CR02 | | 03/24 WIREIN-COMMERCE BK ARMCO | | 68,400.00 | |
| 4/30/08 | CR01 | | 04/01 DEPOSIT | | 1,400.00 | |
| 4/30/08 | CR01 | | 04/04 WIRETRANSFER | | 33,153.00 | |
| 4/30/08 | CR01 | | 04/10 WIRETRANSFER | | 1,262.00 | |
| 4/30/08 | CR01 | | 04/14 WIRETRANSFER | | 301.00 | |
| 4/30/08 | CR01 | | 04/14 WIRETRANSFER | | 25,080.00 | |
| 4/30/08 | CR01 | | 04/23 WIRETRANSFER | | 3,000.00 | |
| 5/31/08 | CR01 | | 05/01 WIRE TRANSFER | | 2,000.00 | |
| 5/31/08 | CR01 | | 05/06 WIRE TRANSFER | | 32,868.00 | |
| 5/31/08 | CR01 | | 05/16 WIRE TRANSFER | | 9,704.00 | |
| 5/31/08 | CR01 | | 05/22 WIRE TRANSFER | | 635.00 | |
| 5/31/08 | CR01 | | 05/29 WIRE TRANSFER | | 175,575.00 | |
| 7/31/08 | CR01 | | 07/03 WIRE TRANSFER | | 12,500.00 | |
| 7/31/08 | CR01 | | 07/16 WIRE TRANSFER | | 19,800.00 | |
| 7/31/08 | CR01 | | 07/18 WIRE TRANSFER | | 25,000.00 | |
| 7/31/08 | CR01 | | 07/23 WIRE TRANSFER | | 26,335.80 | |
| 7/31/08 | CR01 | | 07/30 WIRE TRANSFER | | 58,590.00 | |
| 8/31/08 | CR01 | | 08/22 WIRE TRANSFER | | 6,980.00 | |
| 8/31/08 | CR02 | | 08/12 DEPOSIT | | 21,338.50 | |
| 8/31/08 | CR02 | | 08/19 DEPOSIT | | 21,338.50 | |
| 8/31/08 | CR02 | | 08/25 DEPOSIT | | 13,876.20 | |
| 9/30/08 | CR01 | | 09/04 WIRE TRANSFER | | 33,600.00 | |
| 9/30/08 | CR01 | | 09/08 WIRE TRANSFER | | 45,200.00 | |
| 9/30/08 | CR02 | | 09/02 DEPOSIT | | 3,346.00 | |
| 9/30/08 | CR02 | | 09/08 DEPOSIT | | 29,232.00 | |
| 9/30/08 | CR02 | | 09/25 DEPOSIT | | 1,835.00 | |
| 10/31/08 | CR02 | | 10/02 WIRE:HENDOK LTD | | 77,079.00 | |
| 10/31/08 | CR02 | | 10/20 DEPOSIT | | 700.00 | |

General Ledger Report

CONFIDENTIAL

DR000850

13-3

## AGAPE INDUSTRY, INC.

### General Ledger Report

Run: 5/09/13      4:33PM

12/31/08

| Date | Jrnl/Adj # | Ref # | Description | Debit | Credit | Balance |
|---|---|---|---|---|---|---|
| 10/31/08 | CR02 | | 10/21 C A ARMCO VENEZOLANA | | 600.00 | |
| 10/31/08 | CR02 | | 10/30 WIRE:AMERICAN DAWN INC *Ernest Turoc* | | 60,784.20 | |
| 11/30/08 | CR01 | | 11/10 WIRE TRANSFER | | 15,250.00 | |
| 11/30/08 | CR02 | | 11/05 WIRE:ACERIMAIL AS SA | | 87,500.00 | |
| 11/30/08 | CR02 | | 11/28 DEPOSIT-$9855 | | 7,697.00 | |
| 12/31/08 | CR01 | | 12/09 WIRE TRANSFER | | 8,162.00 | |
| | | | Current Period Change | 1,400.00 | 1,051,143.20 | (1,049,743.20) |
| | | | Ending Balance | | | (1,049,743.20) |

**510-0 Sales, cash**

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | Beginning Balance | | | 0.00 |
| | | | Current Period Change | 0.00 | 0.00 | 0.00 |
| | | | Ending Balance | | | 0.00 |

**520-0 Sales Discounts Allowed**

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | Beginning Balance | | | 0.00 |
| | | | Current Period Change | 0.00 | 0.00 | 0.00 |
| | | | Ending Balance | | | 0.00 |

**521-0 Sales returns**

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | Beginning Balance | | | 0.00 |
| | | | Current Period Change | 0.00 | 0.00 | 0.00 |
| | | | Ending Balance | | | 0.00 |

**600-0 Beginning Inventory**

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | Beginning Balance | | | 0.00 |
| | | | Current Period Change | 0.00 | 0.00 | 0.00 |
| | | | Ending Balance | | | 0.00 |

**601-0 Purchases**

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | Beginning Balance | | | 0.00 |
| 3/31/08 | CD03 | | 03/05 WIRE TRANSFER | 15,717.60 | | |
| 4/18/08 | CD64 | | 04/07 MCNICHOLS CO-MENTAL SVC | 849.51 | | |
| 4/30/08 | CD04 | | 04/01 WIRE TRANSFER | 2,200.00 | | |
| 4/30/08 | CD04 | | 04/01 WIRE TRANSFER | 11,905.10 | | |
| 4/30/08 | CD04 | | 04/09 WIRE TRANSFER | 100,000.00 | | |
| 4/30/08 | CD44 | | 04/07 MEGA INTL BK-KAOHSIUNG | 56,500.00 | | |
| 5/19/08 | CD65 | | 05/19 ORGALIME BRUSSEL | 2,223.34 | | |
| 5/31/08 | CD05 | | DEBIT: AGAPE INDUSTRY | 3,166.22 | | |

Page 13

General Ledger Report

CONFIDENTIAL

DR000851

13-4

AGAPE INDUSTRY, INC.

