**EXHIBIT F**

```
 1              UNITED STATES DISTRICT COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3

 4

 5   JUN-EN ENTERPRISE, a Taiwan      )
     Corporation, AGAPE INDUSTRY      )
 6   CO., LTD., a Taiwan              )
     Corporation,                     )
 7                                    )
                    Plaintiffs,       )
 8                                    )
          vs.                         ) Case No.
 9                                    ) CV 12-02734-PSG-SS
     PETER K. LIN, AGAPE INDUSTRIAL, )
10   INC., and DOES 1 through 10,     ) Volume I
                                      )
11                  Defendants.       )
     _____)
12                                    )
     AND RELATED COUNTER-CLAIM.       )
13   _____)

14

15

16

17       30(b)(6) DEPOSITION OF HSIN-YI CHIU

18            Los Angeles, California

19          Wednesday, February 12, 2014

20

21

22

23

24   Reported by:  Judith Schlussel
                   CSR No. 4307
25   NDS Job No.:  157241
```

1

1                UNITED STATES DISTRICT COURT

2               CENTRAL DISTRICT OF CALIFORNIA

3

4

5    JUN-EN ENTERPRISE, a Taiwan      )
     Corporation, AGAPE INDUSTRY      )
6    CO., LTD., a Taiwan              )
     Corporation,                     )
7                                     )
                    Plaintiffs,       )
8                                     )
         vs.                          ) Case No.
9                                     ) CV 12-02734-PSG-SS
     PETER K. LIN, AGAPE INDUSTRIAL, )
10   INC., and DOES 1 through 10,     ) Volume I
                                      )
11                  Defendants.       )
     _____)
12                                    )
     AND RELATED COUNTER-CLAIM.       )
13   _____)

14

15

16

17          30(b)(6) DEPOSITION OF HSIN-YI CHIU,

18       at 1055 West Seventh Street, Suite 1880, Los

19       Angeles, California, commencing at 8:33 A.M.,

20       on Wednesday, February 12, 2014, before

21       Judith Schlussel, Certified Shorthand

22       Reporter Number 4307.

23

24

25

                                                          2

Hsin-Yi Chiu                                                           February 12, 2014

```
 1      APPEARANCES:

 2

 3     For the Defendants, THIRD PARTY PLAINTIFFS

 4     PETER K. LIN and AGAPE INDUSTRIAL, INC.:

 5

 6          FOX ROTHSCHILD, LLP

 7          BY: THOMAS T. CHAN, ESQ.

 8          1055 West Seventh Street

 9          Suite 1880

10          Los Angeles, California 90017

11          (213) 624-6560

12

13

14     For the Plaintiffs and Counter-Defendants:

15

16          KU & FONG

17          BY:  HOW GUIN ROBERT FONG, ESQ.

18          444 South Flower Street

19          Suite 1500

20          Los Angeles, California 90071

21          (213) 488-1400

22

23

24

25
```

3

```
 1     APPEARANCES (Continued):

 2

 3     Also Present:

 4

 5          PENNY KOLE, Mandarin Interpreter

 6          PETER K. LIN, (Via telephone hookup)

 7          BO HUANG, Chinese Interpreter

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

```
 1                        PENNY KOLE,

 2   the interpreter, was sworn to translate English into

 3   Mandarin and Mandarin into English as follows:

 4

 5                      HSIN-YI CHIU,

 6   the witness, having been administered an oath by the

 7   court reporter, was sworn and testified as follows:

 8             THE WITNESS:  Yes, I do.

 9

10                      EXAMINATION

11   BY MR. CHAN:

12        Q.   Please state your full name.

13        A.   Chiu, Hsin-Yi.

14             Last name, C-H-I-U, given name, H-S-I-N-Y-I.

15        Q.   And you're here today to represent your

16   companies, Jun-En Enterprise and Agape Industry Co.,

17   LTD.?

18        A.   That's correct.

19        Q.   As a witness for the third notice of taking of

20   our FRCP 30(b)(6) deposition of both plaintiff Agape

21   Industry Co., LTD., and Jun-En Enterprise, correct?

22        A.   That is correct.

23        Q.   To streamline our deposition, I'm going to

24   call -- I will, throughout this deposition, in addition

25   to calling Jun-En Enterprise by its full name, I will
```

8

1          MR. CHAN:  I'm glad you're finally learning.

2          THE WITNESS:  Agape Industry in Taiwan was

3   formed on July 2nd, 2003.

4      Q.   BY MR. CHAN:  Why was it formed?

5      A.   To specialize in our metal business relating to

6   our core business.

7      Q.   But you already have Jun-En Taiwan.  Why do you

8   need Agape Taiwan then?

9          MR. FONG:  Objection; argumentative.

10          THE WITNESS:  So does that mean I don't need to

11   answer?

12          MR. FONG:  You need to answer --

13      Q.   BY MR. CHAN:  Please answer my question.

14   Please answer my question unless your lawyer instructs

15   you not to answer.

16      A.   I think it's quite normal in Taiwan to have one

17   company with other companies with different names.

18      Q.   You are not answering my question.  Do you know

19   why Agape Taiwan was formed?

20      A.   I don't know.

21      Q.   Who are the shareholders of Agape Taiwan?

22      A.   Primarily, Hsiu-Ying Lu.

23      Q.   Can you spell it?

24      A.   H-S-I-U-Y-I-N-G, L-U.

25      Q.   Anybody else?

23

1      A.   There are other shareholders, but I don't have

2    the information right now.

3      Q.   Is Tony Yang a shareholder?

4      A.   No.

5      Q.   Is Agape -- strike that.  Is Jun-En Taiwan a

6    shareholder?

7      A.   No.

8      Q.   Do you know who are the officers of Agape

9    Taiwan?

10     A.   Hsiu-Ying Lu.

11     Q.   Do you know who the directors are of Agape

12   Taiwan?

13     A.   To my understanding, Hsiu-Ying Lu.

14     Q.   Does Agape Taiwan do business around the world?

15     A.   Yes.  International trade business is part of

16   it.

17     Q.   Does Agape Taiwan do business in the United

18   States?

19     A.   It's through the company we earlier referred to

20   as Agape USA.  I'm referring to Agape Industry, Inc.

21     Q.   So other than through Agape Industry, Inc., the

22   U.S. company, Agape Taiwan does not do any business in

23   the U.S., correct?

24     A.   That's correct.

25     Q.   So after -- so after 2009, Agape Taiwan doesn't

24

```
1    do any business in the U.S., correct?

2         A.   Can I have a repeat, please.

3              MR. CHAN:  Would you read the question.

4                    (Question read.)

5              THE WITNESS:  Could you define does not do

6    business in the U.S.

7         Q.   BY MR. CHAN:  Has Agape Taiwan sold any product

8    to anyone in the U.S.?

9         A.   He is referring to Agape USA, correct?

10        Q.   Let me ask the question again.  Did Agape

11   Taiwan do any business after 2009 in the United States?

12        A.   Not to my understanding.

13        Q.   Agape -- did Agape Taiwan send any salespeople

14   to the U.S. to solicit business?

15             MR. FONG:  Objection as to time.  Vague and

16   ambiguous as to when.

17        Q.   BY MR. CHAN:  After 2009.

18        A.   The only representative in the U.S. for us is

19   Peter Lin, an employee of ours.  So before he left the

20   company in 2009, he was representing the company in the

21   U.S.

22        Q.   So after Mr. Lin stopped doing business with

23   Agape Taiwan, Agape Taiwan has not done any business in

24   the U.S.?

25        A.   That's correct.
```

25

1    refer to 2009 as a whole year or do you have a specific

2    month in mind?

3         Q.    BY MR. CHAN:  Did Agape Taiwan receive any

4    revenue from the United States at any month in 2009?

5         A.    To my understanding, Agape Taiwan did in 2009;

6    however, I am not familiar with any details.  If you

7    need details, I will have to get the information from

8    the company.

9         Q.    How about 2010?

10        A.    I think so.  I think there was some, because

11   Peter Lin was fired in January 2010.

12        Q.    Do you recall which month that Agape Taiwan

13   obtained any revenue of any customer located in the

14   United States?

15        A.    In 2010, right?

16        Q.    That's right.

17        A.    I don't know.

18        Q.    But did you just say -- didn't you just tell me

19   Agape Taiwan didn't do any business in U.S. in 2010?

20        A.    Just like I said earlier, all business in the

21   U.S. for Agape Taiwan went through Agape USA which was

22   handled by Peter Lin.  And just like I said, Peter Lin

23   left the company in January 2010, so if there was any

24   business in the U.S., it was all through Agape USA.

25   That means that I believe Mr. Lin is more familiar with

                                                           37

1    as we're at the company throughout the period we talked

2    about it.

3              MR. FONG:  Is this a good time for a break?

4    It's already 10:00.  It's 10:00 o'clock.  If there is a

5    good time to break, I need to make a phone call.

6              MR. CHAN:  Okay.  How much time do you need?

7              MR. FONG:  Five minutes.

8              MR. CHAN:  All right.  It's 10:05.  We'll be

9    back 10:10.

10                        (Recess taken.)

11             MR. CHAN:  Let's resume.

12        Q.    BY MR. CHAN:  What is the annual revenue of

13   Jun-En Taiwan in 2003?

14        A.    2003 (in English).

15              2003?

16        Q.    2013.

17        A.    Approximately 10 million U.S. dollars.

18        Q.    What is Jun-En's annual revenue for 2012?

19        A.    It was better, approximately 12 million.

20        Q.    And 2011?

21        A.    Approximately 10 million.

22        Q.    And 2010?

23        A.    I believe it was around 10 million.  Or maybe

24   slightly lower.

25        Q.    How much lower?

                                                            41

1         A.   For 2010, please allow me some time to refresh

2    my recollection.

3              MR. FONG:  For the record, Ms. Reporter, did

4    you get Mr. Chan's question or statement in Chinese?

5              THE REPORTER:  No.  I don't take down Chinese.

6              MR. FONG:  Exactly.

7              MR. CHAN:  The interpreter can interpret when I

8    speak Chinese.

9              MR. FONG:  Tom, please speak English.

10             MR. CHAN:  Mr. Fong, I can speak English or I

11   can speak Chinese.  If I speak Chinese, the interpreter

12   can interpret.

13             MR. FONG:  Penny, do you understand that when

14   Mr. Chan speaks Chinese, you're going to have to

15   interpret that to English?  I'm going to have to hear it

16   and the court reporter has to take it down.  Okay?

17             THE INTERPRETER:  Yes, I do that.  Earlier, the

18   interpreter heard Chinese, 2010, because the deponent

19   was asking, did you say 2009 and Mr. Chan said it in

20   Mandarin, no, 2010.

21             MR. FONG:  Thank you.

22             THE WITNESS:  The current question is about

23   2010, right?  If it's for 2010, to my recollection, it

24   was about 9 million.

25        Q.   BY MR. CHAN:  And in 2009, what is Jun-En

                                                          42

```
 1    Taiwan's annual revenue?

 2         A.   I will have to check because it was long ago.

 3    I do want to specify something.  When we say sales

 4    revenue, it includes our machinery and our products.

 5         Q.   Can you give me an estimate of the Jun-En

 6    Taiwan's annual revenue in 2009?

 7         A.   For 2009, I think it was around 8 million.

 8         Q.   And for 2008?

 9         A.   I think it was around 7 or 8 million, in that

10    range.

11         Q.   So the company's revenue actually increased

12    year by year from 2008 to 2012?

13         A.   Yes.

14         Q.   What is the company's net profit before tax in

15    2012 -- yes, 2012?

16         A.   For net profit, to my recollection, I think it

17    was around 12 percent roughly.

18         Q.   Would that be true for -- from 2008 to 2013?

19         A.   To my recollection, the net profit is about the

20    same.  But sometimes when the economic situation is not

21    good, then the net profit drops below 10 percent.

22         Q.   Did it drop below 10 percent in 2008?

23         A.   I don't know.  For details such as this, I

24    would have to check into the accounting information.

25         Q.   How about 2009?
```

43

1    product does this exhibit show?

2         A.    Different metal mesh.

3         Q.    Are these metal netting products?

4         A.    Yes.

5         Q.    Is metal netting product a kind of metal mesh

6    product?

7         A.    That's a fair statement.

8         Q.    Does Jun-En sell this metal netting product --

9    Jun-En Taiwan?

10             THE INTERPRETER:  Those?

11        Q.    BY MR. CHAN:  Does Jun-En Taiwan sell this

12   metal netting product at any time?

13             MR. FONG:  Object to the question on the

14   grounds that it's vague and ambiguous as to whether

15   you're referring to exactly what is shown in Exhibit 31

16   as opposed to the general category.

17             MR. CHAN:  I'm referring to the general

18   category.

19             MR. FONG:  Okay.  Thank you.

20             THE WITNESS:  Yes.

21        Q.    BY MR. CHAN:  How about Agape Taiwan?

22        A.    Same.

23             THE INTERPRETER:  The interpreter would like to

24   replace "yes" -- change "same" to "yes."

25             MR. CHAN:  Please mark this as Exhibit 32.

45

```
 1              (Deposition Exhibit No. 32 was marked for

 2     identification.)

 3         Q.   BY MR. CHAN:  What would you call this kind of

 4     product in front of you in Exhibit 32?

 5         A.   Perforated sheet.

 6         Q.   Does Jun-En Taiwan sell perforated metal

 7     sheets?

 8         A.   Yes.

 9         Q.   How about Agape Taiwan?

10         A.   Yes.

11         Q.   Let's go back to -- how about a metal netting

12     product, does Agape Taiwan sell metal netting product?

13              MR. FONG:  It's been asked and answered.

14              THE WITNESS:  Yes.

15              MR. FONG:  You did that with Exhibit 31,

16     Counsel.

17              MR. CHAN:  Please mark this as Exhibit 33.

18              (Deposition Exhibit No. 33 was marked for

19     identification.)

20              MR. FONG:  It's a one-page document entitled

21     woven wire cloth.

22         Q.   BY MR. CHAN:  What would you call these

23     products shown in Exhibit 33?