General Ledger Report

| Run: 5/09/13 | | 4:33PM | 12/31/08 | | | |
|---|---|---|---|---|---|---|
| Date | Jrnl/Adj # | Ref # | Description | Debit | Credit | Balance |
| 5/31/08 | CD05 | | 05/12 WIRE TRANSFER | 25,000.00 | | |
| 5/31/08 | CD05 | | 05/16 WIRE TRANSFER | 8,800.00 | | |
| 5/31/08 | CD05 | | 05/21 WIRE TRANSFER | 5,020.91 | | |
| 6/30/08 | CD06 | | 06/02 WIRE TRANSFER | 163,875.00 | | |
| 6/30/08 | CD06 | | 06/30 WIRE TRANSFER | 1,500.00 | | |
| 6/30/08 | CD06 | | 06/30 WIRE TRANSFER | 17,000.00 | | |
| 7/31/08 | CD07 | | 07/16 WIRE TRANSFER | 2,500.00 | | |
| 7/31/08 | CD07 | | 07/16 WIRE TRANSFER | 20,000.00 | | |
| 8/31/08 | CD08 | 597 | WEST COAST STEEL & TUBE | 400.00 | | |
| 9/30/08 | CD09 | 606 | EXPANDED SOLUTION | 11,248.95 | | |
| 9/30/08 | CD09 | | 09/12 WIRE TRANSFER | 157,123.00 | | |
| 9/30/08 | CD49 | | 09/18 WIRE:AGAPE INDUSTRY TW | 71,172.04 | | |
| 10/31/08 | CD50 | | 10/07 WIRE:CHEN CHIANG SU TUO | 65,000.00 | | |
| 11/30/08 | CD51 | | 11/03 WIRE:CHENCHIANG SU TUO | 63,540.00 | | |
| 12/31/08 | CD52 | | 12/04 WIRE:CHEN CHIANG SU TUO | 93,000.00 | | |
| 12/31/08 | CD52 | | WIRE:TICHO INDUSTRIES LIMITED | 7,818.00 | | |
| | | | Current Period Change | 905,559.67 | 0.00 | 905,559.67 |
| | | | Ending Balance | | | 905,559.67 |
| 602-0 Purchase Discounts Taken | | | | | | |
| | | | Beginning Balance | | | 0.00 |
| | | | Current Period Change | 0.00 | 0.00 | 0.00 |
| | | | Ending Balance | | | 0.00 |
| 610-0 Direct Labor | | | | | | |
| | | | Beginning Balance | | | 0.00 |
| | | | Current Period Change | 0.00 | 0.00 | 0.00 |
| | | | Ending Balance | | | 0.00 |
| 620-0 Freight In, Customs & Duty | | | | | | |
| | | | Beginning Balance | | | 0.00 |
| 2/29/08 | CD02 | 509 | GENERAL OCEAN FREIGHTS | 207.72 | | |
| 2/29/08 | CD02 | 517 | SUN CONTINENTAL LOGISTICS | 492.66 | | |
| 6/30/08 | CD06 | 572 | SUN CONTINENTAL LOGISTICS | 242.25 | | |
| 6/30/08 | CD06 | 575 | DELTAMAX FREIGHT | 2,967.90 | | |
| 7/31/08 | CD07 | 583 | ROUND THE WORLD LOGISTICS USA | 622.00 | | |
| 7/31/08 | CD07 | 585 | ROUND THE WORLD LOGISTICS USA | 6,013.04 | | |
| 7/31/08 | CD07 | 589 | DETTAMAX FREIGHTS SYSTEM CORP | 185.00 | | |
| 7/31/08 | CD07 | 590 | SUN CONTINENTAL LOGISTICS INC. | 2,121.84 | | |

General Ledger Report

CONFIDENTIAL

DR000852

13-5

# AGAPE INDUSTRY, INC.

## General Ledger Report

Run: 10/05/11   4:00PM          12/31/09

| Date | Jrnl/Adj # | Ref # | Description | Debit | Credit | Balance |
|------|-----------|-------|-------------|-------|--------|---------|
| | | | **500-0 Sales** | | | |
| | | | Beginning Balance | | | 0.00 |
| 2/27/09 | CR01 | | 02/03 AMERICAN DAWN INC | | 18,666.72 | |
| 3/31/09 | CR01 | | 03/11 CORDOBA-BANKCO MERCHANTI | | 17,200.00 | |
| 4/30/09 | CR02 | | 04/13 MALLAS DE ALAMRE | | 6,443.00 | |
| 4/30/09 | CR02 | | 04/23 AMERICAN DAWN INC | | 43,555.68 | |
| 4/30/09 | CR02 | | 04/24 SPECIAL NEXT DAY CREDIT | | 30,000.00 | |
| 4/30/09 | CR02 | | 04/30 CORDOBA-PAGO MAQUIN | | 6,000.00 | |
| 5/29/09 | CR02 | | 05/26 DEPOSIT  *Loan from Peter Lin* | | 30,000.00 | |
| 5/29/09 | CR02 | | 05/08 DEPOSIT  *Loan from Peter Lin* | | 12,685.00 | |
| 6/30/09 | CR02 | | 06/23 THE FOREST CORP MIAMI FL | | 30,000.00 | |
| 6/30/09 | CR02 | | ETC SA CASEROS PCIA | | 119,980.00 | |
| 6/30/09 | CR22 | | 06/29 DEPOSIT  *Loan form Peter Lin* | | 2,000.00 | |
| 7/31/09 | CR03 | | 07/31 BILL PURCHASE DC BPA | | 63,935.91 | |
| 8/31/09 | CD08 | | 08/14 RETURN OF DEPOSIT | 12,500.00 | | |
| 8/31/09 | CO06 | | 08/26 RETURN OF DOMESTIC ITEM | 12,500.00 | | |
| 9/30/09 | CD09 | | 09/17 RETURN ON DEPOSITED ITEM | 12,500.00 | | |
| 9/30/09 | CR03 | | 09/08 THE FOREST CORP DORAL | | 19,300.00 | |
| 9/30/09 | CR03 | | 09/10 ETC SA ARGENTINA-BANKCO | | 81,270.00 | |
| 9/30/09 | CR03 | | 09/10 DEPOSIT  *Loan from Peter Lin* | | 37,500.00 | |
| 9/30/09 | CR03 | | 09/11 DEPOSIT | | 8,250.00 | |
| 9/30/09 | CR03 | | 09/18 SPECIAL NEXT SAY DRECIT | | 14,986.40 | |
| 9/30/09 | CR03 | | 09/28 HSBC BK INVESTIGATION DE | | 29,908.00 | |
| 9/30/09 | CR03 | | 09/08 DEPOSIT-$12500 | | 4,872.15 | |
| 10/30/09 | CD10 | | 10/19 RETURN OF DEPOSITED ITEM | 12,500.00 | | |
| 10/30/09 | CR04 | | 10/01 DEPOSIT | | 447.57 | |
| 10/30/09 | CR04 | | 10/02 ALMA CLOTURE MONTREAL PQ | | 565.48 | |
| 10/30/09 | CR04 | | 10/15 SPECIAL NEXT DAY CREDIT | | 12,500.00 | |
| 10/30/09 | CR04 | | 10/16 SPECIAL NEXT DAY CREDIT | | 28,801.60 | |
| 11/30/09 | CR04 | | 11/25 BILL PURCHASE DC BPA | | 67,145.97 | |
| 11/30/09 | CR04 | | 11/27 BILL PURCHASE DC BPA | | 67,945.63 | |
| 12/31/09 | CR04 | | 12/14 JPMORGAN-TREXA CA NEWARK | | 75,745.00 | |
| 12/31/09 | CR04 | | 12/15 DEPOSIT  *Loan from Peter Lin* | | 15,000.00 | |
| 12/31/09 | CR04 | | 12/16 DEPOSIT | | 14,870.40 | |
| 12/31/09 | CR04 | | 12/16 BILL PURCHASE DC BPA | | 97,047.48 | |
| 12/31/09 | CR04 | | 12/09 DEPOSIT-$21544 | | 6,066.00 | |
| 12/31/09 | CR04 | | 12/30 DEPOSIT-$49568 | | 16,082.61 | |
| | | | Current Period Change | 50,000.00 | 977,770.60 | (927,770.60) |
| | | | Ending Balance | | | (927,770.60) |