24         A.   We call it woven wire cloth or woven wire

25     netting.
```

46

1      Q.   And does Jun-En Taiwan sell woven wire cloth

2   product?

3      A.   Yes.

4      Q.   Does Agape Taiwan sell woven wire cloth

5   product?

6      A.   Yes.

7           MR. CHAN:  Would you -- court reporter, would

8   you mark this as Exhibit 34.

9           (Deposition Exhibit No. 34 was marked for

10   identification.)

11     Q.   BY MR. CHAN:  Can you identify the products

12   shown in Exhibit 34?

13     A.   We call it metal mesh conveyer belts.

14     Q.   Does Jun-En Taiwan sell metal mesh conveyer

15   belt?

16     A.   Yes.

17     Q.   Does Jun-En -- does Agape Taiwan sell metal

18   mesh conveyer belt?

19     A.   Yes.  Some.

20          MR. CHAN:  Court reporter, please mark this

21   document as Exhibit 35.

22          (Deposition Exhibit No. 35 was marked for

23   identification.)

24     Q.   BY MR. CHAN:  Can you identify the products

25   shown in Exhibit 35?

47

1    very well?

2       A.    Correct.

3       Q.    Is Agape Taiwan currently selling these metal

4    mesh products?

5            MR. FONG:  Vague and ambiguous as to these.

6    Are you referring to what is imaged in Exhibits 31 to 35

7    or generally?

8            THE WITNESS:  Some of them.

9       Q.    BY MR. CHAN:  Which product is Agape Taiwan

10   currently not selling?

11      A.    No rib lath.  Rib lath is more a special --

12   it's more specialized products and Agape Taiwan

13   currently is not selling this type.

14           For other types, more or less the company is

15   selling some of them.

16      Q.    Has Agape Taiwan ever sold metal rib lath

17   product?

18      A.    If you are asking about Agape Taiwan, if you

19   are asking me to lump together domestically and

20   internationally, the answer is yes.

21      Q.    Has Agape Taiwan ever sold any of these five

22   type of metal mesh products to United States?

23      A.    Some were sold to the U.S. through Agape USA.

24      Q.    Other than through Agape USA, is it correct

25   that Agape Taiwan does not sell any of these metal mesh

                                                          50

1    products?

2           MR. FONG:  I'm going to object to the question

3    on the grounds that the tense makes the question totally

4    unclear.

5           MR. CHAN:  Let me try to rephrase.

6           MR. FONG:  Please.  Thank you.

7       Q.   BY MR. CHAN:  Did Agape Taiwan sell any metal

8    mesh product to United States other than through Peter

9    Lin and his companies?

10      A.   Not to my understanding.

11      Q.   So that means after January 2010, Agape Taiwan

12   did not sell any metal mesh products to the United

13   States?

14      A.   Correct.

15      Q.   Does Agape Taiwan continue to sell any of these

16   five types of metal mesh product in any parts of the

17   world outside the United States?

18      A.   Before I answer the question, I just want to

19   confirm, you are asking about the time after January

20   2010, correct?

21      Q.   That's right.

22      A.   Yes.

23      Q.   Does Agape Taiwan sell products through Jun-En

24   Taiwan?

25      A.   For Agape Taiwan to go through Jun-En Taiwan,

51

 1    no, that's not necessary.

 2         Q.    Does Agape Taiwan and Agape -- does Agape

 3    Taiwan and Jun-En Taiwan do business with each other?

 4         A.    Yes.  Some.

 5         Q.    What kind of products?

 6         A.    The products we have seen so far.  I am not

 7    able to be more specific, but yes, in relating to the

 8    products we have seen so far, the answer is yes, because

 9    the two companies do have trading relationship.

10    Sometimes one company will ship products for another

11    company.

12         Q.    Can you clarify what you mean by ship product

13    for the other company?

14         A.    Please look at Exhibit 31 and Exhibit 32.

15    Those are for perforated metal sheets and metal netting.

16    To my understanding, sometimes of those products, one

17    company will ship for the other.

18         Q.    Does Agape Taiwan ever brand its product?

19         A.    Yes.

20         Q.    What brand does Agape Taiwan use?

21         A.    Hold on.  Please clarify, are you asking about

22    Agape or Jun-En?

23         Q.    I'm asking about Agape.

24         A.    Agape brand.

25         Q.    What is the Agape brand?

                                                              52

1              MR. FONG:  Okay.  Thank you.

2              THE WITNESS:  May I have a full question,

3     please.

4         Q.   BY MR. CHAN:  Does Agape Taiwan sell metal mesh

5     machine, any kind of metal mesh machine?

6         A.   Currently?

7         Q.   That's right.

8         A.   Of course.  If the opportunity is there, we are

9     willing to sell it.

10        Q.   But you have stopped selling?

11        A.   Currently, we are not selling it.

12        Q.   You stopped selling since 2010; is that

13    correct?

14        A.   That's a fair statement, because ever since

15    Peter Lin left the company and because the litigation is

16    still ongoing.

17        Q.   Do you have any current plan, any current

18    business plan to sell any kind of metal mesh machine

19    anywhere in the world?

20             MR. FONG:  Objection; vague and ambiguous as to

21    your use of the term you.  Are you referring to the

22    witness or the witness as a representative of Agape or

23    the witness as a representative of Jun-En?

24             MR. CHAN:  I'm still referring to Agape Taiwan.

25             THE WITNESS:  Agape Taiwan does not have any

                                                              56

1    plans for the U.S. market.

2        Q.    BY MR. CHAN:   How about any of the metal mesh

3    products, the five different types of metal mesh

4    products we have just reviewed?

5        A.    No.   Not currently.

6        Q.    So no plans to resume selling any of the metal

7    mesh products in the United States in the future?

8    Please --

9              MR. FONG:   Let him answer, please.

10             THE WITNESS:   We don't want to waive any future

11   opportunities.   But before we do that, we will have

12   to -- to take care of the business or the dispute

13   between the company and Mr. Lin.

14       Q.    BY MR. CHAN:   Please answer my question.   Do

15   you have any current plan to sell any metal mesh

16   products in the United States?   Again, I'm referring to

17   Agape Taiwan.

18       A.    No.   Not currently.

19       Q.    Ever since -- did you have any plan prior to

20   currently since 2010 to now, did you have any plan to

21   sell metal mesh product in the United States?

22             MR. FONG:   Again, you're referring to Agape

23   Taiwan?

24             MR. CHAN:   Agape Taiwan.

25             MR. FONG:   Thank you.

57

1          THE WITNESS:  There were discussions, but no

2     definitive plans.

3          Q.   BY MR. CHAN:  Are you familiar with Agape

4     Taiwan's metal mesh machines?

5          A.   I think so.

6          MR. CHAN:  Court reporter, would you mark this

7     as Exhibit 37.

8          (Deposition Exhibit No. 37 was marked for

9     identification.)

10         Q.   BY MR. CHAN:  Can you identify this machine for

11    me in Exhibit 37.

12         A.   This is a hexanol [sic] wire netting machine.

13         Q.   Is this a kind of metal mesh machine?

14         A.   Yes.

15         Q.   Is this Agape Taiwan's metal mesh machine?

16         A.   Not this one.

17         Q.   How do you know?

18         A.   I am very familiar with Agape Taiwan's

19    machines.  I know this one is not.

20         Q.   Can you tell me why it's not?

21         A.   The machine shown on this exhibit is made by

22    our competitor; this one.

23         Q.   Which competitor?

24         A.   Lead Long, L-E-A-D, L-O-N-G.  Our competitor.

25    I am hundred percent sure this is Lead Long's machine.

                                                          58

1      Q.   Does Agape Taiwan sell Lead Long's machines?

2      A.   No.

3      Q.   Ever?

4      A.   Never.

5      Q.   How about Jun-En Taiwan, does Jun-En Taiwan

6   sell any Lead Long machines?

7      A.   No.

8           MR. FONG:  Just for the court reporter, Lead

9   Long is two words.

10          THE REPORTER:  Thank you.

11     Q.   BY MR. CHAN:  Does Agape -- strike.

12          Does Jun-En Taiwan ever represent Agape Taiwan

13  in selling Agape Taiwan's products?

14     A.   Could you repeat, please.  I didn't get it.

15     Q.   Okay.

16          MR. FONG:  Tom, I think the tense was kind of

17  missed on it.

18     Q.   BY MR. CHAN:  Did Agape Taiwan ever use a

19  company or individual other than Peter Lin and the Agape

20  USA company to sell any of its product?

21     A.   Not to my understanding.

22     Q.   Do you know any -- do you know if Lead Long put

23  the Agape Taiwan's brand on its machine?

24     A.   They do.  And they were sold by Peter Lin.

25          MR. CHAN:  Court reporter, would you mark this

59

1  document as Exhibit 38.

2      (Deposition Exhibit No. 38 was marked for

3  identification.)

4      Q.  BY MR. CHAN:  Do you have Exhibit 38 in front

5  of you?

6      A.  Yes (in English).

7      Yes.

8      Q.  Do you notice the AG logo on that machine?

9      A.  Yes.

10      Q.  Who put that logo on this machine?

11      MR. FONG:  If you know.  You're asking for his

12  personal knowledge, right?

13      THE WITNESS:  To my personal knowledge, or to

14  my personal understanding, Peter Lin put it on.

15      Q.  BY MR. CHAN:  Did Agape Taiwan ever authorize

16  Peter Lin or anyone to put this AG logo on the machine

17  shown in Exhibit 38?

18      A.  No.

19      Q.  Never?

20      A.  Never.

21      Q.  Can you identify the machine shown in Exhibit

22  38.

23      A.  Same as the machine shown on Exhibit 37.  It is

24  a hexanol [sic] metal meshing machine made by Lead Long.

25      Q.  Just to be sure, Agape Taiwan never put this AG

60

1    logo on the machine in Exhibit 38, correct?

2        A.   Never.

3        Q.   Have you heard of a company called Kai Hao Re

4    Chu Li?

5            MR. FONG:  Could you spell that, please.

6            THE INTERPRETER:  The interpreter is offering

7    phonetic spelling which may not be the legal spelling.

8    H-A-I space H-A-O space R-E space C-H-U space L-I.

9        Q.   BY MR. CHAN:  Let me give you in Chinese

10   because I'm not sure if I pronounced it correctly either

11   and I don't know how to give you the English spelling,

12   so maybe interpreter can help us here.

13       A.   I know this company.  It is one of our

14   customers.  It's Jun-En's customer, Jun-En Taiwan's

15   customer.

16           MR. CHAN:  Can the interpreter provide the

17   proper English spelling of this Chinese company name.

18           THE INTERPRETER:  The interpreter provides

19   phonetic spelling which may not be the legal spelling,

20   K-A-I space H-A-O space R-E space C-H-U space L-I.

21       Q.   BY MR. CHAN:  Mr. Chiu, do you know of this

22   other company called Ding Jia --

23           THE INTERPRETER:  D-I-N-G, J-I-A Industrial

24   Company.

25           THE WITNESS:  No.

                                                        61

```
 1              MR. CHAN:  Court reporter, please mark this

 2     document as Exhibit 39.

 3              (Deposition Exhibit No. 39 was marked for

 4     identification.)

 5        Q.   BY MR. CHAN:  Mr. Chiu, can you identify the

 6     product shown in Exhibit 39?

 7        A.   In Mandarin, we call it ladder style metal

 8     belt.  In English, we call it ladder belt.

 9        Q.   Would you also call it metal mesh conveyer

10     belt?

11        A.   This is one of them.

12        Q.   Did Agape Taiwan ever sell the product

13     identified in Exhibit 39?

14        A.   I think so.

15        Q.   Did Agape Taiwan ever sell this metal mesh

16     conveyer belt product to United States?

17        A.   I'm not sure.

18        Q.   How about after 2010, January, has Agape Taiwan

19     sold this metal mesh conveyer belt product to United

20     States?

21        A.   I don't think so.

22        Q.   You say I don't think so.  Are you sure?  I

23     want to get an answer yes or no from you.

24        A.   No.

25        Q.   Absolutely no?  Correct?
```

                                                              63

1      A.   The business with customers in the U.S., you

2   may call it -- it has stopped since January 2010.

3      Q.   Let's go back to those two Chinese companies.

4   Well, let's just talk about Kai Hao Re Chu Li.

5           MR. FONG:  I'd like to have that called Kai

6   Hao.  That's real easy for me as an English speaker.

7      Q.   BY MR. CHAN:  Does Kai Hao Re Chu Li sell any

8   product to the United States?

9      A.   I don't know.  You have to ask Kai Hao.

10     Q.   Has Agape Taiwan ever authorized Kai Hao Re Chu

11  Li to sell any product in the United States?  Any Agape

12  Taiwan's product in the United States?

13          MR. FONG:  Object on the grounds that it

14  assumes that there has been a requirement for

15  authorization.  Assumes facts not in evidence.

16          THE WITNESS:  I don't know.

17     Q.   BY MR. CHAN:  Does Kai Hao Re Chu Li have any

18  office or branch in the United States?

19     A.   I don't know.

20     Q.   Has Agape Taiwan ever sold any product to Kai

21  Hao Re Chu Li in United States?

22     A.   Are you saying Kai Hao Re Chu Li in the U.S.?

23     Q.   Correct.

24     A.   I didn't know if they have a company here.

25          MR. CHAN:  Court reporter, please mark this

64

1        Q.   BY MR. CHAN:  So when the customer receives

2   this metal lath product identified in Exhibit 40, would

3   the customer be able to tell whether this is Agape

4   Taiwan's product?

5             MR. FONG:  I'm going to object on the grounds

6   that it's an incomplete hypothetical.  It's missing a

7   lot of information.  Calls for speculation.  There's

8   also no foundation.

9             THE WITNESS:  I'm not sure whether a customer's

10  able to discern or not.

11       Q.   BY MR. CHAN:  Is this specific product

12  identified in Exhibit 40 also sold by other companies

13  other than Agape Taiwan?

14       A.   Yes.

15       Q.   Exactly the same product sold by other people

16  as well?

17       A.   I think it's quite possible.

18       Q.   Do you put -- does Agape Taiwan ever put any of

19  its -- ever put its AG logo on this metal lath product?

20       A.   No.

21       Q.   How about the product identified in Exhibit 39,

22  does Agape Taiwan ever put its brand on this product?

23       A.   Impossible.

24             MR. FONG:  I'm sorry.  I was interrupted by the

25  message.  Could I have the last question and answer

                                                            66

```
 1     back, please.

 2                          (Record read.)

 3             MR. FONG:  Thank you.

 4        Q.   BY MR. CHAN:  How about using a tag?

 5        A.   It's not going to be easy, because in the

 6     manufacturing process of this type of product, a lot of

 7     oil and stain will come along with the product.

 8     Therefore, it's not easy to attach a tag.

 9        Q.   Well, how about putting the AG logo on a card

10     or a tag and then string it through -- put a string

11     through it and run it through this product?

12        A.   That would be possible.

13        Q.   Has Agape Taiwan ever sold a product with a

14     string-on label?

15        A.   To a rib lath product?  No.

16        Q.   And also how about the product identified in

17     Exhibit 39?  I believe that's a conveyer belt product.

18        A.   No.  No labels.  No string attached labels

19     either.

20             MR. FONG:  Tom, do you have a specific plan for

21     when we want to break for lunch since we started early?

22             MR. CHAN:  It's only 11:30.  I know we did

23     start early.  Maybe we can stop around noon or so when

24     I'm done with this -- I'm almost done with this --

25             MR. FONG:  I understand.  We might be able to
```

67

1   avoid some of the lunch crowd if we break early.

2         MR. CHAN:  You want to -- there is a -- maybe

3   we can find some munchies for you.

4         MR. FONG:  It's up to you.  I'm living on about

5   three hours of sleep right now as well.

6         MR. CHAN:  Let me finish asking these next few

7   questions.

8         MR. FONG:  All right, sure.

9         MR. CHAN:  Please mark this exhibit as -- this

10  document as Exhibit 41.

11        (Deposition Exhibit No. 41 was marked for

12  identification.)

13     Q.   BY MR. CHAN:  Have you ever seen this picture

14  before?

15     A.   No.

16     Q.   Why is this card attached to the metal lath

17  using a string?

18        MR. FONG:  I'm going to object to the question

19  on the grounds there is no foundation and this, did you

20  say it's a string -- looks like a piece of wire to me.

21        MR. CHAN:  Well, some thread-like material

22  attached this card to the metal lath.

23        THE WITNESS:  I have never seen this picture

24  before.

25     Q.   BY MR. CHAN:  Have you ever seen Agape

68

1    Taiwan -- strike that.

2            Has Agape Taiwan ever put a tag like this with

3    its metal lath product?

4       A.   Not to my recollection.

5       Q.   Can you read to me the name of the client

6    identified in this Exhibit 41?

7       A.   Ding Jia industry company.

8            THE INTERPRETER:  D-I-N-G, J-I-A.

9       Q.   BY MR. CHAN:  Can you tell me why this card is

10   being attached to this metal lath product in Exhibit 41?

11           MR. FONG:  I'm going to object on the grounds

12   that there is no foundation, calls for speculation.

13           THE WITNESS:  I don't know.

14      Q.   BY MR. CHAN:  Do you recognize the Agape

15   Taiwan's logo, AG logo on this card?

16      A.   Yes.

17      Q.   Do you have any idea what this card is about?

18      A.   No.

19      Q.   Do you know what the purpose is of this card?

20      A.   I'm not sure.

21           MR. CHAN:  Court reporter, please mark this

22   document as Exhibit 42.

23           (Deposition Exhibit No. 42 was marked for

24   identification.)

25      Q.   BY MR. CHAN:  Can you tell me what is attached

                                                            69

```
 1    to this conveyer belt product?

 2        A.   It's a ladder belt.

 3        Q.   Do you recognize this card or piece of paper

 4    stringed [sic] to this product in Exhibit 42?

 5        A.   No.

 6        Q.   Can you read the words on this card.

 7        A.   Yes.

 8        Q.   Can you read it for us.

 9        A.   Do you only want me to read the Chinese

10    characters?

11        Q.   Both.

12             MR. FONG:  Is this a reading test?

13        Q.   BY MR. CHAN:  Please.

14             MR. FONG:  It's absurd.

15             THE WITNESS:  Agape Industrial company LTD.,

16    (in English).

17             THE INTERPRETER:  This is the interpreter

18    speaking.  The interpreter needs instruction from

19    counsels whether you want the interpreter to clarify

20    which part is in Chinese, which part is in English.

21             MR. FONG:  Tom, that's the absurdity, because

22    basically what you're having is my client reading a

23    document in Chinese --

24             MR. CHAN:  Counsel, you want to make an

25    objection?
```

70

1              MR. CHAN:  Just make your objections.

2         Q.   BY MR. CHAN:  Please proceed.

3         A.   First of all, I do not know the purpose of this

4    card.  If you want me to guess, I would think this might

5    be for a sample.  Just by looking at it, I am not able

6    to say that Kai Hao Re Chu Li is a customer of Agape

7    Taiwan.

8         Q.   Is this how Agape Taiwan brands its metal mesh

9    product with the AG logo?

10        A.   I'm not sure.

11        Q.   Would anybody at Agape Taiwan know the purpose

12   of this card?

13             MR. FONG:  Objection; calls for speculation.

14   Have you established the authenticity of this document,

15   Counsel?  No foundation.

16             THE WITNESS:  I'm not sure.

17        Q.   BY MR. CHAN:  Have you ever seen this picture

18   before?

19        A.   Not to my recollection.

20        Q.   How about Exhibit 41?

21        A.   I don't have recollection.

22        Q.   How long have you known Hsiu-Ying Lu?  Just use

23   your best recollection, please.

24        A.   I have known her for a long time.  And she is a

25   relative of the chairman.  I have known her for more

                                                                          72

1    deposition is on plaintiff trademark infringement claim?

2        A.    Yes.

3        Q.    Yet you've never looked at this document

4    identified as Exhibit 43 in preparing for today's

5    deposition?

6        A.    Specifically for Exhibit 43, today is the first

7    time I saw it.  But for preparation, I did review some

8    other trademark information.

9        Q.    What have you reviewed?  What other trademark

10   information have you reviewed?

11       A.    Information relating to AG mark registration.

12       Q.    Can you look at Exhibit 43.  Can you read the

13   first line of that document to me.

14            MR. FONG:  Which is the first line?

15            THE WITNESS:  Trademark?  The line that starts

16   with "trademark"?

17       Q.    BY MR. CHAN:  Yes, please.

18       A.    Trademark service mark applications, principal

19   register (in English).

20            Trademark, service mark application, principal

21   register.

22       Q.    Can you read to me -- strike that.

23            Can you read down the eighth row, it says

24   description of the mark and color location, if

25   applicable.  Do you see that?

75

1    my taking of this deposition.

2          MR. FONG:  Go ahead, Counsel.  Let's go through

3    with this exercise that you think is so important.

4          THE WITNESS:  The mark consists of stylized

5    representation of the letters AG (in English).

6          The mark consists of a stylized representation

7    of the letters AG.

8       Q.  BY MR. CHAN:  Can you go to the last page.  Do

9    you recognize a signature?

10      A.  Yes.

11      Q.  Can you tell me what you recognize?

12      A.  Signature of Hsiu-Ying Lu.

13          MR. FONG:  Now that we've got that on the

14   record, do you want to take a break for lunch?  It is in

15   English, too, by the way.

16          MR. CHAN:  I wanted to finish this last one and

17   then we can take a break.

18          MR. FONG:  All right.  Thank you.

19          MR. CHAN:  Please mark this as Exhibit 44.

20          (Deposition Exhibit No. 44 was marked for

21   identification.)

22      Q.  BY MR. CHAN:  Are you familiar with this

23   document, Exhibit 44?

24      A.  No.

25      Q.  Let's go back to Exhibit 38.

77

```
1              MR. FONG:  Are we finished looking at Exhibit

2    44, Counsel?

3              MR. CHAN:  Yes, for now.  Do you want to talk

4    some more?  We can talk some more.

5        Q.   BY MR. CHAN:  Are you familiar with this

6    document entitled Response to Office Action?

7        A.   Are you talking about Exhibit 44?

8        Q.   Yes.

9        A.   I'm not familiar with it.

10       Q.   Let's go back to Exhibit 38.  When was the

11   first time you first saw this document?  When was the

12   first time you've seen this document?

13       A.   This document here?

14       Q.   This photo.  I represent to you this is a

15   photo.

16       A.   I think it was at the end of 2009.

17       Q.   So how did you come to have seen this document

18   in 2010?

19       A.   No.  I said 2009.

20       Q.   Sorry.  So you saw this photo in 2009?

21       A.   Yes (in English).

22            Yes.

23       Q.   Where?

24       A.   From some relevant information from Peter.

25       Q.   What relevant document from Peter?  How did you
```

78

```
 1    come into the possession of this photograph?

 2        A.   From Peter's hard disk.

 3             MR. CHAN:  Okay.

 4             MR. FONG:  That was 38, right?

 5             MR. CHAN:  You want to take a break, let's take

 6    a break.

 7             MR. FONG:  38 was from Peter's hard disk?

 8             MR. CHAN:  That's right.

 9             (The luncheon recess was taken

10        at 12:01 P.M.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

79

1    question.  You made what you perceived was a statement

2    of law.  Can we go forward with the deposition, please.