Page 1

General Ledger Report

*(105,435)*

*$822,335.60*

CONFIDENTIAL

EXHIBIT 14
WIT: Daniel Roan
DATE: 10/8/13
LESLIE A. TOLEDO, CSR #8345

DR000924

14-1

5:00 PM
08/31/12
Accrual Basis

**AGAPE INDUSTRY INC.**
**General Ledger**
**As of December 31, 2011**

| Type | Date | Num | Adj | Name | Memo | Split | Debit | Credit | Balance |
|---|---|---|---|---|---|---|---|---|---|
| **Commission** | | | | | | | | | 0.00 |
| Check | 1/26/2011 | 527 | | TURROCY & ASSC... | | HSBC - 2980 | 3,680.00 | | 3,680.00 |
| Check | 2/17/2011 | 531 | | TURROCY & ASSC... | | HSBC - 2980 | 3,680.00 | | 7,360.00 |
| Check | 3/23/2011 | 535 | | TURROCY & ASSC... | | HSBC - 2980 | 14,720.00 | | 22,080.00 |
| Check | 4/11/2011 | 541 | | TURROCY & ASSC... | | HSBC - 2980 | 2,520.00 | | 24,600.00 |
| Check | 4/19/2011 | 543 | | TURROCY & ASSC... | | HSBC - 2980 | 3,680.00 | | 28,280.00 |
| Check | 5/9/2011 | 544 | | TURROCY & ASSC... | | HSBC - 2980 | 10,090.00 | | 38,380.00 |
| Check | 5/27/2011* | 547 | | TURROCY & ASSC... | | HSBC - 2980 | 2,896.00 | | 41,256.00 |
| Check | 6/7/2011 | 549 | | TURROCY & ASSC... | | HSBC - 2980 | 2,896.00 | | 44,152.00 |
| Check | 6/24/2011 | 461 | | TURROCY & ASSC... | | HSBC - 2980 | 7,893.33 | | 52,045.33 |
| Check | 7/14/2011 | 464 | | TURROCY & ASSC... | | HSBC - 2980 | 5,301.33 | | 57,346.66 |
| Check | 8/11/2011 | 466 | | TURROCY & ASSC... | | HSBC - 2980 | 7,436.01 | | 64,782.67 |
| Check | 8/31/2011 | 469 | | TURROCY & ASSC... | | HSBC - 2980 | 7,466.67 | | 72,249.34 |
| Check | 9/16/2011 | 471 | | TURROCY & ASSC... | | HSBC - 2980 | 7,136.01 | | 73,385.35 |
| Check | 10/11/2011 | 475 | | TURROCY & ASSC... | | HSBC - 2980 | 4,870.67 | | 84,256.02 |
| Check | 11/1/2011 | 480 | | TURROCY & ASSC... | | HSBC - 2980 | 5,020.67 | | 89,276.69 |
| Check | 12/15/2011 | 484 | | Green Wish | no ck image | HSBC - 2980 | 3,660.80 | | 92,937.49 |
| Check | 12/15/2011 | 487 | | Green Wish | no ck image | HSBC - 2980 | 5,112.86 | | 98,050.35 |
| Check | 12/15/2011 | 482 | | Lucien Engineer | no ck image | HSBC - 2980 | 8,688.58 | | 106,739.93 |
| General Journal | 12/31/2011 | 3 | · | | to record co... | Loan from Sh... | 40,000.00 | | 146,739.93 |
| **Total Commission** | | | | | | | 146,739.93 | 0.00 | 146,739.93 |
| **Computer and Internet Expenses** | | | | | | | | | 0.00 |
| **Total Computer and Internet Expenses** | | | | | | | | | 0.00 |
| **Contribution** | | | | | | | | | 0.00 |
| **Total Contribution** | | | | | | | | | 0.00 |
| **Delivery** | | | | | | | | | 0.00 |
| **Total Delivery** | | | | | | | | | 0.00 |
| **Depreciation Expense** | | | | | | | | | 0.00 |
| **Total Depreciation Expense** | | | | | | | | | 0.00 |
| **Dues and Subscriptions** | | | | | | | | | 0.00 |
| **Total Dues and Subscriptions** | | | | | | | | | 0.00 |
| **Equipment Rental** | | | | | | | | | 0.00 |
| **Total Equipment Rental** | | | | | | | | | 0.00 |
| **Insurance Expense** | | | | | | | | | 0.00 |
| **Total Insurance Expense** | | | | | | | | | 0.00 |
| **Interest Expense** | | | | | | | | | 0.00 |
| **Total Interest Expense** | | | | | | | | | 0.00 |

CONFIDENTIAL

DR000962

15-

EXHIBIT 15
WIT: Daniel Koan
DATE: 10/8/13
LESLIE A. TOLEDO, CSR #8345

## AGAPE INDUSTRY, INC.

### General Ledger Report

Run: 5/09/13    4:46PM                                      12/31/10

| Date | Jrnl/Adj # | Ref # | Description | Debit | Credit | Balance |
|------|-----------|-------|-------------|-------|--------|---------|
| 12/31/10 CD30 | | | A/E-BUS SVC: MAILING & SHIPPIN | 3,339.64 | | |
| | | | Current Period Change | 179,235.84 | 0.00 | 179,235.84 |
| | | | Ending Balance | | | 179,235.84 |
| **740-0 Insurance** | | | | | | |
| | | | Beginning Balance | | | 0.00 |
| 12/31/10 CD30 | | | A/E-BUS SVC: INSURANCE | 366.49 | | |
| | | | Current Period Change | 366.49 | 0.00 | 366.49 |
| | | | Ending Balance | | | 366.49 |
| **745-0 Interest Expense** | | | | | | |
| | | | Beginning Balance | | | 0.00 |
| | | | Current Period Change | 0.00 | 0.00 | 0.00 |
| | | | Ending Balance | | | 0.00 |
| **750-0 Legal and Accounting** | | | | | | |
| | | | Beginning Balance | | | 0.00 |
| 1/29/10 CD01 | | 222 | DANIEL ROAN | 150.00 | | |
| 2/26/10 CD02 | | 243 | YEE HORN SHUAI | 1,500.00 | | |
| 2/26/10 CD02 | | 241 | CHAN LAW GROUP LLP | 5,000.00 | | |
| 4/30/10 CD04 | | 410 | YEE HORN-ATTORNEY | 1,173.28 | | |
| 5/28/10 CD05 | | | 05/10 LEGALWAY LAW FIRM | 5,700.00 | | |
| 12/31/10 CD30 | | | A/E-BUS SVC: PROFESSIONAL | 105.36 | | |
| | | | Current Period Change | 13,628.64 | 0.00 | 13,628.64 |
| | | | Ending Balance | | | 13,628.64 |
| **760-0 Miscellaneous Expenses** | | | | | | |
| | | | Beginning Balance | | | 0.00 |
| | | | Current Period Change | 0.00 | 0.00 | 0.00 |
| | | | Ending Balance | | | 0.00 |
| **762-0 Marketing & Promotion** | | | | | | |
| | | | Beginning Balance | | | 0.00 |
| | | | Current Period Change | 0.00 | 0.00 | 0.00 |
| | | | Ending Balance | | | 0.00 |

General Ledger Report

CONFIDENTIAL

EXHIBIT
WIT: Daniel Roan
DATE: 10/8/13
LESLIE A. TOLEDO, CSR #8345

DR000946

Apr 09 10 05:39p      PETER            >010                    1-    -325-9008      p.1

HSBC ◀▶            涨  ( , 丂 , ᦙ , )                                    ■○

EXTRAVANTAGE FOR BUSINESS
Statement of Account
Account Number

January 30, 2010 - February 26, 2010
Page 1 of 2



AGAPE INDUSTRY INC            32-00280
24325 CRENSHAW BLVD # 108
TORRANCE CA 90505-5349

Questions?
Call 877-472-2249 or write:
HSBC
P.O. Box 9
Buffalo, New York 14240

Effective with April deposit statements, paper checks will no longer be re-
turned with statements (except those with Cayman/Investment Sweep). Impact-
ed accounts will automatically be converted to receive check imaging, which
will provide the image (front only) of your returned checks within the
statements.  Please contact your Relationship Manager with any questions.