3         Q.  BY MR. CHAN:  Please answer my question.

4              MR. FONG:  What's the question?

5              MR. CHAN:  Please read the question.

6              (The following was read by the reporter:

7              "So what did you talk about?")

8              THE WITNESS:  Well, we talked about different

9    aspects of the case because you do know the case covers

10   a long period of time and to tell you the truth, I have

11   not been able to collect all the information just from

12   one searching, and in addition, we also talked about the

13   attorney's fees.

14        Q.  BY MR. CHAN:  Did you talk about anything

15   pertaining to the questions I've asked you this morning?

16        A.  No.

17        Q.  Mr. Chiu, has Agape Taiwan sold any product to

18   the U.S. since June 2010?

19        A.  No.

20        Q.  When was the last shipment of any product by

21   Agape Taiwan to the United States?

22        A.  I don't know.

23        Q.  Do you have an estimation of the time?  I don't

24   want you to guess wildly.  I want you to give us an

25   estimation that has a basis.

                                                              83

1          A.    I would think it should be in the time frame

2     between 2008 and 2009.  And it was through Agape USA for

3     sales.

4          Q.    When I refer to the AG logo, you understand

5     we're talking about Agape Taiwan's logo in Exhibit 36?

6     Correct?  I want to make sure when we talk about the AG

7     logo, we're talking about the logo that I've shown you

8     in Exhibit 36.  Is that clear?

9          A.    Yes.

10         Q.    Has Agape USA been selling products using the

11    AG logo without Agape Taiwan's permission?

12         A.    I think so.

13         Q.    When?

14         A.    I believe any time between 2007 through 2009.

15         Q.    How about 2010?

16         A.    I think that is possible, too.  I think as long

17    as Peter was at the position, at his position, it is

18    always possible.

19         Q.    How about 2011, has Agape USA sold product

20    using the AG logo without Agape Taiwan's permission?

21         A.    For 2011, I don't know.

22         Q.    How about 2012?

23         A.    I'm not sure.

24         Q.    And 2013?

25         A.    I'm not sure.

                                                              84

1    Peter Lin or Agape Industrial, Inc., exhibited any

2    product, shown any product using the AG logo?

3          MR. FONG:  Could you reask the question,

4    because it looks like you're directing your remarks to

5    the translator which doesn't help the record.

6          Would you like to reask the question, Mr. Chan?

7     Q.   BY MR. CHAN:  Have you attended any trade show

8    where Agape Industrial, Inc., or Peter Lin showed any

9    product?

10    A.   Yes.

11    Q.   What did you see?

12    A.   I saw catalogs, catalogs showing similar logo

13   with some changes, but the catalog itself is the same.

14    Q.   When did you see that?

15    A.   I believe it was 2010.

16    Q.   How about in 2011?

17    A.   Yes.  Something similar also happened in that

18   year.

19    Q.   When?  When in 2011?

20    A.   March or April -- sorry.  February or March.

21    Q.   Where?

22    A.   Some shows.

23    Q.   Do you recall which show?

24    A.   Sitting here right now, I don't recall.

25    Q.   Are there more than one show where you can show

90

1        A.    No.  And I don't have any experience in the

2   application in the U.S., so I don't know.

3        Q.    Do you know whether Agape Taiwan received any

4   trademark registration from the United States on the AG

5   logo?

6        A.    To my understanding, the answer is yes, because

7   they applied for it.

8        Q.    Just because they've applied for it doesn't

9   necessarily mean they receive a registration; is that

10  right?

11            MR. FONG:  Is that a question?

12            THE WITNESS:  I believe it was obtained because

13  it was a process once it was applied for then -- well, I

14  believe it was applied for.

15       Q.    BY MR. CHAN:  Do you know when it was -- do you

16  know when the AG logo was applied for by Agape Taiwan?

17       A.    I believe it was in 2010.  It was after Peter

18  left the company.

19       Q.    So have you ever seen the application?

20       A.    I saw it.  I just didn't read it very

21  carefully.  I also understand that the application was

22  submitted.

23       Q.    Who was involved in that -- in preparing the

24  application?

25       A.    Employees at the Taiwan company and Hsiu-Ying

93

1     Lu.

2         Q.   Do you know who Sunnie Lu is?

3         A.   Yes (in English).

4              Yes.  She was one of them.

5         Q.   Can you tell me who Sunnie Lu is?

6         A.   Secretary to the chairman of Jun-En Taiwan.

7         Q.   Is Ms. Lu related to you?

8         A.   My wife.

9         Q.   Is she related to Mr. Yang?

10        A.   No.

11        Q.   Are you related to Mr. Yang?

12        A.   No.

13        Q.   Are you related to Ms. Hsiu-Ying Lu?

14        A.   No.

15        Q.   Is Hsiu-Ying Lu related to Mr. Yang?

16        A.   Hsiu-Ying Lu is sister-in-law to Tony Yang.  In

17   other words, Tony Yang's wife's younger sister is

18   Hsiu-Ying Lu.  Sorry.  Tony Yang's wife's older sister

19   is Hsiu-Ying Lu.

20        Q.   Do you know who made the decision to apply for

21   the AG logo registration in the U.S.?

22        A.   Hsiu-Ying Lu.

23        Q.   Were you involved in that decision to apply for

24   the AG logo in the U.S.?

25        A.   I wasn't the decision maker, however, I made

94

1    the recommendation because we don't want to have any

2    confusions in customers' mind.  We hope that by doing

3    that, Peter Lin will stop using AG logo.

4        Q.   So applying for the AG logo in the U.S. is your

5    idea?

6        A.   I wasn't the original person.  I wasn't the

7    primary person either.  I did have this finding or

8    discovery, so I brought it up to the company.

9        Q.   So who else made the recommendation to apply

10   for the AG logo trademark registration in the U.S.?

11       A.   Tony Yang, our boss.  Jun-En Taiwan's boss.

12       Q.   Why --

13            THE REPORTER:  I'm sorry, Counsel.

14       Q.   BY MR. CHAN:  Why did Jun-En Taiwan not apply

15   for the trademark -- for the AG logo trademark

16   registration in the U.S. under the name of Jun-En

17   Taiwan?

18       A.   That's because Agape Taiwan had been using this

19   brand, so it's very simple to decide to use Agape Taiwan

20   to apply for the AG trademark logo for -- in the U.S.

21       Q.   So who was involved in preparing the

22   application with the U.S. lawyer?  I presume you -- did

23   you hire a U.S. lawyer to help you file the -- prepare

24   and file the AG trademark application in the U.S.?

25       A.   To my understanding, yes.

95

```
 1         Q.   What brand -- what brand did Jun-En use in

 2    selling to U.S. before Agape USA was form?

 3         A.   Allow me to explain.  Prior to the formation of

 4    Agape USA, we use Jun-En to export shipments to the U.S.

 5    and then the sales at the U.S. will be handled by that

 6    company we were working with.

 7         Q.   What is the name of that company you were

 8    working with?

 9         A.   Bergandi, B-E-R-G-A-N-D-I.

10         Q.   How come you stopped selling products to

11    Bergandi?

12         A.   We stopped because we discovered that they had

13    copied our machines.

14         Q.   Did you sue Bergandi?

15         A.   No.

16         Q.   Why not?

17         A.   That was the boss' decision.

18         Q.   Why did the boss not want to sue?

19         A.   I don't know.  I'm not the boss.

20         Q.   Is Taiwan -- is Agape Taiwan a shareholder of

21    Agape USA?  "Yes" or "no."

22         A.   You are asking me whether Agape Taiwan is a

23    shareholder of Agape USA?

24         Q.   Correct.  "Yes" or "no." Please answer me "yes"

25    or "no."
```

                                                              100

1      A.    No.

2      Q.    Is Jun-En USA a shareholder of Agape USA?

3  "Yes" or "no."

4      A.    No.

5      Q.    So Agape Taiwan does not own Agape USA?  "Yes"

6  or "no."

7      A.    It owns, but not being -- not in the form of a

8  shareholder.  Just like I said earlier, this is our

9  secondary brand; therefore, over here so Peter Lin,

10  being an employee of Jun-En Taiwan, he was the person in

11  charge in the U.S. for Agape USA.  This is a very clear

12  structure or relationship.

13      Q.    If you don't own any shares in Jun-En, can you

14  own Jun-En?

15          MR. FONG:  Objection; calls for speculation.

16  Calls for a legal conclusion.  Not reasonably calculated

17  to lead to discovery of admissible evidence.  It's

18  argumentative.

19      Q.    BY MR. CHAN:  Answer my question.

20      A.    To my understanding, and this is a very, very

21  clear understanding, that Agape USA is part of Jun-En

22  Taiwan, and Peter Lin was an employee of Jun-En Taiwan.

23      Q.    Peter Lin is also an employee of Jun-En Taiwan,

24  right?

25          MR. FONG:  Today?

101

1    the website of the U.S. Patent and Trademark Office.

2            MR. FONG:  There is no question pending.

3        Q.   BY MR. CHAN:  But you have not seen this

4    application, correct?

5        A.   I was referring to this document in this form.

6    That was a no.

7        Q.   But you have seen the trademark application in

8    another form?

9        A.   As far as I can recall, what I saw looked

10   different from this.  Regardless, this is only an

11   application, so it's just an application.

12       Q.   It's not for you to decide whether it is just

13   an application.

14           MR. FONG:  That's okay.  It's not a question.

15   He likes to tell people things, whether they're right or

16   wrong.

17       Q.   BY MR. CHAN:  Please answer my questions and

18   don't add your comments.

19           MR. FONG:  Unless your comments are part of the

20   answer.

21       Q.   BY MR. CHAN:  Unless you're not clear, then I

22   told you you can ask me to clarify.  But otherwise,

23   please answer my question.

24           Can you look at Exhibit 38.  Did you notice

25   this picture as part of your application?

106

1          A.   I didn't notice this picture until I saw the

2     application shown to me this morning.

3          Q.   You're not answering my question.  My question

4     is -- okay.

5               MR. FONG:  He did answer it.

6          Q.   BY MR. CHAN:  So the first time you saw this

7     picture was when I showed you this morning?

8          A.   I already told you this morning that the first

9     time I saw this picture was in January 2010 from Peter

10    Lin's hard disk.  And what I was trying to tell you is I

11    didn't realize that this was part of the application

12    until you showed me Exhibit 44.

13         Q.   Why would you provide this picture as part of

14    your application?

15              MR. FONG:  You're asking him personally.  When

16    you used the word you, it's vague and ambiguous.

17         Q.   BY MR. CHAN:  Why would Agape Taiwan provide

18    this picture as part of its trademark application for

19    the AG logo?

20         A.   To my understanding, the company provided this

21    picture to the attorney because the attorney in the U.S.

22    had asked the company to provide some pictures with the

23    AG logo on the product, on the machine.

24         Q.   Even though this is the use of your AG logo by

25    your competitor?

107

1    it, Tom.  What did he register?  He registered a

2    trademark.

3        Q.   BY MR. CHAN:  So what have you registered AG

4    logo to use with?  What products have you registered the

5    AG logo to use with in your trademark registration?

6             MR. FONG:  You're referring to Agape, not his

7    trademark registration.

8             MR. CHAN:  We're only talking about one

9    trademark registration so far, we have no other

10   trademark registration unless you know of something

11   else.

12            MR. FONG:  I would appreciate it when you use

13   the word you that it is directed to the witness.

14            MR. CHAN:  When I say you, unless I clarify

15   specifically, I have meant the plaintiffs.

16            MR. FONG:  Actually, I don't remember that

17   because the word you is a pronoun for many different --

18            MR. CHAN:  It's okay.  It's okay.  We don't

19   always remember everything.  So unless I personally say

20   you specifically, when I say you, I mean the plaintiffs.

21       Q.   BY MR. CHAN:  Is that clear, Mr. Chiu?

22       A.   I wasn't the person handling the application

23   process.  But to my understanding, because our company

24   carries two category of -- two categories of products,

25   one is metal mesh products and the other one is metal

                                                         110

1    mesh making machinery, so the application for the logo

2    is to be applied to those two categories.  That's my

3    understanding.

4         Q.   So are you ready to provide testimony on the

5    details concerning the preparation of the trademark

6    application, prosecution and maintenance of the AG

7    trademark?

8         A.   I believe so.

9         Q.   But it seems like you don't know what the

10   trademark registration was for.

11        MR. FONG:  Is that a question or just meant to

12   be an insult?

13        MR. CHAN:  I'm trying to clarify.  He said he's

14   ready to testify and I'm saying are you ready, because

15   you don't know the details concerning the preparation of

16   the trademark application.  So I just want to clarify.

17        MR. FONG:  Would you please ask a question,

18   Mr. Chan.

19        MR. CHAN:  I don't want to argue with you.  You

20   want to make an objection, make your objection.

21        MR. FONG:  You haven't asked a question.

22        MR. CHAN:  Make your objection.

23        MR. FONG:  My objections don't --

24        MR. CHAN:  Make the objection.  I'm not here to

25   argue with you.

                                                    111

```
 1   30(b)(6) witness.  When I object, then you say, we will

 2   give you Tony Yang or Ms. Lu.  You did not designate

 3   these people when we first notified you.

 4           MR. FONG:  They were offered back in September,

 5   for God's sake.

 6           MR. CHAN:  But when we notified you of the

 7   deposition again, you provided Charlie Chiu --

 8           MR. FONG:  Hi, Charlie.

 9           MR. CHAN:  -- not Mr. Yang or Ms. Lu until we

10   said, how come you didn't designate Mr. Yang or Ms. Lu.

11   That's when you say, well, I offer those to you before.

12           MR. FONG:  They're still offered.  Proceed.

13           MR. CHAN:  We can argue that on the day of the

14   hearing on this.  Let's not spend time here.

15           MR. FONG:  You know, I can't fly these

16   witnesses from Taiwan.  You've been given a reasonable

17   offer.

18       Q.   BY MR. CHAN:  So Mr. Chiu, if you don't know

19   the answer, just please tell me you don't know the

20   answer.  Can you do that?

21       A.   That's fine.

22       Q.   Do you know if anyone from Agape Taiwan or

23   Jun-En Taiwan ever attended any shareholder meeting of

24   Agape USA?

25       A.   I don't know.
```

114

1          Q.    Do you know if anyone from Agape Taiwan or

2    Jun-En Taiwan ever attended any Board of Directors

3    meetings of Agape USA?

4               THE WITNESS:  May I have the question read

5    back, please.

6                       (Question read.)

7               THE WITNESS:  I don't know.

8          Q.    BY MR. CHAN:  Do you know if anyone from Jun-En

9    Taiwan or Agape Taiwan has ever been officer of Agape

10   USA?

11         A.    Yes.

12         Q.    Who?  I don't want you to refer to any

13   document.  Please answer the question first if you're

14   able to.

15         A.    To my understanding, Ms. Lu, a relative of

16   Hsiu-Ying Lu, has been an officer of Agape USA and she

17   has been to the USA.  I know that.

18         Q.    Can you provide the court reporter the spelling

19   of -- the complete name of --

20         A.    I-Shu Liu.  If you want the spelling, I will

21   have to check my document.  But if you told me not to

22   check the document, I only know how to pronounce the

23   name.

24               THE INTERPRETER:  Interpreter offers phonetic

25   spelling which may not be the legal spelling.  Given

                                                             115

```
 1        A.    To my understanding, Peter Lin for everything.

 2        Q.    Do you know what a corporate seal is?

 3        A.    I've never seen one.  What I mean is I have not

 4   seen the corporate seal for Agape USA.

 5        Q.    That was not my question.  My question was, do

 6   you know what a corporate seal is?

 7        A.    Yes.  I do.  I know that in the U.S., every

 8   company has a corporate seal.

 9        Q.    Do all Taiwanese corporations have corporate

10   seals as well?

11        A.    Yes.

12        Q.    Do you know what a corporate seal is?

13        A.    My understanding is to apply for a corporation,

14   the corporation has to have a corporate seal.

15        Q.    Does Agape Taiwan or Jun-En Taiwan ever have

16   obtained a corporate seal of Agape USA?

17        A.    No.

18        Q.    So Agape USA -- I'm sorry.  Strike that.

19              So Agape Taiwan and Jun-En Taiwan was never in

20   possession of Agape USA's corporate seal at any time?

21        A.    That's correct.  Because Mr. Lin was in charge.

22        Q.    Why did Agape Taiwan not do business directly

23   in USA?

24        A.    Agape Taiwan (in English ).

25        Q.    Agape Taiwan.
```

119

1      A.   Yes.

2      Q.   Who was the general manager before you?

3      A.   Tony Yang.

4      Q.   So he was the general manager and president?

5      A.   Yes (in English).

6           Correct.

7      Q.   So can you tell me again when did you become

8    the general manager?

9      A.   I believe it was 2010.

10     Q.   How would you describe Mr. Yang's health today?

11          MR. FONG:  How would he know that?  He's here

12   today.

13     Q.   BY MR. CHAN:  Do you know -- can you describe

14   to me Mr. Yang's health?  Today, we mean in general.

15   You know what I mean.

16     A.   Sure.  I can do that.

17     Q.   Can you describe his health to me.

18     A.   Around 2010, 2011, he had a heart bypass

19   surgery and also he was diagnosed with lung cancer.  So

20   together, he went through three major surgeries.  Even

21   though he has recovered, but because he is an older

22   person, too, so basically, nowadays from the outside he

23   looks okay.  But he does have to go back to the hospital

24   on regular basis for examinations.

25     Q.   So how often is he going back to the hospital

121

 1          MR. FONG:  No.  They're proper objections.

 2   Identify the question you really want to ask, Mr. Chan,

 3   please.

 4          MR. CHAN:  Would you read the question again.

 5               (Question read.)

 6          THE WITNESS:  No.

 7     Q.   BY MR. CHAN:  Didn't you just say you paid him

 8   salary after May 2009?

 9     A.   Well, just like I told you earlier, that in

10   September he submitted for payment including his salary,

11   including his expenses to the company; however, by

12   October, what he did became known to people at the

13   company and he started to avoid the company.  He started

14   failing to show up at the company.

15          Therefore, the company used some account

16   receivables to even off the money that would be owed to

17   him.  So everything was evened off, not that the company

18   failed to report income, withholding to the government.

19     Q.   Your answer was not responsive to my question.

20          MR. FONG:  Yes, it was, Counsel.

21     Q.   BY MR. CHAN:  I asked you a "yes" or "no"

22   question and you gave me a big explanation.

23          MR. FONG:  Counsel, he gave you the answer.

24   It's supported in the documents we gave you.

25          MR. CHAN:  Are you done arguing?

                                                        147

1           MR. FONG:  You can ask anything you want.

2      That's just an amazing reason to continue a deposition

3      24 hours, is it because Ms. Kole charges a daily?  My

4      gosh.  You're amazing.