SUMMARY OF ACTIVITY FOR THE PERIOD 01/30/10 TO 02/26/10          DATE OF LAST STATEMENT WAS 01/29/10

| | | |
|---|---|---|
| YOUR BALANCE ON 01/29/10 WAS | 146,140.18 | OVERDRAFT ACCOUNT NUMBER |
| THERE WERE CHECKS AND OTHER SUBTRACTIONS | -272,685.13 | |
| THERE WERE DEPOSITS AND OTHER ADDITIONS | 133,000.00 | |
| THERE WERE CHARGES AND FEES OF | -120.00 | |
| YOUR BALANCE ON 02/26/10 | 6,335.05 | |

TRANSACTION DETAIL

| DATE POSTED | DESCRIPTION OF TRANSACTIONS | CHECKS AND OTHER SUBTRACTIONS | DEPOSITS AND OTHER ADDITIONS | BALANCE |
|---|---|---|---|---|
| 02/01/10 | 378END CHIP BANK OF AMERICA N.A.*BNF*MARTIN RUZ*STCHIPSE Q:8248517*TIME:0930*YR REF:BI8192800030090I*MMB REF:0324 18578 | 12,500.00 | | |
| 02/01/10 | CHECK #0240 | 800.00 | | |
| 02/01/10 | BIB DOMESTIC FUNDS TRANSFER FEE | 15.00 | | 132,825.18 |
| 02/04/10 | CHECK #0243 | 1,500.00 | | |
| 02/04/10 | CHECK #0238 | 1,285.20 | | |
| 02/04/10 | CHECK #0239 | 112.00 | | |
| 02/04/10 | CHECK #0237 | 92.40 | | 129,835.58 |
| 02/05/10 | DEPOSIT | | 133,000.00 | |
| 02/05/10 | 4SBOOK DEBIT AGAPE INDUSTRY INC*BNF:CHEN CHIANG SI.TUO,T AIWAY*STBOOK*TIME:0943*YR REF:BI8192800035902*MMB REF:0 3G3B5SI | 120,000.00 | | |
| 02/05/10 | BIB DOMESTIC FUNDS TRANSFER FEE | 15.00 | | 142,820.58 |
| 02/08/10 | 388END CHIP CHINA MERCHANTS BANK, LIMITED*BBK:CHINA MERC HANTS BANK,SHENZHEN*BNF:SUN LI*STCHIPSEQ:02244S8*TIME:09 02*YR REF:BI8192800436009G*MMB REF:03040B489 | 8,844.80 | | |
| 02/08/10 | CHECK #0242 | 1,269.21 | | |
| 02/08/10 | BIB DOMESTIC FUNDS TRANSFER FEE | 15.00 | | 132,691.57 |
| 02/09/10 | 45BOOK DEBIT AGAPE INDUSTRY INC*BNF:CHEN.CHIANG SU TUO*O BLSWIFT CODE  SCBKHKHEXXX*STBOOK*TIME:0622*YR REF:YT81 928004800012*MMB REF:044452382 | 50,000.00 | | |
| 02/09/10 | 46BOOK DEBIT AGAPE INDUSTRY INC*BBK:MEGA INTERNATIONAL C OMMERCIAL BANK,KAOHSIUNG TAIWAN*BNF:TICHO INDUSTRIES LIM ITED*OBI:THIS IS NOT K. TICHO INDUSTRIES C O LTD SWIFT CODE ICBCTWTP902*RP*BOOK*TIM E:5407*YR REF:YT81929004900081*MMB REF:040432379 | 50,000.00 | | |
| 02/09/10 | CHECK #0244 | 89.00 | | |
| 02/09/10 | PAYMENT TO VZ WIRELESS ARC -ARC-9245 VZ WIRELE ARC     9245 | 80.07 | | |
| 02/09/10 | FUNDS TRANSFER OUTGOING FEE        2 TRANSFERS | 60.00 | | 32,462.50 |
| 02/11/10 | PAYMENT TO AMERICAN EXPRESS-ELEC REMIT AMERICAN ELEC REMIT | 4,242.45 | | 28,220.05 |
| 02/12/10 | CHECK #0246 | 800.00 | | |

Please examine your statement at once.  For your convenience,
instructions for balancing your account are included.

If you change your address, please notify your branch office of your
new address. All deposited items are credited subject to final payment.

CONFIDENTIAL

EXHIBIT   17
WIT: Daniel Kean
DATE:   10/8/13
LESLIE A. TOLEDO, CSR #8345

DR000540

17-1

· ·10 05:39p     PETER                                    1-3    ·25-9008        p.2

EXTRAVANTAGE FOR BUSINESS
Statement of Account
Account Number ▮

**AGAPE INDUSTRY INC**

January 30, 2010 - February 26, 2010
Page 2 of 2

## TRANSACTION DETAIL

| DATE POSTED | DESCRIPTION OF TRANSACTIONS | CHECKS AND OTHER SUBTRACTIONS | DEPOSITS AND OTHER ADDITIONS | BALANCE |
|---|---|---|---|---|
| 02/12/10 | CHECK #0247 | 100.00 | | |
| 02/12/10 | CHECK #0241 | 5,000.00 | | 21,620.05 |
| 02/17/10 | CHECK #0249 | 5,000.00 | | 16,620.05 |
| 02/22/10 | CHECK #0248 | 270.00 | | 16,350.05 |
| 02/26/10 | SRSEND CHIP BANK OF NEW YORK*EBK:PERSHING LLC.*RNF:CARLO S MANUEL MAYORCA ZURBIA ANDR*RPCHIP SEQ:430793J*TIME:1117 *YR REF:ARE1923000560033*MIMB REF:057409691 | 10,000.00 | | |
| 02/26/10 | BIB DOMESTIC FUNDS TRANSFER FEE | 15.00 | | 6,335.05 |

## ITEMS PAID ON THIS STATEMENT:

**NUMBERED CHECKS:**

| | | | |
|---|---|---|---|
| #0237 ...........92.48 | #0238 .........1,285.20 | #0239 ...........112.00 | #0240 ...........800.00 |
| #0241 .........5,000.00 | #0242 .........1,269.21 | #0243 .........1,500.00 | #0244 ............89.00 |
| #0246 ...........800.00 * | #0247 ...........800.00 | #0245 ...........270.00 | #0249 .........5,000.00 |

* GAP IN PAID CHECK SEQUENCE

**OTHER ITEMS:**

| | | | |
|---|---|---|---|
| 72,580.00 | 15.00 | 120,000.00 | 15.00 |
| 8,844.80 | 15.00 | 50,000.00 | 50,000.00 |
| 80.07 | 60.00 | 4,242.45 | 10,000.00 |
| 15.00 | | | |

CONFIDENTIAL                                        DR000541

Apr 13 10 03:57p       PETER                                    1: 1-325-9008            p.2

# HSBC ⟨X⟩

**EXTRAVANTAGE FOR BUSINESS**
Statement of Account
Account Number

**February 27, 2010 - March 31, 2010**
Page  1  of  1

AGAPE INDUSTRY INC        32-00280
24325 CRENSHAW BLVD # 108
TORRANCE CA 90505-5349

Questions?
Call 877-472-2249 or write:
HSBC
P.O. Box 9
Buffalo, New York 14240

---

## SUMMARY OF ACTIVITY FOR THE PERIOD 02/27/10 TO 03/31/10

| | |
|---|---|
| YOUR BALANCE ON 02/26/10 WAS | 6,335.05 |
| THERE WERE CHECKS AND OTHER SUBTRACTIONS | -9,848.39 |
| THERE WERE DEPOSITS AND OTHER ADDITIONS | 68,589.05 |
| THERE WERE CHARGES AND FEES OF | -15.00 |
| YOUR BALANCE ON 03/31/10 | 65,060.71 |