5           MR. CHAN:  Are you finished arguing?

6           MR. FONG:  No.  I'm not arguing.

7           MR. CHAN:  I thought you were leaving.

8           MR. FONG:  We are.

9           MR. CHAN:  How come you're still arguing here?

10          MR. FONG:  I'm not arguing.  I'm just telling

11     you what I'm thinking.

12          MR. CHAN:  Thank you very much.  Any other

13     thinking you want to tell me?

14          MR. FONG:  See you tomorrow at 8:00.

15          MR. CHAN:  All right.  Since counsel left on

16     his own, we will come back tomorrow at 8:00.

17               (TIME NOTED:  5:06 P.M.)

18

19

20

21

22

23

24

25

                                                              152

1          CERTIFICATE OF READER/INTERPRETER

2

3          I, _____, whose

4     address is _____,

5     _____,

6     a person who speaks the language of the witness,

7     _____, do hereby certify:

8          That on the _____ day of _____,

9     ____, I did translate the foregoing deposition from

10    the English language into the _____

11    language, reading same to the witness in his/her

12    native tongue to the best of my ability;

13          That all corrections and changes, requested

14    by the witness, were made and initialed by the

15    witness;

16          That upon completion of said reading, the

17    witness did confirm to me that he/she had understood

18    the reading.

19

20

21          _____

22          SIGNATURE OF THE READER/INTERPRETER

23

24

25

                                                    153

```
 1              PENALTY OF PERJURY CERTIFICATE

 2

 3        I hereby declare I am the witness in the within

 4    matter, that I have read the foregoing transcript and

 5    know the contents thereof; that I declare that the same

 6    is true to my knowledge, except as to the matters which

 7    are therein stated upon my information or belief, and as

 8    to those matters, I believe them to be true.

 9        I declare being aware of the penalties of perjury,

10    that the foregoing answers are true and correct.

11

12

13

14

15        Executed on the _____ day of _____, ____,

16    at _____, _____.

17             (CITY)                    (STATE)

18

19

20

21        _____

22                    HSIN-YI CHIU

23

24

25

                                                          154
```

```
1    STATE OF CALIFORNIA        )
                                ) ss:
2    COUNTY OF LOS ANGELES      )

3

4         I, JUDITH SCHLUSSEL, do hereby certify:

5         That I am a duly qualified Certified Shorthand

6    Reporter, in and for the State of California, holder of

7    certificate number 4307, which is in full force and

8    effect and that I am authorized to administer oaths and

9    affirmations;

10        That the foregoing deposition testimony of the

11   herein named witness was taken before me at the time and

12   place herein set forth;

13        That prior to being examined, the witness named

14   in the foregoing deposition, was duly sworn or affirmed

15   by me, to testify the truth, the whole truth, and

16   nothing but the truth;

17        That the testimony of the witness and all

18   objections made at the time of the examination were

19   recorded stenographically by me, and were thereafter

20   transcribed under my direction and supervision;

21        That the foregoing pages contain a full, true

22   and accurate record of the proceedings and testimony to

23   the best of my skill and ability;

24        That prior to the completion of the foregoing

25   deposition, review of the transcript was not requested.
```

155

```
 1              I further certify that I am not a relative or

 2     employee or attorney or counsel of any of the parties,

 3     nor am I a relative or employee of such attorney or

 4     counsel, nor am I financially interested in the outcome

 5     of this action.

 6

 7              IN WITNESS WHEREOF, I have subscribed my name

 8     this _____ day of _____, _____.

 9

10

11              _____

12              JUDITH SCHLUSSEL, CSR No. 4307

13

14

15

16

17

18

19

20

21

22

23

24

25
```

156

```
 1                        ERRATA SHEET

 2

 3       If any corrections to your deposition are necessary,
         indicate them on this sheet, giving the change, page
 4       number, line number and reason for change.

 5       PAGE   LINE  FROM                    TO

 6       ____  ____  _____       _____

 7       Reason  _____

 8       ____  ____  _____       _____

 9       Reason  _____

10       ____  ____  _____       _____

11       Reason  _____

12       ____  ____  _____       _____

13       Reason  _____

14       ____  ____  _____       _____

15       Reason  _____

16       ____  ____  _____       _____

17       Reason  _____

18       ____  ____  _____       _____

19       Reason  _____

20       ____  ____  _____       _____

21       Reason  _____

22       ____  ____  _____       _____

23       Reason  _____

24

         _____    _____
25       Signature of Deponent               Date
```

157

1                UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3

4

5    JUN-EN ENTERPRISE, a Taiwan        )
     Corporation, AGAPE INDUSTRY        )
6    CO., LTD., a Taiwan                )
     Corporation,                       )
7                                       )
                     Plaintiffs,        )
8                                       )
          vs.                           ) Case No.
9                                       ) CV 12-02734-PSG-SS
     PETER K. LIN, AGAPE INDUSTRIAL,    )
10   INC., and DOES 1 through 10,       ) Volume II
                                        )
11                   Defendants.        )
     _____)
12                                      )
     AND RELATED COUNTER-CLAIM.         )
13   _____)

14

15

16

17        30(b)(6) DEPOSITION OF HSIN-YI CHIU

18              Los Angeles, California

19            Thursday, February 13, 2014

20

21

22

23

24   Reported by:  Judith Schlussel
                   CSR No. 4307
25   NDS Job No.:  160302

                                                        158

```
 1              UNITED STATES DISTRICT COURT

 2            CENTRAL DISTRICT OF CALIFORNIA

 3

 4

 5   JUN-EN ENTERPRISE, a Taiwan      )
     Corporation, AGAPE INDUSTRY      )
 6   CO., LTD., a Taiwan              )
     Corporation,                     )
 7                                    )
                    Plaintiffs,       )
 8                                    )
         vs.                          ) Case No.
 9                                    ) CV 12-02734-PSG-SS
     PETER K. LIN, AGAPE INDUSTRIAL, )
10   INC., and DOES 1 through 10,     ) Volume II
                                      )
11                   Defendants.      )
     _____)
12                                    )
     AND RELATED COUNTER-CLAIM.       )
13   _____)

14

15

16

17           30(b)(6) DEPOSITION OF HSIN-YI CHIU,

18       at 1055 West Seventh Street, Suite 1880, Los

19       Angeles, California, commencing at 8:38 A.M.,

20       on Thursday, February 13, 2014, before

21       Judith Schlussel, Certified Shorthand

22       Reporter Number 4307.

23

24

25
                                                    159
```

```
 1     APPEARANCES:

 2

 3     For the Defendants, THIRD PARTY PLAINTIFFS

 4     PETER K. LIN and AGAPE INDUSTRIAL, INC.:

 5

 6          FOX ROTHSCHILD, LLP

 7          BY: THOMAS T. CHAN, ESQ.

 8          1055 West Seventh Street

 9          Suite 1880

10          Los Angeles, California 90017

11          (213) 624-6560

12

13

14     For the Plaintiffs and Counter-Defendants:

15

16          KU & FONG

17          BY:  HOW GUIN ROBERT FONG, ESQ.

18          444 South Flower Street

19          Suite 1500

20          Los Angeles, California 90071

21          (213) 488-1400

22

23

24

25
```

160

```
 1      APPEARANCES (Continued):

 2

 3    Also Present:

 4

 5         PENNY KOLE, Mandarin Interpreter

 6         PETER K. LIN, (Via telephone hookup)

 7         BO HUANG, Chinese Interpreter

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

161

```
 1                         EXAMINATION

 2    BY MR. CHAN:

 3        Q.   Mr. Chiu, I would very much appreciate your

 4    cooperation today.  When I ask you a question, if it's a

 5    "yes" or "no" answer, please answer "yes" or "no." And

 6    if I ask you to explain, I would very much appreciate at

 7    that time you explain to me anything you want to explain

 8    that I ask you to explain.  Otherwise, please keep your

 9    answer to exactly what I ask.  Can you cooperate with me

10    on that?

11        A.   Yes, I do that.

12        Q.   So please take a look at Exhibit 48.  Yesterday

13    we have some trouble figuring out what was the month in

14    the middle of the withholding and non-withholding

15    statement.  I just want you to confirm, if you can, that

16    the ending month is May instead of March.

17        A.   It's May.

18        Q.   Can you also confirm that this document,

19    withholding and non-withholding tax statement with the

20    month ending May is the last withholding and

21    non-withholding tax statement that Jun-En Taiwan ever

22    filed regarding Mr. Lin's compensation?

23        A.   Yes, I can.

24        Q.   Yesterday we -- I asked you about Hsiu-Ying Lu.

25    Do you recall?
```

                                                              168

1          A.    Yes.

2          Q.    Is she an employee of Jun-En Taiwan?

3          A.    Yes.

4          Q.    How long has she been an employee of Jun-En

5     Taiwan?

6          A.    You are asking about Hsiu-Ying Lu herself,

7     right?  Were you asking her employment duration at Agape

8     or Jun-En?

9          Q.    I'm asking about Jun-En Taiwan.

10         A.    I believe it has been more than 20 years.  It's

11    more -- a little more than 20 years.

12         Q.    What does she do at Jun-En Taiwan?

13         A.    Similar to a general affairs work.

14         Q.    Can you explain to me what general affairs

15    means.

16         A.    Well, I don't think you will really need me to

17    explain too much about what general affairs means.  Why

18    is the word general affairs, it's a common term.  It

19    just refers to in the management of people, including

20    people's attendance and including coordination between

21    offices and the factories and also includes Human

22    Resources type of issues.

23              MR. CHAN:  I want to put on the record that

24    Peter Lin is attending this deposition by phone and of

25    course I am Thomas T. Chan.

169

 1    laptop or any parts thereof?

 2         A.    Please explain.

 3         Q.    My question was, did plaintiffs ever make a

 4    copy of Peter Lin's laptop or any part thereof?

 5         A.    May I ask you to clarify something for me?  The

 6    reason I need you to clarify is because I feel that I'm

 7    not able to answer this question just by simple "yes" or

 8    "no," because I'm not clear of what you are truly

 9    asking.

10         The copying process was an open occasion which

11    means there are people there including police there.

12         Q.    Did plaintiffs retain a copy of Peter Lin's

13    laptop?

14         A.    Yes.

15         Q.    When did you obtain a copy of that laptop?

16         MR. FONG:  Okay.  Counsel, I'm going to assume

17    that by copy of the laptop you're referring to the

18    information on the hard drive as opposed to copying the

19    laptop itself.  Is that correct?

20         MR. CHAN:  Yes.

21         MR. FONG:  Just make it clear.

22         MR. CHAN:  Yes, Counsel.

23         MR. FONG:  That was part of the vice of the

24    question and that's why he was confused.

25         MR. CHAN:  I already said yes.

                                                         173

1        Q.    BY MR. CHAN:  Do you recall when you obtained a

2    copy of Peter Lin's laptop's hard drive?

3        A.    January 12th, 2010.

4        Q.    Did you obtain that copy directly from Peter

5    Lin's laptop?

6        A.    No.

7        Q.    Who did you obtain a copy of Peter Lin's laptop

8    hard drive from?

9        A.    The copy was obtained from the police at the

10   location that day.

11       Q.    Who received this laptop -- this hard drive

12   copy from the police at --

13       A.    Tony Yang.

14       Q.    From which police?

15       A.    I don't know.  I don't know the name.  I don't

16   know the name.

17       Q.    Did Mr. Yang receive a copy on the same day

18   that the police -- strike that.

19             Did the police seize Peter Lin's laptop?

20             MR. FONG:  Objection; vague and ambiguous as to

21   the term seize.

22       Q.    BY MR. CHAN:  You can answer.

23       A.    Please repeat.

24       Q.    Did the police obtain a copy -- obtain -- did

25   the police obtain Peter Lin's laptop from Peter Lin?

                                                              174

1      A.   I'm unable to answer it with yes or no because

2    I would like to explain.  To me, the question is just

3    vague.

4      Q.   What is it that's not clear?  Which part of my

5    question is not clear?

6      A.   You are not there -- you were not there at the

7    scene, so what happened over there was not like how you

8    described it.

9      Q.   After Mr. Yang received a copy of the hard

10   drive, do you know what he did with it?

11     A.   I'm not sure.

12     Q.   Do you know who kept custody of that copy of

13   the hard drive at Jun-En Taiwan?

14     A.   Initially, it was kept by Chairman Yang, Tony

15   Yang.

16     Q.   And then who did he give it to?

17     A.   Then he asked me to review the information on

18   it.

19     Q.   And did you have custody of that copy ever

20   since Mr. Yang gave it to you?

21     A.   Yes.

22     Q.   I want to show you Exhibit 38 again.

23     A.   All right.

24     Q.   Did you come across this picture identified in

25   Exhibit 36 when you -- I mean 38 when you reviewed the

175

1   hard drive copy?

2        A.   Yes.

3        Q.   Did you ever give that copy to Sunnie Lu?

4        A.   Yes.

5        Q.   Why did you give this copy to Sunnie Lu?

6        A.   Because Tony Yang gave us instructions to sort

7   things out, to sort out the information; therefore, we

8   were given the assignment to sorting out the information

9   so that we can submit it to Tony Yang.  And this picture

10  was one of the -- part of the information.

11       Q.   So she would know this photograph in Exhibit 38

12  came from Peter Lin's hard drive, correct?

13       A.   Yes, I think so.

14       Q.   Has Hsiu-Ying Lu ever seen this photograph?

15       A.   Yes.

16       Q.   Would she also know this came from Peter Lin's

17  hard drive?

18       A.   I'm not sure.

19       Q.   Do you know if Hsiu-Ying Lu ever -- if she ever

20  met Mr. Lin?

21       A.   They met frequently.

22       Q.   When was the last time they spoke to each

23  other?

24       A.   Between whom?

25       Q.   Between Hsiu-Ying Lu and Peter Lin.

176

1          A.    I'm not sure.

2          Q.    Do you know when Peter Lin became a pure

3     commissioned salesman of Jun-En Taiwan?

4               MR. FONG:  Objection; assumes -- objection;

5     assumes facts not in evidence and not testified to.

6               MR. CHAN:  I will rephrase.

7          Q.    BY MR. CHAN:  Was Peter Lin ever a commissioned

8     salesman of Jun-En Taiwan?

9          A.    To my understanding, never.

10         Q.    Have you talked with Mr. Yang about Mr. Peter

11    Lin's payment as a commissioned salesman?

12         A.    Do you have a specific time frame in mind?

13         Q.    Any time, ever.

14         A.    The chairman and I communicate frequently and

15    we talk about a lot of things.  Part of our conversation

16    involves the payment to people at the company.  Your

17    question is so broad, so I don't know how to answer your

18    question clearly.

19              MR. CHAN:  Court reporter, please mark this as

20    Exhibit 49.

21              (Deposition Exhibit No. 49 was marked for

22    identification.)

23              THE REPORTER:  Counsel, I have a slight

24    emergency.  Could we go off the record for five minutes?

25              MR. CHAN:  Okay.

                                                        178

```
 1                    (Recess taken.)

 2       Q.   BY MR. CHAN:  Mr. Chiu, can you identify this

 3   document identified in Exhibit 49?

 4       A.   What do you mean by identify?

 5       Q.   Do you recognize this document?

 6       A.   I've seen it before.

 7       Q.   Can you tell me what this is?

 8       A.   Budget of expense, monthly budget expense

 9   provided by Peter Lin.

10       Q.   How do you know that?

11       A.   The first time I saw this chart was at our

12   first mediation.  That was the first time I saw it.

13   After that I had discussions with Tony Yang about this

14   document.  The reason is because the handwriting on this

15   page is Tony Yang's handwriting.  It was him writing us

16   a memo as the discussion with Peter Lin.

17       Q.   What did he tell you about this memo that he

18   wrote?

19            MR. FONG:  Objection; assumes facts not in

20   evidence.  It's vague and ambiguous as to when you say

21   who the author of the memo is.

22            THE WITNESS:  Allow me to explain to you a few

23   things based on what Mr. Yang said.