**DATE OF LAST STATEMENT WAS 02/26/10**

**OVERDRAFT ACCOUNT NUMBER**

## TRANSACTION DETAIL

| DATE POSTED | DESCRIPTION OF TRANSACTIONS | CHECKS AND OTHER SUBTRACTIONS | DEPOSITS AND OTHER ADDITIONS | BALANCE |
|---|---|---|---|---|
| 03/03/10 | S3RECD FED BANK OF THE WEST*ORG:FORTRESS RESOURCES LLC D BA,PARAMOUNT CA 94713 2137*BNF:AGAPE INDUSTRY INC,TORRAN CE*OBI:38% DEPOSIT ON PO#S3569, S873786, S7*EBI:21842 HA WTHORNE BLVD TORRANCE CA 90543*ST FEDSEQ:LJB7721C080701 *TIME:1353*YR REF:NONREF*MMB REF:962430771 | | 28,905.60 | |
| 03/03/10 | FUNDS TRANSFER INCOMING FEE | 15.00 | | 35,225.65 |
| 03/15/10 | PAYMENT TO AMERICAN EXPRESS-ELEC REMIT AMERICAN ELEC REMIT | 3,448.39 | | 31,777.26 |
| 03/26/10 | DEPOSIT | | 39,683.45 | 71,460.71 |
| 03/31/10 | CHECK #0481 | 3,200.00 | | |
| 03/31/10 | CHECK #0482 | 3,200.00 | | 65,060.71 |

## ITEMS PAID ON THIS STATEMENT:

**NUMBERRED CHECKS:**

#0481 . . . . . . . . 3,200.00        #0482 . . . . . . . . 3,200.00

**OTHER ITEMS:**

15.00                    3,448.39

---

*Please examine your statement at once. For your convenience, instructions for balancing your account are included.*

*If you change your address, please notify your branch office of your new address. All deposited items are credited subject to final payment.*

CONFIDENTIAL

DR000542

17-3

# HSBC 

EXTRAVANTAGE FOR BUSINESS
Statement of Account
Account Number ▮▮▮▮▮▮

May 1, 2010 - May 28, 2010
Page 1 of 2

Ildhllhndllnllhnddnlddnllndnllhndllhndllhulhlddnlbnlbl

**AGAPE INDUSTRY INC**        32-00280
**24325 CRENSHAW BLVD # 108**
**TORRANCE CA 90505-5349**

Questions?
Call 877-472-2249 or write:
HSBC
P.O. Box 9
Buffalo, New York 14240

As of August 2nd, 2010 all Commercial Banking customers will be required to initiate International and Domestic wires using Business Internet Banking or HSBCnet. If you are not subscribed to one of these services please contact your Relationship Manager or visit your local Branch to sign up. If you have any questions please feel free to call 877.HSBC.BIZ.

---

SUMMARY OF ACTIVITY FOR THE PERIOD  05/01/10  TO  05/28/10          DATE OF LAST STATEMENT WAS  04/30/10

| | |
|---|---|
| YOUR BALANCE ON 04/30/10 WAS | 128,894.84 |
| THERE WERE CHECKS AND OTHER SUBTRACTIONS | -101,005.62 |
| THERE WERE DEPOSITS AND OTHER ADDITIONS | .00 |
| THERE WERE CHARGES AND FEES OF | -60.00 |
| YOUR BALANCE ON 05/28/10 WAS | 27,829.22 |

OVERDRAFT ACCOUNT NUMBER  ▮▮▮▮▮▮

TRANSACTION DETAIL

| DATE POSTED | DESCRIPTION OF TRANSACTIONS | CHECKS AND OTHER SUBTRACTIONS | DEPOSITS AND OTHER ADDITIONS | BALANCE |
|---|---|---|---|---|
| 05/03/10 | CHECK #0417 | 3,520.00 | | |
| 05/03/10 | CHECK #0418 | 1,840.00 | | |
| 05/03/10 | CHECK #0416 | 500.00 | | 123,034.84 |
| 05/10/10 | 46BOOK DEBIT AGAPE INDUSTRY INC*BBK:MEGA INTERNATIONAL C OMMERCIAL BANK,KAOHSIUNG*BNF:LEGALWAY LAW FIRM*STBOOK*TI ME:1503*YR REF:BI819280013000004*MMBREF:130456152 | 5,700.00 | | |
| 05/10/10 | 38SEND CHIP BANK OF NEW YORK*BBK:PERSHING LLC.*BNF:CARLO S MANUEL MAYORCA ZURIMA ANDR*RPCHIFSEQ:0374933*TIME:1602 *YR REF:BI819280013000003*MMBREF:130456151 | 10,000.00 | | |
| 05/10/10 | BIB DOMESTIC FUNDS TRANSFER FEE       2 WIRES | 30.00 | | 107,304.84 |
| 05/14/10 | 46BOOK DEBIT AGAPE INDUSTRY INC*BBK:CHINA CITIC BANK (FO RMERLY CITIC IN,HANGZHOU*BNF:ZHEJIANG ZITIC IMP. EXP. C O., LTD,HANGZHOU, CHINA*STBOOK*TIME:0904*YR REF:BI819280 0133006*MMB REF:134399171 | 15,219.60 | | |
| 05/14/10 | BIB DOMESTIC FUNDS TRANSFER FEE | 15.00 | | 92,070.24 |
| 05/18/10 | 46BOOK DEBIT AGAPE INDUSTRY INC*BBK:MEGA INTERNATIONAL C OMMERCIAL BANK,KAOHSIUNG*BNF:TICHO INDUSTRIES LIMITED*ST BOOK*TIME:1516*YR REF:BI819280013888002*MMBREF:138436300 | 46,400.00 | | |
| 05/18/10 | BIB DOMESTIC FUNDS TRANSFER FEE | 15.00 | | 45,655.24 |
| 05/19/10 | CHECK #0419 | 3,520.00 | | |
| 05/19/10 | CHECK #0420 | 1,840.00 | | 40,295.24 |
| 05/24/10 | CHECK #0421 | 3,000.00 | | 37,295.24 |
| 05/25/10 | PAYMENT TO AMERICAN EXPRESS-ELEC REMIT AMERICAN ELEC REMIT ▮▮▮ | 9,466.02 | | 27,829.22 |

ITEMS PAID ON THIS STATEMENT:

NUMBERED CHECKS:

| | | | |
|---|---|---|---|
| #0416 ..........500.00 | #0417 .........3,520.00 | #0418 .........1,840.00 | #0419 .........3,520.00 |
| #0420 .........1,840.00 | #0421 .........3,000.00 | | |

*Please examine your statement at once. For your convenience, instructions for balancing your account are included.*

*If you change your address, please notify your branch office of your new address. All deposited items are credited subject to final payment.*

CONFIDENTIAL

EXHIBIT  18
WIT: Daniel Koan
DATE: 10/8/13
LESLIE A. TOLEDO, CSR #8345

DR000544

18-1

AGAPE INDUSTRY, INC.