24       Q.   BY MR. CHAN:  Okay.

25       A.   All right.  I'm going to take some time to
```

179

1    explain to you what Mr. Yang said.  At the time Peter

2    Lin was in charge of the market in the U.S., as a matter

3    of fact in America; however, we realized that for

4    several years the performance was not that good,

5    specifically for 2007, 2008, 2009.  The expenses was

6    high and there was a lot of business trips by Mr. Lin.

7         But the sales was not that good.  So Mr. Yang

8    asked Mr. Lin to prepare a sales goal, and they talked

9    about sales volume and corresponding percentage.  Of

10   course, Mr. Yang's goal was by using this method so the

11   sales will increase.

12        Q.   Did you mention commission?

13        A.   On the document, it does read commission;

14   however, Mr. Chairman told me the word commission here

15   in this document is equivalent to our year-end bonus.

16   At our company, including myself and also including

17   Peter Lin after he joined the company, everyone receives

18   year-end bonus based on your personal performance and

19   calculated based on the monthly salary.

20        Q.   So you're saying even though it says eight

21   percent commission, it really meant bonus?

22        A.   You have to understand, this document, this

23   budget chart was prepared by Peter Lin, so it was his --

24   all those items were named by him.

25        Q.   I will strike that answer as nonresponsive.

180

 1   Please answer my question that I asked you "yes" or

 2   "no."

 3       A.   Well, then please repeat your question.  I'm

 4   not clear on what you were asking.

 5            MR. CHAN:  Court reporter, can you repeat the

 6   question.

 7                    (Question read.)

 8            THE WITNESS:  Year-end bonus.

 9       Q.   BY MR. CHAN:  So do you believe Mr. Yang made a

10   mistake putting down eight percent commission instead of

11   eight percent year-end bonus?  Yes or no?

12       A.   I think your question was not correct, because

13   Mr. Yang didn't prepare this.  It was prepared by

14   Mr. Lin.  Sorry.  I don't have the question in mind.

15            MR. CHAN:  Would you please repeat the

16   question, court reporter.

17                    (Question read.)

18            THE WITNESS:  No.

19       Q.   BY MR. CHAN:  Are all of these handwriting

20   Mr. Yang's handwriting?

21       A.   To my understanding, yes.

22       Q.   Were you there when they -- strike that.

23            Did they meet to discuss this document?

24       A.   I'm not sure.

25       Q.   So what else did Mr. Yang tell you about this

                                                         181

1   document?

2       A.    So chairman's original intention was that for

3   Mr. Lin to handle the new work even though everything

4   else including the traffic, rental, office expense and

5   show allowances will remain the same, but instead of

6   following what Mr. Lin proposed with seven percent of

7   what we called year-end bonus at 800,000 sales volume,

8   chairman changed it to eight percent year-end bonus when

9   the sales volume gets higher than one million dollars.

10  His original intention was to encourage Mr. Lin to bring

11  the sales volume up.

12      Q.    Do you know when this new commission payment

13  structure become effective?

14      A.    I don't know.

15      Q.    Can you take a look at the left-hand side of

16  this document.  Do you notice some words there?

17      A.    Yes.

18      Q.    Can you tell us what it says.

19      A.    It reads, effective on May 1st, 2009.

20      Q.    Would you say this commission structure will be

21  effective May 1st, 2009?

22      A.    No.

23      Q.    So what does this 2009, May 1st effective mean?

24      A.    No. 1, this document is only a memo.  I

25  personally do not know the result of their negotiation.

182

1          Q.    BY MR. CHAN:   If Jun-En Taiwan has an employee

2    in United States, do you believe Jun-En USA has to pay

3    income tax, employment withholding tax or welfare

4    benefit tax to the United States Government?

5          MR. FONG:   Objection; calls for speculation.

6    It's an incomplete hypothetical.

7          THE WITNESS:   In your question, you used a

8    term, Jun-En USA.   How come this term -- I don't

9    understand the question.

10         Q.    BY MR. CHAN:   I will start again.   Do you

11   believe Jun-En Taiwan has to pay to the U.S. government

12   any tax derived from its employee in the United States?

13         MR. FONG:   I'm going to object to the question

14   on the grounds that it is vague and ambiguous in the

15   form that you've asked it.

16         Q.    BY MR. CHAN:   Please answer me "yes" or "no."

17         A.    Yes.   It needs to.

18         Q.    Have you heard of Locker?   I'm sorry.   Let me

19   clarify.

20         Have you heard of a company called Locker Group

21   PTY, LTD.?

22         A.    Yes.

23         Q.    What is Locker Group PTY, LTD.'s relationship

24   with Jun-En Taiwan?

25         A.    That company is our customer.

                                                          202

1    Taiwan.  Has Jun-En Taiwan ever received an order from

2    Locker Group PTY, LTD.?

3         A.   Yes (in English).

4              Yes.

5         Q.   When did you receive the first P.O.?  Is this

6    the first P.O.?  Mr. Chiu, is this the first P.O.?  Does

7    it refresh your recollection?

8         A.   I'm not sure.

9              MR. FONG:  Can I have that marked as an

10   exhibit, please.  If you're showing something to the --

11             MR. CHAN:  I'm not using it as an exhibit.

12             MR. FONG:  No.  You've shown the witness

13   something.  I need to know what it is.  Thank you.

14        Q.   BY MR. CHAN:  So you do not recall when you

15   received the first order from Locker?  When I say

16   Locker, I mean Locker Group PTY, LTD.

17        A.   I can't be sure of the date.

18        Q.   What was the dollar amount for the first

19   invoice -- for the first P.O.?

20        A.   I have to check.

21        Q.   Do you have an estimate?

22        A.   I believe -- I believe it was at 985,000 U.S.

23   dollars.

24             MR. CHAN:  Would you mark this as Exhibit 50.

25             (Deposition Exhibit No. 50 was marked for

204

 1   identification.)

 2        Q.   BY MR. CHAN:   Does this document refresh your

 3   recollection as to when you received the first P.O. --

 4   you meaning Jun-En Taiwan -- from Locker?

 5        A.   No.

 6        Q.   Do you recognize this document?

 7        A.   Yes.

 8        Q.   What is this document?

 9        A.   Purchase order from Locker.

10        Q.   What is the date of this P.O.?

11        A.   The document reads June of 2009.

12        Q.   But there could be another P.O. prior to that,

13   correct?

14        A.   I'm sorry.  I'm not sure -- I'm not clear on

15   what you're asking.  Are you asking about purchase order

16   for other machines or are you asking about another

17   purchase order besides this purchase order?

18        Q.   Have plaintiff received any order from Locker

19   prior to June 30, 2009?

20        A.   I'm not sure.

21        Q.   Have you -- has Jun-En Taiwan received any

22   order after this June 30, '09 order?

23        A.   You mean other purchase orders from Locker?

24   Yes.

25        Q.   Can you tell me when you received a subsequent

                                                          205

```
 1   answer this question under the deposition notice.

 2            MR. FONG:  Is that a statement or a question,

 3   Counsel?

 4       Q.   BY MR. CHAN:  Did you review any documents

 5   relating to sales from -- sales to Locker Group prior to

 6   June 30th, 2009?

 7       A.   I need a repeat, please.

 8            (Mr. Cole enters the deposition room.)

 9                  (Question read.)

10            THE WITNESS:  Yes.

11       Q.   BY MR. CHAN:  So what are they?

12       A.   Some email exchange about inquiries of pricing.

13       Q.   But you have not reviewed any P.O. from Locker

14   Group prior to June 30th, 2009, correct?

15       A.   Correct.

16       Q.   And Jun-En never received any P.O. from Locker

17   Group prior to June 30th, 2009, correct?

18       A.   Correct.

19       Q.   Did Peter Lin ever deliver any P.O. from Locker

20   Group to Jun-En Taiwan?

21       A.   Could you explain what you mean by deliver?

22       Q.   Personally hand over the P.O. or email the P.O.

23   or fax the P.O. or text the P.O.  Any way the P.O. was

24   provided to Jun-En Taiwan from Peter Lin?

25       A.   As far as I can recall, yes.
```

212

```
 1         Q.    Are these P.O.s the ones that has been marked

 2    in Exhibit 50?

 3         A.    Yes.

 4         Q.    Did Peter Lin complete Jun-En sales order for

 5    the sales of the products identified in Exhibit 50?

 6         A.    No.

 7               MR. CHAN:  Please mark this as Exhibit 51.

 8               (Deposition Exhibit No. 51 was marked for

 9    identification.)

10         Q.    BY MR. CHAN:  Do you recognize this document?

11         A.    Yes.

12         Q.    Can you tell me what it is?

13         A.    Two purchase orders from Locker for -- I'm

14    sorry.  Purchase orders from Locker for two expanding

15    netting machines.

16         Q.    Is this a Jun-En Taiwan document?

17         A.    Yes.

18         Q.    So it's really more a sales order form of

19    Jun-En Taiwan instead of a P.O. from Locker Group.  Am I

20    correct?

21         A.    I'm not clear on the question.

22         Q.    Can you tell me what is on the upper left of

23    this -- what do the characters mean on the upper left of

24    this document?

25         A.    Customer's purchase order.
```

213

```
 1    customers and convert the requirement into Chinese.

 2    Generally, that's the purpose.

 3        Q.   So who is the salesperson who handled this?

 4        A.   On the document, it reads Peter Lin.

 5             MR. CHAN:  We'll take a break.

 6             MR. FONG:  Sure.

 7             THE WITNESS:  I just want to say that this

 8    document is not a complete transaction, because it lacks

 9    the -- in the area of customer confirmation and in the

10    area of approval.  I see that it's blank.  So this is

11    not a complete document.

12             MR. CHAN:  Shall we take a 10-minute break?

13             MR. FONG:  Sure.

14                      (Recess taken.)

15             MR. CHAN:  Let's go back on the record.

16        Q.   BY MR. CHAN:  Mr. Chiu, you know you're still

17    under oath?

18        A.   Yes.

19        Q.   Can you compare the items -- the product items

20    listed in Exhibit 50 with the items listed in Exhibit 51

21    and let me know if they are the same product?

22        A.   Basically, they are the same.  However, the

23    description may have some discrepancy.

24        Q.   Early on you commented that in Exhibit 51

25    the -- there is no customer signature.  Correct?
```

216

1       Q.    BY MR. CHAN:  Let me ask you again, did you pay

2   Peter Lin any commission on any Locker Group sales?

3       A.    No.

4       Q.    Why not?

5       A.    Peter Lin was an employee of the company, so

6   for him to get the business, there is no commission,

7   because he is -- he was an employee of the company.

8       Q.    I thought earlier on you testified that Tony

9   Yang as the chairman of Jun-En Taiwan agreed to pay

10  Peter Lin eight percent commission on sales?

11      A.    That's not true.

12      Q.    Why not?

13      A.    I'm going to break my answer into sections.

14  First is, if you're referring to this document, this is

15  for Peter Lin's sales in the U.S. market.  And second,

16  just like we said earlier, this is not for commissions.

17  This is our year-end bonus.

18          MR. FONG:  I want to make sure that the record

19  reflects the document that the interpreter was

20  referencing.  I think it was Exhibit 49; is that

21  correct?

22          THE INTERPRETER:  Is this a question to the

23  deponent?

24          MR. FONG:  Yes.  For the record.  The reference

25  to this document was to Exhibit 49?

                                                            219

1        A.   Ever since Peter Lin started, the market covers

2   the America, including the U.S., Canada and South and

3   Central America.

4        Q.   Do you have any document stating that?

5        A.   I do not.

6        Q.   So there are no documents restricting Mr. Lin,

7   Agape USA or Agape Industrial, Inc., from only doing

8   business in the Americas?

9        A.   No documents.

10       Q.   Then why did Jun-En Taiwan not pay Peter Lin

11   for his commissions?

12       A.   Which one?

13       Q.   The commission, eight percent commissions that

14   is due him from this Locker sales?

15       A.   Him being an employee of the company,

16   commissions did not exist.

17       Q.   Despite what your chairman told him and wrote

18   down in writing?

19       A.   I was just telling you what the chairman told

20   me.  The chairman told me that Peter Lin, being an

21   employee of the company, Peter Lin does not receive

22   commissions.

23       Q.   Since May 2009, I have not received any records

24   from you, from Jun-En Taiwan, from Agape Taiwan showing

25   any payment of any kind to Peter Lin.  How do you expect

                                                              221

```
 1   don't want to spend a whole hour let him making a

 2   statement.

 3          MR. FONG:  Sir, we need a record.

 4          MR. CHAN:  Let her interpret, too.

 5          THE WITNESS:  After May 1st, the first time

 6   Mr. Lin made request of payment was on September 11th,

 7   2009.  Based on the details of his request, we would go

 8   through an internal approval process and transfer them

 9   into internal document for each item he requested

10   payment for.

11     Q.    BY MR. CHAN:  Mr. Chiu, you're not answering my

12   question.  You're not responsive to my question.  I will

13   strike -- ask the answer be stricken from the record.

14          My question to you was, can you show me payment

15   records of any payment you have actually made to Peter

16   Lin, whether it was wire transfer or check or cash?

17          MR. FONG:  Just for the -- so I understand the

18   question --

19          MR. CHAN:  Are you making an objection?

20          MR. FONG:  Yes, I'm going to object on the

21   grounds that at the conclusion of the last session,

22   Mr. Chiu offered to explain.  He asked you to allow him

23   to explain, and that's what he's attempting to do.

24          MR. CHAN:  He did not have my permission to

25   explain.  He did not ask me to explain either.  You
```

227

```
 1        Q.   Would you agree with me that both companies

 2   have entered into this agreement?

 3             Please interpret.

 4        A.   I already gave my oath that I would tell the

 5   truth.  In this case, in the course of this case, I have

 6   seen something very similar to what I have on hand.

 7   Because the two copies were so very similar, therefore,

 8   I have to tell the truth regarding to what I have in

 9   front of me.  I am not sure.

10             MR. CHAN:  I want to mark this as Exhibit 53.

11             (Deposition Exhibit No. 53 was marked for

12   identification.)

13        Q.   BY MR. CHAN:  Do you recognize this document?

14        A.   I do.

15        Q.   Can you tell me what it is.

16        A.   Website of Agape USA.

17        Q.   Is that Agape Taiwan's website?

18        A.   No.

19        Q.   Does it show any products made by Agape Taiwan?

20        A.   Everything you'll see here including the

21   machines and the products, they all are.

22        Q.   None of these are your competitor's product,

23   correct?

24        A.   None.

25        Q.   Yesterday you provided testimony on Peter Lin
```

231

1     and Agape Industrial's use of the AG logo after May

2     2009.  Correct?

3          A.   Correct.

4          Q.   When I asked you about their infringing use

5     that you accused them of, I didn't ask you specifically

6     about their use of any confusingly similar marks to AG.

7     So I'd like to ask you whether Peter Lin or Agape

8     Industrial, Inc., used any confusingly similar marks to

9     the AG logo from May 2009 until today?

10               Are you aware of any use by Peter Lin or Agape

11    Industrial of any marks or symbols confusingly similar

12    to the AG logo?

13         A.   Yes.

14         Q.   Can you tell me when did you first encounter

15    the use by Peter Lin or Agape Industrial of any

16    confusingly similar mark?

17         A.   The first time would be the business cards I

18    provided yesterday.

19         Q.   Do you recall meeting Mr. Lin after January

20    2010 in any trade show?

21         A.   Yes.

22         Q.   Can you tell me when did you first meet him at

23    any trade show since January 2010?

24         A.   I believe it was in February 2010.

25         Q.   When was the last time you saw him in any trade

                                                           232

1          A.    I think possibly it was in the range of 30,000

2     U.S. dollars.

3          Q.    2005?

4          A.    I think about the same.

5          Q.    2006?

6          A.    I'm not sure about the amount after 2006.

7          Q.    Somehow I would think you would remember the

8     more recent sales than the earlier sales.  But you're

9     not able to remember the more recent sales?

10         A.    Generally speaking, the sales amount at Agape

11    Taiwan has never been very high, because the operations

12    at Jun-En Taiwan was the primary focus, so generally

13    speaking, Agape Taiwan's sales volume is not high.

14         Q.    Did Agape Taiwan get all its sales from Agape

15    USA?

16         A.    Repeat, please.

17         Q.    Did Agape Taiwan get all its sales from Agape

18    USA?

19         A.    No.

20         Q.    How much of Agape Taiwan's sales would come

21    from Agape USA?

22         A.    Not much.  Because purchase orders received by

23    Agape USA actually goes to Jun-En Taiwan.

24         Q.    How does Agape Taiwan and Jun-En Taiwan decide

25    which sales order that Peter Lin procured would go to

237

1    Agape Taiwan or go to Jun-En Taiwan?

2         A.    There isn't a fixed rule or unchanged rule.

3    But primarily, most of it goes to Jun-En Taiwan.

4         Q.    Is it done randomly?

5         A.    No.

6         Q.    Can you tell me how it was decided which sales

7    order from Agape USA go to Agape Taiwan or go to Jun-En

8    Taiwan?

9         A.    There isn't any set policy or standards.  It

10   all depends on whether the customers' letter of credit

11   is issued to; for instance, if the letter of credit is

12   issued to Agape Taiwan, then Agape Taiwan would be the

13   company receiving the purchase order.  But other than

14   that, all depends on the circumstances at the time.

15   There is no set rules.

16        Q.    So then how does Agape Taiwan and Jun-En Taiwan

17   decide which LC would the customer issue -- issue it to?

18        A.    Well, sometimes it also depends on how the

19   sales communicated with the customer; how the sales

20   obtained the purchase order.  But that being said, I

21   still want to go back to what I said originally.

22   Primarily, purchase orders go to Jun-En Taiwan.

23        Q.    Isn't Agape USA your only customer in the

24   United States?

25        A.    Agape USA is not a customer.  It is our

                                                              238

 1   Jun-En Enterprise or Agape Industry Co., LTD., in any of

 2   its website, advertisement or sales materials?

 3       A.   Please repeat, please.  I need to concentrate

 4   on what you're asking.

 5                    (Question read.)

 6            THE WITNESS:  I have seen the name Agape and

 7   Jun-En, the two names together in shows.

 8       Q.   BY MR. CHAN:  Can you clarify to me when you

 9   refer to Agape and Jun-En which Agape and which Jun-En

10   you're referring to?

11       A.   Agape USA and Jun-En USA.  However, they do use

12   the same logo, Jun-En Taiwan's logo.

13       Q.   Please clarify to me what Jun-En Taiwan logo.

14   Are you referring to the AG logo?

15       A.   No.  No.

16       Q.   But have you seen on any of these websites or

17   sales materials where Jun-En Enterprise, Taiwan or Agape

18   Taiwan, the name of these companies listed at any time?

19       A.   Not to my recollection.

20       Q.   So how would the U.S. customer know in advance

21   whether it is buying any product, whether it was buying

22   any product from Jun-En Taiwan or Agape Taiwan?

23       A.   Well, actually, Jun-En Taiwan and Agape Taiwan

24   are the same company.  All the products came from Jun-En

25   Taiwan's machinery equipment, so to customers, the

                                                          240

 1    products are the same.  It's -- they are -- the two are

 2    the same company.

 3        Q.   I know that's what you have in your mind.  But

 4    how do the world know just from the website of Agape

 5    Industry, Inc., or Agape Industry, Inc., sales

 6    materials, when none of these names were provided in any

 7    sales material or website, and Peter Lin doesn't mention

 8    Agape Taiwan or Jun-En Taiwan in making sales to his

 9    customers?

10         MR. FONG:  Objection; assumes facts not in

11    evidence.  Calls for speculation.  Incomplete

12    hypothetical.  You want the question read back?  It's

13    very complicated.

14         THE WITNESS:  I would like that.  Thank you.

15         MR. CHAN:  Please don't make gratuitous

16    comments, Counsel.  You're welcome to make objections

17    that are not argumentative or suggestive.

18              (Question read.)

19         THE WITNESS:  To my understanding when Peter

20    Lin introduced the machines to customers, he will have

21    to get support from factories, so to my understanding,

22    he will have to mention the factory.  And in terms of

23    website, let's look at the website.  For instance, this

24    machine, this machine bears a logo.  This has Jun-En

25    Taiwan's logo.

                                                          241

```
 1              And sometimes when we ship -- make machine

 2      shipment, some of them will bear Agape Taiwan's name

 3      plate, the brand name.

 4          Q.   BY MR. CHAN:  But that's after the sales have

 5      been made.  I'm talking about making sales.  I'm talking

 6      about the sales process.  So this logo here, this Jun-En

 7      logo, it has -- does not have Jun-En Enterprise listed

 8      anywhere?

 9          A.   It is registered logo, a logo we registered in

10      Taiwan.  It is Jun-En Taiwan's logo.

11          Q.   But a customer who has never done business with

12      Jun-En Taiwan seeing this logo would not know it is

13      Jun-En Taiwan, correct?

14              MR. FONG:  Objection; calls for speculation.

15              THE WITNESS:  I'm not sure.

16          Q.   BY MR. CHAN:  I want to go back to Agape

17      Taiwan's financials.  I asked you about the revenue

18      early on.  How about the profit?  What was Agape

19      Taiwan's profit in year 2004?

20          A.   I'm not sure.

21          Q.   Do you know the profit margin of Agape Taiwan

22      in 2004?

23          A.   Because the function of Agape Taiwan is only as

24      a supporting function, therefore to my understanding,

25      the profit of that company is not very high.  Usually,
```

242

```
 1    between 10 to 15 percent.