Comparative Trial Balance

Prepared by: _____
Reviewed by: _____
Approved by: _____

Run:  12/28/07   5:53PM                    12/31/06

| Account Number/Description | WP # | 12/31/05 | UnAdj Bal | Adjust Number/Amt | | Final Bal |
|---|---|---|---|---|---|---|
| 101-0  Cash on Hand | | 0.00 | 0.00 | | | 0.00 |
| 102-0  Cash in Chinatrust Bank-Checking | | 1,636.47 | 109,475.72 | | | 109,475.72 |
| 110-0  Accounts Receivable, trade | | 0.00 | 0.00 | | | 0.00 |
| 140-0  Inventory | | 0.00 | 0.00 | | | 0.00 |
| 160-0  Prepaid Expenses | | 0.00 | 0.00 | | | 0.00 |
| 190-0  Deposits | | 0.00 | 0.00 | | | 0.00 |
| 194-0  Subscription Receivable | | 10,000.00 | 0.00 | | | 0.00 |
| 195-0  Other Receivable | | 0.00 | 0.00 | | | 0.00 |
| 197-0  Bank Transfer | | 0.00 | 0.00 | | | 0.00 |
| 199-0  Suspense | | 0.00 | 0.00 | | | 0.00 |
| 201-0  Land | | 0.00 | 0.00 | | | 0.00 |
| 202-0  Leasehold Improvement | | 0.00 | 0.00 | | | 0.00 |
| 203-0  Accumulated Depreciation-L/H Imp | | 0.00 | 0.00 | | | 0.00 |
| 204-0  Furniture and fixtures | | 0.00 | 0.00 | | | 0.00 |
| 205-0  Accum Deprec-Furniture & Fixtures | | 0.00 | 0.00 | | | 0.00 |
| 206-0  Machinery and Equipment | | 0.00 | 0.00 | | | 0.00 |
| 207-0  Accum Deprec-Machinery & Equipr | | 0.00 | 0.00 | | | 0.00 |
| 208-0  Vehicle | | 0.00 | 0.00 | | | 0.00 |
| 209-0  Accumulated Depreciation-Vehicle | | 0.00 | 0.00 | | | 0.00 |
| 210-0  Computer | | 0.00 | 0.00 | | | 0.00 |
| 211-0  Accumulated Depreciation-Comput | | 0.00 | 0.00 | | | 0.00 |
| 220-0  Accumulated Depreciation | | 0.00 | 0.00 | | | 0.00 |
| 271-0  Goodwill | | 0.00 | 0.00 | | | 0.00 |
| 275-0  Security Deposits | | 0.00 | 0.00 | | | 0.00 |
| 281-0  Organization Costs | | 1,000.00 | 1,000.00 | | | 1,000.00 |
| 286-0  Accumulated Amortization | | (100.00) | (100.00) | 2 | (200.00) | (300.00) |
| Total Assets | | 12,536.47 | 110,375.72 | | (200.00) | 110,175.72 |
| 310-0  Accounts Payable | | 0.00 | 0.00 | | | 0.00 |
| 320-0  Accrued Wages | | 0.00 | 0.00 | | | 0.00 |
| 321-0  Federal Payroll Tax Payable | | (1,193.40) | (1,193.40) | | | (1,193.40) |
| 322-0  State Payroll Tax Payable | | (357.24) | (62.40) | | | (62.40) |
| 326-0  Accrued FUTA Tax | | (62.40) | (112.00) | | | (112.00) |
| 327-0  Accrued State Unemployment Insu | | 0.00 | 0.00 | | | 0.00 |
| 330-0  Accrued Federal Income Tax | | 0.00 | 0.00 | | | 0.00 |
| 331-0  Accrued State Income Tax | | 0.00 | 800.00 | 1 | (800.00) | 0.00 |
| 335-0  Accrued Local Inc Tax | | 0.00 | 0.00 | | | 0.00 |
| 338-0  Sales Tax Payable | | 0.00 | 0.00 | | | 0.00 |
| 345-0  Customer Deposits | | 0.00 | 0.00 | | | 0.00 |
| 355-0  Loan Payable - Stockholder | | 0.00 | (104,500.00) | | | (104,500.00) |
| 355-1  Loan Payable - Officers | | (7,119.06) | 317.34 | | | 317.34 |

Page  1                                    Comparative Trial Balance

CONFIDENTIAL

EXHIBIT ___19___
WIT: Daniel Loan
DATE: 10/8/13
LESLIE A. TOLEDO, CSR #8345

· DR000780

19-1

## AGAPE INDUSTRY, INC.

### Comparative Trial Balance

Run: 12/28/07  5:53PM                    12/31/06

| Account Number/Description | WP # | 12/31/05 | UnAdj Bal | Adjust Number/Amt | Final Bal |
|---|---|---|---|---|---|
| Total Liabilities | | (8,732.10) | (104,750.46) | (800.00) | (105,550.46) |
| | | | | | |
| 400-0 Common Stock | | (10,000.00) | (10,000.00) | | (10,000.00) |
| 410-0 Additional Paid-in Capital | | 0.00 | 0.00 | | 0.00 |
| 420-0 Treasury Stock, At Cost | | 0.00 | 0.00 | | 0.00 |
| 430-0 Retained Earnings | | 0.00 | 6,195.63 | | 6,195.63 |
| 450-0 Net Income for Current Period | | 0.00 | 0.00 | | 0.00 |
| Total Equity | | (10,000.00) | (3,804.37) | 0.00 | (3,804.37) |
| | | | | | |
| 500-0 Sales | | (65,979.15) | (499,767.01) | | (499,767.01) |
| 510-0 Sales, cash | | 0.00 | 0.00 | | 0.00 |
| 520-0 Sales Discounts Allowed | | 0.00 | 0.00 | | 0.00 |
| 521-0 Sales returns | | 0.00 | 0.00 | | 0.00 |
| Total Income | | (65,979.15) | (499,767.01) | 0.00 | (499,767.01) |
| | | | | | |
| 600-0 Beginning Inventory | | 0.00 | 0.00 | | 0.00 |
| 601-0 Purchases | | 33,012.10 | 385,597.77 | | 385,597.77 |
| 602-0 Purchase Discounts Taken | | 0.00 | 0.00 | | 0.00 |
| 620-0 Freight In, Customs & Duty | | 0.00 | 0.00 | | 0.00 |
| 630-0 Supplies | | 0.00 | 0.00 | | 0.00 |
| 650-0 Ending Inventory | | 0.00 | 0.00 | | 0.00 |
| 652-0 Inventory Variation | | 0.00 | 0.00 | | 0.00 |
| 671-0 Salaries-Officers | | 7,800.00 | 16,800.00 | | 16,800.00 |
| 672-0 Salaries-Others | | 0.00 | 14,400.00 | | 14,400.00 |
| 680-0 Advertising | | 4,790.25 | 8,211.50 | | 8,211.50 |
| 690-0 Amortization Expense | | 100.00 | 0.00 | 2  200.00 | 200.00 |
| 700-0 Auto and Truck Expense | | 0.00 | 0.00 | | 0.00 |
| 710-0 Bad Debt Expense | | 0.00 | 0.00 | | 0.00 |
| 711-0 Bank Charge | | 67.50 | 232.50 | | 232.50 |
| 713-0 Commission | | 0.00 | 0.00 | | 0.00 |
| 714-0 Credit Card Service | | 0.00 | 0.00 | | 0.00 |
| 715-0 Contributions | | 0.00 | 1,000.00 | | 1,000.00 |
| 725-0 Depreciation Expense | | 0.00 | 0.00 | | 0.00 |
| 730-0 Dues and Subscriptions | | 594.00 | 4,399.22 | | 4,399.22 |
| 735-0 Meals & Entertainment | | 0.00 | 0.00 | | 0.00 |
| 738-0 Freight Out | | 812.77 | 1,665.98 | | 1,665.98 |
| 740-0 Insurance | | 0.00 | 8,647.29 | | 8,647.29 |
| 745-0 Interest Expense | | 0.00 | 0.00 | | 0.00 |
| 750-0 Legal and Accounting | | 0.00 | 650.00 | | 650.00 |
| 760-0 Miscellaneous Expenses | | 0.00 | 0.00 | | 0.00 |