 2         Q.   Can you explain to me what you mean by

 3    supporting function?

 4         A.   Well, our -- the focus of our company is on

 5    Jun-En, and it's very easy to understand that sometimes

 6    one company may have two names, just for the convenience

 7    of operation.

 8         Q.   But Jun-En Taiwan and Agape Taiwan are really

 9    one company?

10         A.   Correct.

11         Q.   Both of them are under the control of Mr. Tony

12    Yang?

13         A.   Correct.

14         Q.   Is he the majority shareholder in both

15    companies?

16         A.   Well, on official document, he is only a

17    majority shareholder of Jun-En Taiwan.  On official

18    document, even though Agape Taiwan's owner is Hsiu-Ying

19    Lu, but because they are relatives and this is a family

20    business, so actually, he is a majority holder,

21    shareholder.

22         Q.   So in a way, Mr. Yang runs Agape Taiwan as

23    well?

24         A.   Correct.

25         Q.   Sometimes your English is better than the
```

243

 1    application?

 2              MR. CHAN:  It's okay.  Don't worry.  I'm trying

 3    to get it done as fast as possible.

 4              MR. FONG:  Do you mind if I stand occasionally?

 5    I don't want to feel like I'm on a long airplane flight

 6    which I hate.

 7              MR. CHAN:  That's fine.

 8       Q.   BY MR. CHAN:  Did Peter accompany Locker to

 9    Jun-En before Peter brought the sale shown in Exhibit 51

10    to Jun-En Taiwan?

11       A.   Yes.

12       Q.   Did Peter Lin accompany Locker to Jun-En Taiwan

13    after August 2009?

14       A.   Yes.

15       Q.   Do you recall how many times did Peter

16    accompany Locker to Jun-En Taiwan?

17       A.   At least twice.

18       Q.   Not every month?

19       A.   I don't think that would be necessary to be

20    done on monthly basis.

21       Q.   Was Jun-En satisfied with the Locker P.O. it

22    received in August 2009?

23       A.   It was acceptable.  I'm not sure about the

24    definition of being satisfied, so that's why my answer

25    is acceptable.

                                                          252

```
 1    tax to the U.S. government?

 2         A.    Yes.

 3         Q.    What kind of tax?

 4         A.    Agape USA needed to pay corporation taxes and

 5    that was all handled by a CPA.

 6         Q.    Did you pay to the State of California and the

 7    federal government the employee withholding tax of

 8    Mr. Peter Lin?

 9         A.    To my understanding, this was all handled by

10    Mr. Lin himself and I believe they were all included.

11         Q.    Do all your employees handle all the

12    withholding tax payment themselves?

13         A.    No.

14         Q.    Why do you believe Peter Lin would be any

15    different if he were an employee?

16         A.    That's because Jun-En Taiwan authorized Peter

17    Lin to handle all the expenses and incurred taxes at

18    Agape USA, and Jun-En Taiwan had already made payments

19    as Mr. Lin submitted for those payments.  This Peter Lin

20    handled everything because Jun-En Taiwan gave him

21    complete authorization.

22         Q.    When did Jun-En Taiwan give Peter Lin complete

23    authorization?

24         A.    I believe the authorization started when he was

25    dispatched to the U.S. to handle the U.S. business.
```

289

1      Q.    Who authorized him?

2      A.    Tony Yang.

3      Q.    Did Tony Yang tell you that?

4      A.    Yes.

5      Q.    When did he tell you that?

6      A.    Many years ago, because business with people in

7    the U.S. had been going on for a long time.

8      Q.    Did you check any records on that

9    authorization?

10     A.    No.

11     Q.    And he has total authority to pay tax in the

12   United States?  Is that what you testified just now?

13     A.    Yes.  Because he was fully authorized to manage

14   the U.S. company.

15     Q.    Yet you just testified he's not fully

16   authorized to add his own commission?  Correct?

17          MR. FONG:  Is that a question?

18          THE WITNESS:  We, as employees of Jun-En, we do

19   not receive commissions.  Commissions do not exist.

20     Q.    BY MR. CHAN:  You just testified you have no

21   employees who pay their own tax to the -- withholding

22   tax except Peter Lin.  Why would there be no exceptions

23   on other way of doing business other than tax?

24     A.    I don't know.

25          MR. CHAN:  Are you going to leave at 5:00 or

290

1   about that.  I want to know when you want to talk about

2   that?

3              MR. FONG:  Not now.

4              MR. CHAN:  When?

5              MR. FONG:  When I've had time to discuss things

6   with my client.  And in particular, with respect to your

7   email to me with regard to a supplemental deposition.  I

8   indicated that if it were justified, it might be

9   possible.  But given the performance that I've seen here

10  for the last two days, I don't know that it's justified.

11  Okay?  We'll take it under advisement.  I'll get back to

12  you.  Thank you.

13             MR. CHAN:  Thank you very much.

14             THE WITNESS:  Thank you.

15             MR. CHAN:  We're not terminating the deposition

16  today.  Thank you very much.  Off the record.

17                  (TIME NOTED:  5:11 P.M.)

18             (Deposition Exhibit No. 54 was marked for

19  identification.)

20

21

22

23

24

25

                                                              298

```
 1              CERTIFICATE OF READER/INTERPRETER

 2

 3          I, _____, whose

 4     address is _____,

 5     _____,

 6     a person who speaks the language of the witness,

 7     _____, do hereby certify:

 8             That on the _____ day of _____,

 9     ____, I did translate the foregoing deposition from

10     the English language into the _____

11     language, reading same to the witness in his/her

12     native tongue to the best of my ability;

13             That all corrections and changes, requested

14     by the witness, were made and initialed by the

15     witness;

16             That upon completion of said reading, the

17     witness did confirm to me that he/she had understood

18     the reading.

19

20

21          _____

22          SIGNATURE OF THE READER/INTERPRETER

23

24

25
                                                      299
```

PENALTY OF PERJURY CERTIFICATE

        I hereby declare I am the witness in the within

matter, that I have read the foregoing transcript and

know the contents thereof; that I declare that the same

is true to my knowledge, except as to the matters which

are therein stated upon my information or belief, and as

to those matters, I believe them to be true.

        I declare being aware of the penalties of perjury,

that the foregoing answers are true and correct.

        Executed on the _____ day of _____, ____,

at _____, _____.

            (CITY)                          (STATE)

            _____

                        HSIN-YI CHIU

                                                            300

```
 1  STATE OF CALIFORNIA         )
                                ) ss:
 2  COUNTY OF LOS ANGELES       )

 3

 4          I, JUDITH SCHLUSSEL, do hereby certify:

 5

 6          That I am a duly qualified Certified Shorthand

 7  Reporter, in and for the State of California, holder of

 8  certificate number 4307, which is in full force and

 9  effect and that I am authorized to administer oaths and

10  affirmations;

11          That the foregoing deposition testimony of the

12  herein named witness was taken before me at the time and

13  place herein set forth;

14          That prior to being examined, the witness named

15  in the foregoing deposition, was duly sworn or affirmed

16  by me, to testify the truth, the whole truth, and

17  nothing but the truth;

18          That the testimony of the witness and all

19  objections made at the time of the examination were

20  recorded stenographically by me, and were thereafter

21  transcribed under my direction and supervision;

22          That the foregoing pages contain a full, true

23  and accurate record of the proceedings and testimony to

24  the best of my skill and ability;

25
```

301

1           I further certify that I am not a relative or

2    employee or attorney or counsel of any of the parties,

3    nor am I a relative or employee of such attorney or

4    counsel, nor am I financially interested in the outcome

5    of this action.

6

7           IN WITNESS WHEREOF, I have subscribed my name

8    this _____ day of _____, _____.

9

10

11        _____

12        JUDITH SCHLUSSEL, CSR No. 4307

13

14

15

16

17

18

19

20

21

22

23

24

25

302

```
 1                          ERRATA SHEET

 2

 3      If any corrections to your deposition are necessary,
        indicate them on this sheet, giving the change, page
 4      number, line number and reason for change.