Page 2                                     Comparative Trial Balance

CONFIDENTIAL                                  DR000781

## AGAPE INDUSTRY, INC.

### Comparative Trial Balance

Run:  12/07/07  10:32AM                    12/31/05

| Account Number/Description | WP # | Budget | UnAdj Bal | Adjust Number/Amt | | Final Bal |
|---|---|---|---|---|---|---|
| Total Liabilities | | 0.00 | (1,613.04) | | 0.00 | (1,613.04) |
| | | | | | | |
| 400-0 Common Stock | | 0.00 | 0.00 | 1 | (10,000.00) | (10,000.00) |
| 410-0 Additional Paid-In Capital | | 0.00 | 0.00 | | | 0.00 |
| 420-0 Treasury Stock, At Cost | | 0.00 | 0.00 | | | 0.00 |
| 430-0 Retained Earnings | | 0.00 | 0.00 | | | 0.00 |
| 450-0 Net Income for Current Period | | 0.00 | 0.00 | | | 0.00 |
| Total Equity | | 0.00 | 0.00 | | (10,000.00) | (10,000.00) |
| | | | | | | |
| 500-0 Sales | | 0.00 | (65,979.15) | | | (65,979.15) |
| 510-0 Sales, cash | | 0.00 | 0.00 | | | 0.00 |
| 520-0 Sales Discounts Allowed | | 0.00 | 0.00 | | | 0.00 |
| 521-0 Sales returns | | 0.00 | 0.00 | | | 0.00 |
| Total Income | | 0.00 | (65,979.15) | | 0.00 | (65,979.15) |
| | | | | | | |
| 600-0 Beginning Inventory | | 0.00 | 0.00 | | | 0.00 |
| 601-0 Purchases | | 0.00 | 33,012.10 | | | 33,012.10 |
| 602-0 Purchase Discounts Taken | | 0.00 | 0.00 | | | 0.00 |
| 620-0 Freight In, Customs & Duty | | 0.00 | 0.00 | | | 0.00 |
| 630-0 Supplies | | 0.00 | 0.00 | | | 0.00 |
| 650-0 Ending Inventory | | 0.00 | 0.00 | | | 0.00 |
| 652-0 Inventory Variation | | 0.00 | 0.00 | | | 0.00 |
| 671-0 Salaries-Officers | | 0.00 | 7,800.00 | | | 7,800.00 |
| 672-0 Salaries-Others | | 0.00 | 0.00 | | | 0.00 |
| 680-0 Advertising | | 0.00 | 4,790.25 | | | 4,790.25 |
| 690-0 Amortization Expense | | 0.00 | 0.00 | 2 | 100.00 | 100.00 |
| 700-0 Auto and Truck Expense | | 0.00 | 0.00 | | 0.00 | 0.00 |
| 710-0 Bad Debt Expense | | 0.00 | 0.00 | | 0.00 | 0.00 |
| 711-0 Bank Charge | | 0.00 | 67.50 | | 0.00 | 67.50 |
| 713-0 Commission | | 0.00 | 0.00 | | 0.00 | 0.00 |
| 714-0 Credit Card Service | | 0.00 | 0.00 | | 0.00 | 0.00 |
| 715-0 Contributions | | 0.00 | 0.00 | | 0.00 | 0.00 |
| 725-0 Depreciation Expense | | 0.00 | 0.00 | | 0.00 | 0.00 |
| 730-0 Dues and Subscriptions | | 0.00 | 594.00 | | 0.00 | 594.00 |
| 735-0 Meals & Entertainment | | 0.00 | 0.00 | | 0.00 | 0.00 |
| 738-0 Freight Out | | 0.00 | 812.77 | | 0.00 | 812.77 |
| 740-0 Insurance | | 0.00 | 0.00 | | 0.00 | 0.00 |
| 745-0 Interest Expense | | 0.00 | 0.00 | | 0.00 | 0.00 |
| 750-0 Legal and Accounting | | 0.00 | 0.00 | | 0.00 | 0.00 |
| 760-0 Miscellaneous Expenses | | 0.00 | 0.00 | | 0.00 | 0.00 |

Comparative Trial Balance

CONFIDENTIAL

EXHIBIT 20
WIT: Daniel Joon
DATE: 10/8/13
LESLIE A. TOLEDO, CSR #8345

DR000760

## AGAPE INDUSTRY, INC.

### General Ledger Report

| Run: 5/09/13 | | 4:42PM | 12/31/09 | | | |
|---|---|---|---|---|---|---|
| Date | Jrnl/Adj # | Ref # | Description | Debit | Credit | Balance |
| 12/31/09 CD15 | | | 11/05 XFER TO CHK#02980 | 4,000.00 | | |
| | | | Current Period Change | 29,064.74 | 29,064.74 | 0.00 |
| | | | Ending Balance | | | 0.00 |
| 198-0 Exchange ??? | | | | | | |
| | | | Beginning Balance | | | 0.00 |
| 3/09/09 | CD56 | | 02/22 CHUNG SHEN-TWN$ | 25.16 | | |
| 3/09/09 | CD56 | | 03/04 TSAI MENG-TWN$ | 2,126.16 | | |
| 6/04/09 | CD52 | | 05/28 SHIN JR KAOSHIUNG | 341.07 | | |
| 6/09/09 | CD57 | | 05/15 HAO YUNG KAO-TWN$ | 98.56 | | |
| 6/09/09 | CD57 | | 05/17 SHA WA -TWN$ | 59.95 | | |
| 6/09/09 | CD57 | | 05/17 HAO YUNG KAO-TWN$ | 136.26 | | |
| 6/09/09 | CD57 | | 05/18 BEI GUO -TWN$ | 31.98 | | |
| 6/09/09 | CD57 | | 05/20 HAO YUNG KAO HSIUNG-TWN$ | 165.31 | | |
| 6/09/09 | CD57 | | 05/21 TAI YA-TWN$ | 47.54 | | |
| 6/09/09 | CD57 | | 05/21 SHA WA NA-TWN$ | 105.15 | | |
| 6/09/09 | CD57 | | 05/23 HANG TEN TOU LIU-TWN$ | 37.82 | | |
| 6/09/09 | CD57 | | 05/27 CHUNG HSIN CHIAYI-TWN$ | 204.79 | | |
| 7/04/09 | CD53 | | 06/09 HUA YU HANG KONG-CHN$ | 496.40 | | |
| 7/04/09 | CD53 | | 06/14 SHIH YUEI KAOSHIUNG-TWN$ | 92.56 | | |
| 7/04/09 | CD53 | | 06/16 TSAI MENG-TWN$ | 160.61 | | |
| 7/04/09 | CD53 | | 06/16 TSAI MENG-TWN$ | 318.69 | | |
| 7/04/09 | CD53 | | 06/16 TSAI MENG-TWN$ | 56.89 | | |
| 7/04/09 | CD53 | | 06/16 TSAI MENG-TWN$ | 84.68 | | |
| 7/04/09 | CD53 | | 06/19 TSAI MENG-TWN$ | 56.43 | | |
| 7/04/09 | CD53 | | 06/21 HAN SHIN -TWN$ | 22.05 | | |
| 7/04/09 | CD53 | | 06/21 HAN SHIN -TWN$ | 121.04 | | |
| 7/09/09 | CD58 | | 06/10 BJ ZHONGAOMAGE-CHN$ | 1,498.58 | | |
| 7/09/09 | CD58 | | 06/10 BJ ZHONGAOMAGE-CHN | 12.08 | | |
| 7/09/09 | CD58 | | 07/06 IVISA SVC NEUTRAL BAY-AU | 16.39 | | |
| 11/09/09 CD59 | | | 10/25 BJ ZHONGAOMAGE-CHN$ | 1,057.92 | | |
| 11/09/09 CD59 | | | 10/25 BJ ZHONGAOMAGE-CHN$ | 1,281.77 | | |
| 11/09/09 CD59 | | | 10/26 SHA WA NA -NTW$ | 86.00 | | |
| 11/09/09 CD59 | | | 10/27 JIAN YUAN FILLING-TWN$ | 57.15 | | |
| | 3 | | CC EXP FOR PETER LIN (PERSONAL) | | 8,798.99 | |
| | | | Current Period Change | 8,798.99 | 8,798.99 | 0.00 |
| | | | Ending Balance | | | 0.00 |