 5      PAGE  LINE  FROM                    TO

 6      ____  ____  _____      _____

 7      Reason  _____

 8      ____  ____  _____      _____

 9      Reason  _____

10      ____  ____  _____      _____

11      Reason  _____

12      ____  ____  _____      _____

13      Reason  _____

14      ____  ____  _____      _____

15      Reason  _____

16      ____  ____  _____      _____

17      Reason  _____

18      ____  ____  _____      _____

19      Reason  _____

20      ____  ____  _____      _____

21      Reason  _____

22      ____  ____  _____      _____

23      Reason  _____

24      _____    _____

25      Signature of Deponent               Date

                                                          303
```



PENGAD 800-631-6989

**EXHIBIT**

3ๅ



EXHIBIT

38

PENGAD 800-631-6989



EXHIBIT

39

PENGAD 800-631-6989



EXHIBIT

40



EXHIBIT
41

PENGAD 800-581-6989



EXHIBIT

42

PENGAD 800-631-6989

PTO Form 1478 (Rev 9/2006)
OMB No 0651-0009 (Exp 12/31/2011)

# Trademark/Service Mark Application, Principal Register

**Serial Number: 85038122**
**Filing Date: 05/13/2010**

## The table below presents the data as entered.

| Input Field | Entered |
|---|---|
| **SERIAL NUMBER** | 85038122 |
| **MARK INFORMATION** | |
| ***MARK** | \\TICRS\EXPORT10\IMAGEOUT 10\850\381\85038122\xml1\ APP0002.JPG |
| **SPECIAL FORM** | YES |
| **USPTO-GENERATED IMAGE** | NO |
| **LITERAL ELEMENT** | AG |
| **COLOR MARK** | NO |
| ***DESCRIPTION OF THE MARK (and Color Location, if applicable)** | The mark consists of a stylized representation of the letters AG. |
| **PIXEL COUNT ACCEPTABLE** | YES |
| **PIXEL COUNT** | 593 x 379 |
| **REGISTER** | Principal |
| **APPLICANT INFORMATION** | |
| ***OWNER OF MARK** | Agape Industry Co., Ltd. |
| ***STREET** | 10F, NO. 110 YUCHECNG RD., SANMIN DIST. |
| ***CITY** | KAOHSIUNG |
| ***COUNTRY** | Taiwan |
| **LEGAL ENTITY INFORMATION** | |

FENGAD 800-631-6989
EXHIBIT
43

| TYPE | corporation |
|---|---|
| **STATE/COUNTRY OF INCORPORATION** | Taiwan |

## GOODS AND/OR SERVICES AND BASIS INFORMATION

| **INTERNATIONAL CLASS** | 007 |
|---|---|
| * **IDENTIFICATION** | Metal working machines, namely machines for producing metal mesh products; metal mesh products, namely perforated metal sheets, netting, woven wire cloth and metal mesh conveyor belts. |
| **FILING BASIS** | SECTION 1(a) |
| **FIRST USE ANYWHERE DATE** | At least as early as 03/01/2005 |
| **FIRST USE IN COMMERCE DATE** | At least as early as 03/01/2005 |
| **SPECIMEN FILE NAME(S)** | \\TICRS\EXPORT10\IMAGEOUT 10\850\381\85038122\xml1\APP0003.JPG |
| | \\TICRS\EXPORT10\IMAGEOUT 10\850\381\85038122\xml1\APP0004.JPG |
| **SPECIMEN DESCRIPTION** | Color Brochures with photographs |

## ATTORNEY INFORMATION

| **NAME** | Marc Karish |
|---|---|
| **ATTORNEY DOCKET NUMBER** | 11066.21 |
| **FIRM NAME** | Karish & Bjorgum, PC |
| **STREET** | 510 W. 6th Street, Suite 308 |
| **CITY** | Los Angeles |
| **STATE** | California |
| **COUNTRY** | United States |
| **ZIP/POSTAL CODE** | 90014 |
| **PHONE** | 213-785-8070 |
| **FAX** | 213-995-5010 |
| **EMAIL ADDRESS** | marc.karish@kb-ip.com |

| AUTHORIZED TO COMMUNICATE VIA EMAIL | Yes | |
|---|---|---|
| OTHER APPOINTED ATTORNEY | Eric Bjorgum Rose Rigole | |

## CORRESPONDENCE INFORMATION

| NAME | Marc Karish | |
|---|---|---|
| FIRM NAME | Karish & Bjorgum, PC | |
| STREET | 510 W. 6th Street, Suite 308 | |
| CITY | Los Angeles | |
| STATE | California | |
| COUNTRY | United States | |
| ZIP/POSTAL CODE | 90014 | |
| PHONE | 213-785-8070 | |
| FAX | 213-995-5010 | |
| EMAIL ADDRESS | marc.karish@kb-ip.com | |
| AUTHORIZED TO COMMUNICATE VIA EMAIL | Yes | |

## FEE INFORMATION

| NUMBER OF CLASSES | 1 | |
|---|---|---|
| FEE PER CLASS | 325 | |
| *TOTAL FEE DUE | 325 | |
| *TOTAL FEE PAID | 325 | |

## SIGNATURE INFORMATION

| ORIGINAL PDF FILE | hw_6511510267-174820222 . Signed_Declaration_from_Client.pdf | |
|---|---|---|
| CONVERTED PDF FILE(S) (2 pages) | \\TICRS\EXPORT10\IMAGEOUT10\850\381\85038122\xml1\APP0005.JPG | |
| | \\TICRS\EXPORT10\IMAGEOUT10\850\381\85038122\xml1\APP0006.JPG | |
| SIGNATORY'S NAME | Hsiu-Ying Lu | |
| SIGNATORY'S | | |

| POSITION | President |
| --- | --- |

PTO Form 1478 Rev 9/2006)
OMB No 0651-0009 (Exp 12/31/2011)

# Trademark/Service Mark Application, Principal Register

### Serial Number: 85038122
### Filing Date: 05/13/2010

## To the Commissioner for Trademarks:

**MARK:** AG (stylized and/or with design, see mark)

The literal element of the mark consists of AG.
The mark consists of a stylized representation of the letters AG.
The applicant, Agape Industry Co., Ltd., a corporation of Taiwan, having an address of
    10F, NO. 110 YUCHECNG RD., SANMIN DIST.
    KAOHSIUNG
    Taiwan
requests registration of the trademark/service mark identified above in the United States Patent and
Trademark Office on the Principal Register established by the Act of July 5, 1946 (15 U.S.C. Section 1051
et seq.), as amended, for the following:

    International Class 007: Metal working machines, namely machines for producing metal mesh
products; metal mesh products, namely perforated metal sheets, netting, woven wire cloth and metal mesh
conveyor belts.

In International Class 007, the mark was first used at least as early as 03/01/2005, and first used in
commerce at least as early as 03/01/2005, and is now in use in such commerce. The applicant is
submitting one specimen(s) showing the mark as used in commerce on or in connection with any item in
the class of listed goods and/or services, consisting of a(n) Color Brochures with photographs.
Specimen File1
Specimen File2

The applicant's current Attorney Information:
Marc Karish and Eric Bjorgum Rose Rigole of Karish & Bjorgum, PC
    510 W. 6th Street, Suite 308
    Los Angeles, California 90014
    United States
The attorney docket/reference number is 11066.21.

 The applicant's current Correspondence Information:
    Marc Karish
    Karish & Bjorgum, PC
    510 W. 6th Street, Suite 308
    Los Angeles, California 90014

213-785-8070(phone)
213-995-5010(fax)
marc.karish@kb-ip.com (authorized)

A fee payment in the amount of $325 has been submitted with the application, representing payment for 1 class(es).

## Declaration

**Original PDF file:**
hw_6511510267-174820222_._Signed_Declaration_from_Client.pdf
**Converted PDF file(s)** (2 pages)
Signature File1
Signature File2
Signatory's Name: Hsiu-Ying Lu
Signatory's Position: President


RAM Sale Number: 4453
RAM Accounting Date: 05/14/2010

Serial Number: 85038122
Internet Transmission Date: Thu May 13 18:12:34 EDT 2010
TEAS Stamp: USPTO/BAS-65.115.102.67-2010051318123419
7853-85038122-46086cd1c217d27d3c18b9d695
5d3641e1-DA-4453-20100513174820222599



# AGAPE Industry, Inc.

## Your "SUCCESS" is Our "GOAL"

### ▼ Chain Link Fencing Machine

### ▼ High Speed Barbed Wire Machine




### ▼ P.V.C Extrusion Production Line

### ▼ Razor Barbed Tape Machine





- ► Chain Link Fencing
- ► Chain Link / Slat Inserter Fencing
- ► Single / Double Wire Mini Mesh Fencing
- ► P.V.C. Extrusion Production Line

- ► Tie Wire Machine
- ► Barbed Wire Machine
- ► Razor Ribbon Line
- ► Hexagonal Netting Machine

## For More Information Please contact us

Tel: **310-325-9000** Fax: 310-325-9008

23520 Telo Ave. Suite One, Torrance, CA 90505, U.S.A.

www.agapeindustry.com   E-mail : info@agapeindustry.com

May 10 10 04:34p                                                          p. 1

Trademark/Service Mark Application, Principal Register          http://teas.uspto.gov/forms/xslt.service?xsl=hsign&stamp=USPTO/BAS-6...

PTO Form 1478 (Rev 9/2006)
OMB No. 0651-0009 (Exp 12/31/2011)

## Trademark/Service Mark Application, Principal Register
## Handwritten Signature

**To the Commissioner for Trademarks:**

**MARK:** AG (stylized and/or with design, see mark)

The literal element of the mark consists of AG.
The mark consists of a stylized representation of the letters AG.
The applicant, Agape Industry Co., Ltd., a corporation of Taiwan, having an address of
    10F, NO. 110 YUCHECNG RD., SANMIN DIST.
    KAOHSIUNG
    Taiwan
requests registration of the trademark/service mark identified above in the United States Patent and Trademark Office on the Principal Register
established by the Act of July 5, 1946 (15 U.S.C. Section 1051 et seq.), as amended, for the following:

    International Class 007:  Metal working machines, namely machines for producing metal mesh products; metal mesh products, namely
perforated metal sheets, netting, woven wire cloth and metal mesh conveyor belts.

In International Class 007, the mark was first used at least as early as 03/01/2005, and first used in commerce at least as early as 03/01/2005, and
is now in use in such commerce. The applicant is submitting one specimen(s) showing the mark as used in commerce on or in connection with any
item in the class of listed goods and/or services, consisting of a(n) Color Brochures with photographs.
Specimen-1 [spec-6511510267-183414990_._POSTER-60x45cm-AG1500SP.jpg ]
Specimen-2 [spec-6511510267-183414990_._4.75x6.25.jpg ]

The applicant hereby appoints Marc Karish and Eric Bjorgum Rose Rigole of Karish & Bjorgum, PC
    510 W. 6th Street, Suite 308
    Los Angeles, California 90014
    United States
to submit this application on behalf of the applicant. The attorney docket/reference number is 11066.21.

 Correspondence Information: Marc Karish

                            Karish & Bjorgum, PC

                            510 W. 6th Street, Suite 308

                            Los Angeles, California 90014

                            213-785-8070(phone)

                            213-995-5010(fax)

                            marc.karish@kb-ip.com (authorized)

A fee payment in the amount of $325 will be submitted with the application, representing payment for 1 class(es).

May 10 10 04:34p                                                                P.2

Trademark/Service Mark Application, Principal Register         http://teas.uspto.gov/forms/xslt.service?xsl=hsign&stamp=USPTO/BAS-6...

## Declaration

The undersigned, being hereby warned that willful false statements and the like so made are punishable by fine or imprisonment, or both, under 18 U.S.C. Section 1001, and that such willful false statements, and the like, may jeopardize the validity of the application or any resulting registration, declares that he/she is properly authorized to execute this application on behalf of the applicant; he/she believes the applicant to be the owner of the trademark/service mark sought to be registered, or, if the application is being filed under 15 U.S.C. Section 1051(b), he/she believes applicant to be entitled to use such mark in commerce; to the best of his/her knowledge and belief no other person, firm, corporation, or association has the right to use the mark in commerce, either in the identical form thereof or in such near resemblance thereto as to be likely, when used on or in connection with the goods/services of such other person, to cause confusion, or to cause mistake, or to deceive; and that all statements made of his/her own knowledge are true; and that all statements made on information and belief are believed to be true.

**Signature Section:**

Signature: _____

Signatory's Name: Hsiu-Ying Lu

Signatory's Position: President

Date Signed: _2 0 1 0 / 5 / 1 0_____

**NOTE TO APPLICANT:** When filed as part of the electronic form (i.e., scanned and attached as an image file), the signature page **must** include both the signature information **and** the boilerplate declaration language. Do **not** include the entire application, but do ensure that the boilerplate declaration language actually appears; *a signature by itself will **not** be acceptable.* If, due to browser limitations, the boilerplate declaration language appears on a previous page when printed, you must "merge" the declaration and signature block onto a single page prior to signing, so that the *one complete page* can be scanned to create an acceptable image file. It is recommended that you copy-and-paste the entire text form into another document, manipulate the spacing there to move the declaration and signature section to a separate page, and then print this new version of the text form to send to the signatory.

PTO Form 1957 (Rev 9/2005)
OMB No. 0651-0050 (Exp. 04/30/2011)

# Response to Office Action

## The table below presents the data as entered.

| Input Field | Entered |
|---|---|
| **SERIAL NUMBER** | 85038122 |
| **LAW OFFICE ASSIGNED** | LAW OFFICE 111 |
| **MARK SECTION (no change)** | |
| **GOODS AND/OR SERVICES SECTION (007)(current)** | |
| **INTERNATIONAL CLASS** | 007 |
| **DESCRIPTION** | |
| Metal working machines, namely machines for producing metal mesh products; metal mesh products, namely perforated metal sheets, netting, woven wire cloth and metal mesh conveyor belts | |
| **FILING BASIS** | Section 1(a) |
| **FIRST USE ANYWHERE DATE** | At least as early as 03/01/2005 |
| **FIRST USE IN COMMERCE DATE** | At least as early as 03/01/2005 |
| **GOODS AND/OR SERVICES SECTION (007)(proposed)** | |
| **INTERNATIONAL CLASS** | 007 |
| **TRACKED TEXT DESCRIPTION** | |
| Metal working machines, namely machines for producing metal mesh products; Metal working machines, namely machines for producing metal mesh products.; metal mesh products, namely perforated metal sheets, netting, woven wire cloth and metal mesh conveyor belts | |
| **FINAL DESCRIPTION** | |
| Metal working machines, namely machines for producing metal mesh products. | |
| **FILING BASIS** | Section 1(a) |
| **FIRST USE ANYWHERE DATE** | At least as early as 03/01/2005 |
| **FIRST USE IN COMMERCE DATE** | At least as early as 03/01/2005 |

EXHIBIT
44
PENGAD 800-631-6989

| | |
|---|---|
| **STATEMENT TYPE** | **"The substitute (or new, if appropriate) specimen(s) was/were in use in commerce at least as early as the filing date of the application"***[for an application based on Section 1(a), Use in Commerce]* OR **"The substitute (or new, if appropriate) specimen(s) was/were in use in commerce prior either to the filing of the Amendment to Allege Use or expiration of the filing deadline for filing a Statement of Use"** *[for an application based on Section 1(b) Intent-to-Use].* |
| **SPECIMEN FILE NAME(S)** | \\TICRS\EXPORT11\IMAGEOUT 11\850\381\85038122\xml3\ROA0002.JPG |
| **SPECIMEN DESCRIPTION** | a photograph of a product bearing a label |

## GOODS AND/OR SERVICES SECTION (006)(class added)

| | |
|---|---|
| **INTERNATIONAL CLASS** | 006 |
| **DESCRIPTION** | |

Metal mesh products, namely perforated metal sheets, netting, woven wire cloth and metal mesh conveyor belts for handling loads.

| | |
|---|---|
| **FILING BASIS** | Section 1(a) |
| **FIRST USE ANYWHERE DATE** | At least as early as 03/01/2005 |
| **FIRST USE IN COMMERCE DATE** | At least as early as 03/01/2005 |
| **STATEMENT TYPE** | **"The substitute (or new, if appropriate) specimen(s) was/were in use in commerce at least as early as the filing date of the application"***[for an application based on Section 1(a), Use in Commerce]* OR **"The substitute (or new, if appropriate) specimen(s) was/were in use in commerce prior either to the filing of the Amendment to Allege Use or expiration of the filing deadline for filing a Statement of Use"** *[for an application based on Section 1(b) Intent-to-Use].* |
| **SPECIMEN FILE NAME(S)** | |
| **JPG FILE(S)** | \\TICRS\EXPORT11\IMAGEOUT 11\850\381\85038122\xml3\ROA0004.JPG |
| | \\TICRS\EXPORT11\IMAGEOUT11\850\381\85038122\xml3\ROA0005.JPG |
| **ORIGINAL PDF FILE** | SPN0-6511510271-161832700 . Agape_Industry__Inc.pdf |
| **CONVERTED PDF FILE(S) (1 page)** | \\TICRS\EXPORT11\IMAGEOUT11\850\381\85038122\xml3\ROA0003.JPG |
| **SPECIMEN DESCRIPTION** | a scan of a webpage; photographs of product labels. |

## ADDITIONAL STATEMENTS SECTION

| | |
|---|---|
| | |

| DESCRIPTION OF THE MARK (and Color Location, if applicable) | The mark consists of a stylized representation of the letters "AG" set against a rectangle. A series of horizontal lines extends outward and to the left of the letter "A". |
|---|---|

## PAYMENT SECTION

| NUMBER OF CLASSES | 1 |
|---|---|
| FEE PER CLASS | 325 |
| TOTAL FEES DUE | 325 |

## SIGNATURE SECTION

| ORIGINAL PDF FILE | HS_6511510271-161832700_. Signed_Response.pdf |
|---|---|
| CONVERTED PDF FILE(S) (4 pages) | \\TICRS\EXPORT11\IMAGEOUT11\850\381\85038122\xml3\ROA0006.JPG |
| | \\TICRS\EXPORT11\IMAGEOUT11\850\381\85038122\xml3\ROA0007.JPG |
| | \\TICRS\EXPORT11\IMAGEOUT11\850\381\85038122\xml3\ROA0008.JPG |
| | \\TICRS\EXPORT11\IMAGEOUT11\850\381\85038122\xml3\ROA0009.JPG |
| SIGNATORY'S NAME | Hsiu-Ying Lu |
| SIGNATORY'S POSITION | President |
| RESPONSE SIGNATURE | /Marc Karish/ |
| SIGNATORY'S NAME | Marc Karish |
| SIGNATORY'S POSITION | Attorney of record, California bar member |
| DATE SIGNED | 12/21/2010 |
| AUTHORIZED SIGNATORY | YES |

## FILING INFORMATION SECTION

| SUBMIT DATE | Tue Dec 21 16:28:39 EST 2010 |
|---|---|
| TEAS STAMP | USPTO/ROA-65.115.102.71-2 0101221162839555454-85038 122-470aad7c4ac2767ca7cf9 981920ff1b32-DA-3702-2010 1221161832700421 |

OMB No. 0651-0050 (Exp. 04/30/2011)

# Response to Office Action

## To the Commissioner for Trademarks:

Application serial no. **85038122** has been amended as follows:

### CLASSIFICATION AND LISTING OF GOODS/SERVICES
**Applicant proposes to amend the following class of goods/services in the application:**
**Current:** Class 007 for Metal working machines, namely machines for producing metal mesh products; metal mesh products, namely perforated metal sheets, netting, woven wire cloth and metal mesh conveyor belts
Original Filing Basis:
**Filing Basis: Section 1(a), Use in Commerce:** The applicant is using the mark in commerce, or the applicant's related company or licensee is using the mark in commerce, on or in connection with the identified goods and/or services. 15 U.S.C. Section 1051(a), as amended. The mark was first used at least as early as 03/01/2005 and first used in commerce at least as early as 03/01/2005, and is now in use in such commerce.

**Proposed:**
**Tracked Text Description:** ~~Metal working machines, namely machines for producing metal mesh products~~; Metal working machines, namely machines for producing metal mesh products.; ~~metal mesh products, namely perforated metal sheets, netting, woven wire cloth and metal mesh conveyor belts~~

Class 007 for Metal working machines, namely machines for producing metal mesh products.
**Filing Basis: Section 1(a), Use in Commerce:** The applicant is using the mark in commerce, or the applicant's related company or licensee is using the mark in commerce, on or in connection with the identified goods and/or services. 15 U.S.C. Section 1051(a), as amended. The mark was first used at least as early as 03/01/2005 and first used in commerce at least as early as 03/01/2005, and is now in use in such commerce.
Applicant hereby submits a new specimen for Class 007. The specimen(s) submitted consists of a photograph of a product bearing a label.
**"The substitute (or new, if appropriate) specimen(s) was/were in use in commerce at least as early as the filing date of the application"***[for an application based on Section 1(a), Use in Commerce]* OR **"The substitute (or new, if appropriate) specimen(s) was/were in use in commerce prior either to the filing of the Amendment to Allege Use or expiration of the filing deadline for filing a Statement of Use"**
*[for an application based on Section 1(b) Intent-to-Use].*
Specimen File1

**Applicant hereby adds the following class of goods/services to the application:**
**New:** Class 006 for Metal mesh products, namely perforated metal sheets, netting, woven wire cloth and metal mesh conveyor belts for handling loads.
**Filing Basis: Section 1(a), Use in Commerce:** The applicant is using the mark in commerce, or the applicant's related company or licensee is using the mark in commerce, on or in connection with the identified goods and/or services. 15 U.S.C. Section 1051(a), as amended. The mark was first used at least as early as 03/01/2005 and first used in commerce at least as early as 03/01/2005, and is now in use in such commerce.
Applicant hereby submits a specimen for Class 006. The specimen(s) submitted consists of a scan of a webpage; photographs of product labels..

**"The substitute (or new, if appropriate) specimen(s) was/were in use in commerce at least as early as the filing date of the application"** *[for an application based on Section 1(a), Use in Commerce] OR* **"The substitute (or new, if appropriate) specimen(s) was/were in use in commerce prior either to the filing of the Amendment to Allege Use or expiration of the filing deadline for filing a Statement of Use"** *[for an application based on Section 1(b) Intent-to-Use].*

**JPG file(s):**
Specimen File1
Specimen File2
**Original PDF file:**
SPN0-6511510271-161832700_._Agape_Industry__Inc.pdf
**Converted PDF file(s)** (1 page)
Specimen File1