EXHIBIT 21
WIT: Daniel Tran
DATE: 10/8/13
LESLIE A. TOLEDO, CSR #8345

Page 4

General Ledger Report

CONFIDENTIAL

DR000889

21-1

# AGAPE INDUSTRY, INC.

## General Ledger Report

Run: 12/28/07      5:53PM                          12/31/06

| Date | Jrnl/Adj # | Ref # | Description | Debit | Credit | Balance |
|------|-----------|-------|-------------|-------|--------|---------|
| **330-0 Accrued Federal Income Tax** | | | | | | |
| | | | Beginning Balance | | | 0.00 |
| | | | Current Period Change | 0.00 | 0.00 | 0.00 |
| | | | Ending Balance | | | 0.00 |
| **331-0 Accrued State Income Tax** | | | | | | |
| | | | Beginning Balance | | | 0.00 |
| 4/30/06 | CD04 | 200 | FRANCHISE TAX BOARD | 800.00 | | |
| | 1 | | TO RECORD PROVISION FOR INCOME TAX | | 800.00 | |
| | | | Current Period Change | 800.00 | 800.00 | 0.00 |
| | | | Ending Balance | | | 0.00 |
| **335-0 Accrued Local Inc Tax** | | | | | | |
| | | | Beginning Balance | | | 0.00 |
| | | | Current Period Change | 0.00 | 0.00 | 0.00 |
| | | | Ending Balance | | | 0.00 |
| **338-0 Sales Tax Payable** | | | | | | |
| | | | Beginning Balance | | | 0.00 |
| | | | Current Period Change | 0.00 | 0.00 | 0.00 |
| | | | Ending Balance | | | 0.00 |
| **345-0 Customer Deposits** | | | | | | |
| | | | Beginning Balance | | | 0.00 |
| | | | Current Period Change | 0.00 | 0.00 | 0.00 |
| | | | Ending Balance | | | 0.00 |
| **355-0 Loan Payable - Stockholder** | | | | | | |
| | | | Beginning Balance | | | 0.00 |
| 4/30/06 | CR04 | | 04/17 DEPOSIT LOAN FROM TAIWAN | | 4,500.00 | |
| 8/31/06 | CR08 | | 08/21 DEPOSIT LOAN FROM TAIWAN | | 100,000.00 | |
| | | | Current Period Change | 0.00 | 104,500.00 | (104,500.00) |
| | | | Ending Balance | | | (104,500.00) |
| **355-1 Loan Payable - Officers** | | | | | | |
| | | | Beginning Balance | | | (7,119.06) |
| 3/31/06 | CD03 | 195 | PETER LIN | 20,000.00 | | |
| 3/31/06 | PR01 | | GROSS WAGES-1QTR/2006 | | 7,140.90 | |

CONFIDENTIAL

EXHIBIT 22
WIT: Daniel Roan
DATE: 10/8/13
LESLIE A. TOLEDO, CSR #8345

DR000789

 **Chinatrust Bank (U.S.A.)** 中 國 信 託

www.ch atrustusa.com

AGAPE INDUSTRY, INC.
23520 TELO AVE SUITE#1
TORRANCE CA 90505

SMALL BUSINESS CHECK

8/31/06          10

1          BRANCH-008

----------------------------------------------------------------------

SUMMARY FOR SMALL BUSINESS CHECK

----------------------------------------------------------------------

```
            BEGINNING BALANCE       8/01/06          163,930.00
            DEPOSITS / MISC CREDITS       3          137,720.01
            WITHDRAWALS / MISC DEBITS    13          166,655.68
         ** ENDING BALANCE          8/31/06          134,994.33  **
            SERVICE CHARGE                                  .00
            AVERAGE BALANCE                              64,847
            ENCLOSURES                                       10
```

- - - - - - - - - - - MISCELLANEOUS DEBITS AND CREDITS - - - - - - - - - - - -

```
   DATE        AMOUNT          DESCRIPTION
 8/01/06   160,093.00 DR      WIRE TRANSFER
 8/01/06        30.00 DR      WIRE TRANSFER
 8/04/06    29,750.01 CR      Deposit# 000009988
 8/14/06       667.97 DR      CINGULAR/CHECK PYMT
                              Check Number: 252
 8/21/06     7,970.00 CR      Deposit# 000009991
 8/21/06   100,000.00 CR      Deposit# 000009992
 8/24/06        45.66 DR      SO CAL EDISON/MAILED PMT
                              Check Number: 258
```

- - - - - CHECKS POSTED - - - - - - - - - - - - - - CHECKS POSTED - - - - - -

```
   DATE     CHECK NO.        AMOUNT        DATE    CHECK NO.      AMOUNT
 8/01/06       232           400.00      8/28/06     253*          99.00
 8/04/06       248*          279.40      8/25/06     254          684.25
 8/07/06       249         1,193.40      8/25/06     256*         100.00
 8/10/06       250         1,143.00      8/24/06     257          520.00
 8/10/06       251         1,400.00
```

- - - - - - - - - - - - - DAILY BALANCE SUMMARY - - - - - - - - - - - - - - -

```
   DATE           BALANCE                DATE           BALANCE
 8/01/06          3,407.00             8/21/06        136,443.24
 8/04/06         32,877.61             8/24/06        135,877.58
 8/07/06         31,684.21             8/25/06        135,093.33
 8/10/06         29,141.21             8/28/06        134,994.33
 8/14/06         28,473.24
```

CONFIDENTIAL

EXHIBIT 23
WIT: Daniel Roan
DATE: 10/8/13
LESLIE A. TOLEDO, CSR #8345

R000440

MEMBER

23-1



www.chinatrustusa.com

AGAPE INDUSTRY, INC.                     SMALL BUSINESS CHECK
23520 TELO AVE SUITE#1
TORRANCE CA 90505                        4/28/06              8

                                         1         BRANCH-008

New Rowland Heights and Westminster Branches are now open!
Please join our celebration to enjoy
GREAT RATES, GREAT DISCOUNTS and GREAT GIFTS!!
Rowland Heights Branch >>>>>>
17851-A1 Colima Rd., City of Industry, CA 91748    Tel: 626-839-6656
Westminster Branch >>>>>>
9547A, Bolsa Avenue, Westminster, CA 92683         Tel: 714-531-2156

-----------------------------------------------------------------------
            SUMMARY FOR SMALL BUSINESS CHECK
-----------------------------------------------------------------------
            BEGINNING BALANCE      4/01/06              834.46
            DEPOSITS / MISC CREDITS       4          29,480.00
            WITHDRAWALS / MISC DEBITS    10           5,311.90
        ** ENDING BALANCE          4/30/06          25,002.56  **
            SERVICE CHARGE                                 .00
            AVERAGE BALANCE                            7,163
            ENCLOSURES                                     8

- - - - - - - - - MISCELLANEOUS DEBITS AND CREDITS - - - - - - - - - - - -
    DATE        AMOUNT         DESCRIPTION
  4/05/06     2,000.00 CR    Deposit# 000009982
  4/06/06       209.68 DR    SBC/PAYMENT
  4/17/06     4,500.00 CR    DEPOSIT
  4/24/06    15,000.00 CR    Deposit# 000009987
  4/24/06       393.25 DR    CINGULAR/CHECK PYMT
                             Check Number: 208
  4/27/06     7,980.00 CR    WIRES TRANSFER
  4/27/06         7.50 DR    WIRE TRANSFER

- - - - - - CHECKS POSTED - - - - - - - - - - - - CHECKS POSTED - - - - - -
    DATE      CHECK NO.     AMOUNT        DATE     CHECK NO.      AMOUNT
  4/07/06       199       1,400.00      4/26/06      203          99.00
  4/18/06       200         800.00      4/27/06     206*         777.22
  4/26/06       201         684.25      4/28/06      207         895.00
  4/24/06       202          46.00