**ADDITIONAL STATEMENTS**
**Description of mark**
The mark consists of a stylized representation of the letters "AG" set against a rectangle. A series of horizontal lines extends outward and to the left of the letter "A".


**FEE(S)**
Fee(s) in the amount of $325 is being submitted.


**SIGNATURE(S)**
**Declaration Signature**
**Original PDF file:**
HS_6511510271-161832700_._Signed_Response.pdf
**Converted PDF file(s)** (4 pages)
Signature File1
Signature File2
Signature File3
Signature File4
Signatory's Name: Hsiu-Ying Lu
Signatory's Position: President


**Response Signature**
Signature: /Marc Karish/    Date: 12/21/2010
Signatory's Name: Marc Karish
Signatory's Position: Attorney of record, California bar member


The signatory has confirmed that he/she is an attorney who is a member in good standing of the bar of the highest court of a U.S. state, which includes the District of Columbia, Puerto Rico, and other federal territories and possessions; and he/she is currently the applicant's attorney or an associate thereof; and to the best of his/her knowledge, if prior to his/her appointment another U.S. attorney or a Canadian attorney/agent not currently associated with his/her company/firm previously represented the applicant in this matter: (1) the applicant has filed or is concurrently filing a signed revocation of or substitute power of attorney with the USPTO; (2) the USPTO has granted the request of the prior representative to withdraw; (3) the applicant has filed a power of attorney appointing him/her in this matter; or (4) the applicant's appointed U.S. attorney or Canadian attorney/agent has filed a power of attorney appointing him/her as an associate attorney in this matter.

RAM Sale Number: 3702
RAM Accounting Date: 12/22/2010

Serial Number: 85038122
Internet Transmission Date: Tue Dec 21 16:28:39 EST 2010
TEAS Stamp: USPTO/ROA-65.115.102.71-2010122116283955
5454-85038122-470aad7c4ac2767ca7cf998192
0ff1b32-DA-3702-20101221161832700421



Agape Industry, Inc.

http://www.agapeindustry.com/pages/products.html



## Products

### Machinery for Wire Mesh






### Machinery for Metal Mesh



| EXPANDED METAL | PERFORATED METAL |
| --- | --- |
| METAL LATH | CORNER BEAD |
| RIB LATH | BRICK WORK |



### Product for Metal Mesh



| RAZOR TAPE | CONVEYOR BELT |
| --- | --- |
| EXPANDED METAL | PERFORATED METAL |



### New Equiptment



| AG 1500SP SLAT FENCE | METAL LATH |
| --- | --- |

- ∞ About Us
- ∞ Products
- ∞ News
- ∞ Contact Us
- ∞ Home

**Contact Information**
**Agape Industry, Inc.**
23520 Telo Ave.
Suite one
Torrance, CA 90505, U.S.A.
Phone : (310) 325-9000
Fax : (310) 325-9008

© Copyright 2005-2006 | All right reserved.

Website designed by **Accelerate Online**

12/14/2010 1:54 PM





Response to Office Action                                       http://teasroa.uspto.gov/roa/xslt.service?xsl=hsign

PTO Form 1957 (Rev 9/2005)
OMB No. 0651-0050 (Exp. 04/30/2011)

# Response to Office Action
# Textform with Handwritten Signature

## To the Commissioner for Trademarks:

Application serial no. **85038122** (Stylized and/or with Design, see mark) has been amended as follows:

### CLASSIFICATION AND LISTING OF GOODS/SERVICES
**Applicant proposes to amend the following class of goods/services in the application:**
**Current:** Class 007 for Metal working machines, namely machines for producing metal mesh products; metal mesh products, namely perforated metal sheets, netting, woven wire cloth and metal mesh conveyor belts
Original Filing Basis:
**Filing Basis: Section 1(a), Use in Commerce:** The applicant is using the mark in commerce, or the applicant's related company or licensee is using the mark in commerce, on or in connection with the identified goods and/or services. 15 U.S.C. Section 1051(a), as amended. The mark was first used at least as early as 03/01/2005 and first used in commerce at least as early as 03/01/2005, and is now in use in such commerce.

**Proposed:**
**Tracked Text Description:** ~~Metal working machines, namely machines for producing metal mesh products;~~ Metal working machines, namely machines for producing metal mesh products; ~~metal mesh products, namely perforated metal sheets, netting, woven wire cloth and metal mesh conveyor belts~~

Class 007 for Metal working machines, namely machines for producing metal mesh products.
**Filing Basis: Section 1(a), Use in Commerce:** The applicant is using the mark in commerce, or the applicant's related company or licensee is using the mark in commerce, on or in connection with the identified goods and/or services. 15 U.S.C. Section 1051(a), as amended. The mark was first used at least as early as 03/01/2005 and first used in commerce at least as early as 03/01/2005, and is now in use in such commerce.
Applicant hereby submits a new specimen for Class 007. The specimen(s) submitted consists of a photograph of a product bearing a label.
**"The substitute (or new, if appropriate) specimen(s) was/were in use in commerce at least as early as the filing date of the application"** *[for an application based on Section 1(a), Use in Commerce]* OR **"The substitute (or new, if appropriate) specimen(s) was/were in use in commerce prior either to the filing of the Amendment to Allege Use or expiration of the filing deadline for filing a Statement of Use"** *[for an application based on Section 1(b) Intent-to-Use].*
Specimen-1 [SPU0-1-6511510271-113212144_._3B1B81B9.jpg ]

**Applicant hereby adds the following class of goods/services to the application:**
**New:** Class 006 for Metal mesh products, namely perforated metal sheets, netting, woven wire cloth and metal mesh conveyor belts for handling loads.
**Filing Basis: Section 1(a), Use in Commerce:** The applicant is using the mark in commerce, or the applicant's related company or licensee is using the mark in commerce, on or in connection with the identified goods and/or services. 15 U.S.C. Section 1051(a), as amended. The mark was first used at least as early as 03/01/2005 and first used in commerce at least as early as 03/01/2005, and is now in use in such commerce.
Applicant hereby submits a specimen for Class 006. The specimen(s) submitted consists of a scan of a webpage: photographs of product labels..
**"The substitute (or new, if appropriate) specimen(s) was/were in use in commerce at least as early as the filing date of the application"** *[for an application based on Section 1(a), Use in Commerce]* OR **"The substitute (or new, if appropriate) specimen(s) was/were in use in commerce prior either to the filing of the Amendment to Allege Use or expiration of the filing deadline for filing a Statement of Use"** *[for an application based on Section 1(b) Intent-to-Use].*
Specimen-1 [SPN0-6511510271-113212144_._Agape_Industry__Inc.pdf ]
Specimen-2 [SPN0-6511510271-113212144_._DSC00287.JPG ]
Specimen-3 [SPN0-6511510271-113212144_._DSC00288.JPG ]

### ADDITIONAL STATEMENTS
**Description of mark**
The mark consists of a stylized representation of the letters "AG" set against a rectangle. A series of horizontal lines extends outward and to the left of the letter "A".

**FEE(S)**
Fee(s) in the amount of $325 is being submitted.

**SIGNATURE(S)**

.

Response to Office Action

http://teasroa.uspto.gov/roa/xslt.service?xsl=hsign

**Declaration Signature**

If the applicant is seeking registration under Section 1(b) and/or Section 44 of the Trademark Act, the applicant has had a bona fide intention to use or use through the applicant's related company or licensee the mark in commerce on or in connection with the identified goods and/or services as of the filing date of the application. 37 C.F.R. Secs. 2.34(a)(2)(i); 2.34 (a)(3)(i); and 2.34(a)(4)(ii); and/or the applicant has had a bona fide intention to exercise legitimate control over the use of the mark in commerce by its members. 37 C.F.R. Sec. 2.44. If the applicant is seeking registration under Section 1(a) of the Trademark Act, the mark was in use in commerce on or in connection with the goods and/or services listed in the application as of the application filing date or as of the date of any submitted allegation of use. 37 C.F.R. Secs. 2.34(a)(1)(i); and/or the applicant has exercised legitimate control over the use of the mark in commerce by its members. 37 C.F.R. Sec. 2.44. The undersigned, being hereby warned that willful false statements and the like so made are punishable by fine or imprisonment, or both, under 18 U.S.C. Section 1001, and that such willful false statements may jeopardize the validity of the application or any resulting registration, declares that he/she is properly authorized to execute this application on behalf of the applicant; he/she believes the applicant to be the owner of the trademark/service mark sought to be registered, or, if the application is being filed under 15 U.S.C. Section 1051(b), he/she believes applicant to be entitled to use such mark in commerce; to the best of his/her knowledge and belief no other person, firm, corporation, or association has the right to use the mark in commerce, either in the identical form thereof or in such near resemblance thereto as to be likely, when used on or in connection with the goods/services of such other person, to cause confusion, or to cause mistake, or to deceive; that if the original application was submitted unsigned, that all statements in the original application and this submission made of the declaration signer's knowledge are true; and all statements in the original application and this submission made on information and belief are believed to be true.

**Signature Section:**

Signature: _____

Signatory's Name: Hsiu-Ying Lu

Signatory's Position: President

Date Signed: _2 0 1 0 , 1 2 , 16_

**NOTE TO APPLICANT:** When filed as part of the electronic form (i.e., scanned and attached as an image file), the signature page **must** include both the signature information **and** the boilerplate declaration language. Do **not** include the entire application, but do ensure that the boilerplate declaration language actually appears; *a signature by itself will not be acceptable.* If, due to browser limitations, the boilerplate declaration language appears on a previous page when printed, you must "merge" the declaration and signature block onto a single page prior to signing, so that the *one complete page* can be scanned to create an acceptable image file. It is recommended that you copy-and-paste the entire text form into another document, manipulate the spacing there to move the declaration and signature section to a separate page, and then print this new version of the text form to send to the signatory.

12/16/2010 8:41 AM

**Response Signature**
Signature: /Marc Karish/   Date: 12/16/2010
Signatory's Name: Marc Karish
Signatory's Position: Attorney of record, California bar member

The signatory has confirmed that he/she is an attorney who is a member in good standing of the bar of the highest court of a U.S. state,
which includes the District of Columbia, Puerto Rico, and other federal territories and possessions; and he/she is currently the
applicant's attorney or an associate thereof; and to the best of his/her knowledge, if prior to his/her appointment another U.S. attorney
or a Canadian attorney/agent not currently associated with his/her company/firm previously represented the applicant in this matter:
(1) the applicant has filed or is concurrently filing a signed revocation of or substitute power of attorney with the USPTO; (2) the
USPTO has granted the request of the prior representative to withdraw; (3) the applicant has filed a power of attorney appointing
him/her in this matter; or (4) the applicant's appointed U.S. attorney or Canadian attorney/agent has filed a power of attorney
appointing him/her as an associate attorney in this matter.

Back

12/16/2010 8:41 AM

# RAM SALE NUMBER: 3702
# RAM ACCOUNTING DATE: 20101222

## INTERNET TRANSMISSION DATE:

2010/12/21

## SERIAL NUMBER:

85/038122

| Description | Fee Code | Transaction Date | Fee | Number Of Classes | Total Fees Paid |
|---|---|---|---|---|---|
| New App | 7001 | 2010/12/21 | 325 | 1 | 325 |



**PURCHASE ORDER** (REPRINT)

**LOCKER GROUP PTY LTD**
PO Box 4102, Milperra
NSW 1891, Australia
ABN : 99 004 353 922

Telephone : (02) 9771 4311
Facsimile: (02) 9774 5878
Email : sales@locker.com.au

**054585**
PAGE 1 OF 1

Date Printed: 30 June 2009

ORDER DATE
30/06/09

CONTACT : Jim Savis - Melbourne Phone: 03 8791 1000

TO
JUN-EN ENTERPRISE CORP
69, BADE 2nd ROAD
RENWU TOWNSHIP
KAOHSIUNG 814 TAIWAN ROC
Phone:
FAX :

SUPPLIER NUMBER
04424U

YOUR REFERENCE
JEC250HB

| PRODUCT | DETAILS | REF. | QUANTITY | UOM | DATE RECD | PRICE EX. GST | VALUE EX. GST |
|---|---|---|---|---|---|---|---|
| CAPEX | 2.5m EXPANDED METAL M/C JEC-250HB COMPLETE WITH CLAMPING FEEDER in accordance with Supply Contract Including Attachments 1 & 2, between Jun-En Enterprise Corp (Supplier) and Locker Group Pty Ltd (Purchaser) for the supply and installation of the Equipment. Delivery: FOB, Kaohsiung Taiwan | CXD6136 | 2.000 | EA | 11/12/09 | 492500.00 | 985000.000 |
| CAPEX | INSTALL & COMMISSION EQUIPMENT | CXD6136 | 1.000 | EA | | 20000.00 | 20000.000 |

TOTAL EX. GST USD    1005000.00

PER    [signature]    BUYER

THE ABOVE REQUIREMENTS HAVE BEEN ADEQUATELY SPECIFIED

PENGAD 800-631-6989

THE CONDITIONS GOVERNING THIS PURCHASE ORDER ARE INDICATED AS BELOW
1. THE PO NUMBER IS TO APPEAR ON ALL INVOICES, PACKING SLIPS AND CORRESPONDENCE REFERRING TO THIS ORDER
2. WHEN ANY GOODS REFERRED TO IN THIS ORDER ARE PACKED FOR DESPATCH, A DELIVERY ADVICE TO BE FORWARDED TO OUR PURCHASING DEPARTMENT. GOODS CANNOT BE RECEIVED INTO STOCK WITHOUT AN ACCOMPANYING PACKING SLIP OR INVOICE
3. ANY PACKAGING RETURNABLE FOR CREDIT IS TO BE CLEARLY INDICATED ON PACKING SLIP AND INVOICE
4. THE INVOICE MUST ONLY CONTAIN GOODS ACCORDING TO THIS ORDER AND MUST NOT BE ADDRESSED TO A PRIVATE PERSON

DELIVER TO NAME AND ADDRESS
Locker Group
2 Cojo Place
Dandenong South, Vic 3175
Australia

EXHIBIT
50

DEF000017

# LOCKER group

## LOCKER GROUP PTY LTD

PO Box 4276, Dandenong South
VIC 3164, Australia
ABN : 99 004 353 922
Telephone : (03) 8791 1000
Facsimile: (03) 8791 1092

**REPRINT**

## PURCHASE ORDER

**058819**

**PAGE 1 OF 2**

Date Printed: 07 September 2009

**TO**  JUN-EN ENTERPRISE CORP

89 BADE 2ND ROAD
RENWU TOWNSHIP
KAOHSUING 814 TAIWAN ROC

**Phone:**            **FAX :**

**CONTACT : Jim Savis - Melbourne Phone: 03 8791 1000**

| SUPPLIER NUMBER 04424U | YOUR REFERENCE | | ORDER DATE 07/09/09 |
|---|---|---|---|

| PRODUCT | DETAILS | REF. | QUANTITY | UOM | DATE REQD | PRICE EX. GST | VALUE EX. GST |
|---|---|---|---|---|---|---|---|
| CAPEX | TOP KNIVES - Material type SKD11 | | 31.000 | EA | 11/12/09 | 6371.00 | 197501.000 |
| | Gripwalk (Drg: K1285A) 2 sets | | | | | | |
| | (1 set included with machine, no charge) | | | | | | |
| | Long Parallel (Drg: K1033-1 & A) 2 sets | | | | | | |
| | L76 (Drg: BDEM 5084-1 & 2) 2 sets | | | | | | |
| | 11mm (Drg: BDEM 5058A-1 & 2) 2 sets | | | | | | |
| | R (Drg: BDEM 5082) 1 set | | | | | | |
| | 15mm (Drg: BDEM 5042) 2 sets | | | | | | |
| | 19mm (Drg: K1275) 2 sets | | | | | | |
| | 25 (Drg: BDEM 5050A) 2 sets | | | | | | |
| | 30 WK (Drg: BDEM 5053) 2 sets | | | | | | |
| | 34 WALKWAY (Drg: BDEM 5057-A) 2 sets | | | | | | |
| | 38 (Drg: BDEM 5051) 2 sets | | | | | | |
| | 45 (Drg: BDEM 5044) 3 sets | | | | | | |
| | 50 (Drg: BDEM 5046) 2 sets | | | | | | |
| | 12mm (Drg: BDEM 5028-1) 3 sets | | | | | | |
| | 09 (Drg: FSSB873) 2 sets | | | | | | |
| | 04 (Drg: BDEM 5069) 1 set | | | | | | |

THE CONDITIONS GOVERNING THIS PURCHASE ORDER ARE INDICATED AS BELOW
1. THE PO NUMBER IS TO APPEAR ON ALL INVOICES, PACKING SLIPS AND
   CORRESPONDENCE REFERRING TO THIS ORDER
2. WHEN ANY GOODS REFERRED TO IN THIS ORDER ARE PACKED FOR DESPATCH,
   A DELIVERY ADVICE TO BE FORWARDED TO OUR PURCHASING DEPARTMENT.
   GOODS CANNOT BE RECEIVED INTO STOCK WITHOUT AN ACCOMPANYING
   PACKING SLIP OR INVOICE
3. ANY PACKING IS RETURNABLE FOR CREDIT IS TO BE CLEARLY INDICATED
   ON PACKING SLIP AND INVOICE
4. THE INVOICE MUST ONLY CONTAIN GOODS ACCORDING TO THIS ORDER AND
   MUST NOT BE BE ADDRESSED TO A PRIVATE PERSON

**TOTAL EX. GST USD**

**DELIVER TO NAME AND ADDRESS**
Locker Group
2 Colo Place
Dandenong South Vic 3175
Australia

PER _____ BUYER _____

THE ABOVE REQUIREMENTS HAVE BEEN ADEQUATELY SPECIFIED

# LOCKER group

# PURCHASE ORDER

**058819**

**REPRINT**

**PAGE 2 OF 2**

**LOCKER GROUP PTY LTD**
PO Box 4276, Dandenong South
VIC 3164, Australia
ABN : 99 004 353 922

Telephone : (03) 8791 1000
Facsimile: (03) 8791 1092

TO   **JUN-EN ENTERPRISE CORP**

89 BADE 2ND ROAD
RENWU TOWNSHIP
KAOHSUING  814  TAIWAN ROC

**Phone:**          **FAX :**

**CONTACT : Jim Savis - Melbourne Phone: 03 8791 1000**

Date Printed: 07 September 2009

| SUPPLIER NUMBER | YOUR REFERENCE | | | | ORDER DATE |
| 04424U | | | | | 07/09/09 |

| PRODUCT | DETAILS | REF. | QUANTITY | UOM | DATE REQD | PRICE EX. GST | VALUE EX. GST |
|---|---|---|---|---|---|---|---|
| CAPEX | BOTTOM KNIVES - Material type SKH9 | | 8.000 | EA | 11/12/09 | 10000.00 | 80000.000 |
| | Bottom Knives, 7 sets | | | | | | |
| | (1 set included with machine, no charge) | | | | | | |

**DELIVER TO NAME AND ADDRESS**
Locker Group
2 Colo Place
Dandenong South Vic 3175
Australia

THE CONDITIONS GOVERNING THIS PURCHASE ORDER ARE INDICATED AS  BELOW
1. THE PO NUMBER IS TO APPEAR ON ALL INVOICES, PACKING SLIPS AND
   CORRESPONDENCE REFERRING TO THIS ORDER
2. WHEN ANY GOODS REFERRED TO IN THIS ORDER ARE PACKED FOR DESPATCH,
   A DELIVERY ADVICE TO BE FORWARDED TO OUR PURCHASING DEPARTMENT.
   GOODS CANNOT BE RECEIVED INTO STOCK WITHOUT AN ACCOMPANYING
   PACKING SLIP OR INVOICE
3. ANY PACKAGING RETURNABLE FOR CREDIT IS TO BE CLEARLY INDICATED
   ON PACKING SLIP AND INVOICE
4. THE INVOICE MUST ONLY CONTAIN GOODS ACCORDING TO THIS ORDER AND
   MUST NOT BE ADDRESSED TO A PRIVATE PERSON

**TOTAL EX. GST USD**          **287601.000**

PER _____ BUYER
THE ABOVE REQUIREMENTS HAVE BEEN ADEQUATELY SPECIFIED

DEF000019

# 客戶訂購單 

**久恩企業股份有限公司**
JUN-EN ENTERPRISE CORPORATION
高雄縣燕巢鄉安招路 439 巷 3 號
TEL:(07)6165000 (代)    FAX:(07)6166000

2009年 8月 28日

No.

| 客戶名稱 | Locker Group | | | | 接洽人 | Tony Perera |
|---|---|---|---|---|---|---|
| 交貨地址 | | | | | 電話 | |

| 項目 | 品　名　及　規　格 | 數量 | 單價 |
|---|---|---|---|
| | 8吋擴張網機 附夾比送料 | 2組 | US $545000.00 |
| | 〈加厚料吸盤式 送料 2500mm×4000mm〉 | | |
| | 上模具共31組 | 31組 | US $3700.00 |
| | 下模具共6組 | 6組 | US $6300.00 |
| | 試傳費用 | | US $20000.00 |
| | | TOTAL: US$1263500.00 | |

| 備 | 註 | 發　包　記　錄 |
|---|---|---|

EXHIBIT 51   PENGAD 800-631-6989

| 承辦人 | 林國彬 | 客戶簽章 | | 核准 | | 交　貨　日　期 |
|---|---|---|---|---|---|---|
| | | | | | | 1 月 31 日 2010 |

DEF000013

# 久恩企業股份有限公司

## 高雄縣燕巢鄉安招路439巷3號

TEL: (07) 6165000 (代)    FAX: (07) 6166000

永銘興          訂　購　單          2009年 9月    日

| No | 品　名　及　規　格 | 數　量 | 單　價 |
|----|------------------|-------|-------|
| | 8吋擴張網機 | 2組 | |
| | 附原料吸盤，夾他送料 | | |
| | | | |
| | 詳細規格如附件 | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

| 交 貨 地 點 | |
|-----------|---|
| 備　註： | 交　貨　日　期 |
| | 第一台 1-31-2010 |
| | 第二台 2-28-2010 |

接洽人：林國思          核　准：

DEF000014

**JUN-EN ENTERPRISE (USA), Inc.**

24325 Crenshaw Blvd. #108, Torrance, CA 90505, U.S.A.
TEL:(310)325-9000  FAX:(310)325-9008
www.junenusa.com  E-mail:info@junenusa.com

[澳洲-LOCKER]

1. **擴張網機:**

   ➢ 機型:JEC-250HB
   ➢ 最大工作寬度: 2500mm
   ➢ 最大沖擊力:250噸
   ➢ 材料厚度:
      ● 一般鋼板: 1.0mm ~ 6.0mm
      ● 鋁　　板: 0.5mm ~ 5.0mm
      ● 不銹鋼板: 1.0mm ~ 5.0mm

   ➢ 網　目:
      LWD　24mm ~ 140mm
      SWD　7.0mm ~ 60mm

   ➢ 送　料: 1.0mm ~ 13.0mm

   ➢ 速　度: 為 230次/每分鐘.
   ➢ 馬力:150HP x 6P
   ➢ 電壓: 420V / 50Hz / 3 Phase
   ➢ 自動設定切斷: 0~9999半網目,電子計數器

2. **進料設備:夾片送料與原料堆高裝置**

   ➢ 工作寬度: 500mm ~ 2500mm
   ➢ 原料長度: 500mm ~ 4000mm
   ➢ 最大廢料尾端: 70mm
   ➢ 馬力:5HP + 2HP
   ➢ 電壓: 420V / 50 Hz / 3 Phase
   ➢ 吸盤: 6組
   ➢ **可同時吸兩片夾片送料

DEF000015

**JUN-EN ENTERPRISE (USA), Inc.**

24325 Crenshaw Blvd. #108, Torrance, CA 90505, U.S.A.
TEL:(310)325-9000   FAX:(310)325-9008
www.junenusa.com   E-mail:info@junenusa.com

### 3. 機器包括:

- ➢ 獨立觸控控制箱,工具箱
- ➢ 電路圖與機械圖使AUTO CAD程式
- ➢ 建議備品目錄

### 4. 電子設備

- ➢ 控制電線代表:
- ➢ 所有電控程式
- ➢ 所有電線代表與電控需照CE驗證規範

   ** 所有介面必須清楚標示在內外的面板上.

   ** 所有面板與介面間的電線必須綁住與固定.

   ** 電控箱必須要有30%多餘的空間,以備未來使用.

   **PLC 需要預留多餘接頭,以備未來使用.

   ** 需要網路連絡設備.以便未來維修使用.

   **交貨日期: 1-31-2010***

   ............................................

   久恩 / 林園恩 Sep. 2009

DEF000016



# Products

- About Us
- Products
- News
- Contact Us
- Home



**Machinery for Wire Mesh**





**Machinery for Metal Mesh**

| EXPANDED METAL | PERFORATED METAL |
| METAL LATH | CORNER BEAD |
| RIB LATH | BRICK WORK |



**Product for Metal Mesh**

| RAZOR TAPE | CONVEYOR BELT |
| EXPANDED METAL | PERFORATED METAL |



**New Equiptment**

| AG 1809SP SLAT FENCE | METAL LATH |

## Contact Information

**Agape Industry, Inc.**
23520 Telo Ave.
Suite one
Torrance, CA 90505, U.S.A.
Phone : (310) 325-9000
Fax : (310) 325-9008

© Copyright 2005-2006 | All right reserved.

Website designed by **Accelerate Online**



EXHIBIT
